SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: (949) 459-2124
Fax: (949) 459-2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
*Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | **PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| | [Hon. Edward J. Davila] |

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that the Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant preliminary approval of the proposed class action settlement entered into by the Parties on June 29, 2012 at 9:00 a.m., or at such other time as may be set by the Court, at 280 South 1st Street, San Jose, California, Courtroom 4, 5th Floor, before the Honorable Edward J. Davila.

Plaintiffs seek preliminary approval of this class action settlement, certification of the proposed Class, appointment of the Plaintiffs as Class Representatives, and appointment of their counsel as Class Counsel. The Motion is based on this Notice of Motion, the Brief in Support of the Motion attached hereto and the authorities cited therein, oral argument of counsel, and any other matter raised or submitted at the hearing, and all of the documents in the record.

Dated: May 25, 2012

Respectfully submitted,

**Jeff Milans and Peter Comstock**, individually and on behalf of a class of similarly situated individuals,

By: /s/ Jay Edelson
One of Plaintiffs' Attorneys

JAY EDELSON
(jedelson@edelson.com)
RAFEY S. BALABANIAN
(rbalabanian@edelson.com)
ARI J. SCHARG
(ascharg@edelson.com)
CHANDLER R. GIVENS
(cgivens@edelson.con)
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND .............................................................................. 3

    A.  Nature of the Litigation, Mediation, and Settlement ................................ 3

        1. *The Parties and Events Preceding Litigation* ................................. 3

        2. *Relevant Provisions of the VPPA* .................................................. 4

        3. *Litigation, Mediation, and Settlement* ........................................... 5

        4. *Defendant Netflix's Position* ......................................................... 6

    B.  Terms of the Settlement ............................................................................ 7

        1. *Class Definition* ............................................................................. 7

        2. *Injunctive Relief* ........................................................................... 7

        3. *Settlement Fund Payments* ............................................................ 9

        4. *Cy Pres* .......................................................................................... 9

        5. *Other Relief* ................................................................................. 10

        6. *Release* ........................................................................................ 10

III. ARGUMENT .................................................................................................. 11

    A.  The Court Has Subject Matter Jurisdiction ........................................... 11

    B.  The Court Should Certify the Proposed Class for Settlement Purposes ........... 12

        1. *The Numerosity Requirement is Satisfied* ................................... 13

        2. *The Commonality Requirement is Satisfied* ................................ 13

        3. *The Typicality Requirement is Satisfied* ..................................... 15

        4. *The Adequate Representation Requirement is Satisfied* ............... 16

        5. *The Proposed Settlement Class Meets Rule 23(b)(3)'s Requirements* ............. 16

    C.  The Proposed Settlement Is Fundamentally Fair, Reasonable, and Adequate, And Falls Well Within The Range of Preliminary Approval ........................ 18

        1. *A number of uncertainties inherent to this litigation make the Settlement the best recovery attainable by the Settlement Class* ........................ 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.  *The Cy Pres donations are the best means of providing a monetary benefit to the Class* ..................................................................................... 22

**D.  The Court Should Approve The Proposed Plan for Class Notice** .......................... 23

**IV.  CONCLUSION** ........................................................................................................ 25

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**UNITED STATES SUPREME COURT**

4

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................. 12, 13, 17, 18

5

*Doe v. Bolton*, 410 U.S. 179 (1973) ............................................................................... 12

6

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)..................................................... 11

7

*Sorrell v. IMS Health, Inc.*, 131 S.Ct. 2653 (2011)....................................................21, 22

8

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011)....................................... 13, 14, 15

9

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................ 12

10

**UNITED STATES CIRCUIT COURT OF APPEALS**

11

*Blake v. Arnett*, 633 F.2d 906 (9th Cir. 1981) ............................................................... 13

12

*Fulfillment Servs., Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614 (9th Cir. 2008)..................... 12

13

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)...........................................*passim*

14

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ............................................ 19

15

*In re Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008).................................. 18, 19, 20

16

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)................................ 19

17

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008) ...................................................... 14

18

*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008)............................................ 17

19

*Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012)............................... 12, 21

20

*Trs. of the Constr. Indus. & Laborers Health & Welfare Trust v. Deser Valley*
    *Landscape Maint., Inc.*, 33 F.3d 923 (9th Cir. 2003) ............................................ 11

21

22

*Wolin v. Jaguar Land Rover North Am. LLC*, 617 F.3d 1168 (9th Cir. 2010)...................... 15, 17

23

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ............................. 16

**UNITED STATES DISTRICT CASES:**

24

*Celano v. Marriot Int'l, Inc.*, 242 F.R.D. 544 (N.D. Cal. 2007) ................................... 13

25

*In re DoubleClick, Inc. Privacy Litig.*, No. 00-Civ.0641 (S.D.N.Y. 2001) ................. 22

26

*In re Google Buzz Privacy Litig.*, No.5:10-cv-00672-JW (N.D. Cal. 2010)........................... 2, 22

27

28

*In re Indep. Energy Holdings PLC*, No. 00-CV-6689,
    2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .............................................. 19

*In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010) ............................ 23

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................ 18, 20

*Lane v. Facebook, Inc.*, No. 5:08-cv-03845 RS,
    2009 WL 3359020 (N.D. Cal. Sept. 18, 2009)............................................. 2, 22

*Sterk v. Redbox Automated Retail*, No. 11C1729,
    2012 WL 1419071 (N.D. Ill. Apr. 24, 2012) ............................................. 12, 21

*Sterk v. Redbox Automated Retail*, 806 F. Supp. 2d 1059 (N.D. Ill. 2011)................................. 21

*Smith v. Dean*, No. C-97-011 FMS, 1997 WL 257505 (N.D. Cal. May 6, 1997)........................ 12

*Sullivan v. Kelly Services, Inc.*, 268 F.R.D. 356 (N.D. Cal. 2010) ............................................. 13

**STATUTES**

18 U.S.C. §§ 2710, *et seq* .......................................................................... *passim*

28 U.S.C. § 1332 ..................................................................................... 11

28 U.S.C. §1715 ..................................................................................... 24

Cal. Bus. & Prof. Code §§17200, *et seq* ........................................................ 5

Cal. Civ. Code §1798.80 ........................................................................... 5

Fed. R. Civ. P. 23 ................................................................................... *passim*

**MISCELLANEOUS**

Conte & Newberg, 4 Newberg on Class Actions (4th ed. 2002).............................. 18, 19, 23

Manual for Complex Litigation (4th ed. 2004)................................................ 12, 18

Manual for Complex Litigation (3d ed. 1995) ................................................ 18

1    **I.      INTRODUCTION**

2           As the popularity of Internet-based entertainment services has dramatically increased in

3    recent years, so too have the privacy concerns associated with the computerized retention and use

4    of consumers' personal information. This proposed nationwide class action settlement—which is

5    in line with, or superior to, the Facebook Beacon and Google Buzz privacy settlements—seeks to

6    resolve six putative nationwide class actions challenging the way Defendant Netflix, Inc.

7    ("Netflix" or "Defendant"), a provider of video-by-mail and internet services, retained and used its

8    subscribers' Entertainment Content Viewing Histories ("PII").[1] Specifically, Plaintiffs alleged that

9    Netflix violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710(e) by retaining

10   customer viewing histories longer than "necessary for the purpose for which [they were]

11   collected" and that Netflix disclosed the information to third parties without prior consent to do so.

