

SEP 10 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

In the United States District Court
For the Northern District of California
San Jose Division

In re:

Netflix Privacy Litigation

No. 5:11-cv-00379-EJD

JUDGE: Hon. Edward J. Davila

OBJECTION OF CLASS MEMBER
JOSH GOLDFOOT TO THE
PROPOSED SETTLEMENT



I object, under Rule 23(e), to the proposed class action settlement.

1. STATEMENT THAT THE OBJECTOR IS A MEMBER OF THE SETTLEMENT CLASS

I am a member of the Settlement Class because I was a Netflix subscriber on July 5, 2012. I have not submitted a request for exclusion from the class.

2. SPECIFIC GROUNDS FOR THE OBJECTION

I. THE PROPOSED SETTLEMENT IS UNFAIR AND INADEQUATE UNDER RULE 23 BECAUSE IT WOULD PAY CLASS MEMBERS $0, EVEN THOUGH EACH CLASS MEMBER IS ENTITLED TO LIQUIDATED DAMAGES OF $2,500.

The settlement would give class members $0 each. But each class member is potentially entitled to liquidated damages of $2,500. (Doc. 61 at 15); 18 U.S.C. § 2710(c) ("The court may award— (A) actual damages but not less than liquidated damages in an amount of $2,500"). Every negotiation requires bargaining, so an adequate settlement could conceivably involve a final figure less than $2,500 per class member. But class counsel here went not for half that, or a quarter, or ten percent, or one percent, but straight to *zero*, the most favorable figure imaginable for defendants.

Although class remembers recover nothing, class counsel recovers handsomely. That is because defendants nonetheless must pay into a cy pres "settlement fund," from which class counsel take substantial fees. Such a settlement structure creates a risk that class counsel will make the settlement fund artificially small, so that it superficially appears that a cash distribution to class members would be impossible and cy pres relief is the only option. That strategy gives everyone except the absent class members what they want: Class counsel get massive fees for little investment, class representatives

get paid handsomely, and defendants escape significant liquidated damages by paying only a nuisance settlement. Faced with such an agreement, the Court should scrutinize whether the class members' recovery has been artificially lowered. "In a class action… any settlement must be approved by the court to ensure that class counsel and the named plaintiffs do not place their own interests above those of the absent class members." *Dennis v. Kellogg Co.*, Nos. 11-55674, 11-55706, --- F.3d. ---- (9th Cir. July 17, 2012). Here, the terms of the proposed settlement permit no conclusion other than that class counsel and the named plaintiffs have placed their interests above the absent class members.

It is unambiguously not in the best interest of class members to settle for $0. It is in class members' interest to reject this settlement offer and negotiate a better one, using the threat of trial as leverage. True, if this case goes to trial, the class members may lose. If they do, they will recover nothing. But, if this settlement is approved, class members will *definitely* recover nothing.

However, thanks to an aptly named "incentive payment," the named plaintiffs have completely different interests. The named plaintiffs would stand to win, at most, $2,500 if the case went to trial; but if the settlement is approved, they get $30,000. Thus, the settlement agreement places the class representatives' interests above the class. A complete and total victory at trial would actually leave the class representatives *worse off* than under this settlement, although class members would be better off.

The following two bar charts show how drastically this "incentive payment" leaves the class representatives with interests that are radically different than those of the class members:



For class counsel, the settlement offers a guaranteed $2.25 million plus expenses, after having done work that they themselves value at $25,000. The settlement, then, offers class counsel a 9,000% return on their investment. While it is true that class

2

counsel would make more if they went to trial and won, to do so would require more risk on their part—they would have to bear the expenses of going to trial.

In their motion for approval of the class action, class counsel make a number of arguments that illustrate further how their interests depart from those of class members.

Class counsel argue that litigation is inherently uncertain, and list several reasons why Netflix will either win outright or be required to pay less than $9 million. (Doc. 75 at 19-22). That is true. But in this case, *class members* face no risk from that uncertainty: if they lose, they get nothing, and if they settle, they get nothing. It is only the *class counsel* who face a downside from the uncertainty of a trial. They stand to lose a guaranteed $2.25 million.

