SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:  949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:  312.589.6378
*Admitted *pro hac vice*

*Attorneys for Plaintiffs JEFF MILANS and PETER*
*COMSTOCK and the SETTLEMENT CLASS*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | [Hon. Edward J. Davila] |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD** |
| | Date:    December 5, 2012 |
| | Time:   10:00 a.m. |
| | Location: Courtroom 4, 5th Floor |

## NOTICE OF MOTION

**NOTICE IS HEREBY GIVEN** that the Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of the settlement in this class action on December 5, 2012, at 10:00 a.m., or at such other time as may be set by the Court, at 280 South 1st Street, San Jose, CA 95113, Courtroom 4, 5th Floor, before the Honorable Edward J. Davila. Plaintiffs, as representatives of the Class, seek final approval of the class action settlement reached in this action as fair, reasonable, and adequate. The Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, oral argument of counsel, all of the documents in the record, and any other matter that may be submitted or raised at the hearing on the motion.

Dated: October 31, 2012

Respectfully Submitted,

**JEFF MILANS and PETER COMSTOCK**, individually and on behalf of a class of similarly situated individuals,

By: /s/ Jay Edelson
One of Plaintiffs' Attorneys

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:  312.589.6378

SEAN P. REIS (sreis@edelson.com) (SBN 184044)
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:  949.459.2123

*Attorneys for Plaintiffs* JEFF MILANS, PETER COMSTOCK and the SETTLEMENT CLASS

*Admitted Pro Hac Vice

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ............................................ 4

    A. The Vulnerability of Private Customer Information and the VPPA ................. 4

    B. Netflix's Indefinite Retention of the Plaintiffs' Private Information ................... 5

    C. Litigation, Mediation, and Settlement ................................................ 6

    D. Notice and *Cy Pres* Selection Process .............................................. 8

III. CLASS COUNSEL'S ANALYSIS OF THE CLASS'S CLAIMS ................................ 10

    A. Likely Recovery on the Unlawful Disclosure Claims ............................... 10

        1. The merits of Plaintiffs' disclosure theories .............................. 10

        2. The likelihood of adversarial class certification ........................ 12

        3. The range of recovery at trial ........................................ 13

    B. Likely recovery on Plaintiffs' theory of unlawful retention ........................ 15

        1. The merits of Plaintiffs' retention claims .............................. 15

        2. The likelihood of adversarial class certification ........................ 16

        3. The range of recovery at trial ........................................ 16

    C. Net Present Value of the Class's Claims ............................................ 18

IV. KEY TERMS OF THE SETTLEMENT .................................................. 18

    A. Class Definition ....................................................................... 18

    B. Injunctive Relief ..................................................................... 19

    C. Settlement Fund Payments ........................................................... 19

    D. *Cy Pres* Distribution ............................................................... 20

    E. Payment of Notice and Administrative Expenses .................................... 24

    F. Compensation for the Class Representatives ........................................ 25

    G. Payment of Attorneys' Fees and Expenses .......................................... 24

    H. Release of Claims .................................................................... 24

V. THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23. ........... 25

VI. THE SETTLEMENT WARRANTS FINAL APPROVAL. ............................... 27

A. The Strength of Plaintiffs' Case ................................................................. 28

B. The Risk of Continued Litigation .............................................................. 29

C. The Risk of Maintaining Class Action Status ....................................... 30

D. The Amount Offered in the Settlement is Substantial. ....................... 31

    1. The $9 million fund is sufficient ................................................... 31

    2. The *cy pres* distribution is the best method of benefiting the Class. ....... 32

E. The Extent of Discovery Completed and the Stage of Litigation ...................... 35

F. The Experience and Opinion of Counsel ................................................. 36

G. The Presence of a Governmental Participant ......................................... 37

H. The Reaction of the Class Members to Date .......................................... 37

I. Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny. ........................................................... 38

VII. THE FEE AWARD SOUGHT HERE IS REASONABLE USING EITHER THE PERCENTAGE OR LODESTAR METHOD IN LIGHT OF THE RISK COUNSEL TOOK AND THE BENEFIT THEY CONFERRED ON THE CLASS. ................................................................................................. 41

A. Class Counsel's Benchmark Fee Request is Appropriate Under the Percentage Method. ................................................................................... 42

    1. Class Counsel achieved superior results for the Class. ............. 44

    2. Plaintiffs' novel and untested claims carried a substantial amount of risk. ................................................................................. 45

    3. Prosecuting this case required substantial skill, resulting in the highest quality of representation for the named Plaintiffs and the Class. .................................................................................... 46

    4. Class Counsel advanced significant time and expense on a contingency basis. ..................................................................... 46

    5. Class Counsel's fee request is consistent with awards in similar cases. ............................................................................................. 48

B. The Agreed-Upon Fee Is Reasonable Using the Lodestar Method of Analysis as a Cross-Check. ...................................................................... 50

    1. Class Counsel's current lodestar of $1,352,025 is reasonable, is comprised of reasonable hours and reasonable rates, and supports the requested attorneys' fees. ......................................... 51

    2. A comparison with analogous settlements supports the application of a 1.66 multiplier. ................................................... 52

    **C.**     **Class Counsel is Further Entitled to Reimbursement of Litigation Expenses.** .................................................................................... 54

    **D.**     **The Court Should Approve the Agreed-Upon Incentive Awards to Plaintiffs and the Other Class Representatives.** .................................... 54

**VIII.**   **CONCLUSION** .......................................................................... 56

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Byrd v. Civil Serv. Comm'n*, 459 U.S. 1271 (1983)........................................................... 27

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)........................................................ 13

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001). ................... 13

*Hensley v. Eckerhart,* 461 U.S. 424 (1983)..................................................................... 52

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968). .............. 28

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011)......................................................... 11

*State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003). ....................... 13, 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)............................................ 12, 16

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004).................... 27

*Cunningham v. City of Los Angeles*, 879 F.2d 481 (9th Cir. 1988). ................................ 50

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)................................... 27–28

*Fishel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997 (9th Cir. 2002).......... 42, 53

*Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977)............. 12, 16

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). ...... 39, 40, 41, 42, 43

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)....................... 29–30, 35, 55

*In re Mercury Interactive Corp.,* 618 F.3d 988 (9th Cir. 2010)....................................... 42

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995). ........................................ 36

*In re Prudential Ins. Co.*, 148 F.3d 283 (3rd Cir. 1998). ............................................... 53

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994)..................... 45

*Lane v. Facebook*, No. 10-16380, 2012 WL 4125857 (9th Cir. Sept. 20, 2012)....................*passim*

*Lewis v. Anderson*, 692 F.2d 1267 (9th Cir. 1982). ....................................................... 42

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975)................................. 50, 53

*Molski v. Gleichi*, 318 F.3d 937 (9th Cir. 2003). ................................................. 27

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996).............................. 52

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007). ......................................... 2

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011). ....................................... 2, 31, 33

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982). ...................................................... 29, 32

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989). ..................................... 42

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir. 2003). ...................................... 13, 14

*Powers v. Elchen*, 229 F.3d 1249 (9th Cir. 2000)........................................... 39–40

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009). ........................................ *passim*

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir.1990). ........................ 43

*State of Fla. v. Dunne*, 915 F.2d 542 (9th Cir. 1990)....................................................... 41

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)...................................... 40, 50, 54, 55

*Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012).................................. 4, 7, 15

*Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010). ................................... 11

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002). ...................... 42, 43, 45, 48, 50, 52–53

*Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997). ................................................... 53


**UNITED STATES DISTRICT COURT CASES:**


*Blanco v. CEC Entm't Concepts L.P.*,
    No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008). ............................. 13, 14

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979). .......................................... 36

*Castaneda v. Burger King Corp.*,
    No. C-08-04262-WHA, 2010 WL 2735091 (N. D. Cal. Jul. 10, 2010). ............................. 53

*Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010). ........................................ 11

*Fernandez v. Victoria Secret Stores, LLC*,
    No. CV 06-04149 MMM SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008)............ 48–49

*Garner v. State Farm Mut. Auto Ins. Co.*,
    No. CV-08-1365-CW, 2010 WL 16877832 (N.D. Cal. Apr. 22, 2010). ....................... *passim*

*Hammer v. JP's Sw. Foods, L.L.C.*, 267 F.R.D. 284 (W.D. Mo. 2010). .................................... 12, 16

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988)................................................................ 27

*Harris v. Circuit City Stores, Inc.*,
    No. 07-cv-02512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008)............................................... 12

*Hernandez v. Kovacevich*, 2005 WL 2435906 (E.D. Cal. 2005). .................................................... 49

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001). ................................................ 55

*In Re Facebook Privacy Litig.*, 10-cv-02389-JW, Dkt. No. 69 (N.D. Cal. Decl. 10, 2010). ..... 36–37

*In re: Google Buzz Privacy Litig.*,
    No. 10-cv-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011)............................ *passim*

*In re Google Buzz Privacy Litig.*,
    No. 5:10–cv–00672–JW, Dkt. Nos. 41, 128 (N.D. Cal. 2010). .......................................... 45

*In re Heritage Bond Litig.*,
    No. 02-ML-1475-DT, 2005 WL 1594389 (C.D. Cal. June 10, 2005)........................... 32, 46

*In re HP Laser Printer Litig.*,
    No. SACV 07-0667 AG RNBX, 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011). ............... 39

*In re HPL Technologies, Inc. Securities Litigation*, 366 F. Supp. 2d 912 (N. D. Cal. 2005). ......... 53

*In re Immunex Sec. Litig.*, 864 F. Supp. 142 (W.D. Wash. 1994)...................................................... 49

*In re Informix Corp. Sec. Litig.*, No. 97-1289 (N.D. Cal., Nov.23, 1999). ...................................... 49

*In re Melridge, Inc. Sec. Litig.*,
    No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and Apr. 15, 1996). ............................ 49

*In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010). ................................ 43

*In re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995)............. 49

*In re Netflix Privacy Litig.*, 11-cv-00379-EJD, Dkt. 59 (N.D. Cal. 2011). ...................................... 37

*In re OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)....................................... *passim*

*In re Oracle Securities Litig.*, 131 F.R.D. 688 (N.D. Cal. 1990)........................................................ 41

*In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000)................................................... 43

*Kaufman v. Am. Express Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012). ................. 25

*LaCourt v. Specific Media*,
　　No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011). .......... 11, 14

*Lane v. Facebook, Inc.*,
　　No. C 08-3845 RS, 2010 WL 2076916 (N.D. Cal. May 24, 2010)........................ 48, 49, 53

*Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690 (E.D. Cal. Sept. 11, 2008). ......... 28

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005)................................................. 30

*Low v. LinkedIn Corp.*, No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011)......... 11, 14

*Missaghi v. Blockbuster, LLC*,
　　No. 11-2559-JRT-JSM, Dkt. No. 48 (D. Minn. Aug. 7, 2012). ........................................... 37

*Nat'l Rural Telecomms. Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004). ...................... 35

*Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009). ...... 48

*O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359 (C.D. Cal. 1997). ............................................... 12

*Ozga v. U.S. Remodelers, Inc.*,
　　No. C-09-05112-JSW, 2010 WL 3186971 (N. D. Cal. Aug. 9, 2010)................................. 53

*Razilov v. Nationwide Mut. Ins. Co.*,
　　No. 01-CV-1466-BR, 2006 WL 3312024 (D. Or. Nov. 13, 2006). ..................................... 49

*Rodriguez v. Sony Computer Entm't of Am. LLC*,
　　No. 11-cv-4084-PJH, Dkt. 59 (N.D. Cal. Apr. 20, 2012). ............................................ 11, 15

*Sterk v. Best Buy Stores, L.P.*,
　　No. 11-cv-01894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012). ............................. 11, 15, 16

*Sterk v. Redbox Automated Retail, LLC*,
　　No. 11-cv-01729, 2012 WL 3006674 (N.D. Ill. July 23, 2012). ......................................... 11

*Tarlecki v. bebe Stores, Inc.*,
　　No. C 05-1777 MHP, 2009 WL 3720872 (N.D. Cal. Nov. 3, 2009). .................................. 43

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995). ...................................... 54, 55

*White v. Experian Info. Solutions, Inc.*,
No. 05-cv-1070 DOC, 2011 WL 2971957 (C.D. Cal. July 15, 2011).................................54

**STATE COURT CASES:**

*In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 96 Cal. Rptr. 3d 127 (2009). ...................43

**STATUTES:**

18 U.S.C. § 2710. ....................................................................................................*passim*

28 U.S.C. § 1715. ................................................................................................................38

Cal. Bus. & Prof. Code § 17200.........................................................................................15

Fed. R. Civ. P. 23.....................................................................................................27, 31, 54


**MISCELLANEOUS:**

134 Cong. Rec. S5399 (May 10, 1988). .............................................................................. 1

4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008). .......................55

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:03 (3d ed. 1992). ................52

Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:41 (4th ed. 2002). ..........28, 42

Logan, 24 Class Action Rep..............................................................................................52

Manual for Complex Litig. (Fourth) § 21.61 (2004)........................................................26

R. LeCours, Note,
*Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should Not
be Used to Review Statutory Penalty Awards*, 63 Rutgers L. Rev. 327 (2010). .................13

Stuart Logan et al., *Attorney Fee Awards in Common Fund Class Actions*,
24 Class Action Rep. 167 (2003). .........................................................................42

**MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND AWARD OF
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

## I.   INTRODUCTION

> "[T]he trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."
>
> – Senator Patrick Leahy, 134 Cong. Rec. S5399 (May 10, 1988) (introducing precursor bill to the Video Privacy Protection Act)

The instant class action settlement—which seeks to resolve six[1] nationwide putative class actions that challenged the way Defendant Netflix, Inc. ("Defendant" or "Netflix") retained and used its subscribers' Entertainment Content Viewing Histories and Identification and Payment Methods (collectively "PII") in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA")[2]—not only satisfies Rule 23's "fair, reasonable, and adequate" standard, it is a significant victory for Plaintiffs and the Class.

Indeed, the Settlement: (1) goes above and beyond the test recently articulated by the Ninth Circuit for consumer privacy class actions and is similar to, or better than, other privacy settlements approved in recent years, (2) provides a *cy pres* distribution that offers far more value for the Class than any (ultimately undistributable) *de minimis* cash payments ever could, (3) recovers value *in excess of* the actual harm alleged to have been suffered in this case, and equal to the present value of the case, even when statutory damages are factored in, and (4) stops the conduct the VPPA was enacted to prevent before Plaintiffs and the Class suffered any substantial injury. As such, and as explained in detail below, the Settlement is not only deserving of this Court's final approval, it should serve as a model for future settlements of this sort that utilize the structure of a substantial *cy pres* distribution from a non-reversionary common fund.

---

[1]   This class action settlement, if finally approved, will resolve the claims asserted in the following class action lawsuits, which were related and consolidated with this case: (i) *Bernal v. Netflix, Inc.*, No. 11-CV-0020-EJD (N.D. Cal.) (filed Feb. 22, 2011), (ii) *Rura v. Netflix, Inc.*, No. 11-CV-01705-SBA (N.D. Cal.) (filed Mar. 8, 2011), (iii) *Comstock v. Netflix, Inc.*, No. 11-CV-1218-HRL (N.D. Cal.) (filed Mar. 11, 2011), (iv) *Sevy v. Netflix, Inc.*, No. 11-CV-1309-PSG (N.D. Cal.) (filed Mar. 18, 2011), and (v) *Wizenberg v. Netflix, Inc.*, No. 11-CV-01359-HRL (N.D. Cal.) (filed Mar. 22, 2011).

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed them in the Parties' Settlement Agreement.

First, the Settlement meets and surpasses the test recently announced by the Ninth Circuit for evaluating consumer privacy class action settlements: that the relief must be substantial, by absolute standards. *See Lane v. Facebook*, No. 10-16380, 2012 WL 4125857, at *8 (9th Cir. Sept. 20, 2012) (upholding "Beacon" privacy case in part because the $9.5 million common fund "would be substantial under most circumstances."); *see also In re: Google Buzz Privacy Litig.*, No. 10-cv-00672 JW, 2011 7460099 (N.D. Cal. June 2, 2011) (approving a consumer privacy class action settlement with an $8.5 million common fund and a *cy pres* distribution). Here, the common fund exceeds the *In re: Google Buzz Privacy Litigation* settlement and nearly matches the size of the fund established in *Lane v. Facebook*, the *cy pres* distribution creates far more value for the class than either of those two cases, and the injunctive component—which was virtually absent in *Lane*—offers an additional $4.65 million worth of value to the Class. (*See* Declaration of Dr. Serge Egelman ("Egelman Decl."), ¶ 8, a true and accurate copy of which is attached hereto as Exhibit B.) Thus, this settlement offers more than substantial relief, and based on the Ninth Circuit's findings in *Lane* and the precedent created in *Google Buzz*, could be approved on this basis alone.

