# Exhibit B

1

**UNITED STATES DISTRICT COURT**

2

**NORTHERN DISTRICT OF CALIFORNIA**

3

**SAN JOSE DIVISION**

4

*IN RE: NETFLIX PRIVACY LITIGATION*

Case No. 5:11-cv-00379-EJD

5

**DECLARATION OF DR. SERGE EGELMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL**

6

7

8

[Hon. Edward J. Davila]

9

10

**DECLARATION OF DR. SERGE EGELMAN**

11

Pursuant to 28 U.S.C. § 1746, I, Dr. Serge Egelman, hereby declare and state as follows:

12

1.      I am a resident of the State of California, and am a computer scientist. A copy of

13

my curriculum vitae is attached hereto as Exhibit 1. I am over the age of eighteen and am fully

14

competent to make this declaration. This declaration is based upon my personal knowledge,

15

except where expressly noted otherwise.

16

**Initial Basis for Analysis**

17

2.      For purposes of this declaration, I have been asked to determine the monetary

18

harm to class members as a result of Netflix's allegedly unlawful retention of their personally-

19

identifiable video rental histories (hereinafter "video histories.") My conclusions are stated

20

herein, and are explained more fully in my report attached hereto as Exhibit 2.

21

3.      I have reviewed a significant number of documents in this case including the

22

complaint and the settlement agreement reached by the parties. I have also reviewed the existing

23

literature concerning behavioral economics and privacy practices, as well as the underlying data

24

from my own previous studies of privacy valuations. Additionally, I conducted an online survey

25

in order to identify reasonable proxies for PII from the existing privacy literature.

26

**Analysis**

27

4.      By reviewing the existing behavioral economics studies, conducted by myself and

28

others, I concluded that the upper and lower bounds for the Class's harm in this litigation are $0.41 and $0.15, respectively.

5.      Then, because none of the existing literature measured the value of video histories, I conducted a survey using Amazon's Mechanical Turk to determine a reasonable proxy for the Class members' video histories. Through the survey, I determined that batteries were most similar to PII in terms of value of privacy.

6.      By then looking to existing literature that analyzed the value of privacy in battery purchases, I determined that Netflix's allegedly unlawful retention of the Class members' video histories caused damages of $0.15 per person.

**Conclusion**

7.      Thus, if the $0.15 per person damages figure applied across the roughly 62 million person class brings total, class-wide damages would total approximately $9.3 million. This is likely a serious over-estimation, however, because only some of the Class members—those who have cancelled their Netflix subscriptions—have suffered damages as a result of the alleged retention. Based on publicly available data, I estimate that roughly one-half of the Settlement Class have cancelled their subscriptions and thus suffered damages from Netflix's alleged retention. Thus, by my calculations, the Settlement Class suffered roughly $4.65 million in aggregate actual damages, and the $9 million Settlement Fund offers a more than adequate result for the Class.

8.      Additionally, the injunctive relief further enhances the Settlement's value to the Class. By preventing Netflix from unlawfully retaining the Class members' PII going forward, the injunctive relief is preventing harm of $0.15 to each current Netflix subscriber, thereby giving the injunctive relief $4.65 million in value to the Class.

9.      When viewing the Settlement as a whole, the combination of the Settlement Fund and the valuable injunctive relief provides a beneficial result that outweighs the harm suffered by the Class.

Executed on October 30, 2012 at Berkeley, California.

Dr. Serge Egelman

# Exhibit 1

**Serge Egelman**

731 Soda Hall
Berkeley, CA 94720
USA

Email: serge@guanotronic.com

## Education

- **PhD in Computation, Organizations, and Society**, May 2009
  School of Computer Science, Carnegie Mellon University
- **BS in Computer Engineering**, May 2004
  School of Engineering and Applied Science, University of Virginia

## Refereed Journal Publications

- The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. Information Systems Research (ISR), 22(2), June 2011, pp. 254-268 (with J. Tsai, L. Cranor, and A. Acquisti). *Best Published Paper Award!*
- P3P Deployment on Websites. Electronic Commerce Research and Applications (ECRA), Autumn 2008 (with L. Cranor, S. Sheng, A. McDonald, and A. Chowdhury).
- The Real ID Act: Fixing Identity Documents with Duct Tape. I/S: A Journal of Law and Policy for the Information Society, 2(1), Winter 2006, pp. 149-183 (with L. Cranor).

## Refereed Conference Papers

- Android Permissions: User Attention, Comprehension, and Behavior. Proceedings of the 2012 Symposium on Usable Privacy and Security (SOUPS). July 2012 (with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner). *Best Paper Award!*
- Facebook and Privacy: It's Complicated. Proceedings of the 2012 Symposium on Usable Privacy and Security (SOUPS). July 2012 (with M. Johnson and S. Bellovin).
- Oops, I Did It Again: Mitigating Repeated Access Control Errors on Facebook. CHI '11: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2011 (with A. Oates and S. Krishnamurthi).
- Of Passwords and People: Measuring the Effect of Password-Composition Policies. CHI '11: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2011 (with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor). *Best Paper Nominee!*
- It's All About The Benjamins: An empirical study on incentivizing users to ignore security advice. Financial Cryptography and Data Security. 2011 (with N. Christin, T. Vidas, and J. Grossklags).
- Crying Wolf: An Empirical Study of SSL Warning Effectiveness. The 18th USENIX Security Symposium. 2009 (with J. Sunshine, H. Almuhimedi, N. Atri, and L. Cranor).
- It's No Secret: Measuring the reliability of authentication via 'secret' questions. The 2009 IEEE Symposium on Security and Privacy (with S. Schechter and A.J. Brush).
- It's Not What You Know, But Who You Know: A social approach to last-resort authentication. CHI '09: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2009 (with S. Schechter and R. Reeder).
- Timing Is Everything? The Effects of Timing and Placement of Online Privacy Indicators. CHI '09: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2009 (with J. Tsai, L. Cranor, and A. Acquisti).
- Family Accounts: A new paradigm for user accounts within the home environment. CSCW '08: Proceedings of the 2008 Conference on Computer Supported Cooperative Work. 2008 (with A.J. Brush and K. Inkpen).
- You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings. CHI '08: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2008 (with L. Cranor and J. Hong). *Best Paper Nominee!*
- Phinding Phish: An Evaluation of Anti-Phishing Toolbars. NDSS: Proceedings of the ISOC Symposium on Network and Distributed System Security. February 2007 (with Y. Zhang, L. Cranor, and J. Hong).
- An Analysis of P3P-Enabled Web Sites among Top-20 Search Results. Proceedings of the Eighth International Conference on Electronic Commerce. August 2006 (with L. Cranor and A. Chowdhury).
- Power Strips, Prophylactics, and Privacy, Oh My!. Proceedings of the 2006 Symposium On Usable Privacy and Security (SOUPS). July 2006 (with J. Gideon, L. Cranor, and A. Acquisti).

