# Exhibit C

1

SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:    949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:    312.589.6378
*Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | ) Case No. 5:11-cv-00379-EJD |
| | ) |
| | ) **DECLARATION OF JAY EDELSON IN** |
| | ) **SUPPORT OF PLAINTIFFS'** |
| | ) **MOTION FOR FINAL APPROVAL OF** |
| | ) **SETTLEMENT AND AWARD OF** |
| | ) **ATTORNEYS' FEES, EXPENSES, AND** |
| | ) **INCENTIVE AWARD** |

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

     1.     I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.

     2.     I am an attorney admitted to practice in the State of Illinois and in the United States District Court for the Northern District of Illinois, and other federal district courts. I make this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award.

3.      I am the managing partner at the law firm of Edelson McGuire LLC, which has been appointed lead counsel in this matter, Jeff Milans and Peter Comstock ("Plaintiffs").

4.      Attached as Exhibit 1 to this Declaration is a true and accurate copy of the firm resume of Edelson McGuire, LLC. All capitalized terms have the same meaning set forth in the simultaneously filed Brief in Support of the Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award.

*Pre-Suit Investigation and Underlying Allegations.*

5.      The Complaint alleges Defendant Netflix, Inc. ("Netflix" or "Defendant") is the largest provider of Internet streaming media services in the United States, with over 25 million current paid subscribers. Plaintiffs are former subscribers to Netflix's services, who voluntarily cancelled their Netflix subscriptions.

6.      At the time they became Netflix subscribers, both Plaintiffs were required to provide Netflix with personal information, including their names and billing/shipping information.

7.      Netflix subscribers can access and "stream" a large library of online media through Netflix's website and other applications or, alternatively, rent physical media (*e.g.*, DVDs and Blu-ray discs) from Netflix, with such media being delivered and returned using the United States Postal Service.

8.      Over the course of their subscriptions, both Plaintiffs' media viewing histories (including material each "streamed" online and received through the mail) were stored and associated with their accounts, and Netflix suggested other videos based upon each Plaintiff's individual viewing history using a proprietary algorithm.

9.      After cancelling their Netflix subscriptions, Plaintiffs continued to periodically receive e-mails from Netflix encouraging them to re-activate their account memberships. From these e-mails, it became apparent that Netflix retained its former customers' personal contact information.

10.      Furthermore, prior to the commencement of this lawsuit and as shown by my firm's pre-suit investigation, former Netflix customers who logged back into their cancelled accounts were able to view all of the video materials that they formerly watched through Netflix's services.

11.     In light of the findings described above, it became evident that, in addition to contact information, Netflix also maintained its former customers' video programming selections.

12.     As a result of Netflix's indefinite retention of its customers' video programming selections, Plaintiff Milans filed a lawsuit against Defendant alleging, among other things, violations of the Video Privacy Protection Act, 18 U.S.C. § 2710. His lawsuit is believed to be the first class action filed specifically for violation of the VPPA's unlawful retention provision, 18 U.S.C. § 2710(e).

13.     Several other plaintiffs filed similar actions against Netflix—each arising from the same alleged indefinite retention of its customers' PII—in the United States District Court for the Northern District of California. The Court ultimately related each of these cases to *Milans*, and a leadership fight ensued between the various plaintiffs' attorneys seeking to be appointed interim class counsel. After briefing, the Court appointed me and my firm, Edelson McGuire LLC, to serve as interim lead class counsel.

14.     Before filing an amended complaint for the consolidated cases, and based on an investigation into common practices within the entertainment media industry, my firm additionally concluded that Netflix was, in all likelihood, sharing its own current and former customers' PII (including their individual viewing histories) to analytic companies in order to use and refine its own movie-recommendation algorithm, and to other third-parties who performed services on Netflix's behalf.

15.     That belief was bolstered by information on Netflix's website. In particular, Netflix's privacy policy stated that Netflix used "[third parties to] analyze and enhance data, including users' interaction with our website." Likewise, Netflix made certain changes to its privacy policy after the onset of this litigation, which further suggested disclosures had in fact been made to third parties providing various services to Netflix.

16.     After Plaintiffs filed their Consolidated Amended Class Action Complaint (Dkt. No. 61), the Parties engaged in the discovery planning conference required by Federal Rule of Civil Procedure 26.

17.     Subsequently, Plaintiffs propounded, and Netflix responded to, discovery related to

class and merits issues—including both Interrogatories and Requests for the Production of Documents.

18.     As the case moved forward, the status and strength of Plaintiffs' VPPA claim was clarified and analyzed on an on-going basis. For Plaintiffs' retention theory (*i.e.*, under 18 U.S.C. § 2710(e)), the main questions were whether a private right of action existed for a violation of subsection (e) and whether Plaintiffs' PII was still "necessary" to Netflix despite Plaintiffs' cancelled subscriptions. Plaintiffs' disclosure theory (*i.e.*, under 18 U.S.C. § 2710(b)), in comparison, was premised on the allegation that Netflix was selling its customers' PII to third-party analytic companies so as to use and refine its recommendation algorithm.

19.     During the course of the litigation, we learned that Netflix did not (and does not) sell its customers' PII for profit, or share that PII to data analytic companies in connection with its recommendation algorithm. Rather, we learned that Netflix handles all of its data analytic needs in-house and has a policy of not selling customer PII for profit. We subsequently confirmed these informational findings through the informal deposition of two Netflix executives—its Vice President of Product Engineering and its Vice President of Marketing and Analytics.

***Mediation before Judge Phillips and Execution of the Settlement Agreement.***

20.     After participating in the Court's ADR program, the Parties proceeded to private mediation and selected former District Judge Layn R. Phillips (ret.) of Irell & Manella, LLP, to serve as a mediator.

21.     On February 1, 2012, we met with Netflix's in-house and outside counsel in Santa Ana, California for the formal mediation. Among other productive discussions, the mediation involved explorations of the relative strength of Plaintiffs' claims, Netflix's defenses, and exchanges of information.

22.     As for the mediation, after a full day of arm's-length negotiations facilitated by Judge Phillips, the Parties were able to reach an agreement as to the principle terms of a settlement, which was formalized in a signed Memorandum of Understanding. The Parties did not begin to discuss attorneys' fees or incentive awards until after all relief for the Class was established and settled. Additionally, when fees were discussed, it was insisted that fees be calculated as a

percentage of the common fund, such that attorneys' fees would be inextricably linked to the recovery for the Class.

23. After executing the Memorandum of Understanding, the Parties continued to negotiate regarding the precise wording of the Settlement Agreement. To that end, my firm and counsel for Netflix exchanged many drafts of proposed settlement agreements over the following three months before ultimately executing the finalized Class Action Settlement Agreement on April 30, 2012.

24. As a part finalizing the Settlement Agreement, both Parties solicited notice proposals from class action settlement administrators and ultimately selected Kinsella Media/Rust Consulting ("Rust"), an administrator with extensive experience in providing proper notice in national class action settlements. Before selecting Rust, the Parties considered both estimates of the number of class members each solicited proposal would notify, along with an accompanying cost estimate. Rusts' plan included (1) direct notice to Class members via email, (2) publication notice, (3) a joint press release, (4) creation of a settlement website, and (5) notice to relevant government agencies.

25. The final Settlement Agreement was executed on April 30, 2012.

***Notice to the Class Members and Solicitation of* Cy Pres *Applications.***

26. Beginning on July 25, 2012, Netflix, through Rust and in accordance with the terms set out in the Settlement Agreement, caused Notice to be disseminated to the members of the Settlement Class.  As detailed in the Wheatman Declaration, such notice included, among other efforts, individual emails sent directly to potential Class Members (with 62,039,868 individual emails sent on July 25, 2012), publication notice through an ad placed in *People* magazine and Internet advertising on Facebook.com from August 1, 2012 through October 14, 2012, and publication of the Settlement Website (www.VideoPrivacyClass.com) on July 24, 2012. The direct email notice, the publication notice, and the CAFA notice all contained a functioning hyperlink to, or website address for, the Settlement Website.

27. After notice was sent, my firm received over 1,000 telephonic inquires from Settlement Class Members regarding the underlying lawsuits and the Settlement itself. Our firm's practice is to try to respond to all class member inquiries, if at all possible, within 2 business days.

We believe we were successful in living up that standard in virtually all instances.  I personally spoke with over 100 Class Members who had questions about the settlement.

28.     In addition to the received telephone calls, we received numerous written requests (mostly via email) from Settlement Class Members requesting information on the Settlement. As with the telephone inquiries, we promptly responded to all written communications. Going forward, our firm will continue to respond to all inquiries and provide comprehensive assistance to the Class Members.

29.     Additionally, pursuant to the terms of the Settlement Agreement, my firm received and reviewed over 40 proposals from not-for-profit entities and programs that focus on educating users, regulators, and enterprises regarding issues relating to the protection of privacy, identity, and personal information through user control, and to protect users from online threats.  My firm also responded to inquiries from entities requesting *cy pres* distributions, in order to ensure the highest quality of proposals, and thus the best *cy pres* plan and ultimate result for the Class.

30.     In soliciting the *cy pres* proposals, the Parties suggested that applicants provide the following information, to allow the Parties to make the most informed decision possible in the selection process: the organization's name and address; a description of current programs relating to technology, law, and privacy; how the program benefits the Class; the organization's annual operating budget and the budgets of its relevant programs; the total *cy pres* distribution requested; disclosure of connections between the applicant and the Parties, their counsel, Supporting Counsel, or the Court; and disclosure of any amounts received from the Parties or their counsel in 2011.

31.     Our exhaustive review process included both a thorough review of each individual application and an overall analysis of the body of applications received, so as to best determine an appropriate percentage distribution among selected recipients and ensure that an ultimate *cy pres* distribution would provide maximum benefit for the Class.

32.     Following review of the *cy pres* applications, my firm worked in conjunction with counsel from Netflix to select the final proposed recipients of the Settlement's *cy pres* distribution and, in accordance with the terms of the Settlement, posted a list of those proposed recipients to the Settlement website on October 31, 2012.

33.     Additionally, my firm confirmed that none of the other law firms involved with the consolidated cases is affiliated with or has any nexus with the identified *cy pres* recipients. Likewise, my firm similarly does not share any affiliation or nexus with any identified *cy pres* recipients.

34.     As for the *cy pres* recipients, no organization reported a material connection between itself and the Parties, their counsel, Supporting Counsel, or the Court. Indeed, the only connections identified were:

      a.     The Berkeley Center for Law & Technology ("CLT") reported that the law firm of Wilson Sonsini Goodrich & Rosati is one of over thirty (30) law firm sponsors of CLT;

      b.     The Center for Democracy and Technology ("CDT") reported that it received money from a *cy pres* award in *Standiford v. Palm, Inc.*, No. 09-CV-05719-LHK (C.D. Cal. 2012), a case where Edelson McGuire, LLC was class counsel.  In that case, Edelson McGuire, LLC had no contact with CDT until after the *cy pres* award was approved by the court;

      c.     The International Association of Privacy Professionals ("IAPP"), reported that two Netflix employees are current IAPP members and that other employees, both past and present, of Netflix and the law firms representing the Parties in this case may have attended IAPP conferences or other forums;

      d.     The Markkula Center for Applied Ethics reported that Netflix CEO Reid Hastings once attended a three-day Aspen Institute seminar taught by Kirk Hanson, the Executive Director of the Markkula Center for Applied Ethics;

      e.     The Privacy Project at UC Hastings reported that Judge Davila is a 1979 alumnus of UC Hastings; Judge Davila's wife, the Honorable Judge Mary J. Greenwood, is a 1981 alumna of UC Hastings; and in May of 2012, Judges Davila and Greenwood made a $250.00 cash gift to the La Raza Law Student Organization at UC Hastings;

      f.     The Stanford Center for Internet and Society ("CIS") reported that its Director of Civil Liberties was an attorney at a law firm representing the defendant in

1   *Deacon v. Pandora Media, Inc.*, Case No. 11-CV04674-SBA (N.D. Cal. 2011)—a privacy

2   case brought by Edelson McGuire, LLC. Additionally, CIS reported that Judge Davila

3   taught trial advocacy at Stanford Law School before his appointment as a federal judge.

4       35.     In Class Counsel's view, if the Settlement receives final approval, the selected *cy*

5   *pres* recipients will provide real, tangible, and immediate benefits to the Class by educating the

6   public and raising awareness of privacy issues, working with businesses to ensure compliance with

7   best privacy practices, and developing new technologies to give consumers control over their

8   information privacy.

9   ***Class Counsel's Analysis of the Class's Claims.***

10      36.     Before agreeing to settle—and since settling—Plaintiffs' claims under the VPPA,

11  my firm was careful to analyze the likelihood of certifying an adversarial VPPA class using both

12  unlawful disclosure and retention theories, winning at trial or via summary judgment under both

13  theories, and what relief the Class might expect through continued litigation and at what additional

14  cost.

15      37.     If the litigation were to proceed, in my opinion Netflix would raise several colorable

16  defenses to Plaintiffs' claims—many of which would be create issues of first impression within this

17  Circuit. Specifically, Netflix would likely argue that it retained Plaintiffs' PII for one of the

18  purposes for which it was collected—maintaining their viewing histories and preferences in the

19  event they renewed their subscriptions—that Plaintiffs lacked a private right of action to sue for

20  unlawful retention under the VPPA, and that Plaintiffs lacked Article III standing to sue.

21      38.     Netflix would likely also raise several other weaker arguments that would be, in my

22  opinion, virtually certain to fail, including that Plaintiffs consented to the ongoing retention and

23  disclosure of their data by agreeing to the Netflix privacy policy when they created their accounts,

24  that the statute of limitations had run, and that the VPPA is unconstitutional.  By my estimate, the

25  chance of any of these weaker defenses succeeding is less than ten percent (10%).

26  *Plaintiffs' Unlawful Disclosure Theory.*

27      39.     Considering the information provided by Netflix at the February 1, 2012 mediation,

28  my firm estimated the likelihood of succeeding on the merits under a theory of unlawful disclosure

at less than five percent (5%). That determination considered that while Netflix's affirmative defenses stood little chance of success, in light the above-discussed facts and the inherent uncertainties in litigation, Plaintiffs would struggle to establish a case on the merits.

40.     In terms of certification under a disclosure theory, the key issues germane to the Class were all common ones (*i.e.*, whether Netflix disclosed PII and if so, how, why, to whom, for what purpose, and whether it obtained consent to do so), and we believed that the remaining requirements of Federal Rule of Civil Procedure 23 would not pose undue difficulties. That said, because of the always-present uncertainties of litigation, and lack of any direct, controlling authority on point, we estimated our likelihood of achieving adversarial class certification at eighty percent (80%).

41.     Further, if a certified unlawful disclosure class were to succeed at trial, that class would theoretically be entitled to a more than $150 billion judgment pursuant to 18 U.S.C. § 2710(c)—but my firm believed that such a judgment would be unobtainable. Simply put, such an award would force Netflix out of business and the Class would be left with no relief.

42.     Additionally, constitutional concerns make it extremely unlikely that a court would permit such a large recovery in light of the actual damages suffered by the Class—calculated either by Netflix's benefit from the disclosures (the factual information received in the Parties' mediation suggests that such disclosures did not happen, and the number would be zero) or actual harm to the Class members (a small to trifling amount, if any).

43.     Accordingly, Class Counsel believe that a best-case recovery under Plaintiffs' unlawful disclosure theory may recover at or under $3 million for the Class, plus attorneys' fees.
*Plaintiffs' Unlawful Retention Theory.*

44.     As for Plaintiffs' unlawful retention theory under the VPPA, my firm was acutely aware that Netflix was going to argue that all of the collected PII was still necessary for the purpose for which it was collected (which is a defense under the VPPA). That is, we anticipated that Netflix would argue that the PII was collected for purposes of improving its algorithm, and thus remains perpetually necessary to keep. We also anticipated that Netflix would claim that the PII was collected and kept for other valid reasons, like accounting and tax treatment. We also expected

challenges to the statute on constitutional grounds, including that the pertinent language was unconstitutionally vague. Finally, we anticipated that Netflix would claim that the VPPA did not apply to it. We believed that we would ultimately defeat each and every defense Netflix mounted. Nevertheless, in recognition of the novel issues presented by our case, we estimated the likelihood of succeeding on the merits at just better than a coin-flip; i.e., fifty-five percent (55%).

45.     In terms of certification under a retention theory, once again all the key issues are common ones: the purposes for which Netflix collected its subscribers' PII, whether and for how long retention of that PII was "necessary," and whether Netflix continued to retain such PII after it was no longer necessary to do so. Accordingly, as with Plaintiffs' disclosure theory, we were confident in Plaintiffs' chances at adversarial certification proceedings and estimated the likelihood of achieving adversarial class certification under an unlawful retention theory at eighty percent (80%).

46.     In terms of a possible recovery at trial, Plaintiffs' unlawful retention theory carries many of the same risks as the unlawful disclosure theory—except that, in addition, federal courts considering the issue have thus far held that the VPPA's statutory damages do not apply to claims brought under subsection (e). Accordingly, Class Counsel believe that any recovery would be tied to actual damages suffered by the Class.

47.     In any event, and as supported by the report of Dr. Serge Egelman (attached to Plaintiffs' Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award as Exhibit B-2), Class Counsel estimated that a chance of recovering at least the actual damages of those Class members who overpaid for their subscriptions (i.e., the difference between the charges they did pay, on the one hand, and the amount they would have been willing to pay had they known that Netflix was going to violate the VPPA's unlawful retention provision, on the other) was around fifty-five percent (55%), and that actual damages were no more than $4.65 million. In my view, if Plaintiffs pursued an unlawful retention claim based upon actual damages alone, they would not be foreclosed by the recent court decisions regarding the VPPA's private right of action, because they could bring damages claims under state consumer protection laws.

48.     While Dr. Egelman based his aggregate damages figure on publicly available data about Netflix subscribers, Class Counsel, because of confidential information obtained through discovery regarding the Class composition, recognizes that Dr. Egelman over-estimates the number of Class members who are former Netflix subscribers. Nonetheless, for purposes of analyzing harm to the class and potential recoveries at trial, we assume the damages figures calculated by Dr. Egelman in our calculations.

49.     If Plaintiffs pursued statutory-damages on their unlawful retention claims, they would, as described above, face an uphill battle based on recent case law. Nonetheless, I believe that the one (now-reversed) opinion to find statutory damages available for unlawful retention claims was well-reasoned, and that Plaintiffs stand a one-in-four chance (25%) of ultimately convincing the court that statutory damages are available for VPPA retention claims.

50.     If Plaintiffs were able to recover statutory damages for their unlawful retention claims, I believe that those damages would again be limited by due process principles to a single-digit multiplier of actual damages. Thus, in my opinion, Plaintiffs could not recover at trial more than $46,500,000 in statutory damages, plus fees, on claims of unlawful retention.

*Other Considerations.*

51.     In addition to the above analysis, Class Counsel have estimated that if Settlement had not been reached, obtaining a final judgment for the Class would take at a minimum, an additional three years.

52.     Finally, Class Counsel believe that—had litigation proceeded to and beyond trial—Plaintiffs' stood a forty-four percent (44%) chance (*i.e.*, fifty-five percent (55%) chance of winning on the merits multiplied by an eighty percent (80%) of obtaining and keeping adversarial class certification) of obtaining injunctive relief similar to that obtained by the Settlement.

### Class Counsel's Opinion of the Settlement Agreement

53.     In Class Counsel's view, this litigation has brought exceptional relief to Class Members, culminating in this benchmark settlement. Notably, the Settlement is the first, comprehensive nationwide VPPA settlement of its kind.

54.     First, throughout this case, Class Counsel and Plaintiffs maintained that any class

settlement agreement would need to include injunctive measures to ensure that the Settlement Class Members' information is not retained in a personally-identifiable format longer than necessary, without the explicit opt-in consent of the individual Settlement Class Member. This Settlement Agreement accomplishes this goal.

55.     This injunctive relief offers industry-leading privacy protection and will help prevent the intentional and unintentional use and disclosure of the Settlement Class Members' highly personal Entertainment Content Viewing Histories—the very thing the VPPA was put in place to protect. And the injunctive relief does more than merely repeating Netflix's VPPA duties; rather, it subjects Netflix to contempt of court proceedings if Netflix fails to meet the highly particularized requirements of the Settlement Agreement.

56.     Among the risks prevented by the Settlement is any desire by a company acquiring Netflix to monetize the information retained for longer than necessary. For instance, by forcing Netflix to de-couple PII upon cancellation, a company like Microsoft (which has been rumored as a potential purchaser of Netflix, *see* Eric Savitz, *Netflix Spikes on Rumors of Possible Microsoft Bid*, Forbes.com (Oct. 26, 2012), http://www.forbes.com/sites/ericsavitz/2012/10/26/netflix-spikes-on-rumors-of-possible-microsoft-bid/), would be unable to unlawfully disclose former subscribers' PII, since it could not come into possession of such information in the first place.

57.     Second, given the size of the Settlement Class (an approximated 62 million individuals) any realistically obtainable monetary award would have resulted in payments to Class Members that were negligible on an individual level, to the extent any such payments could be dispersed after factoring in related administrative costs. But rather than obtain negligible payouts, the terms of the Settlement guarantees that the Settlement Class will, instead, benefit from millions of dollars in donations to qualified organizations that educate users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information.

58.     Further, continued litigation would result in significant costs being expended by both Parties, including expert expenses and myriad other costs that accompany trial of a nationwide class action. Additionally, through its communications with Class Counsel, Netflix has made it clear that absent the Settlement, it would vigorously oppose adversarial certification.

59.     In light of all the risks discussed above, the significant costs that would be incurred from proceeding to trial, and from Class Counsel's perspective, the combination of the obtained injunctive and *cy pres* relief for the Settlement Class represents the best possible recovery under the circumstances of this case, and thus more than exceeds what is fair, reasonable, and adequate. As confirmation of the Settlement's more than adequate relief, all seven Plaintiffs' firms involved in this litigation—including several who were engaged in a very heated class leadership fight—unanimously agreed that the relief obtained is far beyond the fair, reasonable, and adequate standard. Together, the relief obtained ensures the Settlement Class enjoys a real benefit that is, importantly, entirely in-line with the focus of Plaintiffs' lawsuit and the goals of the VPPA's unlawful retention provision.

***Netflix's Position.***

60.     At all times, Netflix has denied and continues to deny any wrongdoing whatsoever, and denies that it committed or attempted to commit any wrongful acts or violations of law or duty, including, but not limited to, those alleged in the underlying complaints filed in this case and the Related Actions.

***Class Counsel's Experience.***

61.     Class Counsel have regularly engaged in major complex litigation on behalf of consumers, and have extensive experience in consumer class action lawsuits that are similar in size and complexity to the present case. As shown in the Firm Resume attached here as Exhibit 1, our firm has also been appointed as class counsel in numerous complex consumer class actions.

62.     Our firm also has specific experience in consumer class action litigation involving the VPPA. To that end, we are currently seeking final approval of a class of current and former Blockbuster LLC customers in the District of Minnesota (*see Missaghi v. Blockbuster, LLC*, Case No. 11-cv-2559-JRT (D. Minn.)), and are additionally litigating VPPA claims against Redbox Automated Retail, LLC (*see Sterk, et. al v. Redbox Automated Retail, LLC*, Case No. 11-cv-01729-MFK (N.D. Ill.)), and certain Sony defendants (*see Rodriguez v. Sony Computer Entertainment America LLC, et. al*, Case No. 11-cv-4084-PJH (N.D. Cal.) (currently on appeal to the Ninth Circuit)). These cases, which we have been aggressively litigating at both district and appellate

court levels for nearly two years, all deal with similar issues as in the instant one—*i.e.*, retention and disclosure claims under the VPPA.

***Class Counsel's Contribution to the Case***

63.     From the outset, Class Counsel—along with each of the other law firms involved in the consolidated cases—anticipated spending hundreds of hours litigating these claims with no guarantee of success, knew that prosecution of this case would require that other work be forgone, understood that there was substantial uncertainty surrounding the applicable legal and factual issues (particularly in this case, with Plaintiffs' untested class claims under the VPPA), and continued to prosecute the cases in the face of a substantial opposition. In total, all of the law firms involved in this case have cumulatively spent over 3,100 hours of time.

64.     The work my firm has committed to this case has been substantial. Among other efforts, my firm has:

    a.  Conducted extensive pre-suit investigations, including identification and early legal analysis of the alleged business practices challenged by this case;

    b.  Interviewed dozens of current and former Netflix subscribers, analyzed those customers' common experiences in light of Netflix's information retention practices, and shared—both on a formal and informal basis—information with other law firms and technology experts;

    c.  Drafted and filed Plaintiff Milan's original complaint;

    d.  Communicated early and often with Netflix's counsel, so as to open and maintain a dialogue regarding the Parties' respective views of the relevant facts, law, and overall direction of the litigation, along with advising Netflix of its duty to preserve all electronic data relevant to Plaintiffs' claims;

    e.  Coordinated and prepared for an in-person meeting with Netflix's counsel on March 7, 2011 at JAMS in Los Angeles, California, during which the Parties discussed the factual matters at issue (e.g., the type of customer information retained by Netflix and the advanced algorithms used to collect that information) and possibilities for resolving the lawsuit;

    f.  Briefed and responded to motions seeking appointment as interim class counsel;

    g.  Facilitated collaboration between all attorneys providing representation in the cases that were ultimately consolidated, so as to discuss views regarding the claims and facts at issue and coordinate efforts;

    h.  Drafted and filed the operative Amended Consolidated Class Action Complaint (Dkt. No. 61);

    i.  Prepared Rule 26(a)(1) disclosures and reviewed and analyzed those filed by Netflix;

j.  Propounded/reviewed discovery on/from Netflix, including twenty-five (25) interrogatories and fifty-nine (59) requests for the production of documents;

k.  Participated in Court-ordered telephonic ADR conferences on October 27 and November 29, 2011, which resulted in a stipulation to attend private mediation;

l.  Prepared a mediation brief, which fully presented Plaintiffs' factual contentions and legal theories and responded to Netflix's defenses;

m.  Participated in a full-day mediation with Netflix on February 2, 2012 in Santa Ana, California, resulting in the drafting of a Memorandum of Understanding outlining the underlying settlement structure;

n.  Engaged in continued communication, negotiations, and the exchange of settlement drafts with Netflix's counsel, which resulted in the drafting and execution of the finalized Settlement Agreement;

o.  Successfully briefed and moved for preliminary approval of the Settlement;

p.  Pursuant to the terms of the Settlement, effectuated notice to class members and hired additional staff to help respond to Class Member inquires via telephone and email;

q.  Solicited, received, and reviewed applications from over 40 potential *cy pres* recipients in conjunction with Netflix's counsel, and ultimately selected proposed recipients;

r.  Took actions to protect the class from attorneys who attempted to improperly interfere with the *cy pres* process for their own personal gains; and

s.  Began researching and drafting responses to objections that have already been raised in response to the Settlement, along with those that Class Counsel anticipate will be raised.

65.  Our firm's billable rates and the hours of each attorney who worked on these matters are incorporated in the chart below. In my opinion, the expenditure of time by the attorneys and Edelson McGuire staff that worked on these cases was reasonable and necessary. Our firm's practice generally, which we followed in this case, is to use a collaborative effort in the drafting of all major court filings, exhibits and other important documents. Although several lawyers were involved in the litigation of this matter, each made a conscious effort to minimize the duplication of work and I have reviewed the hours submitted, and subtracted time that I deemed to be unnecessary or duplicative. Additionally, in recognition that complete efficiency cannot always be achieved, we have reduced our base lodestar to account for any unintended inefficiencies. Accordingly, the above attorney time is adjusted inasmuch as we exercised billing judgment, resulting in reduction of our lodestar by five percent (5%). Nevertheless, taking these cases on a contingency basis and not being paid by the hour, we had an incentive to conduct our efforts efficiently. So too, being responsible for advancing all expenses, we had an incentive not to expend funds unnecessarily.

66.     I believe that our firm, Edelson McGuire, assumed a significant risk of non-payment in initiating and prosecuting these case given the novelty of legal issues involved and the vigorous defense that Defendant did and was prepared to raise in litigation had the Parties' settlement efforts failed.

67.     As is the general practice of most law firms, each of the attorneys and law clerks at Edelson McGuire are responsible for keeping track of their billable time. The majority of these records were centralized in a billing management software program to which all employees had access, known as "BigTime." Some attorneys used legacy systems to track their billable time, which have the ability to later be uploaded into "BigTime." On February 13, 2012, Edelson McGuire implemented a new billing management software program, known as "FreshBooks," which was used by almost all of our attorneys to track their time from that point forward.

68.     Based on my experience doing plaintiff's class action work and my knowledge of the billing rates of other firms that pursue complex consumer class action litigation, I believe that the attorneys performing work on this litigation—including those attorneys employed at the law firms involved in all of the consolidated cases—are billed at rates that correlate to their respective experience, that are reasonable in the Chicago and California legal markets, and are at or below the average rates of attorneys with similar backgrounds and experience. Additionally, state and federal courts have approved our prevailing hourly billing rates in substantially similar litigation.

69.     The rates listed are the same rates we use for hourly clients, which comprise a material part of our firm's revenues. The hours, rates, and experience of the particular attorneys involved in this matter are provided in the chart below:

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Jay Edelson Managing Partner Edelson McGuire LLC | 573.3 | $630 | $361,179.00 |
| Rafey S. Balabanian Partner Edelson McGuire LLC | 608.7 | $500 | $304,350.00 |
| Steven Lezell Woodrow | 50.6 | $500 | $25,300.00 |

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Partner Edelson McGuire LLC | | | |
| Steven Teppler Former of counsel Edelson McGuire LLP | 10.5 | $600 | $6,300.00 |
| William Gray Former Associate Edelson McGuire LLC | 67.4 | $395 | $26,623.00 |
| Ari J. Scharg Associate Edelson McGuire LLC | 296.0 | $365 | $108,040.00 |
| Ben Richman Associate Edelson McGuire LLC . | 48.2 | $345 | $16,629.00 |
| Chandler Givens Associate Edelson McGuire LLC | 317 | $295 | $93,515.00 |
| Ben Thomassen Associate Edelson McGuire LLC | 132.90 | $295 | $39,205.50 |
| David Dale Incoming Associate (admission pending) Edelson McGuire LLC | 5.5 | $250 | $1,375.00 |
| Alicia Hwang Incoming Associate (admission pending) Edelson McGuire LLC | 8.25 | $250 | $2,062.50 |
| Nick Larry Incoming Associate (admission pending) Edelson McGuire LLC | 132.94 | $250 | $33,235.00 |
| David Mindell Incoming Associate (admission pending) Edelson McGuire LLC | 4.4 | $250 | $1,100.00 |
| Jordan Savage Contract Associate (admission pending) Edelson McGuire LLC | 77 | $250 | $19,250.00 |
| Daniel Spector Contract Associate (admission pending) Edelson McGuire LLC | 14.1 | $250 | $3,525.00 |
| Law Clerks | 77.4 | $215 | $16,641.00 |

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Edelson McGuire LLC | | | |
| **Total Current Lodestar** | **2,424.19** | | **$1,058,330.00** |
| **5% Reduction** | | | **$52,916.50** |
| **Total Current Adjusted Lodestar** | **2,424.19** | | **$1,005,413.50** |

70.     Based on my experience, I anticipate that our firm will expend at least an additional $100,000 in attorney time over the next several weeks. To that end, we must still attend the final approval hearing, respond to objectors, and remain involved with the Settlement as it is implemented. In addition, our firm remains committed to the Class Members, and will continue to provide comprehensive assistance by responding to all Class Members' inquiries regarding the Settlement and advising them on how to proceed.

71.     Given that Class Counsel and Supporting Counsel have billed $1,352,025.00 and are requesting $2.25 million in attorneys' fees in this case, Class Counsel are requesting a lodestar multiplier of 1.66, which is entirely appropriate given the substantial risks faced in prosecuting this litigation. Class Counsel's fee request also comports with the Ninth Circuit's benchmark 25% award in common fund cases, and, when the value of the injunctive relief is considered, equals only 16.5% of the value recovered.

72.     In addition to this amount, Class Counsel have expended $40,404.92 in reimbursable expenses, such as filing fees, expert fees, appearance fees, mediation fees, mailing, travel, lodging, copying, and case administration, with more expenses yet to come. Every effort was made to keep these expenses at a minimum. Additionally, the fact that Class Counsel agreed to limit reimbursable costs to only $25,000, while total expenses for all seven Plaintiffs' firms is $47,502.56, further demonstrates the Settlement's absolute reasonableness.

***Class Representatives' Contribution to the Case***

73.     As with our firm, from the onset each of the Class Representatives and named-Plaintiffs in the Related Actions have been involved in this litigation and have admirably stood up to Netflix—a huge, popular corporation with vast resources and a strong legal team. This is

especially true with regard to Milans and Comstock, who have been mentioned countless times in the many media reports that have covered this lawsuit.

74.     As confirmed by my own communications with supporting counsel, none of the named-Plaintiffs in the Related Actions were promised they would receive an award of any kind or that Class Counsel would seek any specific award on their behalf. Rather, the requested incentive award only seeks to compensate the Class Representatives and named-Plaintiffs for their time, effort, and contributions to this case.

75.     To that end, throughout the course of this litigation, the Class Representatives and named-Plaintiffs have remained committed to the Classes, have contributed their own time and expended effort toward the litigation of these matters, and are thus deserving of the proposed incentive award.

**The Class's Reaction to the Settlement**

76.     At the time of filing for final approval, the opt-out and objection deadline in this case is still two weeks away. Nonetheless, given the reaction of the Class thus far, I anticipate that the total number of opt-outs and objections will demonstrate the Class's overwhelmingly positive reaction to the Settlement.

77.     To date, 2,157 class members have excluded themselves (0.003% of the Class) from the Settlement, and 97 have objected (0.00016% of the Class), all of whom filed *pro se*. Additionally, thus far, no federal or state official has objected to the Settlement.

78.     Class Counsel anticipate that because of the publicity associated with this suit, the size of the Class, and the size of the Settlement, there will be further objections, particularly from professional objectors delaying their filings as long as possible in order to increase their leverage.

79.     To date, Class Counsel have already witnessed particularly concerning behavior from would-be professional objectors. One California law firm appeared to have fabricated imaginary client-objectors in an attempt to gain access to privileged information, while a Chicago-based firm went so far as to solicit a public interest organization to object to, rather than participate in, the *cy pres* application process.

80.     The conduct of the Chicago-based firm, Krislov Law, warrants further discussion. Specifically, it is our understanding that the Krislov Law firm, led by John Orellana—a yet to be licensed member of the bar—took affirmative steps to locate and contact one or more not-for-profit organizations that were in the process of submitting *cy pres* applications pursuant to the Court's preliminary approval order. When he contacted the applicant(s), Orellana specifically targeted non-attorneys, even though he knew (or should have known) that the applicant(s) had in house attorneys and/or retained outside firms. Orellana's and the Krislov firm's goal was to discourage the applicant(s) from participating in the settlement and instead retain the Krislov firm to represent the applicant(s) in filing an objection to the settlement. In short, they cynically attempted to damage the Class's benefits under the Settlement in order to then manufacture a client and an objection that the Settlement was deficient[1].

81.     Class Counsel will continue investigating the extent of Orellana's and the Krislov firm's interference with the *cy pres* process and take necessary actions to protect the interests of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 31, 2012 at Chicago, Illinois.

/s/ Jay Edelson
Jay Edelson

---

[1]     Indeed, the only stake a *Cy Pres* Organization would have in objecting would be if the process were set up to unfairly exclude them.

# Exhibit 1

# EDELSON MCGUIRE, LLC FIRM RESUME

EDELSON MCGUIRE, LLC is a plaintiff's class action and commercial litigation firm with attorneys in Illinois, Colorado and California.

Our attorneys have been recognized as leaders in these fields by state and federal legislatures, national and international media groups, the courts, and our peers. Our reputation for leadership in class action litigation has led state and federal courts to appoint us lead counsel in many high-profile class action suits, including the recent Thomas the Tank Engine lead paint class actions, the AT&T mobile content class actions, the home equity credit reduction cases, and privacy class actions involving T-Mobile, Facebook, and Netflix. We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy and other issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools and are asked to serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON MCGUIRE is a leader in plaintiffs' class and mass action litigation, with a particular emphasis on technology class actions, and has been called a "class action 'super firm'" by a national organization. (Decalogue Society of Lawyers, Spring 2010.) As has been recognized by federal courts, our firm has an "extensive histor[y] of experience in complex class action litigation, and [is a] well-respected law firm[] in the plaintiffs' class action bar." *In re Pet Food Prod. Liab. Litig.*, MDL Dkt. No. 1850, No. 07-2867 (NLH) (D.N.J. Nov. 18, 2008). A leading arbitrator concurred: "The proof of [the firm's] experience, reputation, and abilities is extraordinary. . . . Each [of their cases] elaborates on the experience and unique success [they] have had in achieving leading roles in the area of 'technology consumer protection class actions.'" (Arbitration award in mobile content class action settlement, August 6, 2009) In appointing EDELSON MCGUIRE interim co-lead in one of the most high profile cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." -In Re JPMorgan Chase Home Equity Line of Credit Litig., No. 10 C 3647 (N.D.Ill, July 16, 2010).

We have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389 (N.D.Cal) (order appointing EDELSON MCGUIRE interim co-lead of privacy class action); see also In re Netflix Privacy Litigation, 5:11-cv-00379 (N.D.Cal. Aug. 12, 2011) (appointing EDELSON MCGUIRE sole lead counsel due, in part, to its "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]")

We have several sub-specialties within our plaintiffs' class and mass action practice group:

***Consumer Technology Class Actions***:  We have established the key precedent under the Telephone Consumer Protection Act concerning text message spam, resulting in multiple eight figure settlements in recent years. We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

**Representative Settlements:**

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton County Sup. Ct., GA):  Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation.  "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Illinois):  Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges.  Case settled for $36 million.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D.Ill):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $16 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.):  Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Case settled for $12 million.

- *Parone v. m-Qube, Inc.* No. 08  CH 15834 (Cook County, Illinois):  Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges.  Case settled for $12.254 million.

- *Rojas v CEC*, No. 1:10-cv-05260 (N.D.Ill):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $19,999,400.

- *Kramer v. B2Mobile, et al*, No. 0-cv-02722-CW (N.D.Cal.):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $12.2 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.).  Co-lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $10 million.

- *Williams, et al. v. Motricity, Inc. et al.*, Case No. 09 CH 19089 (Cook

County, Illinois):  Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.):  Lead counsel in class action settlement alleging unauthorized mobile content charges.  Case settled for $7.6 million.

- *Weinstein, et al. v. Airit2me, Inc.*, Case No. 06 C 0484 (N.D. Ill):  Co-lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $7 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (Los Angeles Sup. Ct.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Settlement provided class members with full refunds.

- *Duffy v. Nevis Mobile, LLC*, No. 08 CH 21376 (Cir. Ct. Cook County, IL): Class counsel in certified class action against mobile content provider for unauthorized mobile content charges resulting in default judgment over $10 million.

- *Zurakov v. Register.com,* No. 01-600703 (New York County, NY):  Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its deceptive practices in registering Internet domain names.  Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

***Privacy/Data Loss Class Actions***: We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Red Box, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft and others involving the failure to protect customers' private information, some resulting from security breaches.

### Representative Cases:

- *In re Netflix Privacy Litigation,*  5:11-cv-00379 (N.D.Cal.):  Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act  by illegally retaining customer viewing information.  $9 million dollar cy pres settlement has been preliminarily approved.

- *In re Facebook Privacy Litigation,* 10-cv-02389 (N.D. Cal.):  Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *Standiford v. Palm*, No. 5:09-cv-05719-LHK (N.D. Cal.):  Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litigation,* 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *Gaos v. Google,* 10-cv-4809 (N.D. Cal.): Part of a team of attorneys in suit alleging that Google unlawfully disclosed its users' search queries to website owners and other third parties.

- *In re Sidekick Litig.* , No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Abrams v. Facebook, Inc.,* No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

- *Desantis v. Sears*, 08 CH 00448 (Cook Cty): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the internet.

***Products Liability Class Actions***: We have been appointed lead counsel in state and federal products liability class settlements, including a $30, million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada.

### Representative Settlements:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cir. Ct. Cook County, IL): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D. N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

***Banking Class Actions***: EDELSON MCGUIRE has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Its suits include claims that the certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. EDELSON MCGUIRE achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "Prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank*, N.A., 673 F.3d

547, 586 (7th Cir. 2012) (Ripple, J., concurring).

### Representative Cases:

- *Hamilton v. Wells Fargo Bank, N.A.*, 4:09-cv-04152-CW (N.D. Cal.). Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines.

- *Levin v. Citibank, N.A.*, C-09-0350 MMC (N.D. Cal.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Preliminarily-approved settlement restores hundreds of millions of dollars in credit in addition to cash payments.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D.Ill.): suing to enforce HAMP trial plans.

- Settled numerous consumer class actions alleging fraud or other unconscionable behavior by banks and other lenders.

***General Consumer Protection Class Actions:*** We have successfully prosecuted countless class action suits against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers.

### Representative Settlements:

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D.Ill): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 1:10-cv-02964 (N.D.Ill): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No 3:11-cv-01785-si (N.D.Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763-crb (N.D.Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook County, IL): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook County, IL): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook County, IL): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook County, IL): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook County, IL): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

***Insurance Class Actions***:   We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds.

**Representative Settlements:**

- *Holloway v. J.C. Penney*, No. 97 C 4555, (N.D. Ill.): One of the primary

attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

***Mass/Class Tort Cases***: Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions.

**Representative Cases:**

- *Aaron v. Chicago Housing Authority,* 99 L 11738, (Cir. Ct. Cook County, IL): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes, to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations. All of our attorneys have regularly practiced in state and federal trial and appellate courts.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner of EDELSON MCGUIRE. He has been recognized as a leader in class actions, technology law, corporate compliance issues and consumer advocacy by his peers, the media, state and federal legislators, academia and courts throughout the country.

Jay has been appointed lead counsel in numerous state, federal, and international class actions, resulting in hundreds of millions of dollars for his clients. He is regularly asked to weigh in on federal and state legislation involving his cases. He testified to the U.S. Senate about the largest pet food recall in the country's history and is advising state and federal politicians on consumer issues relating to the recent federal bailouts, as well as technology issues, such as those involving mobile marketing. Jay also counsels companies on legal compliance and legislative issues in addition to handling all types of complex commercial litigation.

Jay has litigated class actions that have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to Internet businesses, and the interpretation of numerous other state and federal statutes including the Telephone Consumer Protection Act and the Video Privacy Protection Act. As lead counsel, he has also secured settlement in cases of first impression involving Facebook, Microsoft, AT&T and countless others, collectively worth hundreds of millions of dollars.

In addition to technology based litigation, Jay has been involved in a number of high-profile "mass tort" class actions and product recall cases, including cases against Menu Foods for selling contaminated pet food, a $30 million class action settlement involving the Thomas the Tank toy train recall, and suits involving damages arising from second-hand smoke.

In 2009, Jay was named one of the top 40 Illinois attorneys under 40 by the Chicago Daily Law Bulletin. In giving Jay that award, he was heralded for his history of bringing and winning landmark cases and for his "reputation for integrity" in the "rough and tumble class action arena." In the same award, he was called "one of the best in the country" when it "comes to legal strategy and execution." Also in 2009, Jay was included in the American Bar Association's "24 hours of Legal Rebels" program, where he was dubbed one of "the most creative minds in the legal profession" for his views of associate training and firm management.  In 2010, he was presented with the Annual Humanitarian Award in recognition of his "personal integrity, professional achievements, and charitable contributions" by the Hope Presbyterian Church.  In 2011, he was selected as an Illinois Super Lawyer and, separately, as a top Illinois class action lawyer by Benchmark Plaintiff.

Jay is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting, including serving as panelist on national symposium on tort reform and, separately, serving as a panelist on litigating high-profile cases. He has also appeared on dozens of television and radio programs to discuss his cases. He has taught classes on class action law at Northwestern Law School and The John Marshall Law School, and has co-chaired a 2-day national symposium on class action issues.  He has been an adjunct professor, teaching a seminar on class action litigation at Chicago-Kent College of Law since 2010.

Jay is a graduate of Brandeis University and the University of Michigan Law School.

**MYLES MCGUIRE** is a Partner at EDELSON MCGUIRE. His practice concentrates on consumer protection law, class actions, and legal and political consulting to technology companies. Prior to entering private practice, Myles spent several years operating an Internet advertising company, which was later sold, in addition to counseling high-tech companies on legal issues.

Since turning to plaintiffs' advocacy, Myles has had principle control over many nationwide and multi-state class actions. Drawing on his technological background, his specific area of emphasis is on emerging technology class actions, including those involving electronic commerce, cellular telephony and wireless media, among others. He has served in leadership positions in groundbreaking settlements involving Facebook, Verizon, Sprint, and T-Mobile.

Due to his diverse legal and business expertise, Myles has been asked by members of Congress to comment on proposed legislation in the mobile content industry and has worked with state regulatory bodies in related efforts.

Myles graduated from Marquette University Law School in 2000 and is admitted to practice in Wisconsin and Illinois. He is a member of the National Association of Consumer Advocates and the Chicago Bar Association.

**RYAN D. ANDREWS** is a Partner at EDELSON MCGUIRE, and the Chair of the Telecommunications Practice Group. Mr. Andrews has been appointed class counsel in numerous state and federal class actions nationwide that have resulted in nearly $100 million dollars in refunds to consumers, including Satterfield v. Simon & Schuster, Inc., No. C 06 2893 CW (N.D. Cal.), Gray v. Mobile Messenger Americas, Inc., No. 08-CV-61089 (S.D. Fla.), Lofton v. Bank of America Corp., No. 07-5892 (N.D. Cal.), Paluzzi v. Cellco Partnership, No. 07 CH 37213 (Cook County, Ill.), Parone v. m-Qube, Inc. No. 08 CH 15834 (Cook County, Ill.), and Kramer v. Autobytel, Inc., No. 10-cv-2722 (N.D. Cal. 2010).

In addition, Mr. Andrews has achieved groundbreaking court decisions protecting consumers through the application of the Telephone Consumer Protection Act to emerging text-messaging technology. Representative reported decisions include: Lozano v. Twentieth Century Fox, 702 F. Supp. 2d 999 (N.D. Ill. 2010), Satterfield v. Simon & Schuster, Inc. 569 F.3d 946 (9th Cir. 2009), and Kramer v. Autobytel, Inc., 759 F. Supp. 2d 1165 (N.D. Cal. 2010), In re Jiffy Lube Int'l Text Spam Litig, --- F. Supp. 2d ---, No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012).

Mr. Andrews received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Recently, Mr. Andrews has returned to Chicago-Kent as an Adjunct Professor of Law, teaching a third-year seminar on Class Actions. While in law school, Mr. Andrews was a Notes & Comments Editor for The Chicago-Kent Law Review, as well as a teaching assistant for both Property Law and Legal Writing courses. Mr. Andrews externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois, and earned CALI awards for the highest grade in five classes.

A native of the Detroit area, Mr. Andrews graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications.

Mr. Andrews is licensed to practice in Illinois state courts, the United States District Court for

the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and Group Chair at EDELSON McGUIRE. Rafey focuses his practice on prosecuting consumer technology class actions, banking class actions, and general consumer class actions. He is also co-chair of EDELSON McGUIRE's business litigation group.

On the plaintiff's side, Rafey has been the court appointed lead counsel in numerous high-stakes class action litigation and has obtained settlements in excess of $50 million.

On the business litigation side, Rafey has represented individual and corporate clients in a wide variety of complex cases, including commercial disputes seeking damages of $60 million and several "bet the company" cases.

Rafey has first-chaired both jury and bench trials, engaged in extensive motion practice, and acted as lead counsel in several mediations and arbitrations.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, Rafey received a certificate in international and comparative law and earned the CALI award for the highest grade in advanced trial advocacy. Rafey received his B.A. in History, *with distinction*, from the University of Colorado – Boulder in 2002.

**STEVEN LEZELL WOODROW** is a Partner and Group Chair at EDELSON McGUIRE and the firm's hiring attorney. Steven has successfully litigated and settled a number of consumer protection cases through trial, engaged in extensive motion practice, drafted appellate briefs, prosecuted class actions and participated in multi-session mediations.

Prior to joining the firm, Steven was a litigator at a Chicago boutique focusing on consumer protection matters, real estate disputes, fraudulent transfers in bankruptcy and the prosecution of white-knight mortgage fraud cases.

Steven received his J.D. from Chicago-Kent College of Law with High Honors, *Order of Coif*, while earning his certificate in litigation and alternative dispute resolution. During law school, he served as a Judicial Extern for the Honorable Ann C. Williams on the Seventh Circuit Court of Appeals and as President of the Student Bar Association. Steven also served as a Notes and Comments Editor for THE CHICAGO-KENT LAW REVIEW and represented Chicago-Kent at the National Sports Law Moot Court Competition in New Orleans in 2004. Steven was awarded the ABA-ALI Scholarship and Leadership Award for best representing the combination of leadership and scholarship in his graduating class and also received the Lowell H. Jacobson Memorial Scholarship, which is awarded competitively to a student from one of the law schools in the Seventh Circuit to recognize personal commitment and achievement.

Steven received his B.A. in Political Science, *with Distinction*, from the University of Michigan—Ann Arbor in 2002.

**SEAN P. REIS** is Of Counsel to EDELSON McGUIRE . Sean is an experience trial attorney and business litigator. Sean has experience in a wide-range of litigation matters, including those involving trade secrets, real estate fraud, employment, and consumer issues. Sean has tried

sixteen cases, including several multi-week jury trials.

Prior to joining EDELSON MCGUIRE, Sean was trained at an international law firm and later founded his own practice. In 1993, Sean graduated from University of California at San Diego with a degree in quantative economics. Following that Sean graduated from Rutgers University School of Law, Newark, where he was the business editor of the Rutgers Law Review and where he received the graduation for appellate advocacy.

**EVAN M. MEYERS** is Senior Counsel at EDELSON MCGUIRE. Evan is an experienced trial and appellate litigator and has handled a broad range of complex litigation matters, including contract disputes, securities and consumer fraud, employment discrimination, insurance coverage, antitrust, shareholder and tax disputes, business torts and other matters. Evan has managed all aspects of the litigation process, including evaluation and strategic analysis, drafting pleadings in state and federal trial and appellate courts, taking and defending depositions, arguing motions, and representing clients in mediations and settlement conferences. He has also successfully tried cases in state court.

Prior to joining EDELSON MCGUIRE, Evan worked at Drinker Biddle & Reath LLP, where he was an associate in the firm's commercial litigation practice group and represented a wide range of clients in federal and state courts, including manufacturers, insurance and financial services companies, government agencies, close corporations, hospitals, colleges and universities and not-for-profit entities.

Evan received his J.D., cum laude, from the University of Illinois College of Law in 2002, where he was an associate editor of the Elder Law Journal. Additionally, he served as a judicial extern with the Hon. Wayne R. Andersen of the U.S. District Court for the Northern District of Illinois. Evan received his bachelor's degree, with distinction, in political science from the University of Michigan in 1999.

**BRAD BAGLIEN** is an Associate at EDELSON MCGUIRE. Brad focuses his practice on privacy and technology class actions.

Brad previously worked for Sidley Austin LLP, where he represented a wide range of clients, including Fortune 100 companies, small businesses, and individuals. He has handled a variety of complex commercial litigation matters in state and federal courts, including consumer fraud actions, contract disputes, internal investigations, insurance class actions, and commercial tax litigation.

Brad graduated with honors from the University of Chicago Law School, where he participated in the Hinton Moot Court Competition and was an instructor in the Street Law program at several local high schools. During law school, Brad served as a judicial extern for the Honorable Mark Filip in the Northern District of Illinois.

Brad graduated from St. Olaf College with degrees in Economics and Political Science. While at St. Olaf, he was a captain of the baseball team and a member of the football team.

**DAVID DALE** is an incoming Associate at EDELSON MCGUIRE, where he focuses on plaintiff's privacy class actions and litigation.

David received his J.D., magna cum laude, from the John Marshall School of Law, where he was a member of the Law Review, Trial Advocacy Council, and a Teaching Assistant for Prof. Rogelio Lasso in several torts courses. While in law school, David served as a judicial extern to the Honorable James F. Holderman, Chief Judge of the United States District Court for the Northern District of Illinois.

David attended the University of Missouri, where he graduated with a B.J. in Journalism in 2004. Prior to choosing law school, David worked in the fields of marketing, advertising and public relations for the University of Missouri.

David sat for the Illinois Bar in the summer of 2012. His admission is pending.

**CHRISTOPHER L. DORE** is an Associate at EDELSON MCGUIRE and a member of the Technology and Privacy Practice Group. Chris focuses his practice on emerging consumer technology issues, as well as prosecuting unsolicited text message and online fraud cases.

Chris has been appointed class counsel in multiple class actions, including ground breaking technology, text-spam, and fraudulent marketing cases. (Turner v. Storm8, LLC, (09-cv-05234) (N.D. Cal.) and Espinal v Burger King Corporation, (09-20982) (S.D. Fla.)).

Prior to joining EDELSON MCGUIRE, Chris worked for two large defense firms in the areas of employment and products liability.

Chris graduated magna cum laude from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating magna cum laude from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**CHANDLER GIVENS** is an Associate at EDELSON MCGUIRE, where his practice focuses on technology and privacy class actions. His lawsuits have centered on fraudulent software development, unlawful tracking of consumers through mobile devices and computers, and illegal data retention.

Chandler graduated from the University of Pittsburgh School of Law. While in law school, he was a research assistant for Cyberlaw Professor Dr. Kevin Ashley, and a judicial extern for the Honorable David S. Cercone of the United States District Court for the Western District of Pennsylvania. Chandler received CALI awards for the highest course grades in Negotiations as well as Telecommunications Law. He graduated *cum laude* from Virginia Tech, with a B.S. in business information technology, with a focus on computer-based decision support systems. Chandler sits on the ABA committees for Information Security and e-Discovery.

Before joining the legal profession, Chandler worked as a systems analyst. He is regularly invited to speak on issues ranging from network security to consumer privacy and Internet fraud. Chandler currently leads a team of technology investigative researchers at the firm.

Prior to starting with the firm, Chandler interned at the Virginia Attorney General's Office and the U.S. Department of Justice in Washington, D.C.

**ALICIA HWANG** is an incoming Associate at EDELSON MCGUIRE. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law in May 2012, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON MCGUIRE, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated magna cum laude from the University of Southern California, earning her B.A. in Communication in 2007. She is a member of the Phi Beta Kappa honor society.

Alicia sat for the Illinois Bar in the summer of 2012. Her admission is pending.

**NICK LARRY** is an incoming Associate at EDELSON MCGUIRE. Nick practices in the area of consumer class action and general litigation.

Nick received his J.D., cum laude, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law in 2008 and played on the school's rugby team.

Nick sat for the Illinois Bar in the summer of 2012. His admission is pending.

**MEGAN LINDSEY** is an Associate at EDELSON MCGUIRE. Megan practices in the area of consumer class action, focusing on complex class actions in the banking industry.

Prior to joining EDELSON MCGUIRE, Megan worked for several years as a commercial loan underwriter and portfolio officer at Merrill Lynch, Pierce, Fenner & Smith. Megan also worked as an analyst in the troubled asset group at Bank of America, helping to monitor and restructure high-risk loans.

Megan received her J.D. from Chicago-Kent College of Law in May 2011. During law school Megan externed for the Honorable Judge Bauer in the Seventh Circuit Court of Appeals and served as Vice President-Evening Division of the Student Bar Association and Vice President of

the Moot Court Honor Society. Megan also represented Chicago-Kent at the National First Amendment Moot Court Competition in Nashville, Tennessee and the National Cultural Heritage Law Moot Court Competition in Chicago, Illinois, and earned the CALI award for obtaining the highest grade in Legal Writing I, Legal Writing II and Trial Advocacy II courses.

Megan graduated with High Honors from DePaul University in July 2005, earning her B.S. in Finance.

**DAVID I. MINDELL** is an incoming Associate at EDELSON MCGUIRE. David practices in the area of technology and privacy class actions.

David has worked on cases involving fraudulent software products, unlawful collection and retention of consumer data, and mobile-device privacy violations. David also serves as a business consultant to private companies at all stages of development, from start-up to exit.

Prior to joining EDELSON MCGUIRE, David co-founded several technology companies that reached multi-million dollar valuations within 12 months of launch. David has advised or created strategic development and exit plans for a variety of other technology companies.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the predominate cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has given speeches related to his research to a wide-range of audiences.

David sat for the Illinois Bar in the summer of 2012. His admission is pending.

**JOHN OCHOA** is an Associate at EDELSON MCGUIRE. John's practice focuses on consumer class action litigation.

John graduated *magna cum laude* from the John Marshall Law School in May, 2010 and served as Managing Editor for the John Marshall Law Review. His student Comment, which examines bicycling and government tort immunity in Illinois, appears in Vol. 43, No. 1 of the JOHN MARSHALL LAW REVIEW. While in law school, John took advantage of various scholastic opportunities, serving as a research assistant, externing with Judge Thomas Hoffman at the Illinois Court of Appeals, and competing in the ABA National Appellate Advocacy Competition. John was awarded a Herzog scholarship for his academic performance and earned CALI awards for the highest grade in Torts, Property, and Administrative Law.

He received his B.A. with Honors in Political Science from the University of Iowa in 2004.

**EVE-LYNN RAPP** is an Associate at EDELSON MCGUIRE. Eve-Lynn focuses her practice in the areas of consumer and technology class action litigation.

Prior to joining EDELSON MCGUIRE, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (The Honorable Judge Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BENJAMIN H. RICHMAN** is an Associate at EDELSON MCGUIRE and is a member of the firm's Corporate Governance and Business Litigation Practice Group. He handles plaintiff's-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is the director of EDELSON MCGUIRE'S Summer Associate Program.

**ARI J. SCHARG** is an Associate at EDELSON MCGUIRE.  He handles all aspects of litigation from pre-filing investigation through trial.  In addition to class action litigation, Ari has substantial experience litigating commercial, real estate, employment, and constitutional matters. He also counsels entrepreneurs and works closely with startup companies to manage risk and raise capital.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.  He also regularly tries his cases before judges and juries, including a trial that spanned six months.

Ari is very active in community groups and legal industry associations.  He is a member of the Board of Directors of the Chicago Legal Clinic, an organization that provides legal services to low-income families in the Chicago area.  Ari acts as Outreach Chair of the Young Adult Division of American Committee for the Shaare Zedek Medical Center in Jerusalem, and is actively involved with the Anti-Defamation League.  He is also a member of the Standard Club Associates Committee.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for Law Review and competed nationally in trial competitions.  During law school, he also served as a judicial extern to The Honorable Judge Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**IRINA SLAVINA** is an Associate at EDELSON MCGUIRE focusing on consumer class actions. As a Russian attorney, Irina obtained her LL.M degree in International and Comparative Law, with High Honors, from Chicago-Kent College of Law in 2003. Since that time Irina has had a unique legal career in the United States that started in a boutique law office in Chicago and progressed to the legal department of a major gaming and entertainment company on the east coast.

While working in-house with General Counsel, Irina gained extensive experience in drafting and negotiating company contracts and addressing the day-to-day legal inquiries of management. Irina handled patrons' liability claims, worked with state and local government officials in obtaining and renewing company licenses, and assisted with all aspects of corporate governance and compliance.

Irina earned her J.D. from Chicago-Kent College of Law with High Honors, Order of Coif, in 2009. While in law school, Irina represented Chicago-Kent in the McGee National Civil Rights Moot Court Competition. Irina was also a member of the Chicago-Kent Law Review, and her student note on the issue of a casino liability to problem gambles was published in the March 2010 issue, 85 Chi.-Kent L. Rev. 369. Irina externed for the Honorable Susan E. Cox in the Northern District of Illinois, and earned the CALI award for obtaining the highest grade in Constitutional Law, Evidence, and Legal Writing III courses.

**BEN THOMASSEN** is an Associate at EDELSON MCGUIRE and is a member of the Banking and Financial Services Practice Group.

Ben received his J.D., magna cum laude, from Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif.  At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and competed in both the ABA National Appellate Advocacy and National Moot Court

Competitions.  Among other scholarships and awards, Ben earned seven CALI awards for the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before his legal career, Ben worked in and around the Chicago and Washington, D.C. areas, including freelance and firm-based work as a website designer/developer, and many years experience as a film projectionist and media technician for commercial theatres, museums, and educational institutions.  Ben received his Bachelor of Arts, summa cum laude, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.