1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LAKESHORE LAW CENTER**
**Jeffrey Wilens, Esq. (State Bar No. 120371)**
**18340 Yorba Linda Blvd., Suite 107-610**
**Yorba Linda, CA 92886**
**714-854-7205**
**714-854-7206 (fax)**
**jeff@lakeshorelaw.org**

**Attorney for Objector Gary Wilens**

### UNITED STATES DISTRICT COURT,

### NORTHERN DISTRICT OF CALIFORNIA,

### SAN JOSE

| | |
|---|---|
| IN RE NETFLIX PRIVACY LITIGATION | ) Case No.  5:11-cv-00379-EJD<br>)<br>) **OBJECTION OF GARY WILENS**<br>) **TO FINAL APPROVAL OF CLASS**<br>) **ACTION SETTLEMENT, POINTS**<br>) **AND AUTHORITIES,**<br>) **DECLARATION IN SUPPORT**<br>) **THEREOF**<br>)<br>) Hearing Date: December 5, 2012<br>) Hearing Time:  10:00 a.m.<br>) Department 4, 5th Floor<br>) Hon. Edward J. Davila, District Judge |

TO EACH PARTY AND THEIR ATTORNEY OF RECORD:

Objector Gary Wilens respectfully submits these points and

authorities and argument in Objection to the proposed class action

settlement in this Action.  Gary Wilens' address is 12 El Balazo, Rancho

Santa Margarita, California, 92688-4155, and phone number is 949-713-

7135.  He is a member of the Settlement Class.  Objector intends to appear

at the Final Approval Hearing through his counsel Lakeshore Law Center.

DATED: November 6, 2012

                        Respectfully submitted,

            By     ___/s/_Jeffrey Wilens____

                        JEFFREY WILENS
                        Attorney for Objector

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES...........................................................................................i

POINTS AND AUTHORITIES......................................................................................1

ARGUMENT....................................................................................................................1

     I. THE SETTLEMENT IS NOT A FAIR OR REASONABLE RESOLUTION...........1

         A.      THERE IS INSUFFICIENT INFORMATION FOR THE COURT TO DETERMINE DEFENDANT'S TRUE MAXIMUM EXPOSURE AND THEREFORE TO DETERMINE WHETHER THE PAYMENT OF ZERO DOLLARS TO THE CLASS IS FAIR. ................................... 2

         B.      PLAINTIFFS' COMPARISON OF THIS SETTLEMENT WITH THE FACEBOOK "BEACON" CLASS ACTION SETTLEMENT IS INAPT. ..................................... 12

         C.      THE REQUESTED ATTORNEY'S FEES ARE EXCESSIVE IN LIGHT OF THE ACTUAL VALUE OF THE SETTLEMENT TO THE CLASS MEMBERS. ..........................15

CONCLUSION............................................................................................................. 19

DECLARATION OF GARY WILENS ........................................................................1

# **TABLE OF AUTHORITIES**

## **Cases**

Dennis v. Kellogg Co. (9th Cir. 2012) 2012 WL 3800230 ....................................... 3

Hanlon v. Chrysler Corp. (9th Cir. 1998) 150 F.3d 1011 ......................................... 2

Lane v. Facebook, Inc. (9th Cir. 2012) 696 F.3d 811...................................... 12, 13

Sterk v. Redbox Automated Retail, LLC (7th Cir. 2012) 672 F.3d 535 ................................. 4

Objector Gary Wilens' Points and Authorities in Support of Objection to Final Approval
Case No. 5:11-cv-00379-EJD

Walter v. Hughes Communications, Inc. (N.D. Cal. 2011) 2011 WL 2650711 ...................... 2

Yeagley v. Wells Fargo & Co. (N.D. Cal., May 20, 2010, C 05-3403 CRB) 2010 WL

2077013 ............................................................................................................... 18

**Statutes**

18 USC § 2710 ............................................................................................................... 4

Objector Gary Wilens' Points and Authorities in Support of Objection to Final Approval
Case No. 5:11-cv-00379-EJD

# POINTS AND AUTHORITIES

## ARGUMENT

**I.    THE SETTLEMENT IS NOT A FAIR OR REASONABLE RESOLUTION.**

Objector Gary Wilens is a Class Member. His basic objection is quoted below with the legal argument to follow thereafter.

> The Class Counsel gets over $2 million, some organizations that have nothing to do with me or my concerns may get 6-7 million and I get nothing.
>
> If Netflix was really disclosing my video viewing history to third parties I am offended and would like to receive some of the $2,500 statutory fine I am informed the law allows me to recover. But I do not have any proof one way or the other because the Class Counsel has not disclosed the truth of the matter in the court filings.
>
> If it is a frivolous lawsuit, then Class Counsel should not be rewarded. If this lawsuit has merit and Netflix was violating my rights, then Class Counsel should not be rewarded for selling me and the other Class Members out. (Gary Wilens Declaration, ¶¶ 2-5.)

Due in part to these dangers of "collusion between class counsel and the defendant," the Ninth Circuit has adopted the rule of other circuits that "settlement approval that takes place prior to formal class certification requires a higher standard of fairness," leading to "a more probing inquiry than may normally be required under Rule 23(e)." (Hanlon v. Chrysler

<u>Corp</u>. (9th Cir. 1998) 150 F.3d 1011, 1026.)   Not all proposed class action settlements require the same level of court scrutiny.   Some examples of those kind of situations are set forth in <u>Walter</u> v. <u>Hughes</u> <u>Communications</u>, <u>Inc</u>. (N.D. Cal. 2011) 2011 WL 2650711, *11.)   They include situations where the class had the opportunity to participate in settlement negotiations, where the settlement ties the size of the class counsel's attorney fee award to the number of claim forms submitted or the amount disbursed to the class, or where the defendant benefits from a broad release only as to Class Members who submit a claim form.   (<u>Id</u>.)   None of those circumstance are present here.   **What is present should give the Court pause because there are number of red-flags in this settlement.**

      **A.**    **THERE IS INSUFFICIENT INFORMATION FOR THE COURT TO DETERMINE DEFENDANT'S TRUE MAXIMUM EXPOSURE AND THEREFORE TO DETERMINE WHETHER THE PAYMENT OF ZERO DOLLARS TO THE CLASS IS FAIR.**

The Parties propose to pay Class Members <u>zero</u> dollars with the entire $9 million settlement fund being divided between Class Counsel and currently unspecified cy pres organizations.   The approach is extremely problematic because while one of the asserted claims does not provide for recovery of damages, the other claim does provide for recovery of a substantial amount of monetary damages.

As the Ninth Circuit recently explained, Cy Pres is used in lieu of direct distribution of damages to the Class when direct distribution is not feasible because proof of individual claims would be burdensome or distribution of damages costly.  (<u>Dennis</u> v. <u>Kellogg Co</u>. (9th Cir. 2012) 2012 WL 3800230, *5.)  In the instant case, there is no showing that it would be difficult, costly or burdensome to distribute a damages award to each of the Class Members.  Certainly, it would not be difficult for Netflix to credit current customer's accounts.  And given Netflix's technology, it would not seem to be difficult for Netflix to provide to former customers one free video download equivalent in value to the credit being given to current customers.

Therefore, assuming that Class Members or some of them are entitled to monetary damages, it is not fair to require them to forfeit those damages and release any claims for such damages in exchange for a  payment of zero dollars and nothing else of value either.  This Objection will demonstrate that the Court simply does not have enough information in order to assess whether the Class Members are entitled to monetary damages.  Although Class Counsel attempts to discount the possibility to next to nothing, these attempts are not support by either sound reasoning or competent evidence.

The Class Notice states:  "The lawsuit claims that Netflix kept and

disclosed information, including records on the movies and TV shows its customers viewed, in violation of the Video Privacy Protection Act and other laws."

The VPPA, 18 USC § 2710, places restrictions on "video tape service providers" (providers).   Since the definition of those providers includes services that rent or deliver video tape or similar audio visual materials, the Parties apparently concede Netflix is a video tape service provider.

Plaintiff alleges two violations. Subdivision (b) provides a provider who "knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person. . . ."  There are exemptions not pertinent to this lawsuit. Subdivision (c) provides that any person aggrieved by a violation of this section can recover "actual damages but not less than liquidated damages in an amount of $2,500."

Subdivision (e) requires providers to destroy old records containing personally identifiable information (PII) as soon as practicable but no later than one year from the date the information is no longer needed for specified purposes.   However, it appears there is no private remedy for a violation of this subdivision.   (Sterk v. Redbox Automated Retail, LLC (7th Cir. 2012) 672 F.3d 535, 539.)

The proposed settlement would release Class claims under <u>both</u> subdivisions.   (Doc. 76-1, pp. 7-8 ¶ 1.32, ¶ 1.34, p. 15, ¶ 3.2)   Since the settlement proposes to pay zero dollars to Class Members, even if they suffered violations of subdivision (b) (i.e., their PII was illegally disclosed), the settlement on its face is not fair.  Although the settlement also provides for injunctive relief, that is limited to practices to be taken after an account has been closed for a year, which does not address the illegal sharing of information that might have occurred earlier.

Presumably, Class Counsel justifies this non-payment on the grounds there were no violations of subdivision (b).  If indeed Netflix never illegally shared PII, then there is no harm from the release of claims for violation of subdivision (b).  But if Netflix <u>did</u> violate subdivision (b) with respect to some or all of the Class Members, then there is tremendous harm to those Class Members, who are being asked to release claims carrying a minimum civil penalty of $2,500 in exchange for <u>nothing</u>.  In this latter scenario, the release is grossly overbroad or the settlement consideration is grossly inadequate to release such a valuable claim.

So what do the Parties tell the Court regarding the critical question whether Netflix did or did not illegally share PII?  Not much.

As mentioned above, the Class Notice says nothing more than that the

lawsuit claims there was illegal sharing which movies and shows the subscribers viewed.

The Motion for Preliminary Approval states in a brief and vague manner that "Netflix disclosed the information to third parties without prior consent to do so."  (Doc. 76, p. 7.)  The declaration of Mr. Edelson, submitted in support of preliminary approval, states the parties engaged in unspecified discovery regarding class and merits issues.  (Doc. 76-2, p. 3.)  It is not clear if discovery was conducted on the "knowing  disclosure of PII" theory or not.  If it were conducted, the results of that discovery are not stated in the preliminary approval papers.

The Motion for Final Approval provides some additional information but it is not much more.  Class Counsel starts off asserting that in good faith they believed "Netflix disclosed PII in the course of providing data to third-party analytics companies tasked with improving Netflix's recommendation algorithm . . ." and gives reasons why they thought this way.  Class Counsel also indicates they believed Netflix disclosed both current and former subscriber PII because of certain language in the Netflix privacy policy and general industry practice.  (Doc. 191, p. 20:13-26.)

Reversing direction Class Counsel then explains:   "Ultimately, however, through the exchange of both formal and informal discovery,

Plaintiffs determined that Netflix was not selling Class members' protected PII to third parties."  (Doc. 191, p. 20:27-28.)  Class Counsel also noted that Netflix did their "analytics" in house so would not need to share PII with third parties.  (Doc. 191, p. 21:1-2.)  Finally, Class Counsel mentioned that if Netflix was sharing PII with third parties that practice might be covered by an exemption for disclosures done "in the ordinary course of business."  (Doc. 191, p. 21:3-5.)

However, very limited evidence was submitted to support any of these explanations for the "change of heart" on the part of Class Counsel.  First of all, the only evidence to support the statement about whether Netflix was selling PII is the declaration of Jay Edelson.  (Doc. 191-3.)  Mr. Edelson states:  "During the course of the litigation, we learned that Netflix did not (and does not) sell its customers' PH for profit, or share that PH to data analytic companies in connection with its recommendation algorithm.  Rather, we learned that Netflix handles all of its data analytic needs inhouse and has a policy of not selling customer PH for profit. We subsequently confirmed these informational findings through the inforn1al deposition of two Netflix executives-its Vice President of Product Engineering and its Vice President of Marketing and Analytics."  (Doc. 191-3, p. 5:10-15.)

Apparently Class Counsel also relied on information fed to him from Netflix's counsel on March 7, 2011 regarding "the type of customer information retained by Netflix and the advanced algorithms used to collect that information." (Doc. 191-3, p. 15:20-23.)

The foregoing is not satisfactory or sufficient.  First of all, liability under subdivision (b) is not premised on the fact whether PII was "sold" to someone, but rather on whether it was "knowingly disclosed" to any person. Assuming there was competent evidence that Netflix did not sell the PII or even that it did not share it with a third party analytics company, that does not mean it was not disclosed.  Those are just two possible motives for disclosure and not the only ones.  Maybe the information was traded in exchange for similarly valuable information in the hands of the third parties.  For example, Netflix could trade PII about movie viewing habits with another company that had information Netflix wanted.

Secondly, what is an "informal deposition"?  Is that a phone conference not under oath?  Why is there no supporting declaration from the Netflix executives stating under oath that Netflix does not disclose PII with any person under any circumstances (or if it does, under which circumstances)?

Thirdly, although Class Counsel claims they received responses to

interrogatories and document production, there are no discovery responses attached to the moving papers, no summaries of the responses, and nothing to suggest those discovery responses bore on the question whether Netflix was violating subdivision (b).  In fact, Class Counsel admits that the total number of interrogatories submitted by both sides was only 25. (Doc. 191-3, p. 16:1.)   It appears there were no requests for admissions or any formal depositions.

Class Counsel is also apparently relying on unspecified information provided by Netflix at the mediation that led to the settlement.  However, Mr. Edelson's declaration is extremely opaque regarding what was disclosed (if anything) at the mediation about the sharing of PII.  We are only told that a mediation was held on February 1, 2012 and that topics discussed included the "relative strength of Plaintiffs' claims, Netflix's defenses, and exchanges of information."  (Doc. 191-3, p. 5:20-23.)  From that vague reference, Class Counsel then assures the Court that "[c]onsidering the information provided by Netflix at the February 1,2012 mediation, my firm estimated the likelihood of succeeding on the merits under a theory of unlawful disclosure at less than five percent (5%)."  (Doc 191-3, pp. 9:27-10:3.)

What information was provided at the Mediation?  Who knows?  Was

it a sworn statement or just spin from one of Netflix's attorneys?  Was it told to Class Counsel or to the Mediator who then passed it on to Class Counsel?  Objector appreciates that statements made at a mediation are privileged, but this Court should not base its determination on vague representations that something really important was said at the mediation about the subdivision (b) claims.

Finally, Class Counsel argues that even if there were liability under subdivision (b), it is still fair to require Class Members to release their claims in exchange for zero dollars because otherwise the damages might be too high.  Class Counsel notes that the theoretical statutory damages at $2,500 per Class Member could be $150 billion, a figure that would surely bankrupt Netflix.  Of course, Class Counsel acknowledges a court would likely reduce the statutory penalty to reflect constitutional concerns about excessive penalties.  (Doc 191-3, p. 10: 11-19.)  Class Counsel does not consider the reduced sum would be something Netflix could afford to pay.

Yet, Class Counsel also oddly suggests that the "best-case recovery" under subdivision (b) would be $3 million plus attorney's fees.  (Doc. 191, p. 24:9-24; Doc. 191-3, p. 10:20-21.)  How we got from $150 billion to $3 million is not explained very persuasively.  Apparently the Court will just arbitrarily determine that the Class Member's actual damages were a few

cents per violation and impose that instead of the $2,500 per violation statutory penalty.   Class Counsel that confuses the matter further by reducing this potential $3 million verdict by 95% to reflect only a 5% chance of success.  (Doc. 191, p. 24:23-24.)  Of course it would have made more sense to multiply the potential $150 billion verdict by 5% to reflect a potential value of $7.5 billion before any reduction by the Court.   In any event, let's not forget this 5% chance of success is not based on any evidence presented in the motion.   Moreover, ironically, a $3 million award to the Class would still be better than the zero dollars award.

Here is another way to look at this excessive damages concern. According to Plaintiffs' own expert, Netflix could survive a damages award of less than $150 million.   (Doc. 191-4, p. 3:17-19.)   Therefore, there is no reason to assume a Court would necessarily reduce a huge damages award to only a few million since such a dramatic reduction would not be necessary to avoid an "annihilating" verdict.

A final suggestion.   If Netflix is adamant that it will not pay any damages to the Class, then the solution would be to order the Parties to modify the scope of the release by deleting the waiver of claims for damages under subdivision (b).   If Netflix is not willing to pay for a release of those claims, it should not get one.

**B.    PLAINTIFFS'    COMPARISON    OF    THIS
SETTLEMENT WITH THE FACEBOOK "BEACON"
CLASS ACTION SETTLEMENT IS INAPT.**

In an attempt to justify this settlement, Class Counsel relies heavily on the <u>Lane</u> v. <u>Facebook</u>, Inc. (9th Cir. 2012) 696 F.3d 811,  decision approving a $9.5 million settlement that also provided no monetary compensation to individual Class Members and which also involved claims under the VPPA.

That settlement in distinguishable.  Facebook is not the same type of company as Netflix.  While Netflix clearly meets the definition of a "video tape service provider" under the VPPA, it does not appear Facebook meets that definition.  Facebook is not in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ."

The Court in <u>Lane</u> addressed the possibility of liability under the VPPA, but observed only a small number of Class Members might have claims based on the VPPA, the company against whom such a claim might be made, Blockbuster, was on the verge of bankruptcy, and the plaintiff in <u>Lane</u> was relying on "novel legal theories" and "vigorously disputed" factual issues concerning the Beacon program.  (<u>Lane</u>, <u>supra</u>, 2012 WL 4125857, *8.)  By contrast, Netflix is clearly subject to the VPPA as to all of the Class Members and is not on the verge of bankruptcy.  Nor are Plaintiffs here

relying on a novel application of the VPPA.  Thus, the court reasoning in

Lane, supra, is based upon inapposite facts and circumstances  as reflected

in the following quote:

> So even if some of the Class Members in this case
> would have successful claims for $2,500 in statutory
> damages under the VPPA, those individuals
> represent, to use the candid phrasing of Objectors,
> "only a fraction of the 3.6 million-person class."
> Their presence does not in itself render the
> settlement unfair or the $9.5 million recovery
> among all class members too low."  (Lane, supra,
> 2012 WL 4125857, *8.)

However, due to the lack of meaningful discovery, we simply do not know

whether Netflix violated subdivision (b) of the VPPA as to only a small

number of Class Members, many or them or all of them.

     The court in Lane also had this to say:

> Although a settlement is not categorically unfair for
> certain class members simply because they might
> recover higher damages than other class members
> were they to prosecute their claims individually,
> significant variation in claimed damages among
> class members is relevant to the Rule 23(b)(3)
> "predominance" analysis during class certification.
> See Amchem Prods., Inc. v. Windsor, 521 U.S. 591,
> 624–25, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).
> However, Objectors do not challenge the district
> court's class certification or its decision to include
> individuals with VPPA claims in the settlement
> class, so we express no opinion on that issue here."
> (emphasis added)  (Lane, supra, 2012 WL 4135857,
> *8, n. 5.)

In the instant case, this Objector <u>is</u> challenging the decision to include Class Members with subdivision (b) claims in the settlement class.  The burden is on Class Counsel to present competent evidence regarding the number of Class Members who have valid claims under subdivision (b) and they have failed to meet that burden.

Finally, Judge Kleinfeld dissented and made this apropos observation:

> Defendant and class counsel, in any class action, have incentives to collude in an agreement to bar victims' claims for little or no compensation to the victims, in exchange for a big enough attorneys' fee to induce betrayal of the interests of the purported "clients." The defendant's agreement not to oppose some amount for the fee creates the same incentive as a payment to a prizefighter to throw a fight. A real client may refuse a settlement that is bad for him but benefits his lawyer, but a large class of unknown individuals lacks the knowledge or authority to say no. It is hard to imagine a real client saying to his lawyer, "I have no objection to the defendant paying you a lot of money in exchange for agreement to seek nothing for me." "The absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive arrangements in which defendants can pay the attorneys for the plaintiff class enough money to induce them to settle the class action for too little benefit to the class (or too much benefit to the attorneys, if the claim is weak but the risks to the defendants high). (<u>Id</u>. at p. *14.)

Judge Kleinfeld was correct.   In the instant case, Class Counsel has

14

negotiated a large settlement for himself and no money to the class. What client would agree to that?

In any event, it is difficult to see how the Court can evaluate the fairness of the Settlement without accurate information regarding Defendant's maximum exposure. That information should be provided to the Court and to Objectors prior to any ruling on the fairness of this settlement.

### C. THE REQUESTED ATTORNEY'S FEES ARE EXCESSIVE IN LIGHT OF THE ACTUAL VALUE OF THE SETTLEMENT TO THE CLASS MEMBERS.

Not only has Class Counsel negotiated a $2.25 million fee award in a settlement that pays zero dollars but they have obtained two more important concession from Netflix. First, as Class Counsel admits, there is a clear-sailing provision under which Netflix will not oppose or challenge the fees requests. Secondly, Class Counsel has obtained a "quick pay" provision that states the fees will be paid within three business days after the final approval hearing "notwithstanding an appeal, objection, or challenge to the Court's entry of the Judgment or Final Approval Order and Judgment." (Doc. 191-1, p. 23:1-5.)

It is difficult to apply the common fund method of calculating a fair fees award because no money is being paid to the Class and for no

legitimate reason the money is instead being paid to various organizations. As for Class Counsel's claimed lodestar, it is absurd.

Lead Counsel, the Edelson McGuire firm, claims it spent 2,424 hours. According to the docket, the first lawsuit (later joined to form this consolidated action) was filed January 26, 2011. While there are currently 193 docket entries, about 100 of them are simply Objections filed by Class Members. Numerous other early docket entries relate to pro hac vice admissions and notices of related cases leading up to the consolidation. Then there was a bitter but short battle between Edelson McGuire and Bursor & Fisher over who would get to be lead counsel. (Docket 47-58.) A consolidated complaint was filed and Netflix answered. (Docket 61, 66) There were no legal challenges to the pleadings. A protective order was entered by stipulation. (Docket 73)   A notice of settlement was filed on February 10, 2012. (Docket 73)   The rest of the entries relate to the preliminary and final approval hearings.

Basically, nothing happened in this case. No contested motions, no depositions, very little discovery (only 25 interrogatories total on both sides). Edelson McGuire lists various "tasks" it undertook. (Doc. 191-3, pp. 15:11-16:15.)   Theses tasks include some legal research and drafting the complaint, interviewing "dozens" of Netflix customers (why is not clear

16

since they would not be aware of the privacy violations and the damages are statutory), communicating with opposing counsel, meeting with opposing counsel on March 7, 2011, fighting with Bursor & Fisher over who gets to be lead counsel, drafting the consolidated complaint, making the Rule 26 disclosures, the limited written discovery, participating in two telephonic ADR sessions and one in person mediation, and then drafting the settlement agreement and subsequent motions for preliminary and final approval.

It is difficult to imagine how these tasks could have taken the slowest of attorneys 2,424 hours, so surely the very experienced counsel at Edelson McGuire should have been able to complete these tasks in a fraction of the time.   A reasonable review of the court docket and work product generated by Class Counsel suggest no more than 500 hours in total is justified.

Equally disturbing is the evident practice of double, triple, or even quadruple billing.  Mr. Edelson's declaration discloses that no fewer than 15 attorneys and an unspecified number of law clerks dipped their beaks into the pond at one time or another in this case.  (Doc. 191-3, pp. 17-18.)   Of course, Class Counsel have not presented contemporaneous time records so it is not possible to be certain there was double/triple billing but considering the limited number of tasks and events, the inference is

1    unavoidable.

2           Moreover, a multiplier is out of the question.  This was not a difficult

3    case as reflected in the quick submission to settlement by Netflix.  To be

4    clear, if Class Counsel had actually produced monetary benefit to the Class,

5    a 25% of the common fund approach or lodestar plus multiplier would

6    make sense.  But to grossly inflate the number of hours and then demand a

7
8    multiplier on top of that takes real Chutzpah.

9
            Class Counsel asserts that fees were negotiated after the "class relief"
10
     was negotiated.  That means after Class Counsel agreed that Netflix did not
11
12   have to pay any money to Class Members, Netflix agreed not to challenge

13   the fees sought.  Even when there is supposedly no "common fund," Class

14   Members can challenge the fee where it is argued that class counsel

15
     obtained an excessive fee award as part of a deal to accept an inadequate
16
17   settlement for the class.  (Glasser v. Volkswagen Of America, Inc., supra,

18   645 F.3d at p. 1088.)  That is the case here.  In Yeagley v. Wells Fargo & Co.

19
     (N.D. Cal., May 20, 2010, C 05-3403 CRB) 2010 WL 2077013, the Court
20
21   found that 2,100 hours was an excessive amount of time to spend litigating

22   a case that achieved poor results.  It reduced the number of hours used to

23
24   calculate the lodestar to 720 hours.  (Id. at pp. 3-4.)

25          Perhaps most troubling of all, is that Edelson McGuire has a history

26

27

28
                                          18

of negotiating for large fees awards in class actions that provide no relief to the Class.  Sometimes they got away with it and sometimes they did not and were removed as Class Counsel.  These prior settlements are discussed at length in Bursor's Opposition to Appointment of Edelson McGuire.  There several class actions are listed including the Facebook Beacon one, another one with Ameritrade, several others involving Netflix, and one involving Palm, Inc. (Doc. 50, pp. 5-8.)

Objector is not in a position to comment on the accusations made by the Bursor firm and now of course, having presumably been bought off by Edelson, the Bursor firm stands mute.    The point however is that Edelson did push at least a few class settlements which also involved no payout to the Class and a large payout to Edelson.  That fact cannot be denied.  Such conduct hardly justifies any fee multiplier.

## **CONCLUSION**

For the above stated reasons, Objector Gary Wilens respectfully urges the Court to deny final approval of the class action settlement.

DATED: November 6, 2012

Respectfully submitted,

By     ___/s/_Jeffrey Wilens_____
JEFFREY WILENS
Attorney    for    Objector    Gary    Wilens

# DECLARATION OF GARY WILENS

I, GARY WILENS, hereby declare:

1. I could and would competently testify to the below stated facts of my own personal knowledge if called as a witness.

2. I received the official Class Notice in this Action and am a member of the Class as defined in the Notice.

3. I object to this settlement.  The Class Counsel gets over $2 million, some organizations that have nothing to do with me or my concerns may get 6-7 million and I get nothing.

4. If Netflix was really disclosing my video viewing history to third parties I am offended and would like to receive some of the $2,500 statutory fine I am informed the law allows me to recover.  But I do not have any proof one way or the other because the Class Counsel has not disclosed the truth of the matter in the court filings.

5. If this is a frivolous lawsuit, then Class Counsel should not be rewarded.  If this lawsuit has merit and Netflix was violating my rights, then Class Counsel should not be rewarded for selling me and the other Class Members out.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters

stated on information and belief, and as to those matters I believe them to be true.

Executed on November 6, 2012 at Rancho Santa Margarita, California.

By     _____

GARY WILENS
Declarant

Objector Gary Wilens' Points and Authorities in Support of Objection to Final Approval
Case No. 5:11-cv-00379-EJD

stated on information and belief, and as to those matters I believe them to be true.

Executed on November 6, 2012 at Rancho Santa Margarita, California.

By       _____ .

GARY WILENS
Declarant

Objector Gary Wilens' Points and Authorities in Support of Objection to Final Approval
Case No. 5:11-cv-00379-EJD