1  Roy A. Katriel (SBN 265463)
   THE KATRIEL LAW FIRM
2  12707 High Bluff Drive,  Suite 200
   San Diego, California 92130
3  Telephone: (858) 350-4342
   Facsimile:  (858) 430-3719
4  e-mail: rak@katriellaw.com

5  *Attorneys for Objector Lisa B. Katriel*

6

7                    **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN JOSE DIVISION**
9

10                                    )        **Civil Action No. 5:11-cv-0379 EJD**
                                      )
11                                    )
                                      )
12  IN RE: NETFLIX PRIVACY LITIGATION )        **OBJECTION AND MEMORANDUM IN**
                                      )        **SUPPORT OF OBJECTION OF CLASS**
13                                    )        **MEMBER LISA B. KATRIEL TO PROPOSED**
                                      )        **CLASS ACTION SETTLEMENT**
14                                    )
                                      )
15                                    )
                                      )
16                                    )
                                      )        **Judge: Hon. Edward J. Davila**
17                                    )        **Courtroom: 4, 5th Floor**
                                      )        **Hearing Date: Dec. 5, 2012,  10:00 a.m.**
18  _____)

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>OBJECTION AND NOTICE OF COUNSEL'S INTENT TO APPEAR AT FAIRNESS HEARING</u>

Absent member of the Settlement Class, Lisa B. Katriel ("Objector" or "Katriel"), by and through her undersigned counsel, hereby files her objection to the proposed Class Action Settlement Agreement in the above-entitled action.  Objector's counsel intends to appear at the Final Approval scheduled to take place on December 5, 2012.  For the reasons detailed in Katriel's accompanying Declaration and in this memorandum, the proposed class action settlement should not be approved because it is neither fair nor reasonable, and its approval by the Court would amount to a violation of Objector's and other class members' due process rights.  Because the Class Action Settlement Agreement is the sole basis for Plaintiffs' counsels claim for attorneys' fees, the motion for attorneys' fees should likewise be denied.

## <u>INTRODUCTION</u>

Katriel is a resident of San Diego, California and a former Netflix subscriber. *See* Declaration of Lisa B. Katriel, at ¶ 1, 3 [hereinafter "Katriel Decl."].  She cancelled her Netflix subscription in mid-2012.  *Id*. at ¶ 3.  On July 26, 2012, Katriel received e-mail notification of the proposed class action settlement per the Court-approved notice program that informed her of the proposed settlement and her options with respect to the proposed settlement.  *See* Ex. 1 to Katriel Decl.

As the Court well knows, this action involves a putative class action filed against Netflix, Inc. ("Netflix") last year.  A proposed Class Action Settlement Agreement ("Agreement") is now before the Court for determination whether the Court should grant Final Approval pursuant to the provisions of Federal Rule of Civil Procedure 23.  The Agreement should not be approved for several reasons.  As detailed below, the Settlement Class called for by the Agreement fails to meet the requirements of Rule 23.  Further, the relief provided by the Agreement is unreasonably deficient, and Plaintiffs' purported justifications for the terms of the Agreement are unavailing and contrary to law.

## I.    <u>THE SETTLEMENT CLASS SHOULD NOT BE CERTIFIED.</u>

The Settlement Class called for by the terms of the Agreement does not meet the requirements for class certification mandated by Rule 23.   The two named plaintiffs and putative class

*In re: Netflix Privacy Litig.*,
No. 5:11-cv-0379 EJD
Objection To Class Action Settlement

representatives, Jeff Milans and Peter Comstock, are residents, not of California, but rather of the Commonwealth of Virginia. *See* Consolidated Class Action Complaint [Dkt. No. 61], at ¶ 9, 10. They filed a Consolidated Class Action Complaint on September 12, 2011 in which the alleged claims on behalf "[a]ll individuals and entities in the United States and its territories that have cancelled their subscription to Netflix's services." Id. at ¶ 45. Their Consolidated Class Action Complaint alleged claims for violations of: the federal Video Privacy Protection Act, 18 U.S.C. § 2710 (*Id*. at ¶¶ 52 – 59); California's Customer Records Act, Cal. Civ. Code, 1798.80 (*Id*. at ¶¶ 60-64); and, California's Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200 et. seq. (*Id*. at ¶¶ 65-71). They now seek to resolve their case against Netflix by way of the Agreement, which call for, *inter alia*, this Court to certify a nationwide Settlement Class whose members will be deemed to have released all their right to obtain relief against Netflix for any claims that were or could have been alleged in this action.

### A. As Residents Of Virginia, The Named Plaintiffs Cannot Represent A Class That Comprises California Absent Class Members In Claims Asserting Claims That Limit Their Reach To California Residents Only.

Before evaluating the merits of the proposed settlement, it is incumbent on this Court to evaluate whether the proposed Settlement Class may be certified under Federal Rule of Civil Procedure 23. The proposed Settlement Class cannot be certified. Even a cursory review of the allegations pled and the Agreement demonstrates that Comstock and Milans, the only named putative class representatives, fail to meet the typicality and adequacy of representation prongs of Rule 23. This is so because Count II of the Consolidated Class Action Complaint, which the Agreement seeks to resolve and have the absent class members release is, by its express statutory terms, limited in scope and reach to residents of California. In this regard, the Consolidated Class Action Complaint alleged that "Netflix has violated Cal. Civ. Code § 1798.81." (Consolidated Class Action Complaint, at ¶ 63). Yet, that very statutory section explicitly limits the reach of the California Business Records Act to (unsurprisingly) California residents:

> (a) It is the intent of the Legislature to ensure that personal information *about California residents* is protected. To that end, the purpose of this section is to encourage businesses that own or license personal information *about Californians* to provide reasonable security for that information.

Cal. Civ. Code, § 1798.81.5(a) (emphasis added).

*In re: Netflix Privacy Litig.,*
No. 5:11-cv-0379 EJD
Objection To Class Action Settlement

The statute goes on to insist that its scope is limited to California residents (hardly surprising considering that it is a California state statute):

> (b) A business that owns or licenses personal information *about a California resident* shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

Cal. Civ. Code, § 1798.81.5(b) (emphasis added).

The putative plaintiff class representatives proffered here, Comstock and Milans, are not Californians—they are residents of Virginia. As the statute makes expressly clear, Comstock and Milans have no claim under the California Customer Records Act because the protection afforded by that statute, by its terms, is limited to California residents. As previously held by this Court, it is axiomatic that persons like Comstock and Milans, non-Californians as to whom the California Customer Records Act does not even apply, cannot seek to represent a class of California (or other state) putative class members seeking relief under that same statute. *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp.2d 1098, 1107 (N.D. Cal. 2007) (named plaintiffs lacked Article III standing to represent absent class members in other states whose claims for relief depended on laws of those other states that were inapplicable to the named plaintiffs). Virtually every federal court that has considered this issue has held to the same effect. See, e.g., *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. at 157-58 (E.D. Pa. 2009) (named plaintiffs lacked standing to represent a class of other state residents asserting claims based on laws of those other states); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp.2d 1365, 1371 (S.D. Fla. 2001) ("it is clear that no named plaintiff suffered an injury giving rise to an antitrust claim in [AZ, ME, MN, MS, NJ, NM, NC, ND, SD, or WV]. None of these statutes authorizes antitrust actions based on commerce in other states, and the named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief. Class allegations that others suffered injuries giving rise to claims 'add ... nothing to the question of standing.'").

Although the lack of injury under a particular statute fatally negates a finding of adequacy or typicality, other federal courts have described this deficiency as going to the very existence of Article III standing:

> To have standing as a class representative, the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents.

> Here, the Indirect Purchaser Plaintiffs present no allegations that they have suffered an "injury in fact" for each of the asserted claims. The Indirect Complaint does not allege personal injury in any other state, thus, Indirect Purchaser Plaintiffs fail to satisfy their burden of showing Article III standing for states where they do not reside.

*In re Potash Antitrust Litig.*, 667 F. Supp.2d 907, 924 (N.D. Ill. 2009) (internal citations and quotations omitted).

Comstock and Milans, who are Virginia residents and have no right to seek relief under the California Customer Records Act, cannot be said to fairly and reasonably represent absent class members like Katriel, who are residents of California and *do* have a right to seek relief under the California statute pled in the Consolidated Class Action Complaint.  Katriel's due process rights would be violated if she were held by this Court to have been adequately represented by these Virginia residents in asserting a California statute whose protections applied to her but not to them, and so to have released her right to seek relief under this statute.

The fact of the matter is that while Katriel may have a viable claim against Netflix for violation of the California Customer Records Act, neither Comstock nor Milans has any entitlement to even seek relief under this California state statute.  As a result, neither Comstock nor Milans can, consistently with the requirements of due process, adequately represent and compromise Katriel's right to bring a claim under this statute, as is pled in Count II of the Consolidated Class Action Complaint.  While Katriel and other California residents who are absent class members may have an incentive to maximize any relief under the California Customer Records Act, Comstock and Milans, neither of whom even has a legal entitlement to bring a claim under that statute, assuredly lack that incentive.   No class representative, other than a California resident, has standing to settle a claim brought under the California Customer Records Act on behalf of a class that, as here, includes California residents like

Katriel.  This, in and of itself, requires denial of certification of the Settlement Class and, hence of the proposed Agreement.

> **B.    The Same Fatal Problems Dooms Certification OF The Settlement Class With Respect To the UCL Claim.**

The Settlement Class is equally problematic when it comes to settling Count III of the Consolidated Class Action Complaint, which asserts a claim under California's Unfair Competition Law ("UCL"), Section 17200 et. seq. of the Business and Professions Code.   Unlike the California Customer Records Act, California's UCL does not address the extraterritorial application of its provisions within the terms of the statute.  Just this year, however, the United States Court of Appeals for the Ninth Circuit overturned a district court's certification of a nationwide class in a case alleging consumer protection claims under the UCL against a California-headquartered defendant.  *See Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).  *Mazza* involved allegations against Honda, a California corporation headquartered in California, brought by consumers nationwide who claimed that Honda had misrepresented the braking characteristics of some of its vehicles.  The district court certified a nationwide class of Honda owners who alleged claims under California's UCL, premised largely on the fact that Honda was headquartered within California and, hence, the alleged conduct of misrepresentation must have arisen from within California.

The Ninth Circuit reversed.  While acknowledging that California had sufficient aggregation of contacts, by virtue of Honda being headquartered in-state and having California residents form part of the nationwide class, to have the UCL apply in this case (*id.* at 590, *citing Clothesrigger, Inc.  v. GTE Corp.*, 191 Cal. App.3d 605 (1987)), the Ninth Circuit nevertheless concluded that under a traditional conflict of laws analysis, the law of each customer's home state was to apply to that absent putative class member's claim as opposed to the UCL.  *Mazza*, 666 F.3d at 590-94.

*Mazza* counsels that, though there may be sufficient contacts to consider applying the UCL to the Settlement Class in this case by virtue of Netflix's headquarters in California, that consideration is displaced by application of traditional conflict of laws analysis.  This is all the more so when one considers that while in *Mazza*, American Honda Motor Company was to sole distributor for Honda vehicles in the entire United States, here Netflix videos are distributed to class members from 58

Netflix processing centers located across the United States, depending upon the location of the Netflix subscriber.  *See* K. Kovalchik, The Secret Inner Workings Of Netflix (Aug. 6, 2009), available at http://www.mentalfloss.com/blogs/archives/30949 (last visited Nov. 14, 2012) ("Netflix has 58 warehouses nationwide.").  A Netflix subscriber in Virginia, therefore, would not interact or obtain video shipments from California, but rather from a Netflix processing center located in the mid-Atlantic region of the country serving Virginia subscribers.  It is clear that non-California residents in general, and Virginia residents specifically, have only an attenuated contact with Netflix in receiving their videos from Netflix.  As the Ninth Circuit recently held in *Mazza*, under these circumstances, the UCL may not be invoked by such residents, despite the California headquarters of Netflix, and instead is limited to California residents.  Consumers in other states, like Comstock and Milans, are to have their claims adjudged by the law of their home states—i.e., Virginia in the case of these two named class representatives.

Because *Mazza* holds that neither Milans nor Comstock could assert a claim here under the UCL, these named plaintiffs cannot adequately represent California Netflix consumers, like Katriel, who assuredly *do* have a right to seek relief under the UCL for Netflix's alleged wrongdoing.  The inability of Comstock or Milans to assert a UCL claim here is particularly acute because the UCL affords plaintiffs a right to seek restitutionary relief for a defendant's violation of another statute even if that other statute does not afford a private right of action for such relief.  Thus, here, California residents (and only California residents) who could allege that Netflix violated the California Customer Records Act would only be entitled to an injunction under that statute, but relying on that violation of law, these same California residents would be permitted to avail themselves of the UCL to seek restitution of moneys paid to Netflix.   But because neither Milans nor Comstock can seek relief under either the California Customer Records Act or the UCL, they do not have the ability to seek this relief that is available to California subscribers like Katriel.

For Virginia residents Milans and Comstock it may make sense to settle the California Consumer Records Act and corresponding UCL case pled in the Consolidated Class Action Complaint for no monetary compensation because they would not be entitled to relief under those statutes, but California resident Netflix subscribers would have an entirely different calculus.   In any event, it is

clear that neither of the two proposed plaintiff class representatives can adequately represent California absent class members with respect to the litigation of Counts II and III of the Consolidated Class Action Complaint. As a result, the Settlement Class cannot be certified, and the Agreement cannot be approved.

### C. The Named Plaintiffs Cannot Represent A Settlement Class As To Count I Because Their Claims Under The VPPA Are Time Barred.

Comstock and Milans being non-Californians precludes them from asserting (and hence, adequately representing) claims found in Counts II and III of the Consolidated Class Action Complaints (i.e., two-thirds of the claims pled) because those claims are open only to California residents. For different reasons, Comstock and Milans are also inadequate representatives of the Settlement Class with respect to Count I. The count pleads a claim for relief under the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. *See* Consolidated Class Action Complaint, at ¶¶ 52-59.

The VPPA provides relief in the form of statutory damages, injunctive relief, and attorneys' fees for violations of the statute. A key aspect of this federal cause of action, however, is that "[n]o action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery." 18 U.S.C. § 2710(c)(3). The VPPA, therefore, contains its own limitations provision that bars any action commenced more than 1 year and 364 days following the commission of the violation of its discovery by then plaintiff.

The problem Milans and Comstock face in seeking to assert this claim on behalf of a nationwide class of Netflix subscribers is that their moving papers have conceded that both of these plaintiffs' own claims are untimely. This is so because Milans' and Comstock's moving papers in support of the proposed settlement detail how these plaintiffs knew "for years" prior to bringing suit, based on emails that they continued to receive from Netflix, that Netflix had retained their personally identifying information following their cancellation of their Netflix subscriptions. In this regard, Comstock's and Milans' brief in support of their Motion for Final Approval of the Class Action Settlement explains that:

> Plaintiffs learned of Netflix's retention practices when, ***for years** after they closed their Netflix accounts, they intermittently continued to receive emails* from Netflix encouraging them to re-join. (See Edelson Decl. ¶ 9). From these emails, it

became apparent that Neflix retained its former customers' personal contact information.

Plaintiffs' Mem. In Support of Final Approval Mtn. [Dkt. No. 191], at 5:26-6:1 (emphasis added).

That recitation of events provided by the named plaintiffs' counsel establishes that Comstock's and Milans' claims under the VPPA are time-barred because they were aware "for years" after canceling their Netflix subscriptions that Netflix continued to retain their personally identifying information. This delay in bringing suit is fatal under the VPPA, which provides that any cause of action seeking redress under that statute be brought no later than 1 year and 364 days after the violation occurs or the discovery of the same is made by the plaintiff.

Milans' and Comstock's concession that their own claims are time-barred precludes them from being found adequate representatives of a class that includes members whose claims would not be time-barred. Katriel's own claim, for example, presents none of the statute of limitations issues that plague Comstock's and Milans' VPPA claims because Katriel cancelled her Netflix subscription only in mid-2012 (*see* Katriel Decl., at ¶ 3), thereby ensuring that her claim is timely now. Because Comstock and Milans would be faced with litigating a statute of limitations argument as part of their own individual claims that does not apply to claims of many other class members (like Katriel), neither Milans nor Comstock can adequately represent the interests of the class. *See Morgan v. Laborers Pension Trust Fund of Northern California*, 81 F.R.D. 669, 679 (N.D. Cal. 1979) ("The Court must therefore find that application of the four-year statute of limitations prevents Brice from serving as a class representative."); *see also Franze v. Equitable Assurance*, 296 F.3d 1250, 1251 (11th Cir. 2002) ("we reverse the district court's certification of the class because we conclude that the statute of limitations bars the class representatives' claims."); *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 463 (S.D. Cal. 2007) (Plaintiff failed to meet typicality requirement for class certification because she "experienced no harm within the one year statute of limitations.").

Objectors' assertion as to the untimely nature of Comstock's and Milans's individual claims is not novel. Indeed, Netflix seized on this very point and explicitly interposed a statute of limitations Affirmative Defense against the individual claims of Comstock and Milans:

Plaintiffs' claims are barred, in whole or in part, by the statute of limitations. Specifically, Plaintiff and/or members of the class Plaintiffs claim to represent did

*In re: Netflix Privacy Litig.,*
No. 5:11-cv-0379 EJD
Objection To Class Action Settlement

8

not bring this action within two years from the date of the actions complained of or the date of discovery.

Netflix Answer to Consolidated Class Action Complaint [Dkt. No. 66], at p. 7 (Sixth Affirmative Defense).

### D.  The Settlement Class Definition Is Fatally Overbroad Because It Lumps Together Time-Barred Class Members With Those Who Have Timely Claims To Pursue.

The statute of limitations constraint poses a certification problem for the proffered Settlement Class that goes beyond Comstock's and Milans' individual claims.  Even if either of these two plaintiffs could somehow show that his particular VPPA claim was not time-barred, the fact remains that, as defined (and as originally pled), the Settlement Class (and the class definition alleged in the original pleading) is so overbroad that it contains a large number (perhaps a majority) of persons with time-barred claims, while also including as class members persons, like Katriel, whose claims are assuredly timely.

This is so because, subject to a few exclusions not pertinent here, the Settlement Class is defined in the Agreement as "all Subscribers as of the date of the entry of Preliminary Approval." *See* Agreement [Dkt. No. 76-1], at § 1.38.   The term "Subscribers" as used in the Settlement Class definition is, in turn, defined to mean, "a Person in the United States or its territories ***who is, or at one or more times*** was, subscribed to Netflix." *Id*. at § 1.41 (emphasis added).   The Settlement Class definition, therefore, has no time limitation for its inception.  As Netflix touts on its website, Netflix began its video subscription service in 1999.  *See* https://signup.netflix.com/MediaCenter/Timeline (last visited Nov. 14, 2012).   Under the Agreement's Settlement Class definition, persons who subscribed to Netflix as early as 1999 (some 13 years ago) and cancelled shortly thereafter are included within the class definition.  It is patently evident that this wholly overbroad class definition would, therefore, include a large number of persons whose claims were long ago time-barred by the VPPA's two-year statute of limitations.

The fatal flaw is that the Settlement Class definition that the parties urge this Court to certify lumps within it a large number of class members for whom the statute of limitations is a real issue that bars a claim outright or is to be litigated, together with more recent former subscribers, like Katriel, who have no exposure whatsoever to a statute of limitations defense.   Such a fatally overbroad class

does not present common or predominating issues, regardless of whether Comstock or Milans could somehow show that their individual claims were not time-barred. As a sister California federal district court has explained:

> The class definition proposed by plaintiff is extremely broad, including anyone who received a loan from LCC beginning January 24, 2004. This guarantees that some class members will have statute of limitations issues that will need to be resolved, while others will not. While plaintiff will certainly be typical of part of the class in this regard, there may be a broad swath of the class that has no statute of limitations issues, but would be bound by an order of this court if the court finds plaintiff's UCL claim time-barred in defendants' upcoming summary judgment motion. Without any subdivisions in the proposed class definition, this court is skeptical that the statute of limitations defense is reasonably coextensive with the defenses that would be levied against many of the class members. Plaintiff's UCL claim has therefore also failed to meet the typicality requirement.

*Quezada v. Loan Center of California, Inc.*, No. 08-cv-0177, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009).

The same rationale is present here. The unlimited class period forming part of the Settlement Class definition ensures that the class would include large numbers of persons with obviously time-barred claims lumped together with class members, like Katriel, for whom the statute of limitations is not even an issue. The Agreement impermissibly treats these two very disparate scenarios the same, giving each of these differently-situated class members the same consideration in exchange for the release of their claims. The class fails the commonality and typicality requirements for class certification.

the United States Supreme Court cautioned district courts that they must ensure that Rule 23's same rigorous class certification standards are met regardless of whether the class sought to be certified is a settlement class as opposed to an adversarial one. As shown, the Settlement Class called for in the Agreement fails to meet these criteria, and therefore cannot be certified. That, alone, compels denial of Final Approval.

## II. ON THE MERITS, THE SETTLEMENT IS UNFAIR AND UNREASONABLE BECAUSE PLAINTIFFS JUSTIFICATION FOR AFFORDING NO MONEY DAMAGES TO ANY CLASS MEMBER IS UNSUSTAINABLE.

Moving past the procedural hurdles that fatally doom the prospect of certifying the Agreement's Settlement Class, the proposed settlement is also independently unreasonable on the merits.

Specifically, while the VPPA provides for statutory "liquidated damages" of not less than $2,500 (18 U.S.C. § 2710(c)(2)(A)), the proposed Agreement would provide no money damages to any of the class members, and instead would limit its relief to a *cy pres* distribution and purported injunctive relief.  How does putative class counsel justify going from a statutory guarantee of $2,500 to a prevailing party to a zero dollar settlement consideration ?  The movants purport to do so by relying on two assumptions, both of which are unavailing.  First, they claim that, despite Congress' fixing the liquidated damages for a violation of the VPPA at least $2,500, the overall actual damages that were sustained by the average class member were between $0.15 and $0.41.  *See* Ex. 2 to Decl. of Dr. Serge Egelman [Dkt. No. 91-2], at ¶ 4.  Second, they contend that the $2,500 minimal statutory guarantee of statutory damages is irrelevant because the district court would be compelled to reduce any such award of statutory damages to a single-digit multiple of any actual damages proved because the United States Supreme Court has used that guidepost in evaluating the constitutionality of punitive damages awarded at trial.  See Brief in Supp of Final Approval Mtn. [Dkt. No. 191], at 14:13-14 ("Plaintiffs believe that the Court, borrowing from punitive damages jurisprudence, would reduce the damages award to a single-digit multiple of [actual damages].").   Neither of these explanations, however, withstand even cursory scrutiny.

### A. Plaintiffs' Contention That Statutory Damages Are Subject To Due Process Limits Imposed On Punitive Damages Is Plainly Wrong.

Taking these asserted justifications in reverse order, Plaintiffs assertion is that, notwithstanding the actual text of the VPPA in which Congress fixed at $2,500 the minimum statutory "liquidated damages" available to a plaintiff proving a VPPA violation, this Court would "borrow[] from punitive damages jurisprudence" and be required to reduce any statutory liquidated damages award from $2,500 found in the text of the statute to "a single-digit multiple of [actual damages]." *Id*.  This concocted reasoning employed in an attempt to justify a settlement that yields no monetary payment to class

members is wholly without merit.  Indeed, just two months ago, the United States Court of Appeals for the Eight Circuit disposed of this same argument, holding that analogizing statutory damages to punitive damages is senseless:

> The Supreme Court never has held that the punitive damages guideposts are applicable in the context of statutory damages.  Due process prohibits excessive punitive damages because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996).  <u>This concern about fair notice does not apply to statutory damages, because those damages are identified and constrained by the authorizing statute. The guideposts themselves, moreover, would be nonsensical if applied to statutory damages. It makes no sense to consider the disparity between "actual harm" and an award of statutory damages when statutory damages are designed precisely for instances where actual harm is difficult or impossible to calculate. Nor could a reviewing court consider the difference between an award of statutory damages and the "civil penalties authorized," because statutory damages *are* the civil penalties authorized.</u>

*Capital Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907-908 (8th Cir. 2012) (internal citations omitted) (italics in original, underlining added).

   *Capital Records* was merely the latest, but assuredly not the lone decision to so hold.  *See Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 586-587 (6th Cir. 2007) ("We note at the outset that both *Gore* and *Campbell* addressed due-process challenges to *punitive*-damages awards. . . . The Supreme Court has not indicated whether *Gore* and *Campbell* apply to awards of *statutory* damages. We know of no case invalidating such an award of statutory damages under *Gore* or *Campbell*.") (italics in original). And, of course, this Court has opined on this very issue, and dismissed the attempt to analogize the punitive damages guideposts to an award of statutory damages:

> Third, while OnlineNIC urges the Court to apply the single-digit multiplier principle endorsed in *Campbell* to this case, the result would wholly defeat the purpose of the statute, since the maximum available damages award would be $13,212.00, or only $19.92 per domain name. That is of course less than the statutory *minimum* prescribed by Congress. *See* 15 U.S.C. § 1117(d).
>
> *Finally, and most importantly, it is highly doubtful whether Gore and Campbell apply to statutory damages awards at all. Like the Sixth Circuit, this Court 'know[s] of no case invalidating ... an award of statutory damages under Gore or Campbell.'* . . . .

*Verizon California Inc. v. Onlinenic, Inc.*, No. 08-cv-2832 JF, 2009 WL 2706393, at *7 (N.D. Cal. Aug. 25, 2009).

This Court went on at length to explain why it was rejecting the attempt at having the punitive damages presumptive single-digit multiplier due process limit also apply to statutory damages awards:

> It is not difficult to see why *Gore* and *Campbell* have not been applied in the context of statutory damages awards. First, in the context of statutory damages, the Supreme Court has held expressly that "[t]he discretion of the [district] court is wide enough to permit a resort to statutory damages for [the purpose of deterrence,] [such that] .... *[e]ven for uninjurious and unprofitable invasions of copyright* [,] the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952) (emphasis). This suggests that ratios between actual or potential damages and punitive damages—ratios that are at the heart of *Gore* and *Campbell*—simply do not apply in the context of statutory damages.

*Id.* (emphasis added).

In the federal statute under which plaintiffs sued on behalf of the class, the VPPA, Congress provided that, upon proof of a defendant's violation, the prevailing plaintiff would recover "actual damages *but not less than liquidated damages in an amount of $2,500*." 18 U.S.C. § 2710(c)(2)(A) (emphasis added).  Defendants now take pride in securing a settlement that, despite this minimal guarantee, provides no money damages award to any of the class members.  To even present such an argument they cling to the notion that the $2,500 statutory guarantee first depends on an award of actual damages, and next must be limited to a single-digit multiplier of those actual damages because that is what the case law on punitive damages awards provides.  But as the foregoing authorities make clear, Plaintiffs are wrong on both front.  First, a determination of actual damages is assuredly not required as a precondition of obtaining statutory damages.  As *Capitol Records* makes clear, the whole point of Congress providing statutory damages is that actual harm is impossible to determine and that the statutory damages *are* the damages the plaintiff is entitled to receive.  *Capitol Records*, 692 F.3d at 908 ("It makes no sense to consider the disparity between 'actual harm' and an award of statutory damages when statutory damages are designed precisely for instances where actual harm is difficult or impossible to calculate. Nor could a reviewing court consider the difference between an award of

statutory damages and the "civil penalties authorized," because statutory damages *are* the civil penalties authorized.") (italics in original).  Nor, as the foregoing cases hold, is there any basis to holding that, as a matter of due process, the award of statutory damages must be constrained to a single digit multiplier as is presumed in punitive damages awards.

Were there any doubt about the propriety of awarding statutory damages that far exceed the single digit multiplier of actual damages, that doubt would be resolved by resort to binding Supreme Court precedent.  In *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919), the Supreme Court upheld a trial court's entry of judgment against a railway that was sued under an Arkansas statute that called for a statutory award of $75 to the prevailing plaintiff when the defendant was found liable for overcharging above the filed rate.  In *Williams*, the Court upheld, over a due process challenge, an award of $75 in statutory damages when the actual overcharge was a mere $0.66, i.e. a statutory to actual damages ratio of 113.6.  *Id.* at 64.  As the Eight Circuit recently explained in similarly rejecting a due process challenge to a statutory damages award, "*Williams* is still good law." *Capitol Records*, 692 F.3d at 907.

### B.   In Any Event, Plaintiffs' Representation Of The Actual Damages Amount Is Wholly Unrealiable.

Plaintiffs' additional premise to justify the award of zero dollars to class members in a case where the statute provides for a minimum award of $2,500 upon proof of a violation, is that the Egelman Declaration purports to conclude that the actual harm caused to Netflix subscribers by the alleged violations was between $0.15 and $0.41.  Not only is that wholly irrelevant to a case where the provision of guaranteed statutory liquidated damages makes a calculation of actual damages unnecessary, but the very foundations of the Egelman Declaration are so unreliable as to render it inadmissible.  Egelman purported to calculate the value placed by class members on having their privacy as it related to their video rental histories safeguarded by engaging or reviewing online surveys. But the so-called "surveys" that Egelman reviewed would not even begin to pass evidentiary muster. As such, even if a calculation of actual damages were required here (and it is not), Egelman's conclusion does not provide any competent, reliable evidence on this point.

The primary survey upon which Egelman relies is an online survey of purchasers of sex toys. Ex 2 to Egelman Decl. [Dkt. No. 191-2], at pp.4-5. Even ignoring the common sense observation that consumers who willingly provide their identifying information to purchase sex toys online may have a higher privacy threshold than your average American consumer who merely rents movies online for family viewing, the survey relied upon is fatally deficient.  Egelman admitted that, in this case purportedly involving a Settlement Class of some 62 million persons, his universe of survey responders "that were exposed to additional privacy information," was limited to "sixteen participants." *Id*. at p.5 How one could possibly derive meaningful or reliable conclusions to be applied to a 62 million person Settlement Class from a survey universe of 16 respondents is beyond comprehension, and nowhere explained in the Egelman Declaration or elsewhere.

There is simply no basis to support a settlement of zero dollars to class members in this case.

## III.   THE INJUNCTIVE RELIEF COMPONENT IS OF NO VALUE TO A LARGE PORTION OF THE CLASS, AND IN ANY EVENT, IS ILLUSORY.

Plaintiffs also tout the value of the Settlement because they claim it provides valuable injunctive relief.  Yet, review of the injunctive relief provisions of the Agreement shows that this is not so.

For starters, the injunctive relief provisions are only set to apply once a Netflix subscriber has cancelled her Netflix service for a period of at least one year.  *See* Agreement, at §§ 2.1.1, 2.1.2.  For a great portion  of the Settlement Class; namely, those persons, who are still subscribers to Netflix or those, like Katriel, who may not have cancelled their subscription for more than one year as of the Agreement's Effective Date, the injunctive relief offers no immediate benefit.  Moreover, for those subscribers who are still subscribers and who have no plans to cancel their service, the Agreement provides no benefit.  Nothing in the Agreement, for example, seeks or purports to enjoin Netflix from disclosing private identifying information of those who remain current Netflix subscribers.

Not only is the injunctive relief component deficient in terms of the  relief it fails to offer to large members of the Settlement Class, it also suffers from a more basic flaw.  Under the terms of the Agreement, Netflix's obligation to offer this injunctive relief is wholly illusory.  This is so because the Agreement only requires Netflix to provide the injunctive relief called for in the Agreement if Netflix

[R]eceiv[es] confirmation from adverse parties in other pending cases against Netflix, or with the respective courts as needed, that performing such action will not result in allegations of wrongful document destruction or spoliation;

Agreement, at § 2.1.3

Similarly, Netflix's obligation under the Agreement to provide any injunctive relief is further subject to "any relevant document retention obligations imposed by litigation filed after the date that this Agreement is executed." *Id*.

Neither the Agreement nor any of the moving papers identify the "other pending cases against Netflix" that may serve as obstacles to Netflix being required to provide any of the injunctive relief called for in the Agreement.  Nor does the Agreement impose any specific obligation on Netflix to take any affirmative act to secure the agreement of adverse parties in other litigation to have Netflix implement the injunctive relief called for in the Agreement (if a party adverse to Netflix in other litigation refuses to consent to Netflix implementing the injunctive relief in the Agreement, nothing in the Agreement compels or requires Netflix to exercise any efforts to secure that agreement).  At bottom, therefore, class members are being told that Netflix may be required to provide some injunctive relief to some class members, but it may not have to do so if other third parties object (or, merely fail to affirmatively agree) to Netflix doing so.

That provision renders Netflix obligation to provide injunctive relief wholly illusory and unpredictable.  It leaves class members unable to gauge the likelihood that any injunctive relief contemplated by the Agreement will actually take place.

The injunctive relief component of the Agreement is, therefore, also fatally flawed.

## IV.   THE AGREEMENT UNREASONABLY DIRECTS ALL MONETARY RECOVERY TO *CY PRES* RECIPIENTS TO THE EXCLUSION OF ANY CLASS MEMBER.

The Agreement's provision that the entire monetary component of the settlement be paid not to any class member, but rather exclusively to *cy pres* recipients is also indefensible.  Plaintiffs attempt to defend this provision by arguing that the size of the Settlement Class and the small amount of actual damages makes distribution of awards to individual class members unfeasible.  As discussed, however, the Settlement Class is improperly defined overbroadly  to include persons whose claims are undoubtedly time-barred, as well as by including non-California residents for those classes seeking recovery under Counts II and III.  Furthermore, the Settlement Class definition is significantly

overbroad in that it includes both current and former subscribers.  Yet, as Plaintiffs concede, those who remain Netflix subscribers are not injured by Netflix's document retention, and, as current Netflix subscribers, have no claim under either the VPPA or any other statute against Netflix for the alleged retention of their personal identifying information.

Were the class properly defined to include only those entitled to seek relief for the claims asserted, the class size would be significantly reduced.  That coupled with the fact that the amount of recovery is not a mere $0.15 to $0.41 per person as Plaintiffs would have to Court believe, results in a recovery and award that could be feasibly distributed to the class members.  As a result, distribution of all them monetary component of the settlement to *cy pres* recipients to the exclusion of all class members is indefensible.

## V.   PLAINTIFFS' COUNSEL HAVE NO ENTITLEMENT TO ATTORNEYS' FEES.

Because the claim and entitlement for attorneys' fees results solely from the terms of the Agreement, and because for the reasons set forth herein, the Agreement should not be approved, Plaintiffs' counsel is also not entitled to any award of attorneys' fees.

## CONCLUSION

For all the foregoing reasons, Objector's objection to the proposed class action settlement should be sustained and Plaintiffs' Motion for Final Approval should be denied.

Dated:  November 14, 2012                                    Respectfully submitted,


___/s/ Roy A. Katriel_____

Roy A. Katriel (SBN 265463)
THE KATRIEL LAW FIRM
12707 High Bluff Drive,  Suite 200
San Diego, California 92130
Telephone: (858) 350-4342
Facsimile:  (858) 430-3719
e-mail: rak@katriellaw.com

*Attorneys for Objector Lisa B. Katriel*