12   (*See* Docket Number ["Dkt. No."] 1.)

13          Plaintiff Jeff Milans ("Milans"), alleging that Netflix unlawfully retained and disclosed his

14   personally identifiable Entertainment Content Viewing History and the personal information of

15   thousands of other Netflix customers, initiated this class action on January 26, 2011. A wave of

16   similar suits followed, including *Bernal v. Netflix, Inc.*, Case No. 11-CV-00820-EJD (N.D. Cal.)

17   (filed February 22, 2011), *Rura v. Netflix, Inc.*, Case No. 11-CV-01075-SBA (N.D. Cal.) (filed

18   March 8, 2011), *Comstock v. Netflix, Inc.*, Case No. 11-CV-1218-HRL (N.D. Cal.) (filed March

19   11, 2011), *Sevy v. Netflix, Inc.*, Case No. 11-CV-1309-PSG (N.D. Cal.) (filed March 18, 2011),

20   and *Wizenberg v. Netflix, Inc.*, Case No. 11-CV-01359-HRL (N.D. Cal.) (filed March 22, 2011).

21   On August 15, 2011, the Court consolidated these six cases, granted the Plaintiffs leave to file an

22   Amended and Consolidated Complaint, and appointed Jay Edelson of Edelson McGuire, LLC as

23   interim lead Class Counsel. (Dkt. No. 59.)

24          Subsequently, the Parties engaged in discovery while also pursuing the parallel track of

25   exploring the potential for settlement. Settlement talks began in earnest as part of the Court's ADR

---

26   [1]      Unless otherwise stated herein, capitalized terms shall have the same meanings as set forth

27   in the Parties' Settlement Agreement.

28

1   program, which culminated in a day-long mediation with former U.S. District Judge Layn R.

2   Phillips (ret.). After several rounds of arm's-length negotiations with Judge Phillips's assistance

3   and oversight, the Parties reached an agreement on the principal terms of a global settlement. *See*

4   "Settlement Agreement," a copy of which is attached hereto as Exhibit 1. As explained below, the

5   Settlement Agreement—which has the full support of all of the attorneys who filed the cases that

6   were ultimately consolidated with this action—is a tremendous achievement for the Plaintiffs and

7   the proposed Settlement Class and provides landmark relief that will serve as a model for other

8   industry actors who face similar lawsuits.

9       The Settlement Agreement creates a common fund totaling $9,000,000.00, from which

10  money will be distributed to *cy pres* recipients that will advance issues relating to the protection of

11  consumer privacy, identity, and personal information online through user controls, to protect users

12  from online threats, and to otherwise further the policies underlying the VPPA for the benefit of

13  the Settlement Class and the public at-large. The size and scope of the fund is consistent with the

14  settlement structures that were finally approved by the Honorable Chief Judge James Ware in the

15  *Google Buzz*[2] case ($8.5 million *cy pres* fund) and the Honorable Richard Seeborg in the

16  *Facebook Beacon*[3] case ($9.5 million *cy pres* fund). Like this case, the *Google Buzz* and *Facebook*

17  *Beacon* litigation dealt with allegations of wide-scale privacy violations that triggered large

18  statutory damages. (In fact, *Facebook Beacon* dealt with allegations involving the VPPA.)

19      The instant Settlement Agreement, however, goes beyond those deals by also providing for

20  industry-leading injunctive relief, requiring Netflix to decouple Entertainment Content Viewing

21

22  [2]   *See In re* Google Buzz User Privacy Litigation, Case No. 10-cv-00672-JW (N.D. Cal. Sept.
      3, 2010), Dkt. No. 41 (finally approving a $8.5 million fund to be distributed to Internet privacy-
23    related organizations).

24  [3]   *See Lane v. Facebook*, Inc., Case No. 08-cv-03845-RS (N.D. Cal. Oct. 23, 2009), Dkt. No.
      41 (finally approving a $9.5 million fund to establish a privacy foundation devoted to issues of
25    online identity and personal information protection, and otherwise guarding against online
      threats). Currently, the *Facebook Beacon* case is pending on appeal following a challenge to the
26    methodology that the parties used to decide which programs to fund and sponsor. The Parties in
      this case were mindful of this issue and, as further explained below, the Settlement Agreement
27    adopts the methodology endorsed by Chief Judge James Ware in *Google Buzz* to select *cy pres*
      recipients.

28

Histories from payment or identification information for all Settlement Class members. In simpler terms, the injunctive relief puts a stop to the challenged practices at issue in these cases by preventing Netflix from determining which customers rented or viewed any specific titles. This provides tangible value to each Settlement Class member—by tying Entertainment Content Viewing Histories with a customer's personally identifying information and then disclosing such information, customers suffer a diminution in the value of their personal information together with other injuries. The Settlement's requirement that such information be "de-coupled" puts the power to control the information back in the hands of consumers and restores the value of such information while simultaneously reducing the threat that it will fall into the wrong hands.

All told, the results achieved by the Settlement Agreement are well beyond those required for preliminary approval. Plaintiffs thus move the Court for preliminary approval. For convenience, proposed dates and deadlines leading to a final approval hearing are provided in the proposed order separately submitted to the Court.

## II.     FACTUAL BACKGROUND

### A.     Nature of the Litigation, Mediation, and Settlement

#### 1.     *The Parties and Events Preceding Litigation*

Netflix is the largest provider of Internet streaming media services in the United States, with over 21 million paid subscribers. The Plaintiffs alleged that Netflix maintains a database of records containing all of its current and former customers' video programming viewing selections, as well as their billing and contact information. (Dkt. No. 1 ¶¶ 3−7.) Through its Privacy Policy, Netflix asserts that it uses such information for, *inter alia,* "providing recommendations on movies and TV shows we think will be enjoyable, personalizing the service to better reflect particular interests, tracking your instant-watching hours, determining your Internet service provider, helping us quickly and efficiently respond to inquiries and requests and otherwise enhancing or administering our service offering." Netflix Privacy Policy, URL https://signup.netflix.com/PrivacyPolicy (last accessed January 15, 2012).

Plaintiffs Jeff Milans and Peter Comstock (collectively, "Plaintiffs") are former Netflix

subscribers. After they canceled their Netflix subscriptions, Plaintiffs intermittently continued to receive e-mails from Netflix encouraging them to re-open their accounts. (The Declaration of Jay Edelson is attached hereto as Exhibit 2, ¶ 6.) From these e-mails, it became apparent that Netflix retained its former customers' personal contact information. (*Id.*) Moreover, former customers who logged back into their cancelled accounts were able to view all of the video materials they had watched as Netflix customers. (Dkt. No. 1 ¶ 23; Edelson Decl. ¶ 7.) This strongly suggested that Netflix also maintained its former customers' video programming selections.

### 2.     Relevant Provisions of the VPPA

Congress passed the VPPA in the wake of Supreme Court Justice Nominee Robert H. Bork's confirmation proceedings where it was disclosed that the *Washington City* newspaper had obtained and disclosed his personal and family video rental records. Similar to state statutes enacted to prevent libraries from disclosing their patrons' checkout lists, the VPPA was designed to protect consumers' right to privacy in records containing their video viewing decisions. For purposes of this brief, two provisions of the VPPA are particularly relevant.

Subsection (b) of the VPPA prohibits companies that provide video programming from disclosing their customers' PII to third parties. *See* 18 U.S.C. § 2710(b) ("A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person."). Subsection (e) requires that customer records containing PII be destroyed "as soon as practicable." *See* 18 U.S.C. § 2710(e) (video tape service providers "shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected.") Plaintiffs maintained throughout the litigation that a company that violates either of these provisions is liable to the aggrieved person for "(A) actual damages but not less than liquidated damages in an amount of $2,500; (B) punitive damages; (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and (D) such other preliminary and equitable relief as the court determines to be appropriate." 18 U.S.C. § 2710(e).

3.      *Litigation, Mediation, and Settlement*

Plaintiffs alleged that Netflix maintains video rental histories, billing information, and contact information for at least two years after that subscriber cancels his or her Netflix account. (Dkt. No. 1 ¶¶ 3–6.) Plaintiffs also alleged that subscribers reasonably expect their PII to be deleted when they cancel their accounts (Dkt. No. 1 ¶ 30) and that Netflix's ongoing maintenance of "digital dossiers" on its subscribers—after canceling their subscriptions and beyond the point where Netflix still needs the information—constitutes a failure to "destroy [PII] as soon as practicable," in violation of the VPPA, 18 U.S.C. § 2710(e). (Dkt. No. 1 ¶¶ 6, 23, 31, 45–46.) Milans sought relief under the VPPA, the California Consumer Records Act, Cal. Civ. Code § 1798.80 ("CCRA"), and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"). (Dkt. No. 1.) It is worth noting that the Milans's complaint is believed to be the first class action filed specifically for violation of the VPPA's unlawful retention provision, 18 U.S.C. § 2710(e). (Edelson Decl. ¶ 9.)

Several lawsuits followed, including *Bernal v. Netflix, Inc.*, Case No. 11-CV-00820-EJD (N.D. Cal.) (filed February 22, 2011), *Rura v. Netflix, Inc.*, Case No. 11-CV-01075-SBA (N.D. Cal.) (filed March 8, 2011), *Comstock v. Netflix, Inc.*, Case No. 11-CV-1218-HRL (N.D. Cal.) (filed March 11, 2011), *Sevy v. Netflix, Inc.*, Case No. 11-CV-1309-PSG (N.D. Cal.) (filed March 18, 2011), and *Wizenberg v. Netflix, Inc.*, Case No. 11-CV-01359-HRL (N.D. Cal.) (filed March 22, 2011). These suits all arose from the same allegedly unlawful conduct by Netflix—indefinite retention of former customers' PII.

Following the Court's relating of the cases, different plaintiffs' firms submitted briefing seeking to be appointed interim lead counsel. (*See* Dkt. Nos. 15, 33–35, 42, 46, 51, 53.) After consideration of the briefs and argument, on August 12, 2011, the Court consolidated the cases under the caption "*In re: Netflix Privacy Litigation*," and appointed Jay Edelson of Edelson McGuire LLC as Interim Lead Class Counsel. (Dkt. No. 59.)

On September 13, 2011, Plaintiffs filed an Amended Consolidated Class Action Complaint (Dkt. No. 61) adding allegations that Netflix violated the VPPA's disclosure provision, 18 U.S.C.

§ 2710(b), by disclosing Plaintiffs' and the Class's PII without their informed, written consent, and without giving Plaintiffs and the Class an opportunity to prohibit such disclosures. (Dkt. No. 61 ¶¶ 57, 58.)

Thereafter the Parties engaged in the discovery planning conference required by Federal Rule of Civil Procedure 26. (Edelson Decl. ¶ 11.) Plaintiffs then propounded, and Netflix responded to, discovery related to both class and merits issues. (Edelson Decl. ¶ 12.) Though discovery was on-going, the Parties also explored the possibility of settlement and through the Court's ADR program, agreed to give mediation a chance. Eventually, they selected former District Judge Layn R. Phillips (ret.) of Irell & Manella, LLP, to serve as the mediator. (*See* Dkt. No. 70; Edelson Decl. ¶ 13.)

On February 2, 2012, Interim Lead Class Counsel and Netflix's Counsel met in Santa Ana, California for a formal mediation with Judge Phillips. After a full day of arms-length negotiations, the Parties were able to reach a classwide settlement, which was formalized in a signed Memorandum of Understanding ("MOU"). (Edelson Decl. ¶ 13.) After executing the MOU, negotiations continued regarding the precise wording of the settlement agreement. Over a period of approximately three months, the Parties exchanged countless drafts of the agreement and related documents. On April 30, 2012, the Parties executed the Settlement Agreement. (Edelson Decl. ¶ 14.) The Parties now seek the preliminary approval of this Court.

### 4.   Defendant Netflix's Position

At all times, Netflix has denied and continues to deny any wrongdoing whatsoever and has denied and continues to deny that it committed, or threatened or attempted to commit, any wrongful act or violation of law or duty alleged in the Action. (Ex. 1, Recitals at 2:23–3:5.) Netflix also contends that it has acted properly in all regards in connection with its duties under the VPPA. *Id*. Nonetheless, taking into account the uncertainty and risks inherent in any litigation, Netflix has concluded that further defense of the Action would be protracted, risky, burdensome, and expensive, and that it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in the Agreement. (Ex. 1,

Recitals at 2:23–3:5.)

## B.     Terms of the Settlement

The terms of the Settlement are set forth in the Settlement Agreement (*see* Ex. 1) and briefly summarized as follows:

### 1.     Class Definition

The Settlement Agreement provides for a single Settlement Class, defined as follows:

> All Subscribers as of the date of entry of Preliminary Approval. Excluded from the Settlement Class are the following: (i) the Settlement Administrator, (ii) the Mediator, (iii) any respective parent, subsidiary, affiliate or control person of the Defendant or its officers, directors, agents, servants, or employees as of the date of filing of the Action, (iv) any judge presiding over the Action and the immediate family members of any such Person(s), (v) persons who execute and submit a timely request for exclusion, and (vi) all persons who have had their claims against Defendant fully and finally adjudicated or otherwise released.

(Ex. 1, § 1.37.)

### 2.     Injunctive Relief

At all times during settlement negotiations, Plaintiffs and Interim Lead Class Counsel maintained that any settlement would need to include injunctive relief—above and beyond anything obtained through the *Facebook Beacon* and *Google Buzz* settlements—designed to change Defendant's manner of doing business, influence others in the industry to change their manner of doing business, and ensure that the Settlement Class members' information is not retained in a personally-identifiable format longer than necessary, without the explicit opt-in consent of the individual Settlement Class member. (Ex. 1, § 2.1; Edelson Decl. ¶ 15.) The instant Settlement Agreement provides such relief directly. (Ex. 1, § 2.1.)

#### a.     *Personal Information Decoupling*

Within one (1) year of the Effective Date, and subject to the exceptions set forth in the Settlement Agreement, including Section II.B.2 below, Netflix has agreed to do the following:

(1)     For those Subscribers who have not subscribed to Netflix for a period of 365 or more consecutive days as of the Effective Date and who do not rejoin Netflix subsequent to the Effective Date, Netflix will cause their Entertainment Content Viewing Histories

1  to be decoupled from their Identification Information and Payment Methods. (Ex. 1, § 2.1.1.)

2              (2)    Netflix has agreed to implement a data retention practice

3  such that, for Subscribers who have cancelled their Netflix subscriptions and have not been Netflix

4  Subscribers for a period of 365 consecutive days, Netflix will cause their Entertainment Content

5  Viewing Histories to be decoupled from their Identification Information and Payment Methods.

6  The requirements of Section II.B.1.b shall remain in effect and Netflix shall adhere to it for at least

7  four (4) years from the Effective Date unless inconsistent with any newly enacted or amended

8  laws. (Ex. 1, § 2.1.2.)

9              (3)    Netflix's performance of its obligations as outlined in

10  Subsections II.B.1.a and II.B.1.b above is subject to: (i) receiving confirmation from adverse

11  parties in other pending cases against Netflix, or with the respective courts as needed, that

12  performing such actions will not result in allegations of wrongful document destruction and

13  spoliation, and (ii) any relevant document retention obligations imposed by litigation filed after

14  the date that this Agreement is executed. (Ex. 1, § 2.1.3.)

15              b.    *Decoupling Exceptions*

16        The obligations described in Section II.B.1 above shall not apply in the following

17  circumstances:

18              (1)    If a Subscriber, at or after the time he or she cancels his or

19  her subscription, provides express consent to allow Netflix to continue to associate his or her

20  Entertainment Content Viewing History with his or her Identification Information and Payment

21  Method. (Ex. 1, § 2.2.1.)

22              (2)    The obligations described in Subsection II.B.1 above do not

23  apply to Netflix's non-U.S. operations. (Ex. 1, § 2.2.2.)

24              (3)    If Netflix ceases operating its Entertainment Content by-mail

25  service within four (4) years from the Effective Date, Netflix will no longer be subject to the

26  obligations described in Subsections II.B.1.a and II.B.1.b as it pertains to non-Settlement Class

27  members. Nothing herein shall relieve Netflix of its obligations to comply with any and all

28

applicable laws, or of its obligations under Subsections II.B.1.a, II.B.1.b, and II.B.1.c as to the Settlement Class. (Ex. 1, § 2.2.3.)

### 3. Settlement Fund Payments

Netflix has agreed to pay the total amount of nine million dollars ($9,000,000.00 USD) in cash into a Settlement Fund, to be used for the payment of Settlement Administration Expenses, *Cy Pres* distributions to the proposed *Cy Pres* Recipients, any Fee Award or costs awarded to Class Counsel, and any incentive award awarded to the Class Representatives and named plaintiffs in the Related Actions. (Ex. 1, § 2.3.)

### 4. Cy Pres

After payment of Settlement Administration Expenses, the Fee Award, and the collective Incentive Award, the balance of the Settlement Fund shall be distributed to *Cy Pres* Recipients selected by the Parties and approved by the Court. The *Cy Pres* distribution shall be made to not-for-profit organizations, institutions, and/or programs that educate users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information through user control. The designated *Cy Pres* Recipients may have no valid objectionable affiliation with any party or counsel to the Action and Related Actions. (Ex. 1, § 2.4.)

The Parties shall solicit proposals for the nomination of *Cy Pres* Recipients. Proposals from potential not-for-profit organizations seeking nomination shall include: (i) the organization's name and address, (ii) a description of an established program currently undertaking policy or education efforts directed specifically at issues of technology, law, and privacy, (iii) a short statement describing how this program benefits the Class, (iv) the overall annual operating budget of the organization and of the specific program, (v) the total amount of *Cy Pres* distribution sought, (vi) disclosure of any connections, monetary or otherwise, between the organization and the Parties, (vii) disclosure of any connections, monetary or otherwise, between the organization and Class Counsel and Supporting Counsel; and (viii) disclosure of the amount received, if any, in contributions from the Parties or their counsel in 2011. (Ex. 1, § 2.4.3.)

After reviewing nomination proposals, the Parties shall meet and confer to select the final

1   nominations for Court approval that the Parties believe will effectively and efficiently educate

2   users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and

3   personal information online through user control, and to protect users from online threats, further

4   the policies underlying the VPPA, and otherwise promote the Class's interests. In evaluating these

5   criteria, the Parties will consider the requested disbursement amounts and operating budgets when

6   determining *Cy Pres* funding allocations. (Ex. 1, § 2.4.7.) No later than fourteen (14) days before

7   the Objection Deadline, Class Counsel will make public, via the Settlement Website and direct

8   notice to organizations that have submitted proposals, the organizations nominated for *Cy Pres*

9   disbursements, along with their corresponding funding amounts. (Ex. 1, § 2.4.8.)

10              *5.     Other Relief*

11         In addition to the individual and injunctive relief discussed above, Netflix has agreed to

12   provide the following relief:

13              a.     *Payment of Notice and Administrative Fees*: All Settlement

14   Administration Expenses will be paid out of the Settlement Fund as prescribed by the Settlement

15   Agreement. (Ex. 1, § 2.3.)

16              b.     *Compensation for the Class Representatives*: Netflix has agreed to

17   pay from the Settlement Fund, subject to the approval of the Court, an Incentive Award to the

18   Class Representatives and named plaintiffs in the Related Actions in the total amount of thirty

19   thousand dollars ($30,000.00 USD) to be divided among them as appropriate compensation for

20   their time and efforts in the Action and Related Actions. (Ex. 1, §§ 9.2–9.5.)

21              c.     *Payment of Attorneys' Fees and Expenses*: Netflix has agreed that

22   Class Counsel may apply for a Fee Award, subject to Court approval, of up to 25% of the

23   Settlement Fund, plus reimbursement of up to $25,000.00 USD of their costs. (Ex. 1, §§ 9.1, 9.3–

24   9.5.)

25              *6.     Release*

26         In exchange for the relief above, and upon entry of a final order approving this Settlement,

27   Netflix and each of its related affiliates and entities will be released from any claims, whether

28

1   known or unknown, arising out of, relating to, or regarding the alleged retention and disclosure of

2   Plaintiffs' and the Settlement Class's personally identifiable information, Video Rental History,

3   and other information, including but not limited to all claims that were brought, alleged, argued,

4   raised, or asserted in any pleading or court filing in the Action. (*See* Ex. 1, §§ 1.31, 1.32, 1.33,

5   1.42, and 3 for the full release.)

6   **III.    ARGUMENT**

7          Under Rule 23, this Court must decide whether to grant preliminary approval to the instant

8   Settlement Agreement. As explained below, the Settlement Agreement is properly before the

9   Court, presents a settlement class amenable to certification for settlement purposes, and provides

10  relief that falls well within the range acceptable for final approval. The Court should therefore

11  grant preliminary approval and order that notice be issued to the Settlement Class.

12         **A.      The Court Has Subject Matter Jurisdiction**

13         As an initial matter, the Court has subject matter jurisdiction over this case, both under

14  federal question jurisdiction and through the Class Action Fairness Act ("CAFA"), 28 U.S.C. §

15  1332(d). Plaintiffs' lawsuit arises out of Netflix's alleged violations of federal and state law

16  concerning the retention and disclosure of PII, thus providing federal question jurisdiction over the

17  federal claims and supplemental jurisdiction over the state claims. *See Trs. of the Constr. Indus. &*

18  *Laborers Health & Welfare Trust v. Desert Valley Landscape Maint., Inc.*, 333 F.3d 923, 925 (9th

19  Cir. 2003). The Court also has CAFA jurisdiction as (a) many more than one member of the

20  nationwide class are citizens of a state different than Netflix, (b) the claims in this case—as

21  demonstrated by the instant settlement—exceed CAFA's $5 million threshold, and (c) none of

22  CAFA's "exceptions" to jurisdiction apply. 28 U.S.C. § 1332(d).

23         Additionally, there is clearly an Article III "case or controversy" alleged sufficient to

24  confer standing and thus subject matter jurisdiction over this case. *See Lujan v. Defenders of*

25  *Wildlife*, 504 U.S. 555, 560 (1992). Indeed, the "case or controversy" test, which requires

26  allegations of "injury in fact," is met in several ways. First, Plaintiffs bring unlawful disclosure

27  claims, alleging that Netflix disclosed their PII to third parties without their consent. (¶¶ 44, 57,

28

58.) These allegations are sufficient to establish standing. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 538 (7th Cir. 2012) (holding that violation of 18 U.S.C. § 2710(b) causes concrete harm and is sufficient to satisfy Article III's injury-in-fact requirement); *see also Fulfillment Servs., Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 618–19 (9th Cir. 2008) ("The injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'") (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Smith v. Dean*, No. C-97-0911 FMS, 1997 WL 257505, at *2 (N.D. Cal. May 6, 1997) (noting that "[s]tanding is satisfied by allegations of economic or noneconomic injury," including the right to privacy) (citing Doe v. Bolton, 410 U.S. 179, 188 (1973)).[4]

Likewise, Plaintiffs' unlawful retention claims are also sufficient to establish standing and independently confer jurisdiction because they allege that Netflix violated their statutory rights to have their PII destroyed in a timely manner. *See* 18 U.S.C. § 2710(e); *Fulfillment Servs., Inc.*, 528 F.3d at 618–19.[5]

**B.     The Court Should Certify the Proposed Class for Settlement Purposes**

Before granting preliminary approval of a settlement, the court must determine that the proposed Settlement Class is proper for settlement purposes and thus appropriate for certification. MANUAL FOR COMPLEX LITIGATION § 21.632 (4th ed. 2004); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Certification of a class is proper when a plaintiff demonstrates that the

---

[4]      In addition to having an injury in fact by virtue of the invasion of their statutory rights, Plaintiffs also were prepared to prove that the dissemination of PII caused actual monetary damages in that the proper handling of PII was part of the value that they expected to obtain from purchasing Netflix subscriptions, the value of which was diminished by the alleged wrongdoing.

[5]      In *Sterk*, the Seventh Circuit cast doubt on whether the mere retention of PII—without other damage, such as disclosure—caused the requisite level of injury. Because Plaintiffs allege disclosure claims in the instant case, the question of whether the Ninth Circuit may ultimately adopt this analysis is purely academic. Nevertheless, and for purposes of completeness, it is worth noting that even under the *Sterk* decision, Plaintiffs would be permitted to bring injunctive claims in this Court due solely to unlawful retention of PII. *Sterk*, 672 F.3d at 539. And, as the district court in *Sterk* explicitly held on remand, even under the Seventh Circuit's analysis*,* the plaintiffs were entitled to move forward on a modified version of their retention claims in federal court, even though the Seventh Circuit was skeptical of their ultimate ability to demonstrate actual injury. *See Sterk v. Redbox Automated Retail*, No. 11 C 1729, 2012 WL 1419071, at *2-3 (N.D. Ill. Apr. 24, 2012).

1   proposed Class and proposed Class Representatives meet the following prerequisites of Rule

2   23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P.

3   23(a)(1–4).

4          In addition to meeting the requirements of Rule 23(a), a plaintiff seeking class certification

5   must also meet at least one of the three provisions of Rule 23(b). Fed. R. Civ. P. 23(b); *Blake v.*

6   *Arnett*, 663 F.2d 906, 912 (9th Cir. 1981). Where, as here, a plaintiff seeks certification under Rule

7   23(b)(3), he or she must demonstrate that common questions of law or fact predominate over

8   individual issues and that maintaining the suit as a class action is superior to other methods of

9   adjudication. Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615–16; *Sullivan v. Kelly Services,*

10  *Inc.*, 268 F.R.D. 356, 364–65 (N.D. Cal. 2010). The Court should accept the allegations of the

11  complaint as true, but may consider matters beyond the pleadings to determine if the claims are

12  suitable for resolution on a class-wide basis. *Celano v. Marriot Int'l, Inc.*, 242 F.R.D. 544, 548

13  (N.D. Cal. 2007). In this case, Plaintiffs meet each of the prerequisites for class certification.

14              *1.      The Numerosity Requirement is Satisfied*

15         The first class certification prerequisite is numerosity, which requires "the class [be] so

16  numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). To satisfy this

17  requirement, there is no "specific" number required, nor is the plaintiff required to state the

18  "exact" number of potential class members. *Celano*, 242 F.R.D. at 548. Generally, the numerosity

19  requirement is satisfied when the class comprises 40 or more members. *See id.* at 549.

20  Here, the proposed Class is comprised of tens of millions of Netflix subscribers and former

21  subscribers nationwide—a number that obviously satisfies the numerosity requirement.

22  Accordingly, the proposed settlement Class is so numerous that joinder of their claims is

23  impracticable.

24              *2.      The Commonality Requirement is Satisfied*

25         The second threshold to certification requires that "there are questions of law or fact

26  common to the class." Fed. R. Civ. P. 23(a)(2). Commonality may be demonstrated when the

27  claims of all class members "depend upon a common contention" and "even a single common

28

question will do." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551, 2556 (2011) (quotation omitted); *see also Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998) ("[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."). The common contention must be of such a nature that it is capable of class-wide resolution, and that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 131 S.Ct. at 2551. Moreover, the permissive standard of commonality provides that "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008).

In the instant case, all members of the class share common claims arising out of Netflix's alleged unlawful retention and disclosure of their personally identifiable information and Entertainment Content Viewing Histories. As Plaintiffs allege, Netflix has a stated policy for and a uniform practice of retaining and disclosing the personally identifiable information and Entertainment Content Viewing Histories of its subscribers and former subscribers—affecting all those individuals in the same way. Such allegations show that Plaintiffs and the proposed Settlement Class share common statutory claims under the VPPA, as well as various state law claims, that likewise result in common and shared factual and legal questions such as:

      (a)     whether Netflix retained its customers' and former customers' personally identifiable information and Entertainment Content Viewing histories, and if so, for how long,

      (b)     whether Netflix retained its customers' and former customers' personally identifiable information longer than necessary for the purpose for which it was collected,

      (c)     whether Netflix disclosed its customers' and former customers' personally identifiable information and Entertainment Content viewing histories to third parties,

      (d)     whether Netflix obtained the informed consent of its customers and former customers prior to disclosing their personally identifiable information and Entertainment Content viewing histories to third parties,

      (e)     whether Netflix's conduct violated the VPPA,

1      (f)     whether Netflix's conduct violated the CCRA,

2      (g)     whether Netflix's conduct violated the UCL,

3      (h)     whether Netflix breached its privacy policy and terms of use by engaging in the conduct alleged in the Complaint, and

(i)     whether Plaintiffs and the Class are entitled to actual and statutory damages for Netflix's alleged unlawful conduct.

In accordance with the Supreme Court's recent holding in *Wal-Mart,* answering these legal issues would resolve the claims of all members of the Class in one stroke. *Wal-Mart,* 131 S.Ct. at 2551. Thus, considering the nature of the issues and facts that bind each class member together, commonality is satisfied.

       *3.     The Typicality Requirement is Satisfied*

     Rule 23 next requires that the representative plaintiff's claims are typical of those of the putative class or classes he or she seeks to represent. Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that "the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Typicality is measured under a permissive standard and does not require that the representative's claims be identical, but only that they are "reasonably co-extensive with [the claims] of absent class members." *Hanlon*, 150 F.3d at 1020.

     In the instant action, Netflix allegedly retained Plaintiffs' and the Class's personally identifiable information and Entertainment Content viewing histories longer than "necessary for the purpose for which it was collected," and allegedly disclosed it without obtaining the required prior express consent. As a result, Plaintiffs have alleged that such conduct violates the VPPA, which would provide injunctive relief and identical statutory damages to all members of the proposed the Class. Plaintiffs' representation of the Settlement Class is appropriate because they were subjected to the same alleged unlawful conduct and suffered essentially identical damages flowing from that uniform conduct. As such, Plaintiffs' claim for relief is typical of, if not identical to, those of the proposed Class, and Rule 23(a)(3)'s requirement for typicality is met.

4.    *The Adequate Representation Requirement is Satisfied*

The final Rule 23(a) prerequisite is that the proposed class representative has and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine if representation is adequate, the Court must ask "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Plaintiffs' interests are entirely representative of and consistent with the interests of the proposed Settlement Class—all stand to recover statutory damages under the VPPA for Netflix's alleged unlawful retention and disclosure of their personally identifiable information and Entertainment Content viewing histories. Also, Plaintiffs' active participation in this litigation from the time proposed Class Counsel commenced their pre-suit investigation of Netflix's practices, to the initial complaint's filing, and to the present, demonstrates that they have and will continue to protect the interests of the proposed Settlement Class.

Further, as this Court recognized in appointing Jay Edelson Interim Lead Class Counsel, proposed Class Counsel have regularly engaged in major complex litigation and have extensive experience in consumer class action lawsuits that are similar in size, scope, and complexity to the present case. (Edelson Decl. ¶ 18); *see, e.g., Missaghi v. Blockbuster*, No. 0:11-cv-02559 (D. Minn. 2011); *Rodriguez v. Sony Computer Entm't Am., LLC*, No. 4:11-cv-04084 (N.D. Cal. 2011); *Sterk v. Best Buy Stores, et. al.*, No. 1:11-cv-01894 (N.D. Ill. 2011); *Sterk v. Redbox Automated Retail, LLC*, No. 1:11-cv-01729 (N.D. Ill. 2011); *Wagner v. Family Video Movie Club, Inc.*, No. 1:11-cv-05671 (N.D. Ill. 2011); Firm Resume of Edelson McGuire, LLC (attached to the Edelson Decl. as Exhibit A). Accordingly, both Plaintiffs and proposed Class Counsel have and will continue to adequately represent the interests of the proposed Settlement Class.

5.    *The Proposed Settlement Class Meets Rule 23(b)(3)'s Requirements*

In addition to meeting the prerequisites of Rule 23(a), Plaintiffs must also meet one of the three requirements of Rule 23(b) to certify the proposed class. *Zinser v. Accufix Research Inst.*,

*Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(b)(3) provides that a class action can be maintained where: (1) the questions of law and fact common to members of the class predominate over any questions affecting only individuals, and (2) the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Pierce v. County of Orange*, 526 F.3d 1190, 1197 n.5 (9th Cir. 2008). Certification under Rule 23(b)(3) is appropriate and encouraged "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon,* 150 F.3d at 1022.

### a.   Common Questions of Law and Fact Predominate

The focus of the predominance requirement is whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. Predominance exists "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon,* 150 F.3d at 1022.

In this case, the core issues of fact that predominate include whether Netflix unlawfully retained and disclosed the personally identifiable information and Entertainment Content viewing histories of the proposed Class members. The central legal issue concerns whether Netflix's alleged behavior gives rise to liability under the VPPA. Both of these issues can be resolved for all members of the proposed class in a single adjudication. As such, the answers to these common questions that resulted from Netflix's alleged conduct are the primary focus and central issues of this class action and thus predominate over any individual issues that may exist.

### b.   A Class Action is the Superior Mechanism for Adjudicating this Dispute

The certification of this suit as a class action is superior to any other method available to fairly, adequately, and efficiently resolve the claims of the members of both classes. The purpose of the superiority requirement is judicial economy and assurance that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175–76. Absent a class action, and considering the fact that the proposed class includes tens of millions of people, most members of the proposed class would find the cost of litigating their claims to be prohibitive

and, further, such an influx of individual actions would be judicially inefficient. Also, because the action will now settle, the Court need not consider issues of manageability relating to trial. *See Amchem*, 521 U.S. at 620 (citation omitted) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."). Accordingly, common questions predominate and a class action is the superior method of adjudicating this controversy.

**C.     The Proposed Settlement Is Fundamentally Fair, Reasonable, And Adequate, And Falls Well Within The Range Of Preliminary Approval.**

After certifying the proposed Class for the purpose of settlement, the Court should preliminarily approve the settlement. The procedure for review of a proposed class action settlement is a well-established two-step process. Fed. R. Civ. P. 23(e); *see also* CONTE & NEWBERG, 4 NEWBERG ON CLASS ACTIONS, § 11.25, at 3839 (4th ed. 2002). The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." NEWBERG, § 11.25, at 3839 (*quoting* MANUAL FOR COMPLEX LITIGATION § 30.41 (3d ed. 1995)); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). This hearing is not a fairness hearing; rather, its purpose is to ascertain whether there is any reason to notify the putative Class members of the proposed settlement and to proceed with a fairness hearing. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079. Notice of a settlement should be sent out where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Id.* (*quoting* NEWBERG ON CLASS ACTIONS § 11.25 (1992)).

The Manual for Complex Litigation characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by a court on the basis of written submissions and informal presentation from the settling parties. MANUAL FOR COMPLEX LITIGATION § 21.632 (4th ed. 2004). If the Court finds a settlement proposal "within the range of

1   possible approval," it then proceeds to the second step in the review process, which is the final

2   approval hearing. NEWBERG, § 11.25, at 3939.

3        A strong judicial policy exists in favor of voluntary conciliation and settlement of complex

4   class action litigation. *In re Snycor*, 516 F.3d at 1101 (*citing Officers for Justice v. Civil Serv.*

5   *Comm'n*, 688 F.2d 615 (9th Cir. 1982)). While the district court has discretion regarding the

6   approval of a proposed settlement, it should give "proper deference to the private consensual

7   decision of the parties." *Hanlon*, 150 F.3d at 1027. In fact, when a settlement is negotiated at

8   arm's-length by experienced counsel, there is a presumption that it is fair and reasonable. *In re*

9   *Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Further, a settlement negotiated with the

10  assistance of an experienced private mediator is further proof that the settlement was reached

11  fairly and provides adequate relief. *In re Indep. Energy Holdings PLC*, No. 00 CV 6689, 2003 WL

12  22244676, at *4 (S.D.N.Y. Sept. 29, 2003). Ultimately, though, the court's role is to ensure that

13  the settlement is fundamentally fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2); *In re*

14  *Syncor*, 516 F.3d at 1100.

15       In this case, there should be little question that the Settlement Agreement is fair,

16  reasonable, and adequate, especially in light of the uncertainties detailed below. Under this

17  Settlement, Netflix will implement and adhere to industry-leading privacy practices and pay

18  millions of dollars to *Cy Pres* Recipients who will provide the Settlement Class members—and

19  the public at-large—with privacy protection, education, and services. (Ex. 1, § 2.4.) Not only is

20  the Settlement adequate on its own terms, but it again compares favorably with the recovery in

21  similar nationwide privacy class actions reached against *Google* and *Facebook*. *See* Part V.C *infra*.

22  Because the Settlement offers the best immediate benefit available when weighed against the

23  potential risks inherent in the litigation (detailed below), the Settlement should be preliminarily

24  approved.

        *1.    A number of uncertainties inherent to this litigation make the*
25             *Settlement the best recovery attainable by the Settlement Class.*

26       Given the substantial monetary and injunctive relief obtained for the class, and the

27  uncertainties that would accompany continued litigation, there is little question that the proposed

28

---

1  settlement is at least "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484

2  F. Supp. 2d at 1079.

3      Importantly, Netflix has agreed to wide ranging injunctive relief, the crux of which is the

4  "decoupling" of their subscribers' and former subscribers' Entertainment Content Viewing

5  Histories from their Identification Information and Payment Methods. (Ex. 1, § 2.1.) This

6  injunctive relief offers industry-leading privacy protection, (Edelson Decl. ¶ 16), and will help

7  prevent the intentional and unintentional use and disclosure of the Settlement Class members'

8  highly personal Entertainment Content Viewing Histories—the very thing the VPPA was created

9  to protect. (*Id.*)

10      Although Plaintiffs and proposed Class Counsel are confident in the strength of their

11  claims and in their ability to ultimately prevail at trial, they also recognize that litigation is

12  inherently risky. (Edelson Decl. ¶ 19.) If the litigation were to proceed, Netflix would raise several

13  colorable defenses to Plaintiffs' claims, making this Settlement all the more reasonable.

14  Specifically, Netflix would likely argue that Netflix retained Plaintiffs' PII for one of the purposes

15  for which it was collected—maintaining their viewing histories and preferences in case they

16  renewed their subscriptions—and that Plaintiffs consented to the ongoing retention and disclosure

17  of their data by agreeing to the Netflix privacy policy when they created their accounts, and that

18  Plaintiffs and the class suffered no actual damages. (Edelson Decl. ¶ 20.) Plaintiffs also anticipated

19  that even if they had won at trial that Netflix would have a strong argument that awarding full

20  statutory damages (i.e. tens of billions of dollars) far in excess of the value of the company would

21  trigger constitutional Due Process concerns, thus requiring remittitur. Plaintiffs believe they would

22  be more likely than not to succeed on the merits and that even with the possibility of remittitur,

23  would come away with a significant judgment that could be enforced. Nevertheless, the viability

24  of Netflix's factual and legal defenses to Plaintiffs' claims, many of which would create issues of

25  first impression within this Circuit counsels in favor the instant settlement. (Edelson Decl. ¶ 21.)

26      Additionally, two legal issues create uncertainty that Plaintiffs accounted for when

27  deciding to accept settlement. This is one of several class actions pending across the country

28

against video tape service providers for violation of subsection (e) (the "Destruction of Old Records" provision) of the VPPA. One of the main issues in dispute in these cases is whether a civil action for statutory damages under § 2710(c) (the civil penalty provision) could be maintained for violation of subsection § 2710(e). In the case of *Sterk v. Redbox*, the Northern District of Illinois rejected the defendant's argument that no private right of action exists for unlawful retention of PII, finding that statutory damages under § 2710(c) could be sought for violation of § 2710(e). 806 F. Supp. 2d 1059 (N.D. Ill. 2011). However, in the first appellate court decision to squarely address the issue of "whether subsection (e) of the [VPPA] can be enforced by a damages suit under subsection (c) [of the Act]," *Redbox*, 672 F.3d at 536, the Seventh Circuit recently found that subsection 2710(c)'s private right of action provision could be used only to enforce unlawful disclosures as prohibited by subsection 2710(b). *Id.* at 538.[6] During settlement negotiations in this case, the Seventh Circuit had not yet issued its decision, and did so only after the parties reached an agreement and signed the MOU. Ultimately, while the Plaintiffs in this case remain resolute that a civil suit for statutory damages may be maintained for violation of § 2710(e), that doesn't take away from the fact that the opinion highlights the uncertainties inherent in litigation of this sort, and demonstrates the wisdom of the present settlement.

Next, uncertainty regarding the scope of the Supreme Court's ruling in *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), cautions in favor of settlement. In *Sorrell*, the Supreme Court ruled that a Vermont statute restricting pharmacies from selling information about doctors' drug prescription habits for marketing purposes violated the First Amendment. *Id.* at 2671. The Court noted that First Amendment implications arise where information an individual "possesses is

---

[6]     The Seventh Circuit did not, however, categorically eliminate any right to relief arising out of violations of subsection 2710(e). Rather, the Court left open the possibility that a consumer could enforce subsection 2710(e) through a provision other than subsection 2710(c), including through the Stored Communications Act, 18 U.S.C. § 2707 (the "SCA"), and particularly where the consumer alleges some form of economic harm. The district court in *Redbox* recently recognized such a possibility. Indeed, on remand, Judge Kennelly allowed the plaintiff to pursue his unlawful retention claim through the SCA's damages provision, as well as through a breach of contract theory. *See Sterk v. Redbox Automated Retail*, No. 11 C 1729, 2012 WL 1419071, at *2-3 (N.D. Ill. Apr. 24, 2012). The district court determined that the Seventh Circuit's holding did not categorically preclude civil actions to enforce the retention provision of the VPPA and further that Section 2707 of the SCA provides a mechanism to assert such claims. *Id.* at *2.

1    subjected to 'restraints on the way in which the information might be used' or disseminated." *Id.*

2    While Plaintiffs and proposed Class Counsel maintain that neither the VPPA's disclosure

3    provision nor its retention provision violate the First Amendment, *IMS* does present legal

4    uncertainty that may affect the claims, since the full effect of that decision in the lower courts is

5    not yet known.

6        In light of the uncertainty inherent in this litigation, the time value of money, and the

7    immediate benefits offered by the injunctive relief (compared with uncertain relief that would not

8    be available for many years), the Settlement Agreement represents a significant recovery under the

9    circumstances for the proposed Class.

10           2.    *The Cy Pres donations are the best means of providing a monetary benefit*
              *to the Class.*

11

12       The Settlement's *Cy Pres* distribution will give the Class the greatest benefit of any form

     of monetary relief that could have been realized here. Given the size of the Settlement Class, any

13   realistically obtainable monetary award would have resulted in payments to the class members that

14   were negligible on an individual level. (Edelson Decl. ¶ 17.) But under the terms of the instant

15   Settlement, the Settlement Class will benefit from millions of dollars in donations to qualified

16   organizations that educate users, regulators, and enterprises regarding issues relating to protection

17   of privacy, identity, and personal information. (Ex. 1, § 2.4.1.) The donations to these

18   organizations will benefit the Class by aiding consumers in protecting themselves and their

19   privacy online in the future. *(Id.)*

20       Further, the combination of industry-leading injunctive relief and substantial *cy pres*

21   donations compares favorably to settlements in other online consumer privacy cases. *See, e.g., In*

22   *re Google Buzz Privacy Litig.*, No. 5:10-cv-00672-JW (Dkt. No. 41, 128) (N.D. Cal. 2010)

23   (disclosure of email contact lists without consent; $8.5 million settlement fund with *cy pres*

24   payments); *Lane v. Facebook, Inc.*, No. 5:08-cv-03845 RS, 2009 WL 3359020 (N.D. Cal. Sept.

25   18, 2009) (unconsented disclosure of personally identifiable information under the VPPA based on

26   Facebook Beacon program; settlement created privacy foundation with funding of $9.5 million);

27

28

*In re DoubleClick, Inc. Privacy Litig.*, No. 00 Civ. 0641 (Dkt. No. 38) (NRB) (S.D.N.Y. 2001) (defendant, an Internet ad-serving company, revised its notice, choice, and data collection practices and conducted a privacy-oriented public information campaign).

In light of the uncertainties of litigation, the minimal monetary recovery that would be realistically recoverable by individual Settlement Class members even if they obtained a judgment on the merits, and the immediate benefits offered to the Class by the injunctive relief and *Cy Pres* donations, the Settlement Agreement offers the Class the greatest relief possible, and thus is deserving of preliminary approval.

**D.      The Court Should Approve The Proposed Plan For Class Notice**

To satisfy the requirements of both Rule 23 and Due Process, Rule 23(c)(2)(B) provides that,"[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).[7] Rule 23(e)(1) similarly says that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice is "adequate if it may be understood by the average class member." NEWBERG, § 11:53. The substance of the notice to the settlement class must describe the nature of the action, the definition of the class to be certified, the class claims and defenses at issue, as well as explain that settlement class members may enter an appearance through counsel if so desired, request to be excluded from the settlement class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23 (c)(2)(B).

The Parties in this case have created and agreed to perform the following Notice Plan, which will satisfy both the substantive and manner of distribution requirements of Rule 23 and Due Process. (The Declaration of Shannon Wheatman is attached hereto as Exhibit 3, ¶¶ 44, 46.)

---

[7]      Direct mail notice is not required in all circumstances, especially where mailed notice would effectively deplete the settlement fund. *See e.g. In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 345 (E.D.N.Y. 2010) (finding that in class action involving millions of class members, individual notice by mail was "inappropriate," burdensome, expensive and could deplete the settlement fund, but notice via publication and a specially constructed website was both reasonable and appropriate.)

**Email Notice.** Netflix (or in Netflix's discretion, the Settlement Administrator) shall provide email notification to the email address last known by Netflix of any and all reasonably identifiable Settlement Class members. The email notice will be in a form substantially similar to that attached as Exhibit 3-C and include a hyperlink to the Settlement Website. In the event that Notice sent by email to a Settlement Class member results in a bounce-back or is otherwise undeliverable, Netflix shall re-send the Notice by email to the last known email address of each such Settlement Class member. (Ex. 1, § 4.1.1.) Email notice is especially appropriate here given the online nature of Netflix's business and the fact that Settlement Class members *had to* provide a valid email address when creating their Netflix accounts.

**Settlement Website.** The Settlement Administrator shall create and maintain a Settlement Website through the Effective Date. The Settlement Website shall (1) notify Class members of their rights to object to the Settlement Agreement or opt out of the Class; (2) notify Class members that no further notice will be provided to them and that the Settlement has been approved; and (3) inform Class members that they should monitor the Settlement Website for further developments, including the posting of the *Cy Pres* Recipients, and will be in a form substantially similar to that attached as Exhibit 3-E. (Ex. 1, § 4.1.2.)

**Publication Notice.** The Parties shall supplement direct notice with (1) the placement of a half-page advertisement appearing in an issue of People Magazine in the form substantially similar to that attached as Exhibit 3-D, and (2) 60,000,000 impressions of an advertisement (100 x 100 pixels) on Facebook.com, in the form substantially similar to that attached as Exhibit 3-B, that is linked to the Settlement Website. (Ex. 1, § 4.1.3.)

The Notice Plan will be established, and the emails sent, within thirty (30) days of entry of the Preliminary Approval Order with publication notice to be completed within sixty (60) days of entry of the Preliminary Approval Order. All costs associated with implementing the Notice Plan, including the fees and costs of the Settlement Administrator, will be paid out of the Settlement Fund. Within ten (10) days after the filing of this Agreement with the Court, Netflix will also notify the appropriate state and federal officials of this Agreement pursuant to the Class Action

1  Fairness Act of 2005, 28 U.S.C. § 1715. (Ex. 1, § 4.2.)

2       The emails, settlement website, and publication notice represent a cross section of media

3  specifically chosen by the Parties to target likely Class members and attain the widest reach

4  possible. (Wheatman Decl. ¶ 46.) The format and language of each form of notice has been drafted

5  so that it is in plain language, is easy to read, and will be readily understood by the members of the

6  proposed Class, thus satisfying the requirements of Rule 23 and Due Process. (Wheatman Decl. ¶¶

7  37-46.)[8]

8  **IV.    CONCLUSION**

9       For the foregoing reasons, Plaintiffs respectfully ask that the Court grant Plaintiffs' motion

10  for preliminary approval of the Class Action Settlement Agreement, certify the Settlement Class,

11  appoint Jeff Milans and Peter Comstock as the Class Representatives, appoint Jay Edelson of

12  Edelson McGuire LLC as Class Counsel, approve the form and manner of notice described above,

13  and award such other and further relief as the Court deems equitable and just.

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

[8]    The issue of the extent to which Class Counsel will share in the cost of notice has not been
27  resolved. Rather, pursuant to the Settlement Agreement, the Parties will provide their respective
positions to the Honorable Layn Phillips (ret.), who will resolve the issue. (*See* § 11.4.)

28

1  Dated: May 25, 2012                          Respectfully submitted,

2                                               **Jeff Milans and Peter Comstock**, individually
                                                and on behalf of classes of similarly situated
3                                               individuals,

4                                               By:/s/ Rafey S. Balabanian
                                                One of Plaintiffs' Attorneys
5

6
   SEAN P. REIS (sreis@edelson.com) – SBN 184044
7  EDELSON MCGUIRE LLP
   30021 Tomas Street, Suite 300
8  Rancho Santa Margarita, California 92688
   Tel: (949) 459-2124
9  Fax: (949) 459-2123

10 JAY EDELSON (jedelson@edelson.com)
   RAFEY S. BALABANIAN (rbalabanian@edelson.com)
11 ARI J. SCHARG (ascharg@edelson.com)
   CHANDLER R. GIVENS (cgivens@edelson.com)
12 EDELSON MCGUIRE LLC
   350 North LaSalle Street, Suite 1300
13 Chicago, Illinois 60654
   Tel: (312) 589-6370
14
   *Attorneys for Plaintiffs and the Putative Class*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

    I, Rafey S. Balabanian, an attorney, certify that, on May 25, 2012, I caused this document

3

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

4

5

                           /s/ Rafey S. Balabanian

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28