Class counsel argue that even if they win, "Netflix would have a strong argument that awarding full statutory damages (i.e. tens of billions of dollars) far in excess of the value of the company would trigger constitutional Due Process concerns, thus requiring remittitur." (Doc. 75 at 20). But this, also, is an argument *against* the settlement. No matter how much damages are reduced by remittitur, class members are still certain to get more than they would under the settlement—that is, more than zero dollars. A $2,500 reward reduced to $5 is still better than a reward for $0. Remittitur is a problem only for class counsel, because their share of a reduced reward may well be less than the $2.25 million they are now promised. Thus, the settlement agreement may be a good choice for class counsel, but it is a choice that places their interests above the class.

Class counsel argue that the settlement benefits class members because of injunctive relief. (Doc. 76 at 20). It is unlikely that equitable relief could ever be an adequate substitute for $2,500 in liquidated damages. But the equitable relief in this agreement is particularly deficient:

First, the equitable relief applies only to subscribers who have cancelled their Netflix service. (Paragraph 2.1.1 and 2.1.2). The class, however, includes current subscribers. Those current subscribers receive no equitable relief.

Second, the equitable relief contains gigantic exceptions. Notably, Netflix can continue to couple subscribers with their rental history if the subscribers consent. (Paragraph 2.2.1). That means that Netflix simply needs to obtain that consent through a click-through web form, which it can easily do. Also notable is that if Netflix ends its DVD-by-mail service in four years, then its obligations to non-settlement class members end. (Paragraph 2.2.3). Netflix has made no secret that it plans to do just that. Netflix CEO Reed Hastings was paraphrased in the *New York Times* saying as much: "[Netflix's] future, it says, is in streaming; Mr. Hastings said on a conference call

Wednesday evening that the company has no plans to market the DVD service this year." Brian Stelter, "A Turnaround at Netflix, as Its Mail Sector Shrinks," *N.Y. Times*, Jan. 25, 2012, at B4. Netflix already attempted a "plan to spin off its DVD-by-mail service" last year. *Id.*

Because the proposed settlement agreement pays class members so little, it is not fair, reasonable, or adequate.

## II.   THE ATTORNEY FEE AWARD IS EXCESSIVE

The $2.25 million attorney fee award is inconsistent with the Ninth Circuit's opinion in *Kellogg*, cited above. In that case, the Ninth Circuit considered a similar settlement—one that, like this settlement, was arrived at quickly and offered the class members no meaningful benefit. The court held that a $2 million award in such a case was excessive. The same is true here.

Class counsel has, through this settlement, obtained a horrible result for class members, and they should be entitled to no compensation for losing. Cy pres settlements such as this are a crude replacement for "coupon settlements," under which class members received a coupon that most would not use but class counsel calculated their fees based on the value of the coupons. Congress, in the Class Action Fairness Act of 2005, required that "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712. The Court should be guided by the same principle: it should award class counsel a percentage of "value to class members," which, under this settlement, is zero.

Because the proposed settlement agreement pays class counsel too much, it is not fair, reasonable, or adequate.

## III.   CY PRES RELIEF IS INAPPROPRIATE BECAUSE THERE IS NO EVIDENCE THAT PAYING CLAIMS TO INDIVIDUAL CLASS MEMBERS WOULD BE BURDENSOME OR COSTLY

Cy pres payments to charities are "a disfavored substitute for distribution of benefits directly to class members." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). In *Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003), the Ninth Circuit disapproved of a settlement in which "the class members received nothing; the named plaintiff and class counsel received compensation for his injury and their time;

4

and the defendant escaped paying any punitive or almost any compensatory damages." That is the case here.

As in *Molski*, "there is no evidence that proof of individual claims would be burdensome or that distribution of damages would be costly." *Id.* at 955. Notably, most class members likely continue to be Netflix subscribers. Distributing individual claims to them will be easy: just credit the settlement funds to next month's bill. Or, perhaps, give them Netflix service they didn't pay for, such as a free week of streaming or an extra DVD rental.

Of course, the burden is not on absent class members to point out how paying individual claims would be costly; the burden is on the proponents of the settlement to demonstrate why it has not. This, they have simply not attempted to do. The motion to approve the settlement agreement contains absolutely no argument that individual claims would be burdensome or costly. Nor is there any evidence before the court that individual claims would be burdensome or costly. Consequently, under *Molski*, the settlement must be rejected.

The motion to approve the settlement agreement does argue that "Given the size of the Settlement Class, any realistically obtainable monetary award would have resulted in payments to the class members that were negligible on an individual level." (Doc. 76 at 22). But no evidence supports that claim: In support of that assertion, the motion sites Paragraph 17 of the Edelson Declaration. But that Declaration merely repeats those exact words, without offering *any* evidence. Nowhere is there a realistic effort to estimate the size of the settlement class, the amount of money each class member would receive if $9 million were divided evenly, or the costs involved in distributing settlement funds.

Of course, the legal standard is not whether individual class members would receive "negligible" payment; it is whether they might be paid at all. Netflix claims 27 million subscribers. *See* http://ir.netflix.com/. Nine million dollars divided among 27 million subscribers is not "negligible;" it is about 33 cents each. Because Netflix bills most of those subscribers every month, Netflix could pay them the settlement amount simply by deducting 33 cents from one monthly bill. That would not be burdensome or overly expenses; it is a simple, efficient way of paying class members. True, class members who are no longer Netflix subscribers are no longer billed by Netflix, but just as Netflix has mastered the art of sending DVDs through the mail cheaply, it could surely manage to send a quarter and a dime to ex-subscribers cheaply. If not, Netflix could send checks or coupons.

Thus, even under the proposed settlement agreement, payment to class members is realistic. Given that direct payment is possible, *Molski* prohibits cy pres distributions. The per-class member reward could have been higher, had the settlement been adequate (see my first objection). Even so, it is simply not for class counsel to decide whether 33 cents is too "negligible" for class members to care about.

Because the proposed settlement provides for a cy pres distribution even though distribution of benefits directly to class members would be possible, the proposed settlement is not fair, reasonable, or adequate.

## IV. THE SETTLEMENT AGREEMENT IS DEFICIENT FOR FAILING TO SPECIFY TO WHOM CY PRES FUNDS WILL BE GIVEN.

This settlement agreement, like the one in *Kellogg*, "neither identifies the ultimate recipients of the cy pres awards nor sets forth any limiting restriction on those recipients." *Kellogg*. The proposed settlement agreement's centerpiece is the distribution of funds to cy pres recipients, but the settlement agreement fails to identify those recipients. The agreement, then, omits a material term. Any "cy pres distribution" is "an abuse of discretion" if there is " 'no reasonable certainty' that any class member would benefit from it," *Kellogg*. Here, there is no certainty at all that any class member will benefit, because no one knows to whom the settlement agreement would award funds.

Ninth Circuit caselaw has stringent requirements for cy pres recipients. "Cy pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. AOL LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). Indeed, as the Ninth Circuit put it in *Kellogg*:

> Not just any worthy recipient can qualify as an appropriate cy pres beneficiary. To avoid the "many nascent dangers to the fairness of the distribution process," we require that there be "a driving nexus between the plaintiff class and the cy pres beneficiaries." *Nachshin*, 663 F.3d at 1038. A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *id.* at 1039, and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers*, 904 F.2d at 1308. Thus, in addition to asking "whether the class settlement, taken as a whole, is fair, reasonable, and adequate to all concerned," we must also determine "whether the distribution of the approved class settlement complies with our standards governing cy pres

6

awards." *Nachshin*, 663 F.3d at 1040 (internal quotation marks omitted).

The Settlement Agreement, however, does not guarantee—or provide a reasonable certainty—that cy pres recipients will meet any of these criteria. Cy pres recipients have not been selected, and the nominees won't be announced until class members have only 14 days left to object. (Paragraph 2.4.8).

The Settlement Agreement provides for only vague criteria that might be used to select those recipients. That criteria, given in Paragraph 2.4.1, is:

> The Cy Pres distribution shall be made to not-for-profit organizations, institutions, and/or programs that educate users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information through user control, and to protect users from online threats.

Paragraph 2.4.7 also says that a cy pres recipient should "further the policies underlying the VPPA."

Simply agreeing the *criteria* that will be used to select cy pres recipients is inadequate, particularly when the criteria merely parrot the legal standard to be met (like "further the policies underlying the VPPA."). One might as well submit for court approval a one-page settlement agreement that says, "The parties will negotiate the settlement amount, fees to class counsel, and distribution to class members later, but it will all be fair, reasonable, adequate." No Court would approve such a conclusory settlement agreement, and this Court should similarly reject the use of that tactic in identifying cy pres recipients.

Even if identifying criteria, alone, were adequate, the criteria identified in the proposed settlement agreement lacks the required "driving nexus between the plaintiff class and the cy pres beneficiaries.'" *Kellogg*. The criteria call for the use of the funds (1) to "educate" various entities regarding "issues relating to protection of privacy, identity, and personal information through user control," and (2) "to protect users from online threats." Neither of these goals has any nexus with the plaintiff class. The Amended Complaint does not allege that Netflix broke the law because Netflix was poorly educated. Nor does it allege that a lack of education by users or "regulators" was to blame. Giving cy pres funds to the cause of educating "users, regulators, and enterprises" about privacy would therefore give the class no benefit at all. "[P]rotect[ing] users from online threats," while a laudable goal, has no nexus with the plaintiff class, either; the Amendment Complaint does not describe anyone threatening the class members online.

The criteria cut such a broad scope that they fail to meaningfully limit the class of cy pres recipients. The goal of promoting "privacy" is so broad that cy pres recipients could conceivably include: the Free Speech Coalition (a non-profit group that advocates for pornographic film makers, including the privacy of performers); the National Rifle Association (which has advocated, in the name of "gun owners' privacy," that records of gun ownership not be maintained); and either the Democratic or Republican parties (both of whom have weighed in on various "privacy" issues).

Additionally, the settlement agreement would permit awards to organizations who advocate controversial political views that not all class members might agree with. The agreement states that recipient organization can use the funds to "educate... regulators" about "issues relating to protection of privacy;" in other words, lobbying. Lobbying of any type is an inappropriate use of cy pres funds. The Amended Complaint does not allege that class members were harmed because regulators were insufficiently lobbied; indeed, it does not identify any regulators with authority over Netflix. To the extent that the settlement agreement would permit cy pres recipients to lobby regulators in favor of controversial political agendas, it would be even more appropriate; cy pres awards should not be used to fund operations that advance particular political agendas.

Because the proposed settlement agreement fails to identify cy pres recipients, it is not fair, reasonable, or adequate.

## V. THE SETTLEMENT AGREEMENT UNLAWFULLY DELEGATES THE COURT'S AUTHORITY AND CLASS MEMBERS' RIGHTS TO COUNSEL FOR THE PARTIES.

The settlement agreement is unlawful because it creates a procedure for finalizing the settlement agreement, and disposing of class members' rights, under which the Court cedes its authority to counsel for the parties, and class members must cede their rights to counsel for the parties. As discussed above, the settlement agreement leaves a material term—the identity of the cy pres recipients—blank. However, the settlement agreement does create a procedure for filling in that blank, and that procedure requires this Court to cede to class counsel responsibility for determining what is fair, reasonable, and adequate.

The settlement agreement would require this procedure for determining cy pres recipients: (1) counsel for the parties —the counsel who proposed this agreement—will solicit applications; (2) counsel will choose among those applications and from them submit the "final nominations" to the court; and (3) the court will approve those candidates.

This procedure is unlawful because it shifts to counsel for the Parties almost all of the court's authority, and the class's ability to object.

Rule 23(e) requires that, after a hearing, the court must make specific factual findings as to whether the agreement is "fair, reasonable, and adequate"—findings that a court of appeals can scrutinize. But, as to the selection of cy pres recipient, the settlement agreement barely mentions the court being involved at all; it says that the court will have "final approval" of recipients, but permits the court to simply rubber-stamp the work of counsel. It excuses the Court from Rule 23's requirement that the Court make factual findings on this question. All the work in investigating and selecting cy pres recipients is done by the Parties. The facts and data gathered in that investigation remain with the Parties; the court is given only the "final nominations," apparently to approve as a done deal. The Court is given no authority to hold a fairness hearing, no authority to demand that cy pres recipients provide evidence to show that they meet the criteria demanded by Ninth Circuit law, and no authority to recommend its own candidates.

This procedure also shifts the class members' authority to counsel for the Parties. Notably, the procedure does not involve any class members—not even the class representatives, Jeff Milan and Peter Comstock, have a vote. Rule 23(e) gives class members the right to be informed of settlement terms, but this procedure denies any meaningful notice of who the cy pres recipients are other than a web site posting. Rule 23(e) gives class members the right to object to settlement terms, but under the proposed procedure the "final nominations" for cy pres recipient won't be announced until class members have only 14 days left to object—a time that is substantially shortened by the need to mail in objections and have them received by the Court by the end of that 14 day period. (Paragraph 2.4.8) That announcement need only inform class members of the names of recipients; class members will never be told what the recipients promise to do with the money.

Moreover, *no* entity in this procedure—not the Court, not class members, and not counsel for the Parties—is given the responsibility for any due diligence into cy pres recipients. The settlement agreement does not require cy pres recipients to disclose their finances, or to explain how much of their budgets go to advancing the cause of video rental privacy. It also has absolutely no provisions for future audits—for ensuring that the class members' money in fact goes to the purposes promised by organizations, rather than to purposes that are not in the class members' interests.

The Parties should have negotiated cy pres recipients at the same time they negotiated the other settlement terms, and presented the names of those recipients to

9

the Court and then to class members as part of a complete package. Their failure to do what Rule 23 requires makes the proposed settlement unlawful.

Because the proposed settlement agreement creates an unlawful procedure to determine the cy pres recipients, it is not fair, reasonable, or adequate.

### VI. ANY AWARD OF CY PRES RELIEF VIOLATES THE CONSTITUTIONAL DICTATES OF SEPARATION OF POWERS BY EMPLOYING A FEDERAL RULE OF CIVIL PROCEDURE TO ALTER THE COMPENSATORY ENFORCEMENT MECHANISM DICTATED BY THE VIDEO PRIVACY PROTECTION ACT.

In support of this objection, I cite the following law review article: Martin H. Redish et al., Cy pres *Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (2010).

When Congress passed the Video Privacy Protection Act, it decided that companies who violate consumers' rights should pay those consumers damages. But, counsel for the parties ask this Court to alter that statutory enforcement mechanism by instead awarding damages to cy pres recipients. If the Court approves this agreement, it will violate the constitutional dictates of separation of powers. Congress, not the federal courts, has the authority to decide to whom damages must be paid. "As a matter of both constitutional separation of powers and the terms of the Rules Enabling Act, a court may not employ a rule of procedure to alter the essence of the underlying substantive right being enforced. It is therefore constitutionally inappropriate for a court, under the guise of the class action procedure, to alter the underlying structure of the substantive law that the class procedure is intended to enforce." Redish at 644.

Moreover, this Court's authority is limited by Article III of the Constitution to presiding only over "Cases and Controversies." But when a court disposes of a plaintiff's claims by having a defendant pay a charity who is not a party, it violates this restriction. "The constitutional problem, however, is that requiring the defendant to donate to an uninjured charitable recipient amounts to a remedial non-sequitur. The recipient has sued no one—and with good reason, since its legal rights have presumably been violated by no one. Ordering the transfer of defendants' funds to the charitable third party thus remedies no violation of anyone's legally protected rights. The charitable third party and the defendant are in no way adverse to each other when the suit begins. Despite the superficial resemblance of the cy pres litigation to a live case or controversy, a cy pres award fails to satisfy any of the foundational requirements of Article III." Redish at 643. This is true not just when the court orders payment, but when it approves a class action settlement: "Unlike the settlement of a non-class

proceeding, settlement of a class action requires court approval, following the conduct of a fairness hearing. Thus, the federal judiciary is necessarily and substantially involved in every class settlement. Moreover, no defendant would be placed in the position of having to settle a class-wide proceeding—often thereby avoiding having to 'bet' its company—unless the federal court has, either prior to or at the time of settlement, certified the individual plaintiff's suit as a class. Thus, a defendant may be willing to accept the idea of cy pres relief as part of a settlement only because of its awareness that such a form of relief is likely to be employed by a class court in imposing coercive relief following adjudication. It is therefore impossible to view use of cy pres in the course of class settlements as untied to the federal courts' exercise of the judicial power." Redish at 644.

As Judge Edith Jones of the Fifth Circuit observed:

> The opportunities for abuse have been repeatedly noted. *See, e.g., Securities & Exchange Comm'n v. Bear, Stearns & Co., Inc.*, 626 F.Supp.2d 402 (S.D.N.Y.2009) ("While courts and the parties may act with the best intentions, the specter of judges and outside entities dealing in the distribution and solicitation of large sums of money creates an appearance of impropriety."). *See In re Pharm. Indust. Average Wholesale Price Liti.*, 588 F.3d 24 at 34 (1st Cir.2009) (cy pres distributions are controversial)... Whatever the superficial appeal of cy pres in the class action context may have been, the reality of the practice has undermined it. It is time for courts to rethink the justifications of the practice.

*Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 480-81 (5th Cir. 2011). (Jones, J., concurring).

Because the proposed settlement agreement requires the court to alter the essence of the class members' substantive statutory rights and would require the Court to make an award outside its authority under Article III, the proposed settlement agreement is not fair, reasonable, or adequate.

VII. **JEFF MILANS AND PETER COMSTOCK ARE INADEQUATE REPRESENTATIVES BECAUSE (1) NEITHER IS A CURRENT NETFLIX SUBSCRIBER AND (2) THEY HAVE FAILED TO SUPERVISE THE LITIGATION.**

Both named plaintiffs, according to the Amendment Complaint, are *former* Netflix subscribers. (Doc. 61 at 9). The proposed settlement class, however, includes current Netflix subscribers. Those two groups have different interests. First, the "equitable

relief" proposed under the settlement applies only to subscribers who have cancelled their Netflix service. (Paragraph 2.1.1 and 2.1.2). Second, the payment of settlement funds to current subscribers is much easier than payment to former subscribers would be. Current subscribers could just be credited by Netflix on their next bill, while former subscribers would have to be mailed currency or a check. Thus, neither Mr. Milans nor Mr. Comstock can represent the interests of the entire class.

Additionally, the class representatives have proven themselves inadequate to represent any class or subclass, because they have been absent at crucial stages.

The Edelson declaration lists the persons who were present at the settlement agreement negotiations. (Doc. 76-2 at 3, para. 13). Neither Jeff Milans nor Peter Comstock were present. However, Netflix's in-house counsel was. *Id.* Thus, the Defendant had an organic representative at settlement negotiations, but Plaintiffs did not. Despite the absence of the client, class counsel felt comfortable negotiating for a full working day. Not only that, they felt comfortable by ending the negotiation with an agreement. That meeting ended, according to Mr. Edelson, in a signed Memorandum of Understanding. Nowhere does Mr. Edelson report whether the class representatives were ever consulted, or whether they provided any meaningful advice to class counsel before class counsel signed that Memorandum. Other than faxing in their signatures on April 30, it does not appear that Mr. Milans or Mr. Comstock participated at all in the litigation or the negotiation of the settlement.

Mr. Milans and Mr. Comstock also apparently intend to be absent at another important event: the selection of cy pres recipients. The Settlement Agreement gives Netflix a place at the table, but nowhere mentions Mr. Milans or Comstock, or any other class member.

Because the proposed settlement would name Jeff Milans and Peter Comstock the representatives for the class, the proposed settlement agreement is not fair, reasonable, or adequate

### 3. NOTICE OF INTENTION TO APPEAR

I do not plan to attend the fairness hearing, because it is too far from my home. If the court is able to allow class members who do not live near San Jose a way to participate—such as telephone conference—I would welcome that opportunity.

4. OBJECTOR'S FULL NAME, CURRENT ADDRESS AND TELEPHONE NUMBER

Signed,

*[signature]*

Josh Goldfoot
4718 17th St. N
Arlington, VA 22207-2031
(703) 942-9265

goldfoot@outlook.com