Second, the *cy pres* distribution offers the best method of using the Settlement Fund to the Class's benefit, while recognizing the infeasibility of distributing the fund to the 62 million class members. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (explaining that in such situations, the *cy pres* doctrine is utilized to "put the unclaimed fund to its next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class.") (quoting *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007)). Unlike many other *cy pres* settlements—even the one recently approved by the Ninth Circuit in *Lane*—the Parties here negotiated a rigorous selection process that sought to avoid the (often well-deserved) red-flags that have often accompanied *cy pres* settlements and maximize the greatest possible benefit to the Class. *See e.g. Lane*, 2012 WL 4125857, at *8 (approving *cy pres*, despite criticism that the funds were intended to primarily benefit the defendant and class counsel, both of whom were to sit on the board of a new institute created by the settlement funds). Here, the Settlement calls for approximately $6.4 million in funding, distributed to a diverse group of twenty independent non-

1   profits chosen from across the country—including groups focused on academics, advocacy,

2   education, and technology—all of which have all committed to using the money to help protect

3   and expand the Class's privacy rights in the digital age. As discussed below, the benefits flowing

4   from this money provide far more meaningful value to the Class than the ten cent ($0.10) per-

5   person cash distribution ever could, even putting aside the difficulties of administering and

6   distributing those payments.

7       Third, the Settlement compensates the Class in multiples of the actual damages suffered and in

8   an amount that approximates the estimated value of the case, even factoring in statutory damages.

9   Based on calculations done by Dr. Serge Egelman, one of the nation's foremost experts on the

10  behavioral economics of privacy, the Class suffered at most $4.65 million in aggregate actual

11  damages as a result of Netflix's alleged unlawful conduct. (*See* Report of Dr. Serge Egelman

12  ("Egelman Rep."), at 9, a true and accurate copy of which is attached hereto as Exhibit B-2.)

13  Further, based on Class Counsel's evaluation of the likelihood of success at trial and potential

14  recoveries, even factoring in statutory damages, the Settlement Fund approximates the present

15  value of the suit, which Class Counsel estimate to be $6,398,667 owing to the class. (*See*

16  Declaration of Jay Edelson ("Edelson Decl.") ¶¶ 36–50, a true and accurate copy of which is

17  attached hereto as Exhibit C; (Declaration of Donald Frankenfeld ("Frankenfeld Decl.") ¶ 7, a true

18  and accurate copy of which is attached hereto as Exhibit D.)

19      Fourth, and perhaps most importantly, through the Settlement, Plaintiffs have secured for the

20  Class immediate industry-leading injunctive relief that puts control over sensitive PII back in the

21  hands of consumers, ensuring that the harms the VPPA seeks to prevent will never recur. That is,

22  Netflix has agreed that, going forward, it will decouple its subscribers' Entertainment Content

23  Viewing Histories from Identification Information and Payment Methods unless a Class member

24  expressly permits it to retain the information. Critically, if the Settlement is approved, this

25  injunctive relief will take effect before any significant harm is done to Plaintiffs' and the Class's

26  PII. Given the facts of this litigation, the injunctive relief coupled with the *cy pres* distribution

27  offers a resounding victory for the class, particularly when considering that recent courts have

28  explained that an injunction is the intended remedy for violations of the VPPA's unlawful retention

1   provision. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012).

2       In the end, by any metric, the Settlement, which is supported unanimously by the seven

3   Plaintiffs' firms involved, easily satisfies the requirements for final approval. Plaintiffs Jeff Milans

4   and Peter Comstock therefore respectfully request that the Court grant final approval of the

5   Settlement Agreement, dismiss the Released Claims with prejudice, and award the agreed-upon

6   attorneys' fees, expenses, and incentive award.

7   **II.      FACTUAL AND PROCEDURAL BACKGROUND**

8       **A.  The Vulnerability of Private Customer Information and the VPPA**

9       In recent years, technological advances have created new ways for consumers to experience

10  movies, television shows, and music. The days of visiting your local video rental store to pick up a

11  newly released movie or the neighborhood music or bookstore to pick up the next big album or

12  New York Times best seller are a thing of the past. Nowadays, movies, TV shows, and best selling

13  books—and often ones recommended to you by companies based on your viewing and reading

14  history—are mailed to your house or streamed to your digital tablet or mobile device by

15  companies like Netflix and Amazon.com.

16      While such advances have undoubtedly improved the consumer experience, they have also

17  had—at least from the consumers' perspective—the unintended result of allowing entertainment

18  content providers like Netflix to gather and store staggering amounts of personal information

19  about their customers. This collection and storage of highly sensitive, personal information gives

20  rise to serious privacy concerns, ranging from the improper use or disclosure of the information to

21  hyper-accurate consumer profiling, location tracking, and the real risk that such sensitive

22  information will be hacked, stolen, and/or used for illicit purposes. And the longer companies like

23  Netflix retain such information, the greater the risk that it could fall into the wrong hands.

24      Congress passed the VPPA in the wake of Supreme Court Justice Nominee Robert H. Bork's

25  confirmation hearings, where it was revealed that the Washington City newspaper had obtained

26  and disclosed his personal and family video rental records. Similar to state statutes enacted to

27  prevent libraries from disclosing their patrons' checkout lists, the VPPA was designed to protect

28  consumers' right to privacy in records containing their video viewing decisions. The two

provisions of the VPPA pertinent to this case are subsections (b) and (e) of § 2710. Subsection (b) of the VPPA prohibits companies that provide video programming from disclosing their customers' personally identifiable information to third parties without their customers' informed consent. *See* 18 U.S.C. § 2710(b). Subsection (e) requires that customer records containing personally identifiable information be destroyed "as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected." *See* 18 U.S.C. § 2710(e).

### B. Netflix's Indefinite Retention of the Plaintiffs' Private Information

Defendant Netflix is the largest provider of Internet streaming media services in the United States, currently with over 25 million paid U.S. subscribers. Plaintiffs allege that Netflix maintains a database of records containing all of its current and former customers' video programming viewing selections, as well as their billing and contact information. (Dkt. No. 1, ¶¶ 3–7.) Through its Privacy Policy, Netflix asserts that it uses such information for, *inter alia*, "providing recommendations on movies and TV shows we think will be enjoyable, personalizing the service to better reflect particular interests, tracking your instant-watching hours, determining your Internet service provider, helping us quickly and efficiently respond to inquiries and requests and otherwise enhancing or administering our service offering." Netflix Privacy Policy, available at URL https://signup.netlfix.com/PrivacyPolicy (last accessed Oct. 25, 2012).

Jeff Milans and Peter Comstock are former Netflix subscribers. When they signed up for Netflix, Milans and Comstock were required to provide Netflix with numerous pieces of personal information, including their names and billing and shipping information. Throughout their use of the service, Netflix continued to develop and store subscriber profiles containing their unique Entertainment Content Viewing History, Identification Information, and Payment Methods. Eventually, Milans and Comstock cancelled their Netflix subscriptions, but Netflix continued to retain all of this information—including PII—long after they cancelled their subscriptions.

Plaintiffs learned of Netflix's retention practices when, for years after they closed their Netflix accounts, they intermittently continued to receive emails from Netflix encouraging them to re-join. (See Edelson Decl. ¶ 9.) From these emails, it became apparent that Netflix retained its former

customers' personal contact information. (*Id.*) Moreover, former customers who logged back into their closed accounts were able to view all of the video materials they had watched as Netflix customers. (Dkt. No. 1, ¶ 23; Edelson Decl. ¶ 10.) This strongly suggested that Netflix also retained its former customers' video programming selections. Edelson Decl. ¶ 11.

Upon learning of Netflix's information practices, Milans and Comstock filed suit against Netflix claiming that it improperly retained and disclosed its subscribers' and former subscribers' personally identifiable information in violation of the VPPA, the California Consumer Records Act, Cal. Civ. Code § 1798.80 ("CCRA"), and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"). (*See, e.g.,* Dkt. No. 1.) In their initial respective complaints, neither Milans nor Comstock alleged an unlawful disclosure claim against Netflix under subsection (b). Based on common practices within the technology industry more broadly, however, Plaintiffs added allegations to their unlawful retention claim in the Consolidated Complaint that Netflix disclosed it to analytics companies to use and help refine Netflix's movie-recommendation algorithm, and additionally shared it with other third parties. (Edelson Decl. ¶¶ 14, 15.)

### C.  Litigation, Mediation, and Settlement

On January 26, 2011, Class Representative Jeff Milans initiated this class action in the United States District court for the Northern District of California, alleging that Netflix had unlawfully retained his Entertainment Content Viewing History in violation of the VPPA, the CCRA, and the UCL. (Dkt. No. 1.) Milans's complaint was the first class action filed specifically for violation of the VPPA's unlawful retention provision, 18 U.S.C. § 2710(e). (Edelson Decl. ¶ 12.) Shortly thereafter, several similar lawsuits were filed, including *Bernal v. Netflix, Inc.*, Case No. 11-CV-00820-EJD (N.D. Cal.) (filed Feb. 22, 2011), *Rura v. Netflix, Inc.*, Case No. 11-CV-01075-SBA (N.D. Cal.) (filed Mar. 18, 2011), *Sevy v. Netflix, Inc.*, Case No. 11-CV-1309-PSG (N.D. Cal.) (filed Mar. 18, 2011), and *Wizenberg v. Netflix, Inc.*, Case No. 11-CV-01359-HRL (N.D. Cal.) (filed Mar. 22, 2011). These suits all arose from the same allegedly unlawful conduct by Netflix— indefinite retention of former subscribers' PII.

Thereafter, the Court related the above cases, and different plaintiffs' firms submitted briefing seeking appointment as interim class counsel. (*See* Dkt. Nos. 15, 33–35, 42, 46, 51, 53.)

1   Following consideration of the briefs and argument, on August 12, 2011, the Court consolidated

2   the cases under the caption "*In re: Netflix Privacy Litigation*," and appointed Jay Edelson of

3   Edelson McGuire LLC as Interim Lead Class Counsel. (Dkt. No. 59.)

4       On September 13, 2011, Plaintiffs filed an Amended Consolidated Class Action Complaint,

5   (Dkt. No. 61), adding allegations that Netflix violated the VPPA's disclosure provision, 18 U.S.C.

6   § 2710(b), by providing Plaintiffs' and the Class's PII to third parties without their informed,

7   written consent and without giving Plaintiffs and the Class an opportunity to prohibit such

8   disclosures. (Dkt. No. 61, ¶¶ 57–58.) Plaintiffs' theories of unlawful retention were relatively

9   straightforward: they claimed Netflix violated the VPPA by indefinitely retaining their PII after

10  they cancelled their subscriptions. (*See* Dkt. 61, ¶¶ 54–56.) The main questions facing the

11  retention claims were whether a private right of action existed for a violation of subsection (e)[3]

12  and whether Plaintiffs' PII was still necessary to Netflix despite Plaintiffs' cancellation. As stated

13  above, Plaintiffs did not base their VPPA claims in either of their initial complaints on unlawful

14  disclosure. They only later added allegations of unlawful disclosure to their existing VPPA claim

15  (for unlawful retention) when they filed the Consolidated Class Action Complaint. Plaintiffs'

16  disclosure claims were premised on the theories that Netflix disclosing Class members' PII to

17  third-party analytics companies in order to use and refine its algorithm, and sharing it with other

18  third-parties who provided services to Netflix. (Edelson Decl. ¶ 14, 15, 18.)

19      Thereafter, the Parties engaged in the discovery planning conference required by Federal Rule

20  of Civil Procedure 26. (Edelson Decl. ¶ 16.) Plaintiffs then propounded, and Netflix responded to,

21  written discovery related to both class and merits issues, including Interrogatories and Requests

22  for the Production of Documents, in addition to subsequently engaging in informal discovery with

23  Netflix's Vice President of Product Engineering and its Vice President of Marketing and Analytics.

24  (Edelson Decl. ¶¶ 19.) Though discovery was ongoing, the Parties also explored the possibility of

25  settlement and, through the Court's ADR program, agreed to mediation. The Parties selected

26  former District Judge Layn R. Phillips (Ret.) of Irell & Manella, LLP, to serve as the mediator.

27  ---

[3]   This question has since been answered in the negative by both the Northern District, *see*

28  *Rodriguez v. Sony Computer Entm't America, LLC*, No. 11-cv-4084 PJH, 2012 WL 4464563
    (N.D. Cal. Sept. 25, 2012), and the Seventh Circuit, *see Redbox*, 672 F.3d 535 (7th Cir. 2012).

(*See* Dkt. No. 70; Edelson Decl. ¶ 20.) The mediation took place on February 1, 2012, in Santa Ana, California. The mediation was used not only as a vehicle to settle the case, but also as a forum for further informational exchanges, including the informal depositions of two Netflix executives. (Edelson Decl. ¶¶ 21.)

As for the mediation, after a full day of arm's-length negotiations, the Parties were able to reach a settlement, which was formalized in a signed Memorandum of Understanding ("MOU"). (Edelson Decl. ¶ 22.) It was not until all relief was established for the Class that the Parties began to engage in any discussions about attorneys' fees or incentive awards. (*Id*.) After executing the MOU, negotiations continued regarding the precise wording of the Settlement Agreement. (Edelson Decl. ¶ 23.) Over a period of approximately three months, the Parties exchanged countless drafts of the agreement and related documents. (*Id*.) On April 30, 2012, they executed the Settlement Agreement, (Edelson Decl. at ¶ 25), and shortly thereafter, Plaintiffs moved for preliminary approval. (Dkt. 76.) Importantly, all seven plaintiffs' firms involved in this litigation, including those involved in the heated leadership fight that took place, agreed that the Settlement Agreement provided results for the class that went well beyond the fair, reasonable, and adequate standard. (Edelson Decl. ¶¶ 59.)

On July 5, 2012, the Court granted preliminary approval, finding that the settlement "appears fair, non-collusive and within the range of possible final approval," "was a product of arm's length negotiation before a mediator," and "[i]n light of the minimal monetary recovery that would be realistically recoverable by individual Settlement Class members and the immediate benefits offered to the Class by the injunctive relief and *cy pres* donations . . . is deserving of preliminary approval." (Dkt. No. 80 at 4:6–11.) The Court further found that "the procedure described . . . [for giving notice] meets the standards of Rule 23." (*Id.* at 8:1–2.) At that point, the Court directed the Parties to initiate the notice plan. (Dkt. 80.)

### D.  **Notice and *Cy Pres* Selection Process**

Class Counsel thereafter worked with the settlement administrator to ensure that notice was properly distributed, fielded inquiries from potential Class members regarding Settlement details, and aided Class members in the claims process. (Edelson Decl. ¶¶ 26–28.) Here, the Court-

1    approved notice plan was executed to the standards of Due Process and Federal Rule 23, and

2    included direct notice by email to all Settlement Class members, publication notice, a joint press

3    release, the creation of a Settlement Website, and notice to the relevant governmental agencies

4    pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b).

5        Concurrent with Class notice, the Parties solicited proposals from applicants for the *cy pres*

6    distribution, both through letters to potential applicants, as well as through a letter posted on the

7    Settlement Website. As part of the proposal solicitation process, Class Counsel worked extensively

8    with dozens of *cy pres* applicants to ensure that the proposals would be as useful as possible,

9    thereby helping achieve the most beneficial result for the Class. (Edelson Decl. ¶¶ 28–31.)

10   Ultimately, dozens of *cy pres* recipient proposals were submitted. Once all the proposals were

11   submitted, Class Counsel, with input from Netflix, worked exhaustively to vet these proposals and

12   select the organizations that would provide the greatest benefits to the Settlement Class and to

13   appropriately allocate the *cy pres* fund among the chosen applicants. (*Id.*)

14       As set forth in the letter to applicants published on the Settlement Website, *cy pres* applicants

15   were required to include the following information in their proposals: (1) the organization's name

16   and address, (2) a description of current programs relating to technology, law, and privacy, (3) how

17   the program benefits the Class, (4) the organization's annual operating budget and the budgets of

18   its relevant programs, (5) the total *cy pres* distribution requested, (6) disclosure of connections

19   between the applicant and the Parties, their counsel, Supporting Counsel, or the Court, (7) and

20   disclosure of any amounts received from the Parties or their counsel in 2011. (Edelson Decl. ¶ 30.)

21   This in-depth vetting process was designed to ensure the greatest possible benefits for the Class

22   and to also avoid the potential conflicts that have cast suspicion on other recent *cy pres*

23   settlements. *See Lane*, 2012 WL 4125857, at *5. In the end, the Parties have selected neutral and

24   independent *cy pres* recipients lacking any material conflicts, and that will provide real, tangible,

25   and immediate benefits to the Class by educating the public and raising awareness of privacy

26   issues, working with businesses to ensure compliance with best privacy practices, and developing

27   new technologies to give consumers control over their information privacy. (Edelson Decl. ¶ 31.)

28   The selected *Cy Pres* Recipients and their proposed uses for the distribution are detailed further in

1  Part IV.D, *infra*.

2  **III.   CLASS COUNSEL'S ANALYSIS OF THE CLASS'S CLAIMS**

3       The value of the Settlement—both in terms of that created by the injunctive relief and the

4  payments to the *Cy Pres* Recipients—represents a more than adequate recovery compared to what

5  could be obtained at trial. In evaluating Plaintiffs' case, any analysis must contain valuations for

6  both the unlawful retention and unlawful disclosure claims. When the estimated recovery on each

7  theory is combined, Class Counsel estimates that the expected trial recovery has a net present

8  value of $6,398,667 plus fees, a value that is actually less than the $6,411,669.42, that, subject to

9  Court approval, will be recovered and distributed to the *Cy Pres* Recipients for the benefit of the

10  Class. (Edelson Decl. ¶¶ 36–50; Frankenfeld Decl. ¶ 2.)

11     **A.  Likely Recovery on the Unlawful Disclosure Theories**

12         **1.  The merits of Plaintiffs' disclosure theories**

13       Plaintiffs sought recovery under the VPPA, the CCRA, and the UCL, alleging that Netflix had

14  improperly disclosed the Class's PII without first obtaining proper consent. (Dkt. 61.) Based on

15  their investigation, prior experience, as well as knowledge of the entertainment content industry,

16  Plaintiffs (through their counsel) had a good faith belief that Netflix was improperly disclosing PII

17  in three different ways. First, Plaintiffs believed that Netflix disclosed PII in the course of

18  providing data to third-party analytics companies tasked with improving Netflix's

19  recommendation algorithm, due in part to Netflix's public representations that it continually

20  refines its algorithm, as well as language in Netflix's privacy policy stating that "[third parties]

21  analyze and enhance data, including users' interaction with our website." (Edelson Decl. ¶ 14.)

22  Second, based on changes made to Netflix's privacy policy after the onset of litigation, Plaintiffs

23  believed that Netflix disclosed current and former subscribers' PII to third parties who provided

24  certain services involving Netflix data. (Edelson Decl. ¶ 15.) Third, based on common practices

25  within the technology and entertainment media industries, Plaintiffs believed that Netflix might

26  have been more generally sharing their PII with third parties. (*Id.*)

27       Ultimately, however, through the exchange of both formal and informal discovery, Plaintiffs

28  determined that Netflix was not selling Class members' protected PII to third parties. (Edelson

Decl. ¶¶ 19.) Plaintiffs also determined that their "analytics disclosure" claims would fail as Netflix enhanced its algorithm in-house. And Plaintiffs concluded that their third-party services theories would be both highly technical in nature, and, given recent broad interpretations of the VPPA's "ordinary course of business" exception, unlikely to succeed. *See Rodriguez v. Sony Computer Entm't of Am. LLC*, No. 11-cv-4084-PJH, Dkt. 59 (N.D. Cal. Apr. 20, 2012).[4]

In addition to their defenses on the elements of the claims, Plaintiffs considered other available arguments Netflix was likely to make. For example, Plaintiffs were aware that Netflix would argue that the class lacked Article III standing absent any additional harm from the alleged disclosures. Although one court has accepted this view, *see Sterk v. Best Buy Stores, L.P.*, No. 11-cv-01894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012), Plaintiffs did not believe Netflix had a materially significant chance of succeeding on such an argument in the Ninth Circuit. *See Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010) (finding standing for VPPA retention claim despite lack of a private right of action) *cert. granted in part*, 131 S. Ct. 3022 (2011) and *cert. dismissed as improvidently granted*, 132 S. Ct. 2536 (2012) (finding standing where plaintiff alleged invasion of federal statutory right); *see also Sterk v. Redbox Automated Retail, LLC*, No. 11-cv-01729, 2012 WL 3006674, at *8–9 (N.D. Ill. July 23, 2012). Likewise, Plaintiffs believed that Netflix would have advanced other similarly weak arguments based on statute of limitations, consent, or unconstitutionality defenses.[5] Plaintiffs believe that each of these (and other related) defenses would have been virtually certain to fail and thus assigned a ten percent chance of succeeding on any one of these defenses. (Edelson Decl. ¶¶ 37, 38.) Factoring in the extremely long odds of prevailing on the merits of the claims, Class Counsel estimated that the "unlawful

---

[4]   Similarly broad decisions with regard to the CCRA similarly threatened recovery under that statute. *See Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010). And absent an "unlawful" prong, and given courts' recent decisions regarding economic damages in privacy suits, *see Low v. LinkedIn Corp.*, No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011); *LaCourt v. Specific Media*, No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011), Plaintiffs' UCL claims also added little chance of meaningful recovery.

[5]   Netflix's "excessive damages" defense is discussed further in § III.A.3, *infra*. That defense would, in Plaintiff's estimation, reduce the damage but not scuttle the case. Likewise, the Supreme Court's recent decision in *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), creates a minimal risk that a court could find that the VPPA violates the First Amendment.

1  disclosure" claims had less than a five percent (5%) chance of succeeding on the merits. (Edelson

2  Decl. ¶ 39.)

3        **2.    The likelihood of adversarial class certification**

4        Irrespective of the merits, Class Counsel is confident that given the uniform nature of Netflix's

5  conduct toward the class, certification of the Class is proper. The key issues with regard to

6  disclosure are common ones: whether Netflix disclosed PII, and if so, how, why, to whom, for

7  what purpose, and whether it obtained consent. (Edelson Decl. ¶¶ 40.) Regardless of the answers,

8  these questions commonly focus on Netflix's conduct, rather than the Class's. *See Wal-Mart*

9  *Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (explaining that commonality is found where

10 the claims of all class members "depend upon a common question," and "even a single common

11 question will do"); *see also O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 370 (C.D. Cal.

12 1997) (finding commonality where relief "turn[ed] on questions of law applicable in the same

13 manner to each member of the class.").

14       The remaining certification requirements—numerosity, typicality, predominance, and

15 adequacy of representation—would also be satisfied. The 62 million person Class is easily so

16 numerous that joinder would be impracticable. *See Gay v. Waiters' & Dairy Lunchmen's Union*,

17 549 F.2d 1330, 1332–34 (9th Cir. 1977) (finding 184 class members sufficiently numerous).

18 Typicality and predominance have been found where, like here, the defendant acted uniformly

19 toward the class in disclosing the class members' personal information. *See, e.g.*, *Hammer v. JP's*

20 *Sw. Foods, L.L.C.*, 267 F.R.D. 284, 289 (W.D. Mo. 2010) (typicality and predominance met where

21 class alleged disclosure of credit card numbers in violation of the Fair and Accurate Credit

22 Transactions Act); *accord Harris v. Circuit City Stores, Inc.*, No. 07-cv-02512, 2008 WL 400862

23 (N.D. Ill. Feb. 7, 2008). While Class Counsel is confident that it could succeed on adversarial class

24 certification, it also acknowledges the lack of direct, controlling authority on point. (*Id.*) Given the

25 dearth of precedent, Class Counsel estimates an 80 percent chance of achieving adversarial class

26 certification if this litigation were to continue. (*Id.*)

27       **3.    The range of recovery at trial**

28       If the 62 million person Class were to succeed at trial on VPPA disclosure claims, it would

theoretically be entitled to a $155 *billion* judgment. *See* 18 U.S.C. § 2710(c). To start, such a

massive verdict would be wholly unobtainable: Netflix would be forced out of business, and the

Class would likely be left out to dry by the bankruptcy process. (Edelson Decl. ¶ 41.) However,

beyond the impossibility of collection, any such recovery would likely be reduced judicially.[6]

While the Supreme Court has yet to rule on the constitutionality of disproportionate federal

statutory damages, trends in case law have identified limitations on such massive recovery. To that

end, appellate courts have observed that "the potential for a devastatingly large damages award,

out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may

raise due process issues." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003).

The Second Circuit explained that such issues arise:

> from the effects of combining a statutory scheme that imposes minimum statutory
> damages awards on a per-consumer basis . . . with the class action mechanism that
> aggregates many claims-often because there would otherwise be no incentive to
> bring an individual claim. Such a combination may expand the potential statutory
> damages so far beyond the actual damages suffered that . . . the due process clause
> might be invoked, not to prevent certification, but to nullify that effect and reduce
> the aggregate damage award.

*Id.* (citing *State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003); *BMW,* 517 U.S. at

580). Even more, concerns about disproportionately large statutory awards are heightened where a

statutory award would be annihilative to the defendant. In *Blanco v. CEC Entm't Concepts L.P.*,

No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008), for example, the court pointed

out that statutory damages ranging from $200 million to $2 billion "would completely swallow

[defendant's] net income last year of $68,257,000 [and] would be grossly disproportionate to the

harm [alleged]." *Id.* at *2.

Here, in comparison, a theoretical $155 billion statutory damage award is more than *six-*

---

[6]     Though Plaintiffs maintain that the sheer size of a statutory damages award cannot render it
unconstitutional—*see generally* R. LeCours, Note, *Steering Clear of the "Road to Nowhere":
Why the BMW Guideposts Should Not Be Used to Review Statutory Penalty Awards*, 63 Rutgers L.
Rev. 327 (2010); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 443
(2001) ("I continue to believe that the Constitution does not constrain the size of punitive damages
awards") (Thomas, J., concurring) (*citing BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 599 (1996)
(Scalia, J., joined by Thomas, J., dissenting))—they acknowledge the likelihood that if they
obtained a judgment on the merits and the maximum statutory damage award of $155 billion, in
all reality, the Court could reduce the award using remittitur or find the award unconstitutionally
excessive.

*hundred-eighty-five* (685) times greater than Netflix's 2011 net income of $226 million, and thus even more disproportionate than the potential award discussed in *Blanco*. (*See* Netflix, Inc., Annual Report (Form 10-K) (Feb. 10, 2012.) Indeed, even an award of $150 million—less than 1/1000th of the potential statutory penalty—could prove annihilative to Netflix. (*See* Frankenfeld Decl. ¶ 5.) Facing such a massive statutory penalty of $155 billion, 685 times greater than Netflix's 2011 net income, and more than 1000 times larger than necessary to threaten Netflix's continued operations, the Court would, in all likelihood, grant Netflix's fourth affirmative defense, and reduce the award to a more manageable number.

To arrive at a constitutionally permissible damage award, the Court would likely consider the actual damages suffered by the Class.[7] *See Parker,* 331 F.3d at 22; *accord State Farm,* 538 U.S. at 425 ("The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."). In evaluating the damages suffered on an unlawful disclosure theory, Plaintiffs believe that the Court, borrowing from punitive damages jurisprudence, would reduce the damages award to a single-digit multiple[8] of either (a) the amount Netflix benefitted from the disclosures or (b) the amount the Class lost. Given that the discovery obtained from Netflix demonstrated that Netflix did not meaningfully share Class members' PII, Netflix's benefit from the alleged disclosures would be *de minimis*. (Edelson Decl ¶ 42.) Likewise, given the hyper-technical (if at all existent) nature of the alleged disclosures, it seems dubious that the Class could point to any harm to themselves. *See Low*, 2011 WL 5509848; *LaCourt*, 2011 WL 1661532. Thus, in the unlikely event that the Class succeeded at trial on an unlawful disclosure theory, any damage award would likely be cut to a relatively small number. Here, a reasonable estimate of the maximum award would be under $3,000,000 plus attorneys' fees. (Edelson Decl. ¶ 43.) Thus, the value of disclosure-based claims is approximately $120,000 (a $3,000,000 dollar estimated recovery multiplied by a 5 percent chance on the merits, multiplied by an 80 percent

---

[7]   Although the above cases discuss reducing statutory damage awards in the class context, the same foundational analysis applies in an individual case seeking statutory damages awards far in excess of any actual damages suffered.

[8]   *See State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

1   chance of class certification), plus fees.

2   **B.  Likely recovery on Plaintiffs' theory of unlawful retention**

3   **1.  The merits of Plaintiffs' retention claims**

4   Plaintiffs' primary theory of recovery was premised on Netflix's unlawful retention of their

5   PII. (Dkt. 61.) Plaintiffs' unlawful retention claims were premised on the fact that both Milans and

6   Comstock, after cancelling their subscriptions, continued to receive occasional emails from Netflix

7   encouraging them to re-open their accounts. (Edelson Decl. ¶ 9.) From these emails, it became

8   apparent that Netflix retained its former customers' contact information. (*Id.*) Moreover, at the

9   time this lawsuit was filed, former customers who logged back into their cancelled accounts were

10  able to view their prior viewing and renting histories, thereby establishing that Netflix retained

11  their PII after cancellation. (Am. Compl. ¶ 25; Edelson Decl. ¶ 10.) As such, Plaintiffs were

12  confident that Netflix was retaining their PII longer than necessary for the purpose for which it

13  was collected. *See* 18 U.S.C. § 2710(e).

14  Nonetheless, as with Plaintiffs' disclosure theories, Netflix's defenses reduce Plaintiffs'

15  likelihood of success on the merits. Worse for Plaintiffs, every court that has considered the issue

16  has found no private right of action for violation of subsection (e); instead, according to the courts,

17  Congress intended for litigants to get, at most, injunctive relief—but not monetary damages—for

18  retention claims. *See Rodriguez v. Sony Computer Entm't America, LLC*, No. 4:11-cv-04084-PJH,

19  Dkt. 80 (N.D. Cal. Sept. 25, 2012) (dismissing VPPA retention claims with prejudice); *Redbox*,

20  672 F.3d 535 (finding no private right of action for statutory damages for violation of § 2710(e)

21  (the VPPA's unlawful retention provision)); *Best Buy*, 2012 WL 5197901. Plaintiffs respectfully

22  believe that the district court's original holding in *Sterk v. Redbox Automated Retail, LLC*, 806 F.

23  Supp. 2d 1059 (N.D. Ill. 2011) *rev'd by Redbox*, 672 F.3d 535, though ultimately reversed, was a

24  well-reasoned decision, and thus assign an estimate that they have a 25 percent chance of

25  convincing the Ninth Circuit that Congress did intend for a private right of action for VPPA

26  retention claims. (Edelson Decl. ¶ 44.) On the other hand, however, even without a private right of

27  action under the VPPA, if Plaintiffs suffered actual damages from the allegedly unlawful retention,

28  they would be able to recover them under the UCL's "unlawful" prong. Cal. Bus. & Prof. Code §

1   17200.

2   Additionally, even if Plaintiffs could sue for unlawful retention, Netflix stood a chance of

3   defeating Plaintiffs' claims on the merits by arguing that one of the purposes for which it collected

4   and retained Plaintiffs' PII was for refining and improving its recommendation algorithm, even

5   after Plaintiffs cancelled their accounts. As with the disclosure claims, Netflix also stood a slight

6   chance of succeeding on an Article III standing argument, s*ee Best Buy*, 2012 WL 5197901,

7   though Plaintiffs believe such a defense is highly unlikely to succeed. Also, as with Plaintiffs'

8   disclosure claims, Netflix could have prevailed on its necessity, constitutionality, and statutory

9   applicability arguments. (Edelson Decl. ¶ 44.) All told, Class Counsel estimates that Plaintiffs had

10   a 55 percent chance (on top of the one-in-four chance of winning on the private right of action

11   issue) of proving the elements of their unlawful retention claims at trial. (*Id*.)

12   **2. The likelihood of adversarial class certification**

13   As with the disclosure claims, Class Counsel is highly confident that it could certify a class on

14   retention-based theories of recovery. The key issues with regard to retention can be answered in

15   one stroke: the purposes for which Netflix collected subscribers' PII, the point in time following

16   account cancellation when the PII—in personally-identifiable form—is no longer necessary for

17   those purposes, and whether Netflix retained the PII beyond that time period. (Edelson Decl. ¶ 45;

18   *see* 18 U.S.C. § 2710(e).) Again, those questions all focus on Netflix's actions, and thus the

19   answers would be common across the Class. *See Wal-Mart*, 131 S. Ct. at 2551.

20   And as with disclosure, the numerosity, typicality, predominance, and adequacy requirements

21   would also very likely be satisfied. *See Gay*, 549 F.2d 1332-34 (numerosity); *Hammer*, 267 F.R.D.

22   at 289 (typicality and predominance); (Dkt. 80 at 5–6) (adequacy). And as with disclosure

23   certification, while Class Counsel is confident that it could certify a class against even the most

24   strenuous opposition, reasoned experience limits the estimated likelihood of certification to 80

25   percent, in the absence of on-point authority. (Edelson Decl. ¶ 45.)

26   **3. The range of recovery at trial**

27   If Plaintiffs did succeed at trial on a class-basis, damages would again be uncertain. The

28   starting point would, of course, be a judgment equal to the actual damages suffered by the Class.

As detailed in the expert report of Dr. Serge Egelman, the damages suffered by the Settlement Class is the amount that the Class members overpaid for their Netflix subscriptions—*i.e.*, the difference between the charges they did pay, on the one hand, and the amount they would have been willing to pay had they known that Netflix was going to violate the VPPA's unlawful retention provision, on the other. (*See* Egelman Rep. at 2.) On this measure, the per-person damages equal $0.15 per Class member. (Egelman Decl. ¶ 6.) As pointed out by Dr. Egelman, only a portion of the Class (those who cancelled their accounts) have suffered damages as a result of unlawful retention (the rest of the Class would have if not for the injunctive relief), and thus, $9.3 million seriously exceeds the Class's damages. (Egelman Decl. ¶ 7.) Based on Dr. Egelman's estimates and information known to him, actual Class-wide damages arising from unlawful retention are less than $4.65 million (Egelman Decl. ¶ 7.)[9]

On top of actual damages, the Class would have a one-in-four chance of convincing the Court that the VPPA's retention provision did allow litigants a private of right of action, which would, in turn, trigger the Act's statutory damages. However, as with the disclosure claim, Plaintiffs believe that the retention-based claims' statutory damages would be limited by Due Process principles to a single-digit multiplier of actual damages. *See* § III.A.3, *supra*. Therefore, even if the Court determined that the Plaintiffs could obtain statutory damages, Plaintiffs believe statutory damages would be capped at $46.5 million for the Class.

Assuming, as discussed previously, a 55 percent likelihood of Plaintiffs proving the merits of their retention claims, an 80 percent likelihood of Class certification, a 25 percent chance of the Ninth Circuit finding a private right of action and thus statutory damages for VPPA retention claims, Plaintiffs' retention-based claims have a value of $7,161,000[10] plus attorneys' fees.

---

[9]    Based on confidential information obtained through the discovery process about class composition, Class Counsel is confident that the actual, aggregate, class-wide damages are lower than Dr. Egelman's estimates. (Edelson Decl. ¶ 48.) Nonetheless, for purposes of analysis, Class Counsel uses the high damages figure proposed by Dr. Egelman.

[10]    This number is based on an estimated $4.65 million actual damages award multiplied by an 80 percent chance of certification and a fifty-five (55) percent chance on the merits *plus* an estimated $46.5 million statutory damages award multiplied by an 80 percent chance of certification, a 55 percent chance on the merits, and a 25 percent percent chance of having a right of action to seek statutory damages for unlawful retention under the VPPA. (Edelson Decl. ¶¶ 44–50.)

### C.  Net Present Value of the Class's Claims

Any accurate valuation of the Class's claims must consider the time-value of money. In Class Counsel's estimation, based on the hurdles of discovery (including experts), class certification, summary judgment motions, trial, and possible appeal to the Ninth Circuit, it would take an additional three years to obtain a final judgment for the class. (Edelson Decl. ¶ 51.) Thus, the $7,281,000 estimated future value of all of Plaintiffs' claims ($120,000 for unlawful disclosure plus, $7,161,000 for claims based on unlawful retention) must be discounted to determine the net present value of the Class's claims. As detailed in the expert report of Donald L. Frankenfeld, a 4.4% discount rate is reasonable under the circumstances, giving the Class's suit a net present value of $6,398,667, plus fees. (*See* Frankenfeld Decl. ¶4.)

Thus, when compared to the estimated present value of $6,398,667, the Settlement Fund of roughly $6.75 million after the requested attorneys' fees—to say nothing of the injunctive relief, valued at $4.65 million for the class as a whole[11]—represents a more than adequate recovery for the Class in this litigation.

## IV. KEY TERMS OF THE SETTLEMENT

The terms of the Settlement are set forth in the Settlement Agreement, (*see* Ex. A), and briefly summarized as follows:

### A.  Class Definition:

The Court, in its July 5, 2012 Preliminary Approval Order (Dkt. 80, at 2, 8), certified a single Settlement Class, defined as follows:

> All Subscribers as of the date of entry of Preliminary Approval. Excluded from the Settlement Class are the following: (i) the Settlement Administrator, (ii) the Mediator, (iii) any respective parent, subsidiary, affiliate or control person of the Defendant or its officers, directors, agents, servants, or employees as of the date of filing of the Action, (iv) any judge presiding over the Action and the immediate family members of any such Person(s), (v) persons who execute and submit a

---

[11]  As with the actual damages estimate, Dr. Egelman estimates that one-half of the Class are current Netflix subscribers, for whom the injunctive relief will prevent $0.15 overpayment of the sort suffered by former subscribers. *See* Egelman Rep. at 9. Additionally, Class Counsel estimates a 44 percent chance of obtaining injunctive relief similar to that in this case. (Edelson Decl. ¶ 52.) Given that the injunctive relief has been valued at $4.65 million for the class, *see* Egelman Rep. at 9, the expected value of an injunction at trial has a future value of $2,046,000, and thus a present value of $1,798,059.81, assuming a 4.4% discount rate. Thus, the injunctive relief alone has a present-value advantage of $2,851,940.19 over going to trial.

1 timely request for exclusion, and (vi) all persons who have had their claims against Defendant fully and finally adjudicated or otherwise released.

2 (Dkt. 80 at 2.)

3 **B. Injunctive Relief:**

4 At all times during settlement negotiations, Plaintiffs and Class Counsel recognized the

5 necessity of injunctive relief in any settlement, and designed the Settlement to ensure that the

6 Settlement Class members' information is not retained in a personally-identifiable format longer

7 than necessary without the explicit opt-in consent of the individual Settlement Class member.

8 (Edelson Decl. ¶¶ 54.) The Settlement Agreement accomplishes this goal by de-coupling former

9 subscribers' PII and giving current and future subscribers the option to have their PII de-coupled

10 upon cancellation. This injunctive relief is permanent—the PII can never be re-coupled—and it

11 ensures that going forward, in furtherance of the VPPA's purpose of protecting video privacy,

12 Netflix subscribers, rather than Netflix, will be in control of Netflix's access to consumer

13 information.

14 Netflix has agreed that, one year from the Effective Date of the Settlement Agreement, it will

15 automatically de-couple all former subscribers' Entertainment Content Viewing Histories from

16 their Identification and Payment Methods if the subscriber has not reactivated their Netflix

17 accounts within one year. (Ex. A, § 2.1.1.) Further, on a going-forward basis, Netflix will de-

18 couple Entertainment Content Viewing Histories from Identification and Payment methods for all

19 former subscribers who do not activate their accounts for one year. (Ex. A, § 2.1.2.)[12]

20 **C. Settlement Fund Payments.**

21 Netflix has agreed to pay the total amount of nine million dollars ($9,000,000.00 USD) in cash

22 into a Settlement Fund, to be used for the payment of Settlement Administration Expenses, *cy pres*

23 distributions to the *Cy Pres* Recipients, any fee award or costs awarded to Class Counsel, and any

24 incentive award to the Class Representatives and named Plaintiffs in the Related Actions. (Ex. A,

25 ─────────────────
[12]    Netflix will not be required to de-couple personal information for non-U.S. users, for those

26 users who provide express consent—at or after the time of subscription cancellation—for Netflix to continue to associate their Entertainment Content Viewing Histories with their Identification

27 Information and Payment Methods, or, if Netflix ceases to operate its Entertainment-Content by mail service at any point within four years of the Effective Date, then non-Settlement Class

28 member subscribers will not be entitled to de-coupling. (Ex. A, § 2.2.2.)

§ 2.3.)

**D.  *Cy Pres* Distribution**

The settlement provides for a widespread *cy pres* distribution that will benefit numerous organizations devoted to protecting consumer privacy rights. After the payment of Settlement Administration Expenses, the Fee Award, and the collective Incentive Award, the balance of the Settlement Fund shall be distributed to the *Cy Pres* Recipients. Pending the Court's approval, the Parties have agreed to provide charitable distributions to the following twenty existing privacy organizations[13] who will use the funds in the following ways:

**(1)      Berkeley Center for Law & Technology ("CLT"):**  The CLT is a not-for-profit center affiliated with the University of California, Berkeley, School of Law, and is a leading institution for privacy research, education, and policy development. The CLT intends to use its distribution to continue and expand its consumer privacy programs, including employing faculty who draft some of the most influential papers regarding personally identifiable information, developing and releasing the highly influential Web Privacy Census, conducting nationwide surveys on consumer privacy attitudes, organizing conferences, workshops, and other events, and sponsoring further privacy research.

**(2)      Berkman Center for Internet & Society (Harvard) ("Berkman Center"):** The Berkman Center is a leading academic research center devoted to researching and teaching about issues at the intersection of emerging technologies, law, public policy, industry, and education. The Berkman Center intends to use its distribution to support its Youth and Media Lab, which promotes media literacy and empowerment in coordination with partner schools in several major metropolitan areas; to support its Curriculum Development Initiative, which entails focusing University-wide research activities with regard to use of personal data and metadata; and to help establish its Privacy and Security Research Initiative, which will be a cross-disciplinary, Harvard-based program that will include privacy research, education, and outreach.

**(3)      Center for Digital Democracy ("CDD"):** The CDD protects consumer privacy, with special attention paid to privacy for children, teens, and other vulnerable internet users. The CDD uses research, public outreach, and policy work to make little-known but critically important consumer privacy concerns viable, debated, and addressed. The CDD intends to use its distribution to engage full-time privacy legal counsel with a special focus on youth online privacy, focus on the need to protect low-income and other vulnerable online consumers, create a guide to online privacy and interactive video privacy, and establish a broad array of mobile privacy resources for consumers.

**(4)      Center for Democracy and Technology ("CDT"):** The CDT is a consumer advocacy group dedicated to keeping the internet open, innovate, and free. The CDT has contributed to the development and implementation of robust protections for consumer privacy through government policy, improved business practices, privacy design, and consumer awareness and empowerment. The CDT intends to use its distribution to continue to file privacy complaints with the FTC; articulate a broadly applicable privacy framework through appellate *amicus* briefs, public workshops, white papers, and draft legislation; develop a comparison of privacy features on major mobile operating systems, similar to the CDT's existing web browser comparison charts;

---

[13]   The amounts to be distributed to each organization will be posted to the Settlement Website and filed with the Court to concurrently with the filing of this brief.

and develop tools and web education materials.

(5)  **Consumer Watchdog:** Consumer Watchdog is an organization dedicated to educating and advocating on behalf of consumers through policy research, investigation, public education, advocacy (including litigation), and direct consumer outreach. Consumer Watchdog's Privacy Project has helped raise awareness for the Do Not Track movement and has raised anti-trust concerns with regard to major internet companies, in addition to its policy research, consumer education, media advocacy, and litigation practices. Consumer Watchdog intends to use its distribution to: broaden the scope of its Privacy Project, add legal and research staff to allow better representation in front of regulatory bodies, hire a new attorney and research staff to work full-time on online privacy matters, increase overall staff time devoted to online privacy, and increase its advertising and awareness budget.

(6)  **Electronic Frontier Foundation ("EFF"):** The EFF focuses on defending free speech, privacy, innovation, and consumer rights on the cutting edge of technology. The EFF uses reactive education[14]—which grants consumers broader, deeper understandings of their rights and lays out what consumers can do to protect those rights—and technology tools[15]—which aim to make it easier for users to engage in prophylactic behavior with regard to online privacy and security—to further these goals. The CDT intends to use its distribution to ensure that these initiatives are able to continue and expand in the future.

(7)  **Electronic Privacy Information Center ("EPIC"):** EPIC was established in 1994 to focus public attention on emerging privacy and civil liberties issues by pursuing a wide range of activities, including policy research, public education, conferences, litigation, publications, and advocacy. EPIC has also taken an active role in protecting consumers' VPPA rights. EPIC intends to use its distribution to fund: its public education (web sites, newsletters, and publications) project, its Consumer Protection Program, its *Amicus Curiae* Project, its Public Voice Project (which hosts privacy-related conferences), its Open Government Project, its Privacy Coalition, its Program on Government Accountability, and its fellowship programs.

(8)  **High Tech Law Institute of Santa Clara University School of Law ("HTLI"):** The HTLI offers semester-long academic courses and shorter educational programs on privacy for law students, lawyers, and community members. The HTLI intends to use its distribution to fund: continued privacy education programs, its annual Internet Law Work-in-Progress academic symposium, its annual program co-sponsored by Internet advertising organizations focusing on privacy and advertising, its State of the Net West speaker series, its Student Fellowship Program, an all-day academic symposium for Internet Privacy, a research grant for a privacy-related paper, and a day-long seminar for professors on how to teach privacy law.

(9)  **International Association of Privacy Professionals ("IAPP"):** The IAPP educates professionals—across all sectors of American enterprise—that work on the front lines of privacy, actually touch personally identifiable information, and are charged with its proper handling, management, and safekeeping. The IAPP intends to use its distribution to fund and expand three programs: a pro bono privacy initiative that helps charitable organizations provide better privacy, privacy research fellowships for recent college graduates interested in privacy, and a Privacy Law Scholars Wards program that gives cash awards for papers from leading academic privacy scholars.

---

[14]  Examples include a social networking Bill of Rights, best practices for online service providers, a how-to guide on removing Google search histories, and a digital survival guide for U.S. border searches.

[15]  Examples include developing an international "Do Not Track" framework and the EFF's "HTTPS Everywhere" web browser extension.

**(10)    Markkula Center for Applied Ethics:** The Markkula Center provides free online educational materials addressing the ethical implications of technology, law, and privacy, and organizing public events that explore related issues. The Markkula Center also operates a program specifically dealing with internet Ethics. The Markkula Center intends to use its distribution to further its educational efforts and reach policy makers, as well as to continue and expand its support of student and faculty privacy protection research.

**(11)    NYU Information Law Institute ("ILI"):** The ILI is devoted to the study of law, policy, and technology as they define and affect the flow of information in digitally networked societies, with a primary focus on information privacy. The ILI regularly hosts events involving faculty, policy makers, public interest advocates, and industry representatives from the United States and elsewhere around the world. The ILI intends to use its distribution to fund research fellowships related to consumer privacy and VPPA issues; workshops, conferences, and the ILI's Code-a-thon; as well as hiring a lab manager and programmer.

**(12)    Privacy Project (UC Hastings):** The Privacy Project seeks to empower individuals to protect their information with implementable solutions and focuses on consumer privacy issues such as terms of service agreements, third-party data access, social networking websites, mobile applications, and industry standards. The Privacy Project intends to use the distribution to provide customers the tools they need to take control of their privacy priorities and to make informed choices about the Internet options available to them, and to head off problems before they arise by (1) providing implementable tools and education for companies to implement best privacy practices, and (2) working with the Internet community to continually develop and refine best privacy practices.

**(13)    Privacy Rights Clearinghouse ("PRC"):** The PRC provides consumer privacy protection and advocacy. The PRC offers a consumer education program that has created more than 60 fact sheets. In addition, it has an active outreach and social media presence and has launched an Online Complaint Center that enables consumers to raise privacy questions and file complaints. The PRC intends to use its distribution to expand its existing fact sheet series, develop a new quick-read "how to" fact sheet series, optimize its website for mobile devices, and expand the capabilities of the "Chronology of Data Breaches" section of its website.

**(14)    The Rose Foundation for Communities and the Environment, Consumer Privacy Fund:** The Rose Foundation is a grant-making public charity that will use its portion of the distribution to distribute to other organizations that would support projects educating users, regulators, and enterprises regarding critical issues relating to the protection of privacy, identity, and personal information.

**(15)    The Samuelson Law, Technology & Public Policy Clinic (U.C. Berkeley School of Law) ("Samuelson Clinic"):** The Samuelson Clinic supports the public's interest in technology, law, and privacy, and educates law students through real-world work with live clients on cutting-edge policy issues. Much of the Samuelson Clinic's work supports consumers' interest in accessing information privately, protecting identity, and personal information online and in other emerging networked environments, and protecting consumers from a variety of online threats. The Samuelson Clinic will use its distribution to give its students and faculty the opportunity to strengthen consumers' voice on privacy and consumer protection policy debates, which will also have the indirect benefit of better training law students to proactively address privacy issues from emerging technology.

**(16)    Stanford Center for Internet and Society ("CIS"):** The CIS is a public interest technology law and policy program and a part of the Law, Science and Technology Program at Stanford Law School. The CIS works to improve technology law and policy through ongoing interdisciplinary studies, analysis, research, and discussion, and strives to inform the design of both technology and law in furtherance of important policy goals such as privacy, free speech, innovation, and security. The CIS intends to use its distribution to hire a full-time director of

privacy, expand its research on best practices for user privacy notices on mobile devices, develop Do Not Track specifications, and further its current practices.

(17) **University of Maine Center for Law + Innovation ("CLI"):** The CLI provides public and clinical education in legal areas affected and driven by technological advancements, including intellectual property, e-commerce, technology transfer, information privacy, and other technology-related fields. The CLI intends to use its distribution to continue and expand its privacy program by supporting a two-year development plan for its information privacy law school curriculum, pro bono privacy clinical initiative, Information Privacy Summer Institute, annual conference, and student internships.

(18) **The USC Intellectual Property and Technology Law Clinic (USC Gould School of Law) ("USC Clinic"):** The USC Clinic counsels and represents policymakers, nonprofit organizations, artists, and entrepreneurs who are grappling with challenges at the intersection of technology, law, and policy. The USC Clinic intends to use its distribution to enhance its clinical offering by hiring a Clinic Privacy Fellow and by conducting cutting-edge research designed to help lawmakers and regulators nationwide make sound policy in the area of information privacy law.

(19) **U.S. Public Interest Research Group Education Fund ("PIRG") and California Public Interest Research Group Education Fund ("CALPIRG"):** PIRG and CALPIRG operate a Consumer Program that works on digital marketplace privacy to focus on educating consumers, regulators, and enterprises about the various privacy threats and protections. PIRG and CALPIRG intend to use the distribution to develop and distribute one-page online consumer guides titled *How Internet Data Collection Affects You*, *Internet Privacy Tips*, and *Digging Deeper Into Internet Data Collection*; develop a follow-up survey to their 2008 report, *Still In The Dark*, in which consumers reported on their ability to learn how their personal information was used by companies they purchase from; issue a report to the FTC and the CFPB regarding digital privacy issues; update their 2004 survey on credit reporting errors, *Mistakes Do Happen*; and continue and expand their current privacy practices.

(20) **World Privacy Forum ("WPF"):** The WPF's mission is to re-imagine privacy in the digital era in a way that allows for technological innovation while protecting consumer privacy. The WPF publishes research reports and consumer education materials, while providing direct consumer assistance with online privacy queries and working on consumer policy. The WPF intends to use its distribution to continue and expand its operations.

The *cy pres* distributions to these organizations will directly benefit the Class by furthering the VPPA's purpose of protecting consumer privacy rights. The *Cy Pres* Recipients are existing organizations who will spend the funds solely on privacy protection and education efforts, and not on things like startup costs. This will allow consumers, and Class members specifically, to see immediate benefits through implementation and furtherance of an abundance of privacy-protective practices and activities.

**E. Payment of Notice and Administrative Expenses**

Defendant has and will continue to pay out of the Settlement Fund the cost of sending the Court-approved notice, the costs of administration of the Settlement, and all other services performed by the settlement administrator as required by the Settlement Agreement. (Ex. A, § 2.3.)

1    Presently, these costs are $114,570.58, with additional expected costs of $35,000.00. (Affidavit of

2    Tore Hodne ("Hodne Aff."), ¶ 9, a true and accurate copy of which is attached hereto as Exhibit

3    E.)

4       **F.  Compensation for the Class Representatives**

5       In addition to any benefit under the Settlement, in recognition of their efforts on behalf of the

6    Class, and subject to the approval of the Court, Netflix has agreed to pay Class Representatives

7    Jeff Milans and Peter Comstock, as well as the named-plaintiffs in the Related Actions, a

8    collective incentive award out of the Settlement Fund in the amount of $30,000, as appropriate

9    compensation for their time and effort serving as the class representatives in this litigation. (Ex. A,

10   §§ 9.2–9.5.)

11      **G.  Payment of Attorneys' Fees and Expenses**

12       Subject to the approval of the Court, Netflix has agreed to pay Class Counsel a fee award of up

13    to 25% of the Settlement Fund ($2,250,000.00), plus reimbursement of up to $25,000.00 of their

14    costs and expenses. The basis for Class Counsel's fee request is fully set forth below in Section

15    VII.

16      **H.  Release of Claims**

17       Should the Court grant final approval to the Settlement, Plaintiffs and each member of the

18    Settlement Class who has not timely filed a request to be excluded will release and forever

19    discharge Netflix, and each of its related affiliates and entities, from any and all manner of claims,

20    whether known or unknown, arising out of or relating to, or regarding the alleged retention and

21    disclosure of Plaintiffs' and the Settlement Class's PII, Entertainment Content Viewing History,

22    and other information, including but not limited to all claims that were brought, alleged, argued,

23    raised, or asserted in any pleading or court filing in the Action. (*See* Ex. A, §§ 1.31, 1.32, 1.33,

24    1.42, and 3 for the full release.)

25  **V.  THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23**

26       Before final approval of a class action can issue, notice of the settlement must be provided to

27    the class. Fed. R. Civ. P. 23(e)(1). Here, the Court-approved notice plan was executed to the

28    standards of Due Process and Rule 23, which require that the class receive "the best notice

1    practicable under the circumstances, including individual notice to all members who can be

2    identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); (Declaration of Shannon R.

3    Wheatmanm Ph.D ("Wheatman Decl."), ¶ 5–6, a true and accurate copy of which is attached

4    hereto as Exhibit F.) Specifically, Rule 23(c)(2)(B) requires the notice directed to the class to

5    clearly, and in concise, plain, easily-understood language state: (a) the nature of the action; (b) the

6    definition of the class certified; (c) the class claims, issues, or defense; (d) that a class member

7    may enter an appearance through an attorney if he or she desires; (e) that the court will exclude

8    any member of the class upon request; (f) the method and time to request exclusion; and (g) that

9    the judgment will be binding on class members. The Parties have strictly adhered to these

10   requirements in this case.

11       To start, the Parties solicited notice proposals from respected class action settlement

12   administrators and selected Kinsella Media/Rust Consulting ("Rust"), an administrator with

13   extensive experience in providing proper notice. (Edelson Decl. ¶ 24; *see also Kaufman v. Am.*

14   *Express Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012) (*sua sponte* proposing Dr.

15   Wheatman as notice expert).) In conjunction with Rust, the Parties developed and implemented a

16   notice plan involving direct notice by email to all Settlement Class members, publication notice, a

17   joint press release, the creation of a Settlement Website, and notice to the relevant governmental

18   agencies pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b). In its July 5, 2012

19   Preliminary Approval Order, the Court specifically found that the Notice Plan "meets the

20   standards of Rule 23." (Dkt. 80 at 7.)

21       The Parties fully implemented the Notice Plan in compliance with Due Process and Rule 23.

22   The direct email notice reached a total of 40,858,293 out of 62,039,868 Class members, with

23   21,181,575 emails undelievered (Wheatman Decl. ¶ 10; Declaration of Sara Cantwell ("Cantwell

24   Decl.," a true and accurate copy of which is attached hereto as Exhibit G, ¶ 5.) Rust then

25   implemented the publication notice procedure, which included a half-page advertisement in

26   *People* magazine, and an advertisement on Facebook.com. (Wheatman Decl. ¶¶ 12–13.) Finally,

27   on June 4, 2012, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715(b), Netflix

28   mailed a letter, prepared by Defendants' counsel, enclosing the requisite court documents to the

U.S. Attorney General and the Attorneys General of each state and U.S. territory giving notice of the Settlement. (*See* Certificate of Service via Certified Mail in Support of Final Approval of Class Action Settlement, a true and accurate copy of which is attached hereto as Exhibit H.)

The Court-approved summary notice, CAFA Notice, and the Facebook and *People* advertisements all provided links to, or the address for, the neutral Settlement Website, URL www.videoprivacyclass.com, which went live on July 24, 2012. (Wheatman Decl. ¶18.) The Court-approved Settlement website: (1) provided full details regarding the rights of Class Members to object to or opt-out of the Settlement, (2) notified Class members that no further notice will be provided to them and that the Settlement had been preliminarily approved, and (3) informed Class members that they should monitor the Settlement Website for further developments. The Settlement Website has been viewed at least 128,549 times. (Hodne Decl. ¶ 4.) The website provides the traditional "long form" notice of the Settlement, and allows for members of the Class to obtain additional information and documents about the Settlement, including a .pdf file of the Long Form Notice, Court documents, and Frequently Asked Questions. (Wheatman Decl. ¶ 18.) All told, the Notice Plan achieved its projected saturation and reached more than 80% of the Class, an average of 1.6 times each. (Wheatman Decl. ¶¶ 14.)

In addition to implementing the methods of notice that resulted in reaching the greatest number of Class members possible, the content of the notice was specifically designed by Shannon R. Wheatman, Senior Vice President of Kinsella Media, LLC, so that it used simple, plain language encouraging readership and comprehension. (Wheatman Decl. ¶¶ 5, 25–29.) The summary notice met each requirement of Rule(c)(2)(B) and the long-form notice provided—in an easy-to-understand-way—even more detail about the nature of Plaintiff's claims concerning the alleged violations of the VPPA, along with Class members' rights to participate in or object to the Settlement. (Wheatman Decl. ¶¶ 25–29.)

In sum, notice to the Class complied with the Preliminary Approval Order, Rule 23, and Due Process, plainly comprising the "best practicable notice under the circumstances."

**VI. THE SETTLEMENT WARRANTS FINAL APPROVAL**

The law favors the compromise and settlement of class actions. *See*, *e.g.*, *Byrd v. Civil Serv.*

*Comm'n*, 459 U.S. 1271 (1983); *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 576 (9th Cir. 2004). Under Federal Rule of Civil Procedure 23(e), "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues or defenses of a certified class" and such approval may occur "only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed. R. Civ. P. 23; *In re OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D. Cal. 2008). A settlement is fair, reasonable, and adequate where, as here, "the interests of the class are better served by the settlement than by further litigation." *Garner v. State Farm Mut. Auto Ins. Co.*, No. CV-08-1365-CW, 2010 WL 16877832, *8 (N.D. Cal. Apr. 22, 2010) (quoting Manual for Complex Litig. (Fourth) § 21.61 (2004)). "[T]he decision to approve or reject a settlement [under Rule 23(e)] is committed to the sound discretion of the trial Judge. . . ." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988). In exercising such discretion, courts should give "proper deference to the private consensual decision of the parties." *Garner*, 2010 WL 16877832, at *8 (citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution. . . .").

In assessing the fairness, reasonableness, and adequacy of a class action settlement, courts generally consider the following non-exhaustive list of factors: "(1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the state of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement." *Rodriguez*, 563 F.3d at 963 (quoting *Molski v. Gleichi*, 318 F.3d 937, 953 (9th Cir. 2003) *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)).

While the Court may consider each of the foregoing factors when considering the final approval of a class action settlement, "[i]n the Ninth Circuit, a court affords a presumption of fairness to a settlement, if: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a

small fraction of the class objected." *Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690, at *7 (E.D. Cal. Sept. 11, 2008) (citing Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41 (4th ed. 2002)). As discussed herein, the Settlement was reached: (1) after extensive, arm's-length negotiations with the assistance of a well-respected mediator; (2) after the exchange of both formal and informal discovery; and (3) by experienced counsel with extensive experience with the VPPA and class actions.[16] Accordingly, the Court's analysis of the factors listed below should be examined with a presumption that the Settlement Agreement is fair.

### A. The Strength of Plaintiffs' Case

The first step in assessing the fairness of a class action settlement is to examine "Plaintiff[s'] likelihood of success on the merits and the range of possible recovery." *Garner*, 2010 WL 1687832, at *9; *see also Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation."). The analysis of Plaintiffs' probability of success on the merits, however, is not rigid or beholden to any "particular formula by which the outcome must be tested," nor is the Court supposed to "reach any ultimate conclusions of the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Garner*, 2010 WL 1687832, at *9 (citing and quoting *Rodriguez*, 563 F.3d at 965). "Rather, the Court's assessment of the likelihood of success is 'nothing more than an 'amalgam of delicate balancing, gross approximations and rough justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)). Given the subjective components inherent in handicapping any potential range of recovery, "the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff[s'] likelihood of recovery." *Id.* (citing *Rodriguez*, 563 F.3d at

---

[16]   As discussed in § VI.H, *infra*, the deadline for requesting exclusion from or objecting to the Settlement is November 14, 2012, and Plaintiffs have until November 28, 2012 to respond to objections from Class members. (Preliminary Approval Order at 9; Settlement Agreement ¶¶ 1.24, 5.6.) At that point, Plaintiffs will submit a brief fully addressing the objections and exclusions, and more fully analyzing the reaction of the Class to the Settlement.

965).

Despite the benefit of this presumption, Plaintiffs have chosen to essentially "show their work" and in Section III, *supra*, have explained how they view and value their claims and Netflix's defenses. For the Court's convenience, below is a chart summarizing those views:

| | Disclosure-based theory | Retention-based theory |
|---|---|---|
| Likelihood of succeeding on merits | 5% | 55% |
| Likelihood of obtaining adversarial class certification | 80% | 80% |
| Likelihood of the Ninth Circuit disagreeing with the Seventh Circuit's *Redbox* opinion | N/A | 25% |
| Likely statutory damages recovery | $3 million plus fees | $46.5 million plus fees |
| Likely Actual Damages Recovery | | $4.65 million plus fees |
| Expected Future Value of Actual Damages Claim | $120,000 plus fees | $2,046,000 plus fees |
| Expected Future Value of Statutory Damages Claim | | $5,115,000 plus fees |
| Total Future Value | $120,000 plus fees | $7,161,000 plus fees |
| Total net present value (3 year litigation period, 4.4% discount rate) | $6,398,667 plus fees | |

The strength of the Plaintiffs' case, the value of which is actually less than the Settlement Fund, is a factor strongly in favor of granting final approval to this Settlement.

**B.  The Risk of Continued Litigation**

The second "fairness" factor this Court may consider is "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *In re Omnivision*, 559 F. Supp. 2d at 1041 (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005); *see also Garner*, 2010 WL 1687832, at *10 ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and

1  substantial recovery for the Plaintiff class."). Further, this factor favors the approval of a

2  settlement where, as here, significant procedural hurdles remain, including anticipated summary

3  judgment motions, class certification, and possible appeals. *Garner*, 2010 WL 1687832, at *10

4  (citing *Rodriguez*, 563 F.3d at 966).

5      Here, it is certain that the expense, duration, and complexity of the protracted litigation that

6  would result in the absence of settlement would be substantial. Significant costs would be

7  expended by both Parties should this matter proceed to trial, including expenses for expert

8  witnesses related to valuation of damages, and the myriad other costs that accompany the trial of a

9  nation-wide class action. (Edelson Decl. ¶ 58.) Yet, the added cost and burden of continued

10 litigation would not likely procure better results for the Class, especially in light of the *Sterk* and

11 *Rodriguez* opinions, the lack of support for Plaintiffs' disclosure theories, and the massive size of

12 the Class and substantial costs that would be incurred in attempting to disburse any *de minimis*

13 monetary payments to Class members. It is also difficult to contemplate an award of more

14 comprehensive injunctive relief to prevent future alleged violations of the VPPA's unlawful

15 retention provision, 18 U.S.C. §2710(e). As Plaintiffs face significant challenges in proving their

16 case on the merits, the substantial and prompt relief provided to the Class under the Settlement,

17 balanced against the inherent risk of continued litigation, weighs heavily in favor of final approval.

18 **C.  The Risk of Maintaining Class Action Status**

19     The Court's July 5, 2012 Order certified a nationwide class for settlement purposes only. (Dkt.

20 80 at 6.) Although Plaintiffs and Class Counsel believe they would be successful in obtaining

21 certification of an adversarial class absent the Settlement, Netflix has made it clear that, in its

22 absence, it would vigorously oppose adversarial certification. (Edelson Decl. ¶ 58.) Further, even

23 if Plaintiffs were successful in a motion for class certification absent the Settlement, Netflix could

24 move for decertification of the Class before or during trial and likely would challenge certification

25 on appeal. Fed. R. Civ. P. 23(c)(1)(C). Accordingly, this factor weighs in favor of approving the

26 Settlement Agreement because if at any point the Class failed to become certified or if certification

27 was reversed, the Class would get nothing.

28

### D.  The Amount Offered in the Settlement is Substantial

Here, the size of the *cy pres* recovery obtained by Plaintiffs also strongly supports approval. A *cy pres* class action settlement is appropriate where "the proof of individual claims would be burdensome or distribution of damages costly." *Nachshin,* 663 F.3d at 1036. "The district court's review of a class-action settlement that calls for a *cy pres* remedy is not substantively different from that of any other class-action settlement except that the court should not find the settlement fair, adequate, and reasonable unless the *cy pres* remedy 'account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.'" *Lane,* 2012 WL 4125857, at *4.

#### 1.  The $9 million fund is sufficient.

The $9 million common Fund secured by the Settlement is substantial in relation to the Class's best possible outcome at trial. The reasonableness of the amount offered can be determined by comparing it to the maximum potential recovery if Plaintiff were to ultimately succeed at trial. *See OmniVision,* 559 F. Supp. 2d at 1042 (finding a recovery of 9% of potential recovery to be reasonable and favoring approval of the settlement). In fact, "[i]t is well-settled that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *Officers for Justice,* 688 F.2d at 628. Here, as described in § III.C, *supra,* the Settlement Fund exceeds the $6,398,667.00 plus fees that represents the net present value of the Class's claims. Not only that, the Fund—even without valuing the accompanying injunctive relief—represents more than complete recovery for the damages suffered.

As described above, Class-wide damages for unlawful retention are equal to approximately $4.65 million, as that is the amount by which the class as a whole overpaid for their subscriptions in light of Netflix's allegedly unlawful conduct. (Egelman Decl. Rep at 9.) The Settlement Fund also approximates the likely result at trial, even factoring in statutory damages. Given the negative law surrounding the VPPA, this represents a significant victory for the Class. *See In re Heritage Bond Litig.*, No. 02-ML-1475-DT, 2005 WL 1594389, at *8-9 (C.D. Cal. June 10, 2005) (finding average recovery in shareholder derivative settlements from 2002 to 2006 to range between 2.2%

and 3% of potential recovery); *Officers for Justice*, 688 F.2d at 628; *Cf. Garner*, 2010 WL

1687832, at *9 ("[T]he Court may presume that through negotiation, the Parties, counsel, and

mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of

recovery.") (citing *Rodriguez*, 563 F.3d at 965).

In addition to—or perhaps even more important than—the $9 million Settlement Fund, the

Settlement's value to the Class is bolstered by the industry-leading injunctive relief obtained.

Again, the Settlement requires that Netflix de-couple qualifying Class members' Entertainment

Content Viewing Histories from their Identification and Payment Information and that it do so in

the future whenever a subscriber cancels his or her account, absent express consent allowing such

retention. (Ex. A, § 2.1.) This injunctive relief has a value of $0.15 per Class member and thus has

a value of approximately $4.65 million to the Class as a whole. (*See* Egelman Decl. ¶ 8.)

Accordingly, when the Settlement Fund is combined with the value of the injunctive relief, the

Settlement actually provides a value of $13.65 million to the Class, compared to $4.65 million in

damages, a ratio of 2.9-to-1. As a result, when considering the value of the Settlement Fund and

the industry-leading injunctive relief, the Settlement represents a more than adequate recovery for

the Class.

Moreover, the certainty and the relative immediacy of the *cy pres* distribution under the

Settlement Agreement, when compared with the risk associated with seeking the full amount of

damages but receiving nothing, further justifies the reasonableness of accepting less than the

maximum potential statutory recovery. *See OmniVision*, 559 F. Supp. 2d at 1042. Thus, given the

constitutional concerns and other risks, the $9 million Fund, coupled with the Settlement's strong

injunctive measures, is entirely reasonable and preferable.

### 2.  The *cy pres* distribution is the best method of benefiting the Class.

In addition to being adequate in size, the Settlement's *cy pres* distribution is a reasonable

method of giving relief to the Class. Of course, under ideal circumstances Plaintiffs would have

obtained a meaningful and direct cash payment for the individual Class members. But, given the

size of the Class and the amount recovered, direct payments would have been *de minimis*, and the

cost of distributing them prohibitively excessive. Accordingly, the *cy pres* distribution is the best

feasible alternative.

"A *cy pres* remedy . . . is a settlement structure wherein class members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment." *Lane,* 2012 WL 4125857, at *4. The "*cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin,* 663 F.3d at 1036. "For purposes of the *cy pres* doctrine, a class-action settlement fund is 'non-distributable' when 'the proof of individual claims would be burdensome or distribution of damages costly.'" *Lane*, 2012 WL 4125857, at *4 (quoting *Nachshin*, 663 F.3d at 1038). To warrant approval, the *cy pres* remedy must "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." *Nachshin*, 663 F.3d at 1036.

The instant Settlement goes well beyond analogous settlements within this Circuit and, as such, the *cy pres* relief warrants approval. In *Lane*, for example, the Ninth Circuit recently affirmed final approval of a *cy pres* settlement that provided less meaningful relief than is present here. In *Lane*, the class asserted claims under the VPPA, Electronic Communications Privacy Act (which provides statutory damages of $1,000 per person), the Computer Fraud and Abuse Act, California's Consumer Legal Remedies Act, and California's Computer Crime Law. *See* 2012 WL 4125857, at *1, n.1. There, the Ninth Circuit approved a roughly $9.5 million *cy pres* settlement fund over objections that the donation would be used to create a new privacy organization (rather than fund existing organizations) and that one of the organization's three directors would be an employee of the defendant. *Id.* at *5−6. The Ninth Circuit also looked favorably upon the *Lane* settlement's injunctive component—which mandated the permanent termination injunction of Facebook's "Beacon" program—over objections that "Beacon was already effectively terminated" at the time of the settlement, *id.* at *10, and even though class counsel had "conceded that Facebook was free to reinstitute the same program under a different name." *Id.* at *13 (Kleinfeld, J., dissenting). In rejecting the objectors' arguments relating to the *cy pres* relief, the Court noted that the Ninth Circuit does not "require as part of [the *cy pres* doctrine] that the settling parties select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an

1   intrusion into the private parties' negotiations would be improper and disruptive to the settlement

2   process." *Id.* Ultimately, the Ninth Circuit found that because (1) "[a] $9.5 million class recovery

3   would be substantial under most circumstances," (2) any class member's individual recovery

4   would be *de minimis* and outweighed by administrative costs, and (3) Facebook's promise to

5   terminate the Beacon program provided meaningful injunctive relief to the class, the settlement

6   warranted approval. *Id.*

7       Here, the contemplated *cy pres* fund and injunctive relief make this Settlement even stronger

8   than the *Lane* settlement. First, from an absolute standpoint, and comparable to the $9.5 million

9   fund in *Lane*, this Settlement will produce a substantial $9 million Class recovery. If the Court

10  approves Class Counsel's contemporaneous request for fees and expenses, approximately $6.4

11  million in *cy pres* distributions will go to numerous privacy organizations and programs—each of

12  which will advance efforts to protect consumers' privacy and increase consumer privacy

13  awareness, and none of which will be operated by Defendant's employees. (Edelson Decl. ¶¶ 31–

14  34.)

15      Importantly, all identified *Cy Pres* Recipients are *existing* organizations or programs with

16  proven track records that have identified specific uses for the distributed funds, ensuring that each

17  *cy pres* distribution accounts for the nature of the Plaintiffs' lawsuit (protecting consumer privacy),

18  the objectives of the underlying statutes (protecting consumer privacy), and the interests of the

19  silent Class members (having their privacy protected). These organizations include leading

20  consumer advocacy groups such as the Center for Democracy and Technology, the Electronic

21  Privacy Information Center, the Electronic Frontier Foundation, Privacy Rights Clearinghouse,

22  and Consumer Watchdog, as well as leading academic privacy institutions such as the Berkman

23  Center for Internet and Society (Harvard), the Stanford Center for Internet and Society, and the

24  Samuelson Clinic at the Berkeley Center for Law & Technology. These organizations and others

25  located throughout the country will provide substantial benefits to the Settlement Class and

26  consumers generally through outreach and education programs, litigation and public advocacy,

27  legislative activity, privacy and best-practices consultation, and development of privacy-protecting

28  technological tools, and other methods.

1    Second, here, as in *Lane*, the sheer size of the Class (over 62 million members) all but

2  guarantees that each Class member would receive only a *de minimis* payment from any direct cash

3  distribution, and even that would be completely nullified by distribution costs. (Edelson Decl.

4  ¶ 57.) Such a "non-recovery" only bolsters the value of this Settlement to the Class.

5    Third and finally, while the injunctive relief in *Lane* merely prevented the defendant from re-

6  launching its allegedly unlawful (and, according to the objectors, already terminated) Beacon

7  program under that same name, here the Settlement offers truly industry-changing relief: Netflix

8  will not continue to store its subscribers' PII (as it does now) after they cancel their subscriptions

9  unless the subscribers choose to allow it, and Netflix cannot change that policy without being in

10  contempt of court. (Edelson Decl. ¶ 55.) Thus, while the class in *Lane* was left guessing at the

11  future value of the obtained relief, here the Settlement Class will rest assured that Netflix will *not*

12  retain their sensitive PII in continued violation of the VPPA. Put simply, this Settlement is superior

13  to the *Lane* settlement in almost every way. Thus, this factor too favors final approval.

14  **E.  The Extent of Discovery Completed and the Stage of Litigation**

15    The next factor requires the Court to consider both the extent of the discovery conducted to

16  date and the stage of the litigation as indicators of class counsel's familiarity with the case and

17  ability to make informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego Fin.*

18  *Corp.*, 213 F. 23d at 459). A compromise based on an understanding of the legal and factual issues

19  with a genuine arm's-length negotiation is "presumed fair." *Nat'l Rural Telecomms. Corp. v.*

20  *DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

21    This case is well-developed—the parties have been through an early mediation and initial

22  focused discovery on certain legal and factual issues. (Edelson Decl. ¶¶ 63–64.) Specifically,

23  Plaintiffs propounded, and Netflix responded to formal discovery concerning Netflix's PII use,

24  retention, and disclosure practices and policies, Netflix's purposes for collecting subscribers' PII,

25  and Class size and composition. (Edelson Decl. ¶ 64.) Further, Class Counsel had extensive

26  experience from which to draw from other similar VPPA cases, thus allowing them to make

27  informed decisions about the claims. (Edelson Decl. ¶ 62.) With this information, Class Counsel

28  were able to fully understand the facts and merits of Plaintiffs' claims, were able to properly

1 evaluate the strength and value of the case, and had a realistic view regarding what was likely

2 obtainable through either a settlement or judgment.

3   When Class Counsel appeared at the mediation with former United States District Judge Layn

4 R. Phillips (Ret.), they were intimately familiar with the applicable case law and were in

5 possession of sufficient discovery to intelligently negotiate the terms of the instant settlement to

6 the ultimate benefit of the Class members. Accordingly, this factor also favors approval of the

7 Settlement Agreement.

8   **F.   The Experience and Opinion of Counsel**

9   The next factor to consider is counsel's experience and views about the adequacy of the

10 Settlement. *Garner*, 2010 WL 1687832, at \*14 (considering views of plaintiff's and defendant's

11 counsel that the settlement was fair); *see also OmniVision*, 559 F. Supp. 2d at 1043. In fact, "[t]he

12 recommendations of plaintiff's counsel should be given a presumption of reasonableness."

13 *OmniVision*, 559 F. Supp. 2d at 1043 (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D.

14 Cal. 1979)). Reliance on such recommendations is premised on the fact that "parties represented

15 by competent counsel are better positioned than courts to produce a settlement that fairly reflects

16 each party's expected outcome in litigation." *Rodriguez*, 563 F.3 at 967 (quoting *In re Pacific*

17 *Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).

18   Class Counsel have regularly engaged in major complex litigation, and have extensive

19 experience in prosecuting consumer class actions of similar size and complexity. (*See* Edelson

20 Decl. ¶ 61; *see also* Dkt. 59 at 4–5.) They have regularly engaged in major complex privacy

21 litigation involving technology companies, have the resources necessary to conduct litigation of

22 this nature and have frequently been appointed lead class counsel by courts throughout the

23 country. (*See* Firm Resume of Edelson McGuire LLC, attached to the Edelson Decl. as Exhibit C-

24 1); *In Re Facebook Privacy Litig.*, 10-cv-02389-JW, Dkt. No. 69 (N.D. Cal. Decl. 10, 2010)

25 (Judge Ware, in appointing co-lead counsel, noted that Edelson McGuire attorneys "were pioneers

26 in the electronic privacy class action field, having litigated some of the largest consumer class

27 actions in the country on this issue.").

28   Indeed, as this Court expressed in its Order appointing Interim Lead Class Counsel, Edelson

McGuire "specializes in class actions relating to consumer technology and privacy issues" and that the "firm's significant and particularly specialized expertise in electronic privacy litigation and class actions, renders them superior to represent the putative class." (Dkt. 59 at 4–5.) And, specific to the issues in this case, Edelson McGuire is one of the few firms in the country that has significant experience litigating VPPA claims on a class basis. *See*, *e.g.*, *Missaghi v. Blockbuster, LLC*, Case No. 11-2559-JRT-JSM, Dkt. No. 48 (D. Minn. Aug. 7, 2012) (granting preliminary approval of class action settlement alleging unlawful retention of class members' video viewing histories in violation of the VPPA, 18 U.S.C. § 2710(e) and appointing Jay Edelson, and others, as class counsel for settlement purposes).

Further, Edelson McGuire has been at the forefront of technology and privacy class actions generally, successfully prosecuting cases against companies such as Microsoft, Amazon, Facebook, Zynga, AT&T, and comScore. (*See* Firm Resume, Exhibit C-1.) This body of experience has informed and supported Class Counsel's efforts throughout this litigation, was a critical factor in obtaining the relief embodied by the Settlement, and ensured that the Class received the highest quality of representation.

Through their investigation, review of discovery materials, and the settlement process, Class Counsel have gained an intimate understanding of the instant litigation and believe the Settlement to more than exceed the "fair, adequate, and reasonable" standard required for the Court's approval. (Edelson Decl. ¶ 59.) Furthermore, all seven of the Plaintiffs' firms involved in this litigation, including those involved in what was a heated leadership fight, fully support this Settlement and agree that it presents a more than adequate recovery for the Class. (Edelson Decl. ¶ 59.) This factor, therefore, also favors the Court's final approval of the Settlement.

**G.  The Presence of a Governmental Participant**

Although there were no "governmental coattails for the class to ride" in this case, *Rodriguez*, 563 F.3d at 964, Defendant was nonetheless obligated to notify the United States Attorney General and the appropriate state officials as a condition of obtaining Court approval. 28 U.S.C. § 1715; *Garner*, 2010 WL 1687832, at *14. "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA

presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Id.* Netflix timely complied with CAFA's notice requirement and provided the requisite notice on June 4, 2012. (Ex. H.) As of the date of filing, no state or federal official has raised any objection to the settlement. (*Id.*) Accordingly, this factor also favors approval of the Settlement.

### H. The Reaction of the Class Members to Date

Although the deadline for opt-outs and objections is still two weeks away, thus far, only 2,157 class members have excluded themselves (0.003%), (Hodne Decl. ¶ 8), and 97 have objected to the Settlement, (0.00016%). (*See generally* Dkt. 80–186.) While Class Counsel anticipates that the publicity associated with this suit, the size of the Class, and the size of the Settlement will trigger further objections—particularly from professional objectors delaying their filings as long as possible in order to increase their leverage[17]—Plaintiffs anticipate that given the results so far, the total number of opt-outs and objections will demonstrate the Class's overwhelmingly positive reaction to the Settlement, especially when compared to the recently approved *Lane* settlement. *See Lane*, 2012 WL 4125857, at *5 (four objectors out of a 3.6 million person class, for a 0.00011% objection rate). Pursuant to the Court's Preliminary Approval Order, the exclusion period ends on November 14, 2012, and Plaintiffs have until November 28, 2012 to respond to the objections. (Dkt. 80 at 9; Settlement Agreement ¶¶ 1.24, 5.6.) Plaintiffs look forward to addressing the objectors' concerns with the Settlement at that time, when they will submit a brief in fulsome with their responses.

### I. Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny

In addition to the foregoing factors—all of which support certification here—the Ninth Circuit has instructed courts to carefully scrutinize cases that are settled without adversarial certification for possible collusion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir.

---

[17]   Class Counsel has already seen concerning behavior from would-be professional objectors, including one firm going so far as to solicit a public interest organization to object rather than participate in the *cy pres* application process (presumably so that the objectors could then assert that the funds were not being distributed to the best recipients), and another firm making up imaginary clients in an attempt to gain access to privileged information. (Edelson Decl. ¶ 79.)

2011). In particular, courts are to be aware of certain "warning signs" that warrant heightened scrutiny, including where class counsel receives a disproportionate distribution of the settlement or the class receives no monetary distribution, where unawarded attorneys' fees revert to the defendants rather than to the settlement fund for the class, and where there is a "clear sailing" fee arrangement. *Id.* When these warning signs are present, "the Court must 'examine the negotiation process with even greater scrutiny than is ordinarily demanded.'" *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011) (quoting *In re Bluetooth*, 654 F.3d at 947). In essence, each of these "warning signs" is designed to root out evidence of collusion or evidence that class counsel have put their own interests ahead of the class, which "may not always be evident on the face of a settlement." *In re Bluetooth*, 654 F.3d at 947.

The instant Settlement Agreement is wholly free of collusion. At the outset, although the "verbal assurances" of counsel and "the mere presence of a neutral mediator" during settlement and fee negations is a non-dispositive "factor weighing in favor of a finding of non-collusiveness," *Id.* at 948, the Parties here have submitted sworn proof detailing the steps taken in the mediation process that resulted in both the class relief and fee amount. (Edelson Decl. ¶¶ 20–25.) As described *supra*, the complete process resulting in the Settlement was done at arms-length, by well-represented parties, and under the supervision of a former federal judge.

Moreover, the terms of the Settlement do not raise the concerns identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation*. First, unlike *In re Bluetooth*—where class counsel sought up to *eight times* the $100,000 "provid[ed to] the class . . . in *cy pres* awards"— here, the requested fee award sought by Class Counsel is not a "disproportionate distribution of the settlement." *Id.* Rather, and as discussed more thoroughly below in § VII, *infra*, Class Counsel seek only the Ninth Circuit's "benchmark" twenty-five percent (25%) fee award of the $9 million common Fund earmarked for *cy pres* distribution. *See Powers v. Elchen*, 229 F.3d 1249, 1256 (9th Cir. 2000) ("We have . . . established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach."). Further, while it's true that the Settlement does not involve a direct cash distribution to Class members, such a distribution would—as discussed in § V.D.2, *supra*—produce only *de minimis* cash payments,

1   which would be reduced even further after applying administrative and distribution costs. Instead,

2   the terms of the Settlement ensure that each Class member enjoys an actual indirect benefit

3   through the sizeable *cy pres* distributions.

4   Additionally, it again bears noting that although the Settlement requires Defendant to abide by

5   strong injunctive relief designed to prevent the allegedly unlawful conduct at issue in this

6   litigation—which does in fact provide tangible value to the Class[18] and corrects the very conduct

7   challenged by this lawsuit—Class Counsel are not seeking to increase their fee by specifically

8   valuing the non-monetary benefits provided by the Settlement. *See Staton v. Boeing Co.*, 327 F.3d

9   938, 974 (9th Cir. 2003) ("[p]recisely because the value of injunctive relief is difficult to quantify,

10  its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned

11  to a common fund."). Rather, Class Counsel seek only a percentage of the $9 million cash value of

12  the common Fund.

13  Second, unlike the agreements in *Staton v. Boeing Co.,* and *In re Bluetooth*, this Settlement

14  does not provide for payment of attorneys' fees separate and apart from funds paid to the Class.

15  *Staton*, 327 F.3d at 970; *In re Bluetooth*, 654 F.3d at 948-49. Rather, Class Counsel are seeking a

16  percentage of the common fund from which *cy pres* distributions will be made—and any funds not

17  awarded in fees will simply be distributed to the approved *cy pres* recipients rather than reverting

18  to Netflix. *See In re Bluetooth*, 654 F.3d at 949 ("a kicker arrangement reverting unpaid attorneys'

19  fees to the defendant rather than the class amplifies the danger of collusion . . .").

20  Third, unlike *Staton*, the Settlement is not contingent on the Court awarding a specific fee to

21  Class Counsel. Rather, the Parties have agreed to an overall Settlement Fund and have "left the

22  division of that fund as between the class and counsel to the district court, as is usual in common

23  fund cases." *Staton*, 327 F.3d at 971.

24  Finally, while there does exist a "clear sailing" provision[19] in the Parties' Settlement

---

25  [18]   *See* Egelman Rep. at 9–10.

26  [19]   A "clear sailing" provision refers to a settlement term in which a defendant agrees not to

27  challenge class counsel's fee request up to an agreed amount. The core of the Ninth Circuit's
    concern related to such a provision is the instance in which the requested fee is agreed upon as an
    independent figure separate and apart from the amount provided to the class. *In re Bluetooth*, 654

28  F.3d 935 at 947 ("[W]hen the parties negotiate a 'clear sailing' arrangement providing for the

---

Agreement, the requested attorneys' fees were negotiated solely as a percentage of the overall Settlement Fund, meaning that Class Counsel's fees are inextricably linked to the common fund obtained for Class's benefit. (Edelson Decl. ¶ 22); *see also In re Oracle Securities Litig.*, 131 F.R.D. 688, 694 (N.D. Cal. 1990) (noting that contingent, percentage based fees act as "a monitoring device" and "align the interests of lawyer and client. The lawyer gains only to the extent his client gains."). The fee negotiations here came only after Class relief was agreed upon by the Parties—the fee amount was not independently created or the product of "red-carpet treatment" in exchange for reduced benefits to the Class. Rather, the fee agreement and incentive award were the final negotiated points of a "package deal" and were entirely based upon the benefits provided to the Class. *See In re Bluetooth*, 654 F.3d at 947-49; Edelson Decl. ¶ 22.

Accordingly, the non-collusive nature of this Settlement, reached after a series of arm's length negotiations and a contested mediation, should dispel any concern of the "warning signs" that appear in some class actions but are completely absent here.

## VII. THE FEE AWARD SOUGHT HERE IS REASONABLE USING EITHER THE PERCENTAGE OR LODESTAR METHOD IN LIGHT OF THE RISK COUNSEL TOOK AND THE BENEFIT THEY CONFERRED ON THE CLASS.

Class Counsel seek attorneys' fees of $2.25 million—equal to the 25% benchmark fee award for Ninth Circuit common fund cases—plus $25,000 of its out-of-pocket costs pursuant to the Settlement Agreement. Courts throughout the Ninth Circuit have long-recognized that "[w]hen counsel recover a common fund which confers a 'substantial benefit' upon a class of beneficiaries, they are entitled to recover their attorney's fees from the fund." *Fishel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002) (citing *Lewis v. Anderson*, 692 F.2d 1267, 1270 (9th Cir. 1982)). Accordingly, when a settlement produces a common fund for the class,

---

payment of attorneys' fees separate and apart from class funds, [it] carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.'"). Under those circumstances, the *In re Bluetooth* Court cautioned, "the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class. *Id.* [Citation omitted] Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* at 948. The circumstances giving rise to the Ninth Circuit's concerns are not present with respect to this Settlement as Class Counsel's fee request is directly related to the Class relief.

courts in the Ninth Circuit primarily employ a percentage-of-recovery method and award class counsel a fee that constitutes a certain percentage of the fund. *In re Bluetooth*, 654 F.3d at 942. However, "courts [ultimately] have discretion to employ either the lodestar method or the percentage-of-recovery method" when evaluating whether "the award, like the settlement itself, is reasonable." *Id.* (citing *In re Mercury Interactive Corp.,* 618 F.3d 988, 992 (9th Cir. 2010)). Regardless of which method is used, the fee award should take into account the particular factors in the specific case and must be "reasonable under the circumstances." *State of Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990).

As discussed below, Class Counsel's fee request is reasonable using either a percentage of recovery or lodestar analysis and, consequently, should be approved.

## A. Class Counsel's Benchmark Fee Request is Appropriate Under the Percentage Method.

For common fund settlements, like this one, the Ninth Circuit has set the "benchmark" fee award at 25 percent of the recovery obtained. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citing *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989)). More generally, percentage-based attorneys' fees commonly range from 20 to 50%. Newberg on Class Actions § 14.6. Additional studies have found that for Settlements recovering less than a $10 million common fund—such as the instant Settlement—awarded attorneys fees average between 30.4% and 31.9%. *See* Stuart Logan et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167 (2003) (finding that "[t]he percentage of the class recovery consumed by attorney fees and costs [averages from 30.4% to 31.9%] for recoveries under $10 million" in a study of 1,120 cases). Ultimately, a district court may depart from the 25 percent benchmark—either upwards or downwards—but only after "providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942 (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990)); *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit has established a non-exhaustive list of factors used to evaluate the reasonableness of a percentage ultimately awarded, including: "(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the

1   contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made

2   in similar cases." *Tarlecki v. bebe Stores, Inc.*, C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D.

3   Cal. Nov. 3, 2009) (citing *Vizcaino*, 290 F.3d at 1048-50).

4       Courts utilize the same percentage method and analysis regardless of whether class members

5   benefit directly (in the form of direct payments from the fund) or indirectly (in the form of, for

6   example, fund distributions to *cy pres* recipients). *See*, *e.g.*, *In re Google Buzz*, 2011 WL 7460099,

7   at *4 (direct *cy pres* distributions to existing organizations focused on Internet privacy policy or

8   privacy education would "provide[] an indirect benefit to the Class Members consistent with the

9   Class Members' claims"); *Lane*, 2012 WL 4125857, at *4 (observing that "[t]he district court's

10  review of a class-action settlement that calls for a *cy pres* remedy is not substantively different

11  from that of any other class-action settlement."). Indeed, courts both within and outside of this

12  Circuit have approved percentage awards for settlements making *cy pres* distributions from a

13  common fund. *See*, *e.g.*, *In re Google Buzz*, 2011 WL 7460099, at *4 (awarding 25% of a $8.5

14  million fund distributed only to *cy pres* recipients); *In re Toys R Us Antitrust Litig.*, 191 F.R.D.

15  347, 348 (E.D.N.Y. 2000) (awarding approximately 27% of a common fund, where the only cash

16  benefit of the settlement was a *cy pres* distribution to State governments as *parens patriae* on

17  behalf of resident consumers); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297

18  (E.D.N.Y. 2010) (awarding 21% of a common fund, $2.5 million of which was marked for

19  distribution via *cy pres*); *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 549, 96 Cal. Rptr.

20  3d 127, 130 (2009) (affirming fee award based on common fund theory where relief secured

21  included a $3.25 million *cy pres* distribution to privacy-related organizations).

22      Here, Class Counsel seek no more than the standard benchmark recovery of 25% of the

23  Settlement's common fund. And again, the requested amount *only* contemplates a percentage of

24  the cash-portion of the total recovery obtained for the Class, and does not factor in the significant

25  value of the Settlement's substantial injunctive relief, which means that Class Counsel is seeking,

26  in essence, 16.5% of the value of the total relief secured for the Class.[20]

27

28  _____

[20]   *See* § VI.I, *supra*; Edelson Decl. ¶ 71.

**1.   Class Counsel achieved superior results for the Class.**

Most importantly, and as discussed at length above, the instant Settlement provides significant relief for the Class. To that end, the Settlement provides both (1) injunctive relief that directly addresses—and corrects—the very conduct challenged by this case, *see supra*, § IV.B, and (2) indirect relief to the Class through a $9,000,000 common Fund, which will be predominately distributed to approved *Cy Pres* Recipients, *see supra*, §§ IV.C–D. While either mode of relief provides a significant benefit to the Class, the Settlement's complete recovery is remarkable.

Indeed, as discussed previously, the contemplated injunctive relief requires that Netflix permanently de-couple Class Members' Entertainment Content Viewing Histories from their Identification and Payment Information. These measures effectively "anonymize" the viewing histories of former subscribers retained by Netflix and, on Plaintiffs' view, simultaneously (1) bring Netflix into compliance with the VPPA's unlawful retention provision and, consistent with the purpose of the statute, (2) ensure that the PII of consumers who cancel (or who have cancelled) their Netflix subscriptions is safe from misuse stemming from, for example, any future compromise of Netflix's data security or any desire by a company acquiring Netflix[21] to monetize the information it has unlawfully retained.

Likewise, the anticipated *cy pres* fund and proposed distribution is substantial and will provide real benefits for the Class—especially in comparison to any prospective *de minimis* cash payment, to the extent one is even feasible in light of applicable administrative and notice costs. To that end, the contemplated fund rivals analogous landmark privacy-related *cy pres* settlements recently approved in this District. *See In re Google Buzz Privacy Litig.*, No. 5:10–cv–00672–JW, Dkt. Nos. 41, 128 (N.D. Cal. 2010) ($8.5 million settlement fund with approximately $6.5 million in *cy pres* payments to organizations focusing on Internet privacy policy or privacy education); *Lane*, 2012 WL 4125857, at *2 ($9.5 million settlement fund with approximately $6.5 million distribution of settlement funds used "to set up a new charity organization . . . designed to educate users, regulators[,] and enterprises regarding critical issues relating to protection of identity and personal

---

[21]   There are current reports, for example, that Microsoft is exploring a takeover of Netflix. (Edelson Decl. ¶ 56.)

information online through user control, and the protection of users from online threats"). Moreover, the total value of this *cy pres* fund exceeds the actual damages suffered by the Class and avoids the strongest criticisms of the *Lane* settlement, which recently received approval from the Ninth Circuit. *See supra*, §§ VI.D.1-2.

In all, these two modes of relief offer a substantial benefit to the entire Class and directly address the heart of Plaintiffs' claims and allegations. As such, the results achieved by the Settlement support the fee request.

### 2. Plaintiffs' novel and untested claims carried a substantial amount of risk.

Class Counsel accepted and pursued Plaintiffs' claims on a purely contingent basis and, particularly in this case, invested considerable resources towards prosecution of this matter despite substantial risk. That investment justifies the requested benchmark fee. *See Vizcaino*, 290 F.3d at 1051 ("In common fund cases, 'attorneys whose compensation depends on their winning the case[] must make up in compensation in the cases they win for the lack of compensation in the cases they lose.'") (quoting *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300-01 (9th Cir. 1994)).

While attorneys always face the prospect of non-payment when working on a contingency, here, Plaintiffs' claims relied upon an untested theory of recovery and, accordingly, carried exceptional risk. As noted here and elsewhere, Class Counsel believe that Milans' original complaint was the nation's first class action specifically alleging a violation of the VPPA's unlawful retention provision, 18 USC § 2710(e). (Edelson Decl. at ¶ 12; Dkt. No. 76 at 11.) Indeed, those very claims comprise the core of this case and guide each aspect of relief contemplated by the Settlement. Thus, as discussed in detail above, Plaintiffs' case moved forward without any guiding precedent (other than the VPPA itself) and, if settlement had not been reached, recovery was far from certain—especially in light of Netflix's anticipated defenses, recent case law from this District and the Seventh Circuit, and the risk of continued litigation. *See supra*, § III.A.1.

All told, this case involved a substantial amount of risk of non-payment/reimbursement, yet required a large commitment of time and resources from Class Counsel. That risk additionally

justifies the requested benchmark fee.

### 3. Prosecuting this case required substantial skill, resulting in the highest quality of representation for the named Plaintiffs and the Class

The prosecution of a complex, nationwide class action "requires unique skills and abilities." *In re OmniVision,* 559 F. Supp. 2d at 1047. Here, that requirement was present in droves. As discussed above, this case followed untested theories of recovery that affected an enormous (approximately 62 million) group of consumers. Netflix—a massive corporation with vast resources and a highly skilled legal team—contested (and still contests) each of Plaintiffs' claims. Accordingly, effective and efficient prosecution of Plaintiffs' claims required all of Class Counsel's discussed legal skill and experience. *See supra* § VI.F. Further, the fact that Class Counsel was (and is) prosecuting other, similar national class actions under the VPPA—in this and other District courts—means that the Class enjoyed the benefit of Counsel's specific experience without additional cost or time expended reviewing/analyzing related federal cases.

Ultimately, Class Counsel obtained a substantial, timely recovery for the Class in the face of substantial challenges against a formidable adversary. *See In re Heritage Bond Litig.*, 2005 WL 1594389, at *12 ("[The] single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."). Such representation supports the instant fee request.

### 4. Class Counsel advanced significant time and expense on a contingency basis.

At the time Milan's original complaint was filed, Class Counsel knew that they would spend hundreds of hours of attorney time in contested litigation with no guarantee of success. (Edelson Decl. at ¶ 63.) To date, Class Counsel and supporting counsel have in fact reasonably spent over 2424 hours representing Plaintiffs and the Class without compensation and requiring that other work be forgone. (Edelson Decl. ¶ 69.) In connection with that representation, Class Counsel and supporting counsel have advanced $47,502.56 in out-of-pocket litigation expenses prosecuting this case, with considerable risk of non-return. (Edelson Decl. ¶ 72.) Finally, Class Counsel anticipate devoting further time and resources to this case as the Settlement is shepherded through and beyond the final approval process. (Edelson Decl. ¶ 70.) In terms of actual investments made to-date, and among other such steps, Class Counsel:

(a) Conducted extensive pre-suit investigations, including identification and early legal analysis of the alleged business practices challenged by this case;

(b) Interviewed dozens of current and former Netflix subscribers, analyzed those customers' common experiences in light of Netflix's information retention practices, and shared—both on a formal and informal basis—information with other law firms and technology experts;

(c) Drafted and filed Plaintiff Milans's original complaint;

(d) Communicated early and often with Netflix's counsel, so as to open and maintain a dialogue regarding the Parties' respective views of the relevant facts, law, and overall direction of the litigation, along with advising Netflix of its duty to preserve all electronic data relevant to Plaintiffs' claims;

(e) Coordinated and prepared for an in-person meeting with Netflix's counsel on March 7, 2011 at JAMS in Los Angles, California, during which the Parties discussed the factual matters at issue (e.g., the type of customer information retained by Netflix and the advanced algorithms used to collect that information) and possibilities for resolving the lawsuit;

(f) Briefed and responded to motions seeking appointment as interim class counsel;

(g) Facilitated collaboration between all attorneys providing representation in the cases that were ultimately consolidated, so as to discuss views regarding the claims and facts at issue and coordinate efforts;

(h) Drafted and filed the operative Amended Consolidated Class Action Complaint (Dkt. No. 61);

(i) Prepared Rule 26(a)(1) disclosures and reviewed and analyzed those filed by Netflix;

(j) Propounded/reviewed discovery on/from Netflix, including twenty-five (25) interrogatories and fifty-nine (59) requests for the production of documents;

(k) Participated in Court-ordered telephonic ADR conferences on October 27 and November 29, 2011, which resulted in a stipulation to attend private mediation;

(l) Prepared a mediation brief, which fully presented Plaintiffs' factual contentions and legal theories and responded to Netflix's defenses;

(m) Participated in a full-day mediation with Netflix on February 2, 2012 in Santa Ana, California, resulting in the drafting of a Memorandum of Understanding outlining the underlying settlement structure;

(n) Engaged in continued communication, negotiations, and the exchange of settlement drafts with Netflix's counsel, which resulted in the drafting and execution of the finalized Settlement Agreement;

(o) Successfully briefed and moved for preliminary approval of the Settlement;

(p) Pursuant to the terms of the Settlement, effectuated notice to class members and hired additional staff to help respond to Class member inquires via telephone and email;

    (q) Solicited, received, and reviewed applications from over 40 potential *cy pres* recipients in conjunction with Netflix's counsel, and ultimately selected proposed recipients;

    (r) Took actions to protect the class from attorneys who attempted to improperly interfere with the *cy pres* process for their own personal gain;

    (s) Began researching and drafting responses to objections that have already been raised in response to the Settlement, along with those that Class Counsel anticipate will be raised.

(Edelson Decl. ¶¶ 64.) Of course, each step involved allocation of attorney time, required that other worked be forgone, and, in many cases, involved actual out-of-pocket expenses. Through such efforts and expenses, Class Counsel have invested significant time and finances into their representation of the Class without any guarantee of payment or reimbursement.

    **5. Class Counsel's fee request is consistent with awards in similar cases.**

    As previously noted, Class Counsel's fee request seeks the 25% benchmark set by the Ninth Circuit for common fund cases. *See Vizcaino*, 290 F.3d at 1047. That amount is directly in line with other recent consumer class action cases establishing a common fund both within and outside of this District. *See*, *e.g.*, *In re Google Buzz*, 2011 WL 7460099, at *4 (awarding class counsel attorney fees amounting to 25% of an $8,500,000 fund involving *cy pres* recipients (fees totaling $2,125,000) arising from consumer privacy claims); *Lane v. Facebook, Inc.*, No. C 08-3845 RS, 2010 WL 2076916, at *2 (N.D. Cal. May 24, 2010) (awarding class counsel attorney fees of approximately 25% of a $9,500,000 fund involving *cy pres* recipients (fees totaling $2,364,973) arising from consumer privacy claims); *Nobles v. MBNA Corp.*, C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) (awarding class counsel attorney fees amounting to 25% of an approximately $9.3 million fund (fees totaling $2,318,176.58) arising from a consumer fraudulent solicitation claim); *Fernandez v. Victoria Secret Stores, LLC*, CV 06-04149 MMM SHX, 2008 WL 8150856, at *16 (C.D. Cal. July 21, 2008) (awarding class counsel attorney fees amounting to 34% of an $8.5 million fund (fees totaling $2,890,000) arising from a class action brought on behalf of job applicants "who were subjected to unpaid job training"); *Razilov v. Nationwide Mut. Ins. Co.*, 01-CV-1466-BR, 2006 WL 3312024, at *1 (D. Or. Nov. 13, 2006) (awarding class counsel attorney fees amounting to 30% of a $19 million fund (fees totaling $5,772,606), arising from a Fair Credit Reporting Act case); *see also In re Informix Corp. Sec. Litig.*, No. 97-1289

1   (N.D. Cal., Nov.23, 1999) (Breyer, J.) (30% of $137 million fund (fees totaling $40 million)); *In*

2   *re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995) (Brooks,

3   M.J.) (30% of a $64 million fund (fees totaling $19 million)); *see also In re Immunex Sec. Litig.*,

4   864 F. Supp. 142 (W.D. Wash. 1994) (Dwyer, J.) (30% of $14 million fund (fees totaling $3.9

5   million)); *In re Melridge, Inc. Sec. Litig.*, No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and

6   Apr. 15, 1996) (Frye, J.) (37.1% of $54 million fund (fees totaling $20 million)); and *Hernandez*

7   *v. Kovacevich*, 2005 WL 2435906 (E.D. Cal. 2005) (Wagner, J.) (33.3% of $2.5 million fund (fees

8   totaling $795,000 fee)).

9        The *In re Google Buzz* matter is of particular note here, as that case, like this one: (1)

10   concerned federal and state statutory violations concerning the online privacy of consumers; (2)

11   produced a common fund of analogous size ($8.5 million); (3) involved a cash fund distribution to

12   *cy pres* recipients rather than class members; and (4) awarded the benchmark 25% fee award

13   ($2.125 million) to class counsel. *See In re Google Buzz*, 2011 WL 7460099, at *4. Likewise, the

14   *Lane* matter (1) involved alleged violations of state and federal law—including the VPPA—

15   concerning the online privacy of consumers; (2) produced a common fund of analogous size ($9.5

16   million); (3) used the cash fund to "set up a new charity organization called the Digital Trust

17   Fund" as a *cy pres* recipient and did not involve cash distributions to class members; and (4)

18   awarded approximately 25% of the common fund to class counsel in fees ($2,364,973). *Lane,*

19   2010 WL 2076916, at **2, 13.

20        In the end, Class Counsel's investment into this case on a contingent basis—coupled with the

21   high degree of risk in prosecuting Plaintiffs' claims, requisite level of skill, and, above all else, the

22   substantial results obtained for the Class—justifies the requested 25% benchmark fee. Class

23   Counsel's request is fair, in line with percentage awards granted in analogous cases, and should be

24   approved.

25        **B.   The Agreed-Upon Fee Is Reasonable Using the Lodestar Method of Analysis as a
             Cross-Check.**

26        The "lodestar method" calculates attorneys' fees by multiplying the number of hours that class

27   counsel reasonably expended on the litigation by an hourly rate that takes into consideration the

28

region and the experience of the lawyer. *Staton*, 327 F.3d at 965. It is appropriate to calculate

attorneys' fees at prevailing rates to compensate for delay in receipt of payment. *Vizcaino*, 290

F.3d at 1051. Courts typically apply a multiplier or enhancement to the lodestar to account for the

substantial risk that class counsel undertook by accepting a case where no payment would be

received if the lawsuit did not succeed. *Id.* at 1051.

The Ninth Circuit has identified twelve factors used in determining the reasonableness of a fee

award under a lodestar analysis:

> (1) the time and labor required, (2) the novelty and difficulty of the questions
> involved, (3) the skill requisite to perform the legal service properly, (4) the
> preclusion of other employment by the attorney due to acceptance of the case, (5)
> the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations
> imposed by the client or the circumstances, (8) the amount involved and the results
> obtained, (9) the experience, reputation, and ability of the attorneys, (10) the
> 'undesirability' of the case, (11) the nature and length of the professional
> relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *see Cunningham v. City of Los*

*Angeles*, 879 F.2d 481, 486 (9th Cir. 1988). These factors largely overlap with those discussed

above—*i.e.*, the five *Tarlecki* factors identified and discussed with respect to Class Counsel's

request for the benchmark 25% fee from the $9.0 million fund (*see supra* § VII.A))—and each

additionally supports the fee request using the lodestar method.

Here, the requested fee draws firm support from Class Counsel and supporting counsel's

combined current lodestar of $1,352,025 and present costs totaling $47,502.56, is reasonable, and

is well supported by the applicable factors discussed above and otherwise set forth in *Kerr*.

Further, the requested $2.25 million fee requires a modest multiplier of only 1.66—a value that

will only lessen as Class Counsel continues to work towards the final fairness hearing and the

Settlement's implementation. Accordingly, this Court should find that the negotiated fee is

reasonable using the lodestar method as a crosscheck to the percentage method discussed *supra*,

§ VII.A.

**1.   Class Counsel's current lodestar of $1,352,025 is reasonable, is comprised of reasonable hours and reasonable rates, and supports the requested attorneys' fees**

Class Counsel's current lodestar and out-of-pocket costs support the agreed-upon fee award of

$2.25 million and reimbursement of $25,000 in costs. Class Counsel and supporting counsel have

reasonably expended 3108.69 hours working on this case, which results in a current base lodestar of $1,352,025 (Edelson Decl. ¶ 71; Declaration of attorney Joseph Marchese attached hereto as Exhibit I ("Marchese Decl." ¶ 5 ); Declaration of attorney Christopher Marlborough attached hereto as Exhibit J ("Marlborough Decl.") ¶ 5); Declaration of attorney David Parisi attached hereto as Exhibit K ("Parisi Decl.") ¶ 6); Declaration of attorney Joseph Siprut attached hereto as Exhibit L ("Siprut Decl.") ¶ 5); Declaration of attorney Sameer Dua attached hereto as Exhibit M ("Dua Decl.") ¶ 5); Declaration of attorney Marc Godino attached hereto as Exhibit N ("Godino Decl.") ¶ 6.) The hours submitted have been reviewed, and any unnecessary hours have been adjusted or removed. (Edelson Decl. ¶ 65; Marchese Decl. ¶ 4; Marlborough Decl. ¶ 4; Parisi Decl. ¶ 5; Siprut Decl. ¶ 4; Dua Decl. ¶ 4; Godino Decl. ¶ 4.) Further, the attorneys working on this litigation bill hours at rates that correlate to their respective experience and are reasonable in the legal markets in Chicago and California. (Edelson Decl. ¶ 68.) The following chart[22] breaks down the lodestar figure into hours by each law firm involved in the consolidated cases:

| Law Firm | Hours | Total |
|---|---|---|
| Edelson McGuire, LLC | 2424.19 | $1,005,413.50[23] |
| Bursor & Fisher | 181.70 | $99,545.00 |
| Dua & Associates | 41.25 | $13,406.25 |
| Faruqi & Faruqi | 220.75 | $122,732.50 |
| Glancy, Binkow & Goldberg | 43.4 | $17,493.75 |
| Parisi & Havens | 45.3 | $18,509.00 |
| Siprut PC | 152.1 | $74,925.00 |
| **Total Current Lodestar** | **3108.69** | **$1,352,025.00** |

(Edelson Decl. ¶ 69; Marchese Decl. ¶ 5; Marlborough Decl. ¶ 5; Parisi Decl. ¶ 6; Siprut Decl. ¶ 5; Dua Decl. ¶ 5; Godino Decl. ¶ 6.)

This current lodestar of $1,352,025.00 represents the total work Class Counsel and Supporting Counsel have undertaken since the inception of this case. *See supra* § VII.A.4. Further, Class

---

[22]   A detailed breakdown of the lodestar figure into hours and hourly rate of each attorney who contributed to the prosecution of this case can be found in the declarations representing the seven law firms involved in the prosecution of this case. (Edelson Decl. ¶ 69; Marchese Decl. ¶ 5; Marlborough Decl. ¶ 5; Parisi Decl. ¶ 6; Siprut Decl. ¶ 5; Dua Decl. ¶ 7; Godino Decl. Ex. 2.)

[23]   In recognition that complete efficiency cannot always be achieved, we have reduced our base lodestar to account for any unintended inefficiencies.  Accordingly, the above attorney time is adjusted inasmuch as we exercised billing judgment, resulting in reduction of our lodestar by five percent.

Counsel anticipate that many more hours of attorney time (not included in the present lodestar value) will be required to prepare and file all papers in support of final approval, address objections to the Settlement, respond to all Settlement Class Member inquiries, and litigate any appeals. (Edelson Decl. ¶ 70.) Accordingly, the work performed to date, along with the work anticipated going forward, supports Class Counsel's lodestar.

### 2. A comparison with analogous settlements supports the application of a 1.66 multiplier

The lodestar analysis is not limited to the initial mathematical calculation of class counsel's base fee. *See Morales v. City of San Rafael*, 96 F.3d 359, 363–64 (9th Cir. 1996). Rather, counsel's actual lodestar may be enhanced according to those factors that have not been "subsumed within the initial calculation of hours reasonably expended at a reasonable rate." *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983); *Morales*, 96 F.3d at 364. In a historical review of numerous class action settlements, the Ninth Circuit found that lodestar multipliers normally range from 0.6 to 19.6, with most (83%) falling between 1 and 4, and a bare majority (54%) between 1.5 and 3. *Vizcaino*, 290 F.3d at 1051 n.6 and Appendix; *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:03 (3d ed. 1992) (recognizing that multipliers of 1 to 4 are frequently awarded).

Here, a modest 1.66 multiplier applied to the current lodestar supports the agreed-upon fee award. Doing the math shows that $1,352,025 x 1.66 = $2,244,361.50. When recoverable expenses (under the terms of the Settlement) of $25,000 are added, the total equals $2,269,361.50, an amount just above the requested fee and expenses award of $2,250,000.

The referenced 1.66 multiplier falls at the low end of the normal range applied in similar cases. *See Lane*, 2010 WL 2076916, at *2 (applying multiplier of 2); *In re Google Buzz*, 2011 WL 7460099 (approving crosscheck multiplier of 1.67); *Vizcaino*, 290 F.3d at 1052-54 (approving crosscheck multiplier of 3.65 and citing a survey of class settlements from 1996-2001 indicating that most multipliers range from 1.0 to 4.0); *see also In re Prudential Ins. Co.*, 148 F.3d 283, 341 (3rd Cir. 1998) ("[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."). In fact, multipliers at or above 2.0 are frequently

awarded to compensate attorneys who bring contingency fee suits in high-risk areas of law such as consumer class actions. *See*, *e.g.*, *Lane*, 2010 WL 2076916, at *2 (applying multiplier of 2); *Castaneda v. Burger King Corp.*, No. C-08-04262-WHA, 2010 WL 2735091 (N. D. Cal. Jul. 10, 2010) (awarding a multiplier of 1.9 in action by disabled consumers alleging ADA violations); *Ozga v. U.S. Remodelers, Inc.*, No. C-09-05112-JSW, 2010 WL 3186971 (N. D. Cal. Aug. 9, 2010) (awarding a multiplier of 2.3 in a wage-and-hour action); *In re HPL Technologies, Inc. Securities Litigation*, 366 F. Supp. 2d 912, 922-25 (N. D. Cal. 2005) (awarding multiplier of 2.87 in a securities action); *Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997) (affirming multiplier of 2.0 in 19 environmental contamination suits brought on behalf of residential property owners); *see also* Logan, 24 Class Action Rep. at 167 (concluding in empirical study of 1,120 common fund cases that in $5-10 million fund settlements the average percentage award is 30%, average multiplier is 1.89). In any event, the multiplier here is fully supported by the relevant lodestar-enhancing factors, including (a) the time and labor required, (b) preclusion of other employment by counsel, (c) fee awards in similar cases, and (d) risk of non-payment. (Edelson Decl. at ¶ 71); *see also Kerr,* 526 F.2d at 70; *Fischel*, 307 F.3d at 1008.

What's more, the required 1.66 multiplier will necessarily decrease as this case moves forward, and presumably beyond, final approval of the Settlement. Class Counsel projects that, at minimum, an additional $100,000 in attorneys' time will be required if the case moves forward and the Settlement is implemented. (Edelson Decl. at ¶ 70.) To that end, Class Counsel have yet to (1) respond to Class Member inquires received after the filing of this brief (which will be extensive), (2) receive, review, and reply to all objections to the Settlement, (3) prepare and appear for the final fairness hearing in this matter (scheduled for December 5, 2012), (4) respond to any concerns raised by the Court at and after the final fairness hearing, (5) assuming the Court grants this Motion, take all subsequent steps required to effectuate the settlement, and (6) defend the Settlement against any appeals. (Edelson Decl. at ¶ 70.)

In light of the results obtained on behalf of the Class, those other factors discussed above, the range of multipliers awarded in analogous cases, and the fact that the needed multiplier will only decrease as this litigation concludes, the requested 1.66 multiplier is reasonable.

**C.  Class Counsel is Further Entitled to Reimbursement of Litigation Expenses.**

It is settled that in a certified class action, "in addition to attorneys fees, reasonable costs and expenses are eligible for reimbursement." *White v. Experian Info. Solutions, Inc.*, No. 05-cv-1070 DOC, 2011 WL 2971957, at *2 (C.D. Cal. July 15, 2011); *see* Fed. R. Civ. P. 23(h).

Here, while the law firms involved in the prosecution of the consolidated cases have expended over $47,502.56 in out-of-pocket costs (all of which is potentially recoverable from the achieved common fund), Class Counsel agreed to limit reimbursable costs to only $25,000—further demonstrating the Settlement's absolute reasonableness. (Edelson Decl. ¶ 72; Marchese Decl. ¶ 6; Marlborough Decl. ¶ 6; Parisi Decl. ¶ 7; Siprut Decl. ¶ x; Godino Decl. ¶ 7.) These expenses include filing fees, summons and service fees, *pro hac vice* application fees and other court costs, expert costs, mediator fees, travel, lodging, mailing fees, and messenger delivery fees. (Edelson Decl. ¶ 72; Marchese Decl. ¶ 7; Marlborough Decl. ¶ 5; Parisi Decl. ¶ x; Siprut Decl. ¶ 6; Godino Decl. ¶ 7.) These expenses were necessary litigation expenses and costs that were reasonably expended by Class Counsel and were made without any assurance that they would be repaid. (*Id.*) *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (awarding class counsel over $2,000,000 in reasonable litigation expenses). Class Counsel made every effort to keep such costs at a minimum. (Edelson Decl. ¶ 72.) Accordingly, Class Counsel's request for reimbursement of expenses should be granted.

**D.  The Court Should Approve the Agreed-Upon Incentive Awards to the Class Representatives and Named-Plaintiffs in the Related Actions.**

The Settlement provides that, subject to Court approval, the Class Representatives and named-Plaintiffs in the Related Actions shall receive a collective Incentive Award of thirty thousand dollars ($30,000) to be paid from the Settlement Fund. (Ex. A at § 9.2) "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. Such awards are "fairly typical in class action cases." *Rodriguez*, 563 F.3d at 958 (citing *See* 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008)); *see also*, *e.g.*, *Staton,* 327 F.3d at 976 (9th Cir. 2003) (noting approval of incentive award of $5,000 for each class representative); *Ingram v. The Coca-Cola*

*Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving payments of $3,000 for each person who executed an affidavit, in recognition of contribution to litigation that entailed risk and effort). Incentive awards "are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez,* 563 F.3d. at 958-59 (citing *In re Mego Fin. Corp.,* 213 F.3d at 463).  In addition, "the notoriety and personal difficulties encountered by the class representative" should also be considered. *Van Vranken*, 901 F. Supp. at 299.

Here, the requested award is supported by the fact that each Class Representative and named-Plaintiff has admirably stood up to Netflix—a giant, well-known corporation with vast resources—and remained absolutely committed to pursuing their respective cases on behalf of the Class. (Edelson Decl. ¶ 73.) Each of them accepted the responsibilities and burdens attendant to serving as a class representative in a high profile lawsuit and each faced public scrutiny through the wide media coverage of this case—with Plaintiffs Jeff Milans and Peter Comstock being discussed personally and often throughout the various stages of this litigation. (Edelson Decl. ¶ 74.) No one was promised that Class Counsel would seek any specific incentive award at any stage of the litigation, and the requested incentive award is in no way tied to the relief obtained for the Class. (Edelson Decl. ¶ 74.) Rather, the requested award is solely designed to compensate the six representatives ($6,000 to each of the Class Representatives and $3,000 to each of the named-Plaintiffs in the Related Actions) for their efforts in this case and willingness to serve as Class Representatives despite any associated reputational risks.

As such, the Court should approve the agreed-upon cumulative incentive award of $30,000 to these individuals.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order: (a) granting final approval of the Agreement; (b) dismissing all Released Claims with prejudice; (c) approving the negotiated attorneys' fees and incentive award; and (d) granting such other and further relief as the Court deems reasonable and just.

October 31, 2012                          Respectfully Submitted,

                                          **JEFF MILANS and PETER COMSTOCK**,
                                          individually and on behalf of classes of similarly
                                          situated individuals,

                                          By: /s/ Jay Edelson
                                          One of Plaintiffs' Attorneys

SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: 949.459.2124
Fax: 949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
*Admitted *pro hac vice*
*Attorneys for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on October 31, 2012, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: October 31, 2012                    /s/ Rafey S. Balabanian