## Refereed Workshop Papers

- I've Got 99 Problems, But Vibration Ain't One: A Survey of Smartphone Users' Concerns. The 2nd Annual ACM CCS Workshop on Security and Privacy in Smartphones and Mobile Devices (SPSM). October 2012 (with A. P. Felt and D. Wagner).
- How to Ask for Permission. The 7th USENIX Workshop on Hot Topics in Security (HotSec '12). August 2012 (with A. P. Felt, M. Finifter, D. Akhawe, and D. Wagner).
- Choice Architecture and Smartphone Privacy: There's A Price for That. Workshop on the Economics of Information Security (WEIS). June 2012 (with A. P. Felt and D. Wagner).
- How Good Is Good Enough? The Sisyphean Struggle for Optimal Privacy Settings. CSCW 2012 Workshop on Reconciling Privacy with Social Media. February 2012 (with M. Johnson).
- Toward Privacy Standards Based on Empirical Studies. W3C Workshop on Web Tracking and User Privacy. April

2011 (with E. McCallister).

- Please Continue to Hold: An empirical study on user tolerance of security delays. Workshop on the Economics of Information Security (WEIS). June 2010 (with D. Molnar, N. Christin, A. Acquisti, C. Herley, and S. Krishnamurthi).
- Tell Me Lies: A Methodology for Scientifically Rigorous Security User Studies. Workshop on Studying Online Behaviour at CHI'10. April 2010 (with J. Tsai and L. F. Cranor).
- The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. Workshop on the Economics of Information Security (WEIS). June 2007 (with J. Tsai, L. Cranor, and A. Acquisti).
- Security User Studies: Methodologies and Best Practices. CHI '07 Extended Abstracts on Human Factors in Computing Systems. April 2007 (with J. King, R. Miller, N. Ragouzis, and E. Shehan).
- Studying The Impact of Privacy Information on Online Purchase Decisions. Workshop on Privacy and HCI: Methodologies for Studying Privacy Issues at CHI'06. April 2006 (with J. Tsai, L. Cranor, and A. Acquisti).

## Book Chapters and Magazine Articles

- Crowdsourcing. To appear in *Ways of Knowing in HCI*, J. Olson and W. Kellogg (Eds.), to be published by Springer (with E. Chi and S. Dow).
- Conference Report: SOUPS 2006. *IEEE Security & Privacy*. November/December 2006 (with J. Tsai).
- Conference Report: 14th USENIX Security Symposium. *;login:*. December 2005 (with K. Butler, M. Chow, J. Duerig, B. Hicks, F. Hsu, S. Kelm, and M. Rajagopalan).
- Conference Report: 13th USENIX Security Symposium. *;login:*. December 2004 (with A. AuYoung, E. Cronin, M. Dougherty, R. Greenstadt, S. Kelm, Z. Liang, C. Mano, N. Smith, A. Raniwala, T. Whalen, and W. Xu).
- Suing Spammers for Fun and Profit. *;login:*. April 2004.
- Installation. *Peter Norton's Complete Guide to Linux*. Macmillan Computer Publishing. 1999.
- User Administration. *Peter Norton's Complete Guide to Linux*. Macmillan Computer Publishing. 1999.

## Research Experience

**Scientist**
*University of California, Berkeley*
September 2011-present

I am currently working with David Wagner's research group to examine privacy and security issues on mobile devices (e.g., smartphones). Specifically, we are examining how users make decisions to install particular applications and how to better alert them to potential malware. We are in the process of creating a new architecture for prompting users when an application requests certain hardware or software abilities.

**Scientist**
*NIST*
August 2010-July 2011

I helped design and conduct studies to examine how users interact with authentication systems, specifically password and token-based systems. I co-organized a workshop on the NIST campus to discuss ways in which usable security research and techniques could be formally integrated into the development process, as well as reviewed grant proposals for NIST funding.

**Postdoctoral Research Associate**
*Brown University*
August 2009-August 2010

I worked with Shriram Krishnamurthi on creating better interfaces for policy authors to specify access control policies. We conducted studies to determine common policy errors, the causes of these errors, and the types of interfaces that policy authors currently use. We developed a new policy authoring interface that allows users of social networking websites to interactively specify policies in order to more easily detect and clarify ambiguities. We designed and conducted a usability study to validate our tool.

**Research Assistant**
*Carnegie Mellon University*
June 2004-May 2009

While pursuing a PhD under the direction of Dr. Lorrie Cranor in the Computation, Organizations, and Society program at CMU, I focused primarily on the usability of privacy and security systems. Areas that I worked in included creating more effective web browser trust indicators, creating usable privacy tools, Internet anonymity, and detection and prevention of phishing attacks. My dissertation is entitled "Trust Me: Designing Trustworthy Trust Indicators." My committee consisted of Lorrie Cranor (chair), Jim Herbsleb, Jason Hong, and Steve Bellovin (Columbia University).

**Research Intern**
*Microsoft Research*
July 2008-October 2008

During my second internship at MSR, I conducted two user studies with Stuart Schechter. We first looked at using social networks as a means for authenticating webmail users who had forgotten their passwords. We tested the usability of our system as well as how susceptible it would be to various attacks. Additionally, I assisted the Internet Explorer team with new designs for their security warnings based on my research. We tested the new warnings in the laboratory using an eye tracker.

**Research Intern**
*Microsoft Research*
January 2008-April 2008

I was an intern at MSR working with A.J. Brush and Kori Inpken on user account models for shared family computers. We examined why the current user account model does not work on computers shared by trusted individuals (i.e. communal home computers) and developed a more appropriate model. I implemented our prototype in C# and ran a usability study.

This work was published at the 2008 Computer Supported Cooperative Work (CSCW) conference.

**Research Intern**
*Xerox PARC*
June 2006-September 2006

During the summer of 2006, I worked with Jim Thornton in the Computer Science Lab (CSL) at PARC. My main focus was on malware detection using virtualization. The project involved creating a Windows kernel driver that would intercept system calls (like a rootkit) on the guest operating system, and then reporting back the state of the guest to the host. Additional work focused on writing security mechanisms to protect code running under a virtual machine.

## Professional Experience

**Developer**
*Tovaris: The Digital Identity Company*
2000-2001

I worked part time doing development in C++ for the Mithril Secure Server (an encrypted email solution). I mostly wrote CGI code for administering the servers from a front-end, although I did do some work on the back-end. This involved getting very familiar with the OpenSSL libraries. Most of the development was done under OpenBSD, using C++, though I also did some work in Perl.

**Technical Support / Developer / System Administrator**
*Broadband Network Services, Inc.*
1999-2000

I handled all of the technical support questions via telephone and e-mail. I maintained and administrated all of our databases using MySQL. This included setting up new database customers, adding and removing databases, and maintaining MySQL. I used PHP, Perl, and bash to write scripts to aid in system administration and to automate other common tasks. I handled most of the website development that we were hired to do; this included writing scripts, HTML, and database management. My administrative responsibilities included maintaining our primary and secondary DNS, Sendmail, Apache, and PHP. I also aided in creating and removing accounts, setting up new virtual hosts, setting up and maintaining network monitoring, and maintaining hardware; this included building and configuring computers.

## Teaching Experience

**Information Security & Privacy (46-861)**
*Carnegie Mellon University*
Fall 2007

Teaching assistant duties included developing course materials (topics for lectures, assignments, and exams), grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

**Computers and Society (15-290)**
*Carnegie Mellon University*
Spring 2006

Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

**Information Security (CS 451)**
*University of Virginia*
Fall 2003

Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, and holding office hours.

**Intellectual Property (TCC 200)**
*University of Virginia*
Fall 2003

Teaching assistant duties included grading assignments and holding office hours.

**Advanced Software Development Methods (CS 340)**
*University of Virginia*
Spring 2003, Spring 2004

Teaching assistant duties included grading assignments and exams, and holding office hours.

**Engineering Software (CS 201J)**
*University of Virginia*
Fall 2002

Teaching assistant duties included grading assignments and holding office hours.

## Research Grants

- Google Faculty Research Award, *Designing Usable Certificate Dialogs in Chrome*. Principal Investigator, 2010. Budget: $60,000.

- NSF Trustworthy Computing, Small, *Interfaces to Reduce Human Error in Access Control Policy Authoring*. Principal Investigator (Co-PIs: Shriram Krishnamurthi and Kathi Fisler), 2010. Budget: $500,000; *Recommended for funding, though upon accepting a job within the government, we were forced to subsequently withdraw the proposal.*

## Professional Activities

- **Program Committees**
  2013: CHI; Symposium On Usable Privacy and Security (SOUPS)
  2012: Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW)
  2011: Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Computers, Freedom, and Privacy (CFP) Conference (poster session co-chair); Software and Usable Security Aligned for Good Engineering (SAUSAGE) Workshop (co-chair)
  2010: Symposium On Usable Privacy and Security (SOUPS)
  2008: Conference on Information and Knowledge Management (CIKM)
  2007: CHI 2007 Workshop - Security User Studies: Methodologies and Best Practices; Anti-Phishing Working Group eCrime Researchers Summit (poster session co-chair)
  2006: Computers, Freedom, and Privacy (CFP) Conference
- **Standards Committees**
  2007-2008: W3C Web Security Context (WSC) Working Group
  2004-2006: W3C Platform for Privacy Preferences (P3P) 1.1 Working Group
- **Leadership Roles**
  *Legislative Concerns Chair, Board of Directors*
  National Association of Graduate and Professional Students (NAGPS), 2006-2008
  *Vice President for External Affairs*
  Carnegie Mellon Graduate Student Assembly, 2006-2008

## Awards and Nominations

- **ISR Best Published Paper**, 2012

  *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, received the Best Published Paper Award at the 2012 INFORMS Conference (with J. Tsai, L. Cranor, and A. Acquisti).
- **SOUPS Best Paper Award**, 2012

  *Android Permissions: User Attention, Comprehension, and Behavior*, received the Best Paper Award at the Symposium on Usable Privacy and Security (with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner).
- **CHI Best Paper Nominee**, 2011

  *Of Passwords and People: Measuring the Effect of Password-Composition Policies*, received an honorable mention at CHI 2011 (with with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor).
- **CHI Best Paper Nominee**, 2008

  *You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings*, received an honorable mention at CHI 2008 (with L. Cranor and J. Hong).
- **Tor Graphical User Interface Design Competition**, 2006

  Phase 1 Overall Winner (with L. Cranor, J. Hong, P. Kumaraguru, C. Kuo, S. Romanosky, J. Tsai, and K. Vaniea).
- **University of Virginia Dean's List of Scholars**

  I was included on the Spring 2003 and 2004 Dean's List of Scholars.
- **Publisher's Clearing House Finalist**

  I *may* already be a winner.

Last modified October 2012.

# Exhibit 2

# Expert Witness Report

**In re: Netflix Privacy Litigation,**
**No. 5:11-cv-00379-EJD (N.D. Cal.)**

Serge Egelman, Ph.D.

October 30, 2012

## Contents

**1. Introduction**     **2**

**2. Previous Privacy Valuations**     **3**
    2.1. Privacy-Sensitive Online Purchases . . . . . . . . . . . . . . . . . 4
    2.2. Location Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.3. Demographic Data . . . . . . . . . . . . . . . . . . . . . . . . . 7

**3. Survey of Internet Users**     **7**

**4. Conclusion**     **9**

**A. Survey Instrument**     **12**

**B. Biography**     **16**

**C. Curriculum Vitae**     **17**

1

# 1. Introduction

This case stems from Netflix's alleged unlawful retention and dissemination of former customers' video viewing histories. The theory of damages used in the settlement agreement stems from estimates of the value that each customer likely placed on his or her viewing history, and therefore would have accepted as compensation in exchange for willingly granting Netflix perpetual access to this information. In this report, I estimate the monetary value of this data on a per user basis.

While many individuals claim to value their privacy, few are willing to take actions or pay costs in order to actually protect it [1, 16, 3]. This means that observations of human behavior are the only way of yielding accurate estimates for how people value their personal information. Because I am unaware of any research that has been conducted to assess customers' perceived values of their Netflix (or other video rental) histories, the method I used for calculating my estimate is twofold. First, I examined existing privacy literature on willingness to pay and willingness to accept across varying types of data. In the past five years, research studies have been conducted to assess the maximum amount that people would be willing to pay to prevent the disclosure of certain types of personal information, as well as the corollary (willingness to accept), which is the minimum amount they would be willing to receive in exchange for disclosure. These studies have examined a variety of data types, ranging from the benign (e.g., location data collected by a smartphone's onboard GPS sensor) to the highly sensitive (e.g., online sex toy purchases). Behavioral economics studies provide reasonable bounds for the value that we can expect customers to accept in exchange for disclosing their Netflix data. However, one missing component from these studies is that they do not establish how Netflix customers value their Netflix data relative to the data types that have been studied. Therefore, in the second part of this report I performed an online survey of Netflix customers to establish how they value their video rental histories relative to other data types.

Based on my review of the literature and my survey of Netflix users, I estimate that the upper bound for the value of the data is approximately $0.41 per person, since this is the average value that prior study participants have placed on protecting highly-sensitive online purchases. However, based on my survey results, which show that customers likely view their Netflix histories similarly to other benign online purchases (and slightly less than location data), I believe that the true value is likely around $0.15 per person. In the remainder of this report, I outline prior work in the area that I used to come up with my estimates, as well as my survey methodology and results.

## 2. Previous Privacy Valuations

Over the past five years, researchers have performed several studies to assess the value that Internet users place upon different types of personal information. However, studies that observed direct exchanges of money for personal data should be taken with a grain of salt because users rarely encounter these scenarios in real life: choosing to divulge or retain personal information is always part of a much larger value proposition. For instance, a grocery store customer is never explicitly asked to name a price to be paid in exchange for providing her purchasing habits; instead, she receives discounts if she chooses to use a loyalty card.

Acquisti and Grossklags empirically showed this: in their experiment, they found that individuals claimed to want very large amounts of compensation for outright selling their private information to an entity with whom they otherwise would not interact. When that same personal information was requested as part of other transactions, participants accepted much smaller discounts for its disclosure [2]. To give a more concrete example, when Danezis et al. asked people the amount of money they would like to receive in exchange for disclosing their location data, the mean response was £27 [6]. I performed a similar study last year, in which the decision to disclose GPS location was part of a much larger value proposition (i.e., the decision of whether or not to install a smartphone application). In that study, we found that participants' valuations of their location data decreased by two orders of magnitude [8]. While this change cannot be solely attributed to the way in which the request was framed (e.g., the studies were conducted on different samples six years apart), it strongly suggests that directly asking people to make valuations of their personal data is likely to lead to highly inflated values.

Therefore, the extent to which people value their personal information can most accurately be assessed through rigorously controlled experiments wherein the decisions to disclose personal information are part of larger value propositions. Indeed, this is the scenario that Netflix users face: data was retained, in part, to improve recommendations, as well as for convenience, in the case of a returning former customer. Thus, both the benefits and costs of disclosure need to be included in the valuation of the data.

I am unaware of research that has been performed to directly assess the monetary value that Netflix customers (or other video rental customers) place upon their rental histories. However, by examining studies on personal data that individuals found more sensitive than video rental histories, it is possible to interpolate upper bounds for the monetary value of an individual's video history data. In this section, I provide an overview of a few relevant privacy research studies that have examined willingness to pay and willingness to accept within the contexts of privacy-sensitive online purchases, location tracking, and demographic data.

3

## 2.1. Privacy-Sensitive Online Purchases

I have personally performed studies to assess the amount that individuals are willing to pay to prevent the disclosure of sensitive personal information when conducting online shopping transactions. In several studies (e.g., [10, 18, 9]), we observed individuals while they made online purchases that involved items that were designed to raise privacy concerns. We observed whether they would pay additional money to make their purchases from websites with better privacy practices. To maximize effect sizes, we selected the items that participants would be purchasing based on a survey we conducted; our goal was to select items that were likely to raise participants' privacy concerns, yet not be so sensitive that participants would refuse to complete the experiment because they were unwilling to purchase the items under any circumstances.

In September of 2006, we conducted an online survey of 276 individuals to determine what types of products were likely to raise privacy concerns when purchased online [18]. Our sample population was between 18 and 71 years of age ($\mu = 30.2$), with a majority being female (62.5%). We asked respondents to categorize various items using a 4-point Likert scale with the following options:

1. Would not purchase

2. Would purchase, but very concerned

3. Would purchase, but somewhat concerned

4. Would purchase, no concerns

From our survey results (see Figure 1), we decided to focus on the purchase of sex toys, since they raised significant privacy concerns, but at the same time most participants were still willing to purchase them. As a control, participants also purchased office supplies, since our survey results indicated that those transactions would be unlikely to raise privacy concerns. Thus, participants came to the laboratory to make two purchases from online retailers: a pack of AA batteries and a particular sex toy. The order in which they purchased each product was randomized. A subset of our participants used a search engine that I wrote which annotated search results with meters that reflected the strength of each website's privacy policy; participants in the control condition saw no such privacy indicators. High-privacy websites made promises to not retain or disclose information, whereas low-privacy websites did not make these guarantees. We curated the search results such that the vendors with the most stringent privacy policies were also more expensive: privacy-concerned participants would have to pay a premium to make purchases from the websites with the more stringent privacy policies. Specifically, the average premium for the batteries was $0.61 (i.e., the



Figure 1: Online survey respondents categorized their willingness to purchase spe-
cific items using a scale from 1 to 4 that represented in increasing order:
"would not purchase," "would purchase but very concerned," "would
purchase, but somewhat concerned," and "would purchase, no concerns."

price difference between high-privacy and low-privacy vendors) over the average
base price of $14.53, whereas the average premium for the sex toy was $1.32 over
the average base price of $15.22.

During recruitment for the experiment, we screened out 12.5% of our potential
participants because they did not care about online privacy, and therefore would
be unwilling to pay a premium for privacy under any circumstances. Overall, the
sixteen participants who were exposed to additional privacy information paid an
average privacy premium of $0.62 when purchasing the sex toys, whereas they
paid an average privacy premium of $0.59 when purchasing the batteries. If we
extrapolate this to the larger population (i.e., multiplied by 87.5%), we can expect
the estimates of the privacy premiums to be $0.54 and $0.52, respectively.

However, these estimates are likely very high because our participants did not pay premiums out of pocket, instead they were reimbursed for their full purchase amounts. We rectified this confound in a followup experiment [9]. In this followup experiment, we compensated every participant with the same flat amount, which meant that if they bought items from more expensive vendors—in order to better protect their privacy—they would be paying that premium out of pocket. As in our prior experiment [18], we screened out 16.4% of potential participants because they stated a lack of concern for privacy issues when performing online transactions. We observed that when contrasts between websites' privacy policies were made apparent to participants, thirty-five (52% of 67) were willing to pay a $0.75 premium to buy the sex toy from the website with the most stringent privacy policy (i.e., the one that did not retain or sell transaction data), while 24 (36% of 67) were willing to pay this same privacy premium when purchasing the batteries. Factoring in the 16.4% of the population that was excluded from the study, I calculate that the expected value for the sex toy data is between $0.25 and $0.41 per person (95% confidence interval), whereas I calculate the expected value for the more-benign battery purchase at between $0.15 and $0.30 per person.

Thus, I believe that $0.41 is a reasonable upper bound for estimating the amount of money that people might pay to prevent the disclosure or retention of information about transactions involving highly sensitive products.

## 2.2. Location Data

In October of 2011, I performed an online experiment to examine whether smartphone users would be willing to pay additional money for applications that collected less personal information [8]. The experiment featured 483 participants in total who were given a choice between four different smartphone applications that only differed based on price and the information they collected. Faced with the choice of whether or not to disclose their locations (based on their smartphones' onboard GPS sensors), 151 participants (31.3% of 483) stated that they would grant the application access in order to save $0.50. Taking into account the 95% confidence interval based upon our sample size, I would estimate that generalized to the larger population, this would put the value of location data at between $0.14 and $0.18. Of course, this estimate is based on a study in which participants only stated their willingness to accept privacy tradeoffs, rather than one in which they were observed making actual purchases and disclosing their actual information. Likewise, this study was performed within the context of a specific smartphone application; it is unclear how this estimate might change based on a different context. For example, a more desirable application may decrease the value that they place on their location privacy.

## 2.3. Demographic Data

Beresford et al. performed a study on willingness to pay for privacy by observing laboratory participants make online DVD purchases [5]. They gave participants the option of making purchases from two different fictitious online stores that differed based on their prices and the information they requested to complete purchases. The more expensive store charged 1 Euro more, but unlike the cheaper store, it did not require customers to report their income. The researchers found that only three participants (7% of 42) were willing to pay the 1 Euro privacy premium. Converted to U.S. Dollars, the 95% confidence interval for participants' average expected value for disclosing their income is between $0.02 and $0.25.

# 3. Survey of Internet Users

While the studies that I have summarized in the previous sections of this report provide reasonable estimates for how individuals value certain types of information, none of these studies directly addressed video rental history data, which is the subject of this case. Without performing a survey to gauge how individuals compare the sensitivity of video rental history data to other well-studied types of personal data, we can only speculate about the value of the former. Thus, I took it upon myself to perform such a survey.

On October 10th, 2012, I conducted an online survey in which I asked respondents to rank the sensitivity of their Netflix rental histories relative to other types of data. In the survey, I first asked participants three questions to classify them using Westin's most recent privacy index [17]. On the second page of the survey, I provided participants with 11 types of personal data and asked them to rank the data types based on how concerned they would be if a website were to collect each one. As a sanity check, I asked them to explain why they chose their particular ranking. The third and final page of the survey featured questions to assess demographic information, as well as whether they had ever had a Netflix account.

I posted this survey on Amazon's Mechanical Turk [4], which is a crowd-sourcing website that has become an accepted research participant recruitment tool (e.g., [11, 15, 13]). I paid each participant $0.25 to complete the survey and limited participation to those within the U.S. Rather than screening for Netflix users and potentially priming participants to the purpose of the survey, I instead included questions at the end to determine whether they had accounts with (or visited) several popular websites, which included Netflix. Therefore, participants were unlikely to have understood that their Netflix data was the primary focus. I received responses from 139 Netflix users and 34 non-Netflix users.[1]

---

[1]Opinions did not statistically significantly differ between Netflix users and non-Netflix users.

| Rank | Data Type | $\mu$ | $(\sigma)$ |
|---|---|---|---|
| 1 | Mailing Address | 3.46 | (2.41) |
| 2 | Facebook Profile Information | 4.94 | (2.93) |
| 3 | Google Search History | 5.09 | (3.00) |
| 4 | Receipt from Online Sex Toy Purchase | 5.43 | (3.28) |
| 5 | Name | 5.56 | (3.33) |
| 6 | Income | 5.57 | (2.76) |
| 7 | Email Address | 5.83 | (2.51) |
| 8 | Date of Birth | 6.20 | (2.72) |
| 9 | GPS Location | 6.87 | (3.12) |
| 10 | Receipt from Online Office Supplies Purchase | 8.22 | (2.62) |
| 11 | Netflix Video Rental History | 8.82 | (2.17) |

Table 1: Results from a survey where 139 Netflix users ranked the relative concern level over the collection of 11 types of personal data, sorted from "most sensitive" to "least sensitive." The last two columns depict respondents' average ranking and the standard deviations.

Respondents' ages ranged from 18 to 65, with an average of 27.1 years ($\sigma = 7.59$). My sample was skewed toward male respondents: 67.6% compared to 32.4% females. However, I do not believe that this sample bias impacted any of my findings: males and females did not statistically differ with regard to how they ranked the sensitivities of their Netflix data. Overall, I believe that my sample is relatively representative of U.S. Internet users with regard to their privacy preferences: when classifying respondents based on Westin's privacy index [17], I observed that 8% can be considered "Privacy Unconcerned," 55% are "Privacy Pragmatists," and 37% are "Privacy Fundamentalists." These proportions are similar to what others have found in prior studies about the privacy preferences of Internet users [12].

Table 1 shows the resulting rankings, sorted by the average concern level, from "most sensitive" to "least sensitive." As can be seen from the data, the perceived sensitivity of Netflix video rental histories was ranked very last, on average. Not one respondent ranked it as "most sensitive," and only twelve respondents (8.6% of 139; 95%CI: [4.5%, 14.6%]) ranked it among the top five most sensitive data types. To directly compare respondents' rankings of their Netflix data with each of the other data types in the ranking, I performed a Wilcoxon Signed Ranks test [19], and applied the Bonferroni correction to account for multiple tests ($\alpha = 0.005$) [7]. What I found was that all of the comparisons were statistically significant ($p < 0.005$), except when comparing the perceived sensitivity of the Netflix histories with the perceived sensitivity of online purchase records for office supplies ($p < 0.023$).

8

In layman's terms, Netflix rental histories are likely viewed by Netflix customers as being less sensitive than the first nine data types in Table 1. At the same time, there is not enough data to support a contrast between the Netflix rental histories and purchase records for online office supplies; the two are statistically indistinguishable. Therefore, it is my opinion that prior research on the value of purchase records from benign online products (i.e., office supplies) are a reasonable proxy for the value of customers' Netflix histories.

## 4.  Conclusion

In this report, I estimated the average value of a Netflix customer's rental history based on previous research that has assessed the value of other types of personal data. I conducted a survey of Netflix customers and found that they did not observably value their rental histories any differently than a hypothetical online purchase of office supplies. Based on previous research that has examined willingness to pay for privacy during these types of transactions [9], I estimate the value of this data to be between $0.15 and $0.30 per person. Since the survey also shows that the Netflix data is likely less sensitive than location data, which prior research has valued at between $0.14 and $0.18, I believe that the estimated value of the Netflix data is much closer to $0.15.

The settlement agreement calls for compensation to the sum of $9 million. Since the class size is exactly 62,039,868 people who are current and former Netflix customers, this amounts to $0.15 per person. However, I believe that this amount of compensation outweighs the damages.

The valuation that I computed in this report applies to the retention of video rental histories of former customers, in alleged violation of the VPPA. The damage suffered by current Netflix customers is likely to be far less than this amount because their information has not yet been unlawfully retained. From my calculation, former customers represent approximately half of the class; while I do not know exactly how many former Netflix customers there are, Netflix claims to have over 30 million current customers [14]. Therefore, the total cost of damages due to the allegedly unlawful retention of records is closer to $4.65 million. Thus, I believe that the settlement amount more than adequately covers the damages.

Moving forward, the settlement also provides for injunctive relief to prevent future violations from occurring: video rental histories are to be separated from personally identifiable information. These records are primarily used for improving Netflix's recommendation algorithms, and therefore they do not necessarily need to be identifiable (though anonymizing them would also prevent resale). Thus, the cost of compliance is marginal, while at the same time preventing future violations from occurring—which would cost current and future customers around $0.15 each.

9

Therefore, in my opinion, the injunctive relief provides a net positive for consumers.

# References

[1] Acquisti, A., and Grossklags, J. Privacy and rationality in individual decision making. *IEEE Security & Privacy* (January/February 2005), 24–30. http://www.dtc.umn.edu/weis2004/acquisti.pdf.

[2] Acquisti, A., and Grossklags, J. Uncertainty, ambiguity, and privacy. In *Workshop on the Economics of Information Security (WEIS '05)* (2005). http://infosecon.net/workshop/pdf/64.pdf.

[3] Acquisti, A., and Grossklags, J. What can behavioral economics teach us about privacy? In *Digital Privacy: Theory, Technologies, and Practices*, A. Acquisti, S. Gritzalis, S. D. Vimercati, and C. Lambrinoudakis, Eds. Auerbach Publications, Boca Raton, FL, 2007, pp. 363–380.

[4] Amazon.com, Inc. Mechanical turk. http://www.mturk.com/, 2012.

[5] Beresford, A. R., Kübler, D., and Preibusch, S. Unwillingness to pay for privacy: A field experiment. IZA Discussion Papers 5017, Institute for the Study of Labor (IZA), June 2010.

[6] Danezis, G., Lewis, S., and Anderson, R. How much is location privacy worth? In *Proceedings of the Workshop on the Economics of Information Security Series (WEIS 2005)* (2005).

[7] Dunn, O. J. Multiple comparisons among means. *Journal of the American Statistical Association 56*, 293 (March 1961), 52–64. http://www.jstor.org/stable/2282330.

[8] Egelman, S., Felt, A. P., and Wagner, D. Choice architecture and smartphone privacy: There's a price for that. In *The 2012 Workshop on the Economics of Information Security (WEIS)* (2012).

[9] Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A. Timing is everything?: the effects of timing and placement of online privacy indicators. In *Proceedings of the 27th international conference on Human factors in computing systems* (New York, NY, USA, 2009), CHI '09, ACM, pp. 319–328.

[10] Gideon, J., Egelman, S., Cranor, L., and Acquisti, A. Power Strips, Prophylactics, and Privacy, Oh My! In *Proceedings of the 2006 Symposium on Usable Privacy and Security* (July 2006), pp. 133–144.

[11] Jakobsson, M.   Experimenting on Mechanical Turk:   5 How Tos.   http://blogs.parc.com/blog/2009/07/experimenting-on-mechanical-turk-5-how-tos/, July 2009.

[12] Kumaraguru, P., and Cranor, L. F.   Privacy indexes: A survey of westin's studies.   Tech. Rep. CMU-ISRI-5-138, Carnegie Mellon University, December 2005.   http://reports-archive.adm.cs.cmu.edu/anon/isri2005/CMU-ISRI-05-138.pdf.

[13] Little, G., Chilton, L. B., Goldman, M., and Miller, R. C. TurKit: Tools for iterative tasks on Mechanical Turk. In *Proceedings of the ACM SIGKDD Workshop on Human Computation* (New York, NY, USA, June 28 2009), P. Bennett, R. Chandrasekar, M. Chickering, P. Ipeirotis, E. Law, A. Mityagin, F. Provost, and L. von Ahn, Eds., vol. HCOMP '09, ACM Press, pp. 29–30.

[14] Netflix, Inc. Company overview. https://signup.netflix.com/MediaCenter. Accessed: October 25, 2012.

[15] Paolacci, G., Chandler, J., and Ipeirotis, P. G. Running experiments on amazon mechanical turk. *Judgment and Decision Making 5*, 5 (August 2010).

[16] Rose, E. Data users versus data subjects: Are consumers willing to pay for property rights to personal information? In *Proceedings of the Proceedings of the 38th Annual Hawaii International Conference on System Sciences - Volume 07* (Washington, DC, USA, 2005), HICSS '05, IEEE Computer Society, pp. 180.3–.

[17] Taylor, H. Most People are "Privacy Pragmatists" Who, While Concerned about Privacy, Will Sometimes Trade It Off for Other Benefits. *The Harris Poll 17* (March 2003).   http://www.harrisinteractive.com/vault/Harris-Interactive-Poll-Research-Most-People-Are-Privacy-Pragmatists-Who-While-Conc-2003-03.pdf.

[18] Tsai, J., Egelman, S., Cranor, L., and Acquisti, A. The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. *Information Systems Research 22*, 2 (June 2011), 254–268.   http://www.guanotronic.com/~serge/papers/isr10.pdf.

[19] Wilcoxon, F. Individual comparisons by ranking methods. *Biometrics Bulletin 1*, 6 (December 1945), 80–83.   http://sci2s.ugr.es/keel/pdf/algorithm/articulo/wilcoxon1945.pdf.

11

# A. Survey Instrument

# General Attitudes

**Please read each statement below and rate the extent to which you agree or disagree with it.**

**1) Consumers have lost all control over how personal information is collected and used by companies.**

( ) Strongly Agree

( ) Somewhat Agree

( ) Somewhat Disagree

( ) Strongly Disagree

**2) Most businesses handle the personal information they collect about consumers in a proper and confidential way.**

( ) Strongly Agree

( ) Somewhat Agree

( ) Somewhat Disagree

( ) Strongly Disagree

**3) Existing laws and organizational practices provide a reasonable level of protection for consumer privacy today.**

( ) Strongly Agree

( ) Somewhat Agree

( ) Somewhat Disagree

( ) Strongly Disagree

# Ranking Task

**When performing transactions online, many websites often collect additional data on their users in order to keep costs low or provide their services for free.  Please read through the types of data below and think about how concerned you would be if a company were to collect it from you after visiting their website.**

**1. Read through the various types of information in the left column.**

**2. Imagine that each of the types of information applies to you (e.g., you use Google, have a Netflix account, have a Facebook profile, use location-based services, etc.).**

**3. Use your mouse to drag and drop them into the column on the right based on how sensitive you believe each item is.**

**Please order the items from "most sensitive" (1) to "least sensitive" (11).**

**4) Please order the items on the left from "most sensitive" (1) to "least sensitive" (11)**

_____Receipt from an online sex toy purchase

_____Receipt from an online office supplies purchase

_____Your most recent FourSquare check-in (i.e., one-time GPS location)

_____Your birthdate

_____Your income

_____Your name

_____Your mailing address

_____Your email address

_____Your Netflix video rental history

_____Your Google search history

_____Your Facebook profile information

**5) Please explain why ranked your responses the way you did (e.g., what did you rank as "most sensitive" and why?)**

# Demographic Information

**6) Have you ever used Google?**

( ) Yes

( ) No

**7) Have you ever had a Facebook account?**

( ) Yes

( ) No

**8) Have you ever had a Netflix account?**

( ) Yes

( ) No

**9) Have you ever used location-based services to share your location with others (e.g., FourSquare check-ins, location updates on Twitter or Facebook, etc.)?**

( ) Yes

( ) No

**10) In what year were you born?**

_____

**11) What is your gender?**

( ) Male

( ) Female

# B.  Biography

Serge Egelman is a research scientist in the Computer Science Department at the University of California, Berkeley. His research focuses on online privacy, security, and human-computer interaction. He routinely performs studies to examine the privacy and security practices of Internet users in order to help designers create better systems that have the user in mind. His research topics have included privacy-enhancements to search engines, web browser security warnings, social networking privacy settings, and smartphone application privacy. Dr. Egelman has over thirty peer-reviewed publications, including top conferences and journals. Several systems based on his research have been deployed for hundreds of millions of Internet users.

Serge Egelman received his B.S. in Computer Engineering from the University of Virginia in 2004, and his doctorate from Carnegie Mellon University's School of Computer Science in 2009. Dr. Egelman has performed research at Xerox PARC, Microsoft, Brown University, and the U.S. National Institute of Standards and Technology (NIST).

# C. Curriculum Vitae

**Serge Egelman**

731 Soda Hall
Berkeley, CA 94720
USA

Email: serge@guanotronic.com

## Education

- **PhD in Computation, Organizations, and Society**, May 2009
  School of Computer Science, Carnegie Mellon University
- **BS in Computer Engineering**, May 2004
  School of Engineering and Applied Science, University of Virginia

## Refereed Journal Publications

- The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. Information Systems Research (ISR), 22(2), June 2011, pp. 254-268 (with J. Tsai, L. Cranor, and A. Acquisti). *Best Published Paper Award!*
- P3P Deployment on Websites. Electronic Commerce Research and Applications (ECRA), Autumn 2008 (with L. Cranor, S. Sheng, A. McDonald, and A. Chowdhury).
- The Real ID Act: Fixing Identity Documents with Duct Tape. I/S: A Journal of Law and Policy for the Information Society, 2(1), Winter 2006, pp. 149-183 (with L. Cranor).

## Refereed Conference Papers

- Android Permissions: User Attention, Comprehension, and Behavior. Proceedings of the 2012 Symposium on Usable Privacy and Security (SOUPS). July 2012 (with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner). *Best Paper Award!*
- Facebook and Privacy: It's Complicated. Proceedings of the 2012 Symposium on Usable Privacy and Security (SOUPS). July 2012 (with M. Johnson and S. Bellovin).
- Oops, I Did It Again: Mitigating Repeated Access Control Errors on Facebook. CHI '11: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2011 (with A. Oates and S. Krishnamurthi).
- Of Passwords and People: Measuring the Effect of Password-Composition Policies. CHI '11: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2011 (with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor). *Best Paper Nominee!*
- It's All About The Benjamins: An empirical study on incentivizing users to ignore security advice. Financial Cryptography and Data Security. 2011 (with N. Christin, T. Vidas, and J. Grossklags).
- Crying Wolf: An Empirical Study of SSL Warning Effectiveness. The 18th USENIX Security Symposium. 2009 (with J. Sunshine, H. Almuhimedi, N. Atri, and L. Cranor).
- It's No Secret: Measuring the reliability of authentication via 'secret' questions. The 2009 IEEE Symposium on Security and Privacy (with S. Schechter and A.J. Brush).
- It's Not What You Know, But Who You Know: A social approach to last-resort authentication. CHI '09: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2009 (with S. Schechter and R. Reeder).
- Timing Is Everything? The Effects of Timing and Placement of Online Privacy Indicators. CHI '09: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2009 (with J. Tsai, L. Cranor, and A. Acquisti).
- Family Accounts: A new paradigm for user accounts within the home environment. CSCW '08: Proceedings of the 2008 Conference on Computer Supported Cooperative Work. 2008 (with A.J. Brush and K. Inkpen).
- You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings. CHI '08: Proceedings of the SIGCHI Conference on Human Factors in Computing Systems. 2008 (with L. Cranor and J. Hong). *Best Paper Nominee!*
- Phinding Phish: An Evaluation of Anti-Phishing Toolbars. NDSS: Proceedings of the ISOC Symposium on Network and Distributed System Security. February 2007 (with Y. Zhang, L. Cranor, and J. Hong).
- An Analysis of P3P-Enabled Web Sites among Top-20 Search Results. Proceedings of the Eighth International Conference on Electronic Commerce. August 2006 (with L. Cranor and A. Chowdhury).
- Power Strips, Prophylactics, and Privacy, Oh My!. Proceedings of the 2006 Symposium On Usable Privacy and Security (SOUPS). July 2006 (with J. Gideon, L. Cranor, and A. Acquisti).

## Refereed Workshop Papers

- I've Got 99 Problems, But Vibration Ain't One: A Survey of Smartphone Users' Concerns. The 2nd Annual ACM CCS Workshop on Security and Privacy in Smartphones and Mobile Devices (SPSM). October 2012 (with A. P. Felt and D. Wagner).
- How to Ask for Permission. The 7th USENIX Workshop on Hot Topics in Security (HotSec '12). August 2012 (with A. P. Felt, M. Finifter, D. Akhawe, and D. Wagner).
- Choice Architecture and Smartphone Privacy: There's A Price for That. Workshop on the Economics of Information Security (WEIS). June 2012 (with A. P. Felt and D. Wagner).
- How Good Is Good Enough? The Sisyphean Struggle for Optimal Privacy Settings. CSCW 2012 Workshop on Reconciling Privacy with Social Media. February 2012 (with M. Johnson).
- Toward Privacy Standards Based on Empirical Studies. W3C Workshop on Web Tracking and User Privacy. April

2011 (with E. McCallister).

- Please Continue to Hold: An empirical study on user tolerance of security delays. Workshop on the Economics of Information Security (WEIS). June 2010 (with D. Molnar, N. Christin, A. Acquisti, C. Herley, and S. Krishnamurthi).
- Tell Me Lies: A Methodology for Scientifically Rigorous Security User Studies. Workshop on Studying Online Behaviour at CHI'10. April 2010 (with J. Tsai and L. F. Cranor).
- The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. Workshop on the Economics of Information Security (WEIS). June 2007 (with J. Tsai, L. Cranor, and A. Acquisti).
- Security User Studies: Methodologies and Best Practices. CHI '07 Extended Abstracts on Human Factors in Computing Systems. April 2007 (with J. King, R. Miller, N. Ragouzis, and E. Shehan).
- Studying The Impact of Privacy Information on Online Purchase Decisions. Workshop on Privacy and HCI: Methodologies for Studying Privacy Issues at CHI'06. April 2006 (with J. Tsai, L. Cranor, and A. Acquisti).

## Book Chapters and Magazine Articles

- Crowdsourcing. To appear in *Ways of Knowing in HCI*, J. Olson and W. Kellogg (Eds.), to be published by Springer (with E. Chi and S. Dow).
- Conference Report: SOUPS 2006. *IEEE Security & Privacy*. November/December 2006 (with J. Tsai).
- Conference Report: 14th USENIX Security Symposium. *;login:*. December 2005 (with K. Butler, M. Chow, J. Duerig, B. Hicks, F. Hsu, S. Kelm, and M. Rajagopalan).
- Conference Report: 13th USENIX Security Symposium. *;login:*. December 2004 (with A. AuYoung, E. Cronin, M. Dougherty, R. Greenstadt, S. Kelm, Z. Liang, C. Mano, N. Smith, A. Raniwala, T. Whalen, and W. Xu).
- Suing Spammers for Fun and Profit. *;login:*. April 2004.
- Installation. *Peter Norton's Complete Guide to Linux*. Macmillan Computer Publishing. 1999.
- User Administration. *Peter Norton's Complete Guide to Linux*. Macmillan Computer Publishing. 1999.

## Research Experience

**Scientist**
*University of California, Berkeley*
September 2011-present

I am currently working with David Wagner's research group to examine privacy and security issues on mobile devices (e.g., smartphones). Specifically, we are examining how users make decisions to install particular applications and how to better alert them to potential malware. We are in the process of creating a new architecture for prompting users when an application requests certain hardware or software abilities.

**Scientist**
*NIST*
August 2010-July 2011

I helped design and conduct studies to examine how users interact with authentication systems, specifically password and token-based systems. I co-organized a workshop on the NIST campus to discuss ways in which usable security research and techniques could be formally integrated into the development process, as well as reviewed grant proposals for NIST funding.

**Postdoctoral Research Associate**
*Brown University*
August 2009-August 2010

I worked with Shriram Krishnamurthi on creating better interfaces for policy authors to specify access control policies. We conducted studies to determine common policy errors, the causes of these errors, and the types of interfaces that policy authors currently use. We developed a new policy authoring interface that allows users of social networking websites to interactively specify policies in order to more easily detect and clarify ambiguities. We designed and conducted a usability study to validate our tool.

**Research Assistant**
*Carnegie Mellon University*
June 2004-May 2009

While pursuing a PhD under the direction of Dr. Lorrie Cranor in the Computation, Organizations, and Society program at CMU, I focused primarily on the usability of privacy and security systems. Areas that I worked in included creating more effective web browser trust indicators, creating usable privacy tools, Internet anonymity, and detection and prevention of phishing attacks. My dissertation is entitled "Trust Me: Designing Trustworthy Trust Indicators." My committee consisted of Lorrie Cranor (chair), Jim Herbsleb, Jason Hong, and Steve Bellovin (Columbia University).

**Research Intern**
*Microsoft Research*
July 2008-October 2008

During my second internship at MSR, I conducted two user studies with Stuart Schechter. We first looked at using social networks as a means for authenticating webmail users who had forgotten their passwords. We tested the usability of our system as well as how susceptible it would be to various attacks. Additionally, I assisted the Internet Explorer team with new designs for their security warnings based on my research. We tested the new warnings in the laboratory using an eye tracker.

**Research Intern**
*Microsoft Research*
January 2008-April 2008

I was an intern at MSR working with A.J. Brush and Kori Inpken on user account models for shared family computers. We examined why the current user account model does not work on computers shared by trusted individuals (i.e. communal home computers) and developed a more appropriate model. I implemented our prototype in C# and ran a usability study.

This work was published at the 2008 Computer Supported Cooperative Work (CSCW) conference.

**Research Intern**
*Xerox PARC*
June 2006-September 2006

During the summer of 2006, I worked with Jim Thornton in the Computer Science Lab (CSL) at PARC. My main focus was on malware detection using virtualization. The project involved creating a Windows kernel driver that would intercept system calls (like a rootkit) on the guest operating system, and then reporting back the state of the guest to the host. Additional work focused on writing security mechanisms to protect code running under a virtual machine.

## Professional Experience

**Developer**
*Tovaris: The Digital Identity Company*
2000-2001

I worked part time doing development in C++ for the Mithril Secure Server (an encrypted email solution). I mostly wrote CGI code for administering the servers from a front-end, although I did do some work on the back-end. This involved getting very familiar with the OpenSSL libraries. Most of the development was done under OpenBSD, using C++, though I also did some work in Perl.

**Technical Support / Developer / System Administrator**
*Broadband Network Services, Inc.*
1999-2000

I handled all of the technical support questions via telephone and e-mail. I maintained and administrated all of our databases using MySQL. This included setting up new database customers, adding and removing databases, and maintaining MySQL. I used PHP, Perl, and bash to write scripts to aid in system administration and to automate other common tasks. I handled most of the website development that we were hired to do; this included writing scripts, HTML, and database management. My administrative responsibilities included maintaining our primary and secondary DNS, Sendmail, Apache, and PHP. I also aided in creating and removing accounts, setting up new virtual hosts, setting up and maintaining network monitoring, and maintaining hardware; this included building and configuring computers.

## Teaching Experience

**Information Security & Privacy (46-861)**
*Carnegie Mellon University*
Fall 2007

Teaching assistant duties included developing course materials (topics for lectures, assignments, and exams), grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

**Computers and Society (15-290)**
*Carnegie Mellon University*
Spring 2006

Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

**Information Security (CS 451)**
*University of Virginia*
Fall 2003

Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, and holding office hours.

**Intellectual Property (TCC 200)**
*University of Virginia*
Fall 2003

Teaching assistant duties included grading assignments and holding office hours.

**Advanced Software Development Methods (CS 340)**
*University of Virginia*
Spring 2003, Spring 2004

Teaching assistant duties included grading assignments and exams, and holding office hours.

**Engineering Software (CS 201J)**
*University of Virginia*
Fall 2002

Teaching assistant duties included grading assignments and holding office hours.

## Research Grants

- Google Faculty Research Award, *Designing Usable Certificate Dialogs in Chrome*. Principal Investigator, 2010. Budget: $60,000.

- NSF Trustworthy Computing, Small, *Interfaces to Reduce Human Error in Access Control Policy Authoring*. Principal Investigator (Co-PIs: Shriram Krishnamurthi and Kathi Fisler), 2010. Budget: $500,000; *Recommended for funding, though upon accepting a job within the government, we were forced to subsequently withdraw the proposal.*

## Professional Activities

- **Program Committees**
  2013: CHI; Symposium On Usable Privacy and Security (SOUPS)
  2012: Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW)
  2011: Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Computers, Freedom, and Privacy (CFP) Conference (poster session co-chair); Software and Usable Security Aligned for Good Engineering (SAUSAGE) Workshop (co-chair)
  2010: Symposium On Usable Privacy and Security (SOUPS)
  2008: Conference on Information and Knowledge Management (CIKM)
  2007: CHI 2007 Workshop - Security User Studies: Methodologies and Best Practices; Anti-Phishing Working Group eCrime Researchers Summit (poster session co-chair)
  2006: Computers, Freedom, and Privacy (CFP) Conference
- **Standards Committees**
  2007-2008: W3C Web Security Context (WSC) Working Group
  2004-2006: W3C Platform for Privacy Preferences (P3P) 1.1 Working Group
- **Leadership Roles**
  *Legislative Concerns Chair, Board of Directors*
  National Association of Graduate and Professional Students (NAGPS), 2006-2008
  *Vice President for External Affairs*
  Carnegie Mellon Graduate Student Assembly, 2006-2008

## Awards and Nominations

- **ISR Best Published Paper**, 2012

  *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, received the Best Published Paper Award at the 2012 INFORMS Conference (with J. Tsai, L. Cranor, and A. Acquisti).
- **SOUPS Best Paper Award**, 2012

  *Android Permissions: User Attention, Comprehension, and Behavior*, received the Best Paper Award at the Symposium on Usable Privacy and Security (with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner).
- **CHI Best Paper Nominee**, 2011

  *Of Passwords and People: Measuring the Effect of Password-Composition Policies*, received an honorable mention at CHI 2011 (with with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor).
- **CHI Best Paper Nominee**, 2008

  *You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings*, received an honorable mention at CHI 2008 (with L. Cranor and J. Hong).
- **Tor Graphical User Interface Design Competition**, 2006

  Phase 1 Overall Winner (with L. Cranor, J. Hong, P. Kumaraguru, C. Kuo, S. Romanosky, J. Tsai, and K. Vaniea).
- **University of Virginia Dean's List of Scholars**

  I was included on the Spring 2003 and 2004 Dean's List of Scholars.
- **Publisher's Clearing House Finalist**

  I *may* already be a winner.

Last modified October 2012.