1  KRISLOV & ASSOCIATES, LTD.
2  Clinton A. Krislov
3  John Orellana
4  20 North Wacker Dr., Ste. 1350
5  Chicago, IL 60606
6  Tel: (312) 606-0500
7  Fax: (312) 606-0207
8  Firm Number: 21169

9
10        IN THE UNITED STATES DISTRICT COURT
11          NORTHERN DISTRICT OF CALIFORNIA
12                  SAN JOSE DIVISION
13

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION,* | Case No. 5:11-cv-00379-EJD |
| | Honorable Edward J. Davila |
| | ***OBJECTION TO CLASS ACTION SETTLEMENT*** |

Name of Objector:   Matthew D. Tanner
Address:            53 West Jackson Boulevard, Suite 400
                    Chicago, Illinois 60604
Telephone:          (312) 588-1970

MATTHEW TANNER, a member of the Class, represented by Clinton A. Krislov of

Krislov & Associates, Ltd., objects to the proposed Settlement agreement entered into between

Plaintiffs, Jeff Miland and Peter Comstock ("the Named Plaintiffs"), on behalf of the Class, and

Netflix, Inc., and asks the court to reject the Settlement and replace Class Counsel for the reasons

listed herein.  Mr. Krislov does not intend to appear at the fairness hearing, but will certainly do

so if requested by the Court.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i – ii

TABLE OF AUTHORITIES .............................................................................. ii – iv

INTRODUCTION .............................................................................................. 1 – 2

ARGUMENT ...................................................................................................... 3 – 29

I.    The "Decoupling" Injunction is Valueless and Does Not Justify
Release of Class Members' Claims ........................................................ 3 – 8

    a.    The Decoupling Injunction Does Not Meet the Statutory Mandate
of the VPPA Requiring Destruction of Class Members' Video
Rental Histories, and Fails to Anonymize and Protect Class
Members' Personal Identities ..................................................... 3 – 6

    b.    The Decoupling Injunction Does Not Provide Relief to the
Majority of Class Members ......................................................... 6 – 7

    c.    The Injunctive Relief Does Not Prohibit the Illegal Disclosure to
Third Parties of Personally Identifying Information of Class
Members who are Current Subscribers of Netflix ........................... 7

    d.    Injunctive Relief Does Not Compensate Claims for Actual or
Statutory Damages, as a Matter of Law ..................................... 7 – 8

II.    The *Cy Pres* Relief is Inappropriate and Insufficient to Justify
Release of Class Members' Claims ...................................................... 8 – 20

    a.    Plaintiffs' Justification for *Cy Pres* Only Relief is Solely a
Function of a Collusive and Unprecedented Expansion of the
Class ...................................................................................... 9 – 13

    b.    The Worth of the Common Fund is Insufficiently Valued .... 13 – 19

    c.    The *Cy Pres* Relief is Not Sufficiently Related to Class
Members' Claims ................................................................. 19 – 20

III.    The Settlement Benefits Only Class Counsel and the Named
Plaintiffs, and Administration of the *Cy Pres* Awards is
Improper ............................................................................................. 20 – 25

    a.    The Plaintiffs' Incentive Awards are Improper ................... 20 – 21

    b.    Administration of the *Cy Pres* Awards Is Improper ........... 21 – 23

c.    The Results Achieved Do Not Justify the Attorney's Fee Award.................................................................................23 – 25

IV.    Class Counsel's Unethical Conduct Warrants their Removal as Lead Counsel.................................................................................25 – 29

CONCLUSION ...........................................................................................30 – 31

## **TABLE OF AUTHORITIES**

### **CASES**

*Abner v. Kansas City Southern R. Co.*, 154 (5th Cir. 2008) ................................15

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)................................14, 15, 16

*Bristol Tech., Inc. v. Microsoft Corp.*, 114 F.Supp.2d 59 (D.Conn. 2000).........................15

*Chambers v. Superior Court*, 121 Cal.App.3d 893 (1981)................................28

*City of Chicago v. Korshak*, 206 Ill.App.3d 968 (1st Dist. 1990) ......................................29

*Cooper v. Casey*, 97 F.3d 914 (7th Cir. 1996).....................................................................14

*Crane v. State Bar of California*, 30 Cal.3d 117 (1981)................................28

*Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000) .........11, 12, 20

*Dennis v. Kellogg Co.*, 2012 WL 3800230 (9th Cir.) ........................................8, 23, 24, 30

*Elliot v. McFarland Unified School Dist.*, 165 Cal.App.3d 562 (1985) ............................28

*Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997 (9th Cir. 2002).............25

*Fraley v. Facebook, Inc.*, No. 3:11-cv-01726-RS (N.D.Cal. August 17, 2012)(Order Denying Preliminary Approval of Settlement Agreement Without Prejudice) ...8, 9, 24, 30

*Georgine v. AmChem Prod., Inc.* 1994 WL 124866  (E.D. Pa.)........................................29

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ......................................10

*Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) ...............................................................23

*In re Asbestos Litigation (Ahearn)*, 90 F.3d 963 (5th Cir. 1996).......................................29

*In re Bluetooth Headset Products Liability Lit.*, 654 F.3d 935 (9th Cir. 2011)...........10, 23

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2001 WL 243494 (D.Me.).......................................................................................................30

*In re Domestic Air Transportation Antitrust Litigation*, MDL 861, 144 F.R.D. 421 (N.D.Ga. 1992) .............................................................................................29

*In re Matzo Food Products Litigation.* 156 F.R.D. 600 (D.N.J. 1994) ........................8, 24

*In re Pet Food Prod. Liab. Lit.*, 629 F.3d 333 (3d Cir. 2010) .............................................8

*In re Pharmaceutical Industry Average Wholesale Price Lit.*, 2008 WL 53278
(D.Mass.)..........................................................................................................................28

*In re Prudential-Bache Energy Income Partnership Securities Litigation*, 1994 WL
202394 (E.D.La.) .............................................................................................................29

*In re Prudential Securities Inc. Ltd. Partnerships Litigation*, MDL 1005, 912
F.Supp. 97 (S.D.N.Y. 1996)..............................................................................................29

*In re Thornburg Mortg., Inc. Securities Lit.*, No. Civ 07-0815 JB/WDS, 2012 WL
3150408 (D.N.M.)........................................................................................................9, 22

*Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999) ...................15

*Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354 (11th Cir. 2004)..................................15

*Lane v. Facebook*, 696 F.3d 811 (9th Cir. 2012) ............................................................30

*Lane v. Facebook, Inc.*, No. 5:08-cv-03845-RS, 2012 WL 4125857 (9th Cir.) ................11

*Mills Land & Water Co. v. Golden West Refining Co.*, 186 Cal.App.3d 116 (1986) ........28

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ..........................................8

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006) ....................................21

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011)..............................................19, 20

*Saunders v. Branch Banking and Trust Co. of Virginia*, 526 F.3d 142
(4th Cir. 2008).................................................................................................................15

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ........................................................10

*TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993) ...................14, 15, 16

*William H. Raley Co. v. Superior Court*, 149 Cal.App.3d 1042 (1983) ...........................28

## STATUTES

18 U.S.C. § 2710, *et seq.*..................................................................................3, 5, 7, 20

45 C.F.R. § 164.514(b) .......................................................................................................5

## LAW REVIEWS

*Paul Ohm*, Broken Promises of Privacy: Responding to the Surprising Failures of
Anonymization, 57 UCLA L. Rev., 1701 (August, 2010)...........................................4, 5, 6

## INTRODUCTION

This action arose on behalf of a class of Netflix consumers who had terminated their accounts, but were allegedly harmed when Netflix failed to destroy account information linking their personal identities to their video rental histories, as required pursuant to Section (e) of the Video Privacy Protection Act (VPPA).  Shortly after appointment of lead counsel (a process which lasted more than six months), Netflix filed its Answer, the parties informally exchanged discovery and began settlement discussions almost immediately.  The parties required only a day to reach a settlement agreement, apparently reaching a dollar figure of modest means and expanding the class to a number so large that no class member could receive more than small cents.

The proposed Settlement embodies the current paradigm "money-for-nothing" class action, awarding lucrative, percentage based attorney's fees to Class Counsel in exchange for solely *cy pres* relief of no material benefit to the Class and short-lived injunctive relief that fails to substantially protect the Class' privacy interests.

In addition, the Settlement's unprecedented expansion of the Class by tens of millions of members, who receive no injunctive relief preventing Netflix from disclosing their "personally identifiable information" pursuant to Section (b) of the VPPA, presents serious questions regarding the Plaintiffs' and Class Counsel's loyalty to the Class.  Despite that Plaintiffs and Class Counsel secured a fully tax deductible *cy pres* award worth $9 million against Netflix's $155 billion potential liability, with no monetary distribution to the Class, the named Plaintiffs will receive more than *twice* the amount they would be entitled to from a successful trial on the merits, and Class Counsel will receive $2.25 million in fees for minimal effort, taken as a percentage of the *cy pres* common fund.  The Settlement has produced extensive criticism, garnering a staggering ninety-seven (97) objections.  The Settlement is neither fair nor reasonable under the law, and should be set aside in its entirety.

1   Edelson, facing the substantial criticism of his partner's (Kamber) Facebook settlement's

2   creation of a new digital privacy entity with Facebook on its board, essentially co-opted the likely

3   objectors by inviting them to apply for grants from the settlement, months ahead of the due date for

4   objections.  Indeed, when one of our clerks called the *Fraley v. Facebook* objector, Consumer

5   Watchdog, to indicate interest in working together on *this* objection, we were [ ] contacted thereafter by

6   the Edelson firm, accusing us of unlawful solicitation and interference.  Indeed, it was only after receipt

7   of the attached accusatory letter that this firm learned that Consumer Watchdog had actually been

8   invited as a potential recipient of the *cy pres* relief by the Edelson firm.  [ ] Counsel Edelson's bullying

9   tactics should not be tolerated and viewed instead as a lack of faith in the merits of their own proposed

10  Settlement.

## ARGUMENT

I.   **The "Decoupling" Injunction is Valueless and Does Not Justify Release of Class Members' Claims.**

    a.   **The Decoupling Injunction Does Not Meet the Statutory Mandate of the VPPA Requiring Destruction of Class Members' Video Rental Histories, and Fails to Anonymize and Protect Class Members' Personal Identities.**

Plaintiffs make much of the purportedly "industry-leading" injunctive relief, arguing it offers "a

resounding victory for the class, particularly when considering that recent courts have explained that an

injunction is the intended remedy for violation of the VPPA's unlawful retention provision."

Plaintiffs' Notice of Motion and Motion for and Memorandum in Support of Final Approval of Class

Action Settlement and Award of Attorneys' Fees, Expenses and Incentive Award (hereinafter

"Plaintiffs' Motion for Final Approval") at 3-4, *In re Netflix Privacy Litigation*, No. 5:11-cv-00379-

EJD (N.D.Cal. October 31, 2012).  Plaintiffs' proposed injunctive relief, however, is form over

substance and does not offer the Class any meaningful protection.

Under Section (e) of the VPPA, Netflix is required to destroy customers' personal video rental

1    histories "as soon as practicable" but within one year of cancellation of their accounts.  *See* 18 U.S.C. §

2    2710(e).[1]  Netflix, however, is apparently unwilling to do so.  Instead, the Settlement requires Netflix

3    to non-specifically "decouple" Class Members' Identification Information and Payment Method from

4    their Entertainment Content Viewing History within one (1) year after cancellation of their accounts,

5    and to continue this practice for only four (4) years.[2]  This short-term solution theoretically allows

6
7    Netflix to retain Class Members' Entertainment Content Viewing Histories under the guise of

8    anonymizing their associated personal identities.

9            In furtherance of their fiction, Plaintiffs and Netflix have suppressed the fact that Class

10   Members' gender, birthdate and zip code information will *not* be severed from their Entertainment

11   Content Viewing Histories.  Under the Settlement, "Identification Information" is defined as "a

12
13   [p]erson's name, postal address (except zip code), email address, phone number, and company name,"

14   but *does not* include a person's gender, birthdate or zip code.  *See* Class Action Settlement Agreement,

15   5-6, *In re Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD (N.D.Ca. May 25, 2012).

16           While tying these three pieces of information to Class Members' Entertainment Content

17   Viewing Histories provides Netflix with analytics for tracking gender, age and geographical viewing

18
19   preferences, these same three pieces of information also expose the personal identities of 87.1% of the

20   United States population.  *See Paul Ohm*, Broken Promises of Privacy: Responding to the Surprising

21   Failures of Anonymization, 57 UCLA L. Rev., 1701, 1705 (August, 2010).[3]  In a study performed to

22   substantiate this claim, Latanya Sweeney, professor of computer science at Carnegie Mellon

23
24   _____
     [1] 18 U.S.C. § 2710(e) states "[a] person subject to this section shall destroy personally identifiable information as soon as
25   practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was
     collected."  18 U.S.C. § 2710(1)(3) defines "personally identifiable information" as "information which identifies a person
26   as having requested or obtained specific video materials or services from a video tape service provider."
     [2] The injunctive relief is actually effective for only three (3) years since Netflix has an entire year from the date of final
27   approval to institute the practice.
     [3] "How many other people in the United States share your specific combination of ZIP code, birth date (including year), and
28   sex?  According to a landmark study for 87 percent of the American population, the answer is zero; these three pieces of
     information uniquely identify each of them … Prior to these studies, nobody would have classified ZIP code, birth date, sex,

1 University,[4] used gender, birthdate and zip code information to obtain and send to the then Governor of

2 Massachusetts his own personal health records. *Id.* at 1719.

3     The implications of this study are recognized by law. In light of this study, Congress enacted

4 HIPAA privacy regulations recognizing the sensitivity of birthdates and zip codes on individuals'

5 personal medical records, which require birthdates to be generalized to only the year, and zip codes to

6 only the first three digits. *Id.* at 1737[5]; 45 C.F.R. § 164.514(b). In comparison, Congress' mandate

7 under the VPPA is in fact *stronger*, requiring complete destruction of "personally identifiable

8 information" which is not, as Plaintiffs presume, limited to only individuals' names, addresses and

9 emails, but broadly defined as "information which identifies a person as having requested or obtained

10 specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). If

11 Plaintiffs and Netflix are genuinely concerned with protecting Class Members' personally identifying

12 information, they must also sever Class Members' gender, birthdate and zip code information from

13 their Entertainment Content Viewing Histories, or at a minimum, adopt the HIPAA privacy practice.

14     The Settlement also disturbingly fails to define the term "decouple" or to explain the process

15 and how it will protect Class Members' personally identifiable information. For instance, the

16 Settlement omits whether Netflix will continue to associate Class Members' Entertainment Content

17 Viewing History with their Identification Information through an alphanumeric tag. Such tags have, in

18 the past, exposed individuals' information to privacy breaches. *See Id.* at 1717-1718.[6]

19     Moreover, a study specifically tailored to Netflix subscriber movie ratings found that with

20 knowledge of a subscriber's ratings of only six (6) movies and the dates of those ratings (within a

---

or movie ratings as PII. As a result, even after these studies, companies have disclosed this kind of information connected to sensitive data in supposedly anonymized databases, with absolute impunity."

[4] She is currently a professor at Harvard University.

[5] "Owing to the release of Dr. Sweeney's study around the same time, the Privacy Rule requires the researcher to generalize birth dates to years and zip codes to their initial three digits."

[6] Discussing AOL's 2006 research initiative in which AOL publicly released some users' search queries. In order to protect users, AOL suppressed usernames and IP addresses, but assigned "unique identification numbers" to correlate with specific users. As a result, bloggers were able to track down personal identities of certain users.

margin of error of two weeks) a person can uniquely identify that subscriber from the database with an astonishing 99% rate of accuracy. *Ohm*, 57 UCLA L. Rev. at 1721. Notably, this study utilized subscribers' movie ratings exclusively; when paired with Class Members' gender, birthdate, zip code and other information, discovery of Class Members' personal identities becomes virtually certain. Accordingly, the Settlement completely fails to protect the Class from (as Plaintiffs say) "the real risk that such sensitive information will be hacked, stolen, and/or used for illicit purposes." Plaintiffs' Motion for Final Approval at 4. The decoupling injunction's ineffectiveness is especially telling in light of Plaintiffs' statements that their "industry-leading injunctive relief"—which has been undermined by research freely through a Google search—is "perhaps most important[]" to the Settlement's satisfaction of Rule 23(e). Plaintiffs' Motion for Final Approval at 3. The injunctive relief provided by the Settlement, is *valueless*.

### b. The Decoupling Injunction Does Not Provide Relief to the Majority of Class Members.

It is disconcerting that a class which was initially comprised of "*thousands* of other Netflix consumers" (who actually could obtain meaningful recoveries) has by the Settlement been expanded to a class "comprised of *tens of millions* of Netflix subscribers and former subscribers nationwide," or more specifically, *62,039,686*, a class far too large to obtain actual relief from a $9 million common fund. Egelman's Expert Witness Report, 9, (Attachment to Exhibit C of Plaintiffs' Motion for Final Approval) *In Re Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD (N.D.Cal. October 31, 2012)(hereinafter "Egelman's Expert Witness Report"). More specifically, the class was expanded from those who had cancelled their accounts within the past year and had only VPPA Section (e) "unlawful retention" claims, to a class comprised of *all* Netflix subscribers who had Section (b) unlawful disclosure claims and (possibly) unlawful retention claims.

However, the newly added Class Members have only Section (b) unlawful disclosure claims

because they, by definition, never cancelled their Netflix accounts and thus, never suffered an injury-in-fact for unlawful retention. Consequently, the decoupling injunction, which (theoretically) alleviates only Section (e) unlawful retention claims, provides *no benefit* to Class Members with only Section (b) unlawful disclosure claims. Therefore, the decoupling injunction cannot serve as meaningful consideration for release of any Class Member's Section (b) unlawful disclosure claims. Unfortunately, the majority of Class Members have only Section (b) claims.[7]

### c. The Injunctive Relief Does Not Prohibit the Illegal Disclosure to Third Parties of Personally Identifying Information of Class Members who are Current Subscribers of Netflix.

Despite the fact that the majority of the Class is comprised of Members with only Section (b) unlawful disclosure claims, the Settlement provides them *no injunctive relief* prohibiting disclosure of their personally identifiable information. Even if it were believed that the decoupling injunction diminished the value to Netflix of disclosing Class Members' Entertainment Content Viewing Histories, nothing in the Settlement prevents Netflix from disclosing their personally identifiable information *while they are active subscribers* of Netflix, during which time Class Members' Identification Information is *not* decoupled from their Entertainment Content Viewing History.

### d. Injunctive Relief Does Not Compensate Claims for Actual or Statutory Damages, as a Matter of Law.

Nonetheless, even if the decoupling injunction truly benefited *all* Class Members, injunctive relief, in general, applies only to *future* harm and does not compensate Class Members for statutory damages or justify release of those claims. *See* Order Denying Preliminary Approval of Settlement Agreement Without Prejudice, *Fraley v. Facebook, Inc.*, No. 3:11-cv-01726-RS, *4 (N.D.Cal. August 17, 2012)("The problem with treating the *cy pres* element of the recovery as effectively a 'bonus,' such

---

[7] Dr. Egelman estimates half the Class has unlawful retention claims because Netflix states it has approximately 30 million current customers and the total Class is estimated at approximately 62 million. However, this estimation is flawed because an unlawful retention claim does not arise *immediately* after a Netflix customer cancels their account, but rather, *after an*

1   that *any* payment could be seen as fair, adequate, and reasonable, is that the injunctive relief relates

2   only to Facebook's future conduct … Regardless of the importance and value to plaintiffs of the

3   injunctive relief, it cannot serve as meaningful consideration for a release of class members' claims for

4   damages, statutory or actual.")  Accordingly, the *cy pres* award is crucial to determining the

5   appropriateness of the Settlement and must justify the release of Class Members' claims.  Id. ("Thus,

6   contrary to plaintiffs' argument, the *cy pres* payment remains critically important to

7   evaluating the appropriateness of the settlement."); *Dennis v. Kellogg Co.*, 2012 WL 3800230, *5 (9th

8   Cir. 2012)("[*Cy pres* payments are] [u]sed in lieu of direct distribution of damages to silent class

9

10   members.")

11   II.   **The *Cy Pres* Relief is Inappropriate and Insufficient to Justify Release of Class**
12         **Members' Claims.**

13         Purely *cy pres* settlements with no monetary benefits to class members have been in disrepute

14   at least since *In re Matzo Food Products Litigation.*  156 F.R.D. 600 (D.N.J. 1994).  In fact, *cy pres*

15   distributions in the class action context have, in general, drawn ire from several courts.  *Mirfasihi v.*

16   *Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004)(*Cy pres* relief provides "no indirect benefit to

17   the class" and is "purely punitive."); *In re Pet Food Prod. Liab. Lit.*, 629 F.3d 333, 363 (3d Cir.

18

19   2010)("Certainly, this lawsuit is not charitable.  There are no individuals whose wishes need be

20   considered and there is no intent to benefit charitable purposes that can be attributed to the class

21   members or lawyers who established the fund.")  The District Court of New Mexico has recently set

22   forth comprehensive reasons for its skepticism towards the use of *cy pres* awards in class actions:

23         The Court has a basic disagreement with the *cy pres* doctrine for several reasons:
24         (i) class actions are disputes between parties and the money damages should
             remain among the parties, rather than be distributed to some third party; (ii) it is
25         unseemly for judges to engage in the selection of third-party beneficiaries and to
             distribute class action damages to third parties; (iii) judges are often not in the
26         best position to choose a charitable organization that would best approximate the

27

28   *entire year has elapsed.  See* Egelman Affidavit, 17; 18 U.S.C. § 2710(e).  Many customers frequently join and rejoin, so many are only transiently inactive and are not part of the Class with Section (e) unlawful retention claims.

1   unpaid class members' interests; and (iv) the doctrine encourages charitable
    organizations, and plaintiffs' lawyers, to lobby the court for *cy pres* awards.

2   *In re Thornburg Mortg., Inc. Securities Lit.*, No. Civ 07-0815 JB/WDS, 2012 WL 3150408, *11

3   (D.N.M. July 24, 2012).  While Class Counsel presents itself as a new form of "evolved" lawyer,[8] this

4

5   is merely the revival of an old *discredited* practice.

6       **a.  Plaintiffs' Justification for *Cy Pres* Only Relief is Solely a Function of a
            Collusive and Unprecedented Expansion of the Class.**

7

8       Plaintiffs' only basis for resorting to *cy pres* relief is that the Class is so large that meaningful

9   distribution of the $9 million common fund is infeasible.  Indeed, no other basis is applicable.  With

10  skepticism towards *cy pres* Settlements on the rise, at least one court has recently held that *cy pres*

11  awards cannot be justified solely on those grounds.  *Fraley*, No. 3:11-cv-01726-RS at *3 ("Merely

12  pointing to the infeasibility of dividing up the agreed-to $10 million recovery, or the relatively small

13  per-use revenue Facebook derived, is insufficient, standing alone to justify resort to purely *cy pres*

14  payments.")  Here, in addition to Plaintiffs' lack of justification for the exclusive use of a *cy pres*

15

16  remedy, the negotiation of the Settlement played a direct part in multiplying the class size and diluting

17  any potential recovery to the Class.

18      It is generally unremarkable to a defendant to expand the class definition to ensure that it

19  obtains global closure.  But when, as here, expansion of the class occurs on a vastly expanded

20  population resulting in no recoveries to anyone, red flags should be set off.  For Class Counsel, the

21  purpose and effect is to enlarge the common fund from which they extract their percentage based fees.

22

23  For Netflix, the purpose is to gain a massive release of liability at a wholesale price, paid only to

24  favored grant applicants, including likely objectors.  For the Class, the effect is to diffuse their monies

25  to the point of eliminating the possibility of monetary redress, diverting their money instead to co-

26  opting in the likely opponents.

27

28  _____
    [8] See www.edelson.com.
    _____

A settlement that occurs before class certification is especially susceptible to collusion and must meet a *higher* standard than the usual Rule 23(e) standard requiring settlements to be fair, reasonable and adequate. *In re Bluetooth Headset Products Liability Lit.*, 654 F.3d 935, 946-947 (9th Cir. 2011). Courts must be extraordinarily thorough in reviewing such settlements to ensure there are no subtle signs of collusion indicating that class counsel and the named plaintiffs have acted in their own self-interest. *Id.* at 947; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Accordingly, the Court's duty in reviewing class action settlements extends beyond merely looking for overt mediator misconduct. *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003).

As Senior Circuit Judge Kleinfeld recently opined in dissent, collusion becomes particularly suspect when a class is expanded as part of the settlement, because class counsel's and defendant's interests align:

> Once the parties agree to settle, and agree to certify a class, defendant's interests are reversed. Plaintiffs' counsel still have an interest in keeping a large class certified, because the larger the class, the higher attorneys' fees are likely to be. But if the defendant will get a bar against claims, almost always a term of any settlement, the more people whose claims are barred the better. The risk of having to pay out a huge amount of money gets converted, by class certification, into a certainty that vast numbers of people will be unable to sue the defendant. So when settling before class certification, and agreeing upon class certification as part of the settlement, both sides have the same incentive, to certify the class and make it as vast and all-encompassing as possible. It is a bonanza for the defendant if it can bar the claims not only of everyone in the class described in the complaint, but also of a much larger class on whose behalf more and different claims might have been asserted.

*Lane v. Facebook, Inc.*, No. 5:08-cv-03845-RS, 2012 WL 4125857, *16 (9th Cir. 2012)(Petition for *en banc* rehearing currently pending; appellant's response due November 21, 2012 pursuant to Order of November 2, 2012.)

The Seventh Circuit has also held that settlements which increase class size to the detriment of class members' payouts should be rejected and indicate disloyalty on the part of class counsel and

named plaintiffs:

> All questions of notice and opt-out aside, the settlement is substantively troubling. Crawford and his attorney were paid handsomely to go away; the other class members received nothing (not even any value from the $5,500 "donation") and lost the right to pursue class relief. By agreeing to a class definition so broad that it included anyone who was sent a letter "similar" to the one he had received, Crawford consented to a class of approximately 214,000 members, which ensured that none could recover much-recall that the cap under § 1692k(a)(2)(B)(ii) is $500,000, implying a maximum award of $2.34 apiece, and if Equifax's net worth is less than $50 million then the cap is even lower. Blair and Wilbon, by contrast, have been certified to represent smaller classes for which the cap could be as high as $250 per debtor, holding out some prospect of a net judgment after Equifax's setoff rights. Although Magistrate Judge Schenkier stated that the prospective part of the deal is valuable to the class, Blair and Wilbon believe that Equifax stopped using the challenged letters early in 1998. Given the litigation risk, Equifax is not apt to employ them again no matter what the settlement provides. Even if Equifax's promise is of some value to debtors in the future, the change in form letters is useful to *class members* only if they again write bad checks that Equifax has verified. For persons who stay out of financial trouble, only damages matter, yet all the settlement does for (to?) them is cut them off at the knees. They gain nothing, yet lose the right to the benefits of aggregation in a class. Magistrate Judge Schenkier concluded that Crawford's attorney was a vigorous champion of the class, despite the appearance that for $78,000 he sold out the class. Even so, the fact that one class member receives $2,000 and the other 200,000+ nothing is quite enough to demonstrate that the terms should not have been approved under Rule 23(e).

*Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000).

Indeed, defendants have every incentive to increase the class size during settlement negotiations because they can obtain a larger release on liability for a less than proportional price. Class counsel has every incentive to increase class size as well, even if the class size increase leads to a much less than proportional increase in the size of the common fund, because a larger class size means a larger share of fees.[9]

The problem is only aggravated when, as here, a *cy pres* award is valued identically to a common fund providing actual compensation to class members, because Class Counsel has no

---

[9] For instance, if Class Counsel can double the size of the common fund by increasing class size ten-fold, Class Counsel doubles its fees despite diminishing each Class Member's share.

1  incentive to engage in substantial litigation or secure a meaningful recovery for the Class.  Sadly, the

2  only individuals who suffer are the absent class members without any decision making authority,

3  whose claims are diluted into oblivion for defendant's, class counsel's and the named plaintiffs' own

4  gain.  Theoretically, the named Plaintiffs would prevent this sort of abuse, but they too will be

5  handsomely rewarded by the Settlement and have no incentive to pursue a better deal (Plaintiffs'

6  incentive awards are discussed *infra*).  Indeed, a more fitting breeding ground for a conflict of interest

7  is difficult to imagine.

8  Here, Plaintiffs have seriously diluted the common fund in this Settlement through expansion of

9

10  the Class.  Plaintiffs' original class included only Section (e) unlawful retention claims with a

11  purported cumulative worth of $7,161,000.[10]  Plaintiffs' Motion for Final Approval at 17.  The

12  Settlement, however, has now expanded the Class to include an additional (approximately) 32 million

13  claimants, with claims purportedly worth (approximately) only *$60,000* in total.[11]  *Id.* at 14.  Plaintiffs'

14  case was never about Section (b) violations.[12]  Rather, Plaintiffs and Class Counsel appear to have

15

16  expanded the Class with what they assert as valueless claims in order to appease Netflix into

17  Settlement, at the expense of the Class, and at no expense to Plaintiffs and Class Counsel since they

18  will receive their same share of incentive awards and attorney's fees.  To account for this massive

19  inequity in the worth of claims, Section (b) claimants should be severed from the Settlement, or at the

20  very least, relief should be divided among subclasses.  A proper damages valuation (discussed *infra*) as

21

22

23

---

[10] We argue this amount is severely undervalued *infra*.
[11] According to Plaintiffs, the total worth of Section (b) claims is only *$120,000*, because Section (e) unlawful retention claimants also have Section (b) unlawful disclosure claims.  Thus, the 32 million members with only Section (b) unlawful disclosure claims added to the Class, which comprise about half of the Class according to Plaintiffs, have claims worth about only half of $120,000.
[12] The original complaint filed by Plaintiffs included only an allegation under Section (e) of the VPPA, and accordingly, limited the class size to only those subscribers who had cancelled their Netflix subscriptions.  The amended consolidated class action complaint added an allegation that Netflix had also violated Section (b) of the VPPA by disclosing subscribers' PII to third-parties and retained the same class definition, limiting it to subscribers who had cancelled their Netflix subscriptions, which in the Court's and Class Counsel's own estimate, included only "thousands of other Netflix consumers."

1   well as subclass division would entitle at least some Class Members to meaningful, direct monetary

2   relief.

### b.  The Worth of the Common Fund is Insufficiently Valued.

4   According to Plaintiffs, the value of the common fund *cy pres* award is based on the expected

5   value of their claims if they were to proceed to trial.  As Plaintiffs admit, the potential liability to the

6   Class is approximately *$155 billion*.  Obviously, such an amount would never be attainable because of

7   due process and defendant solvency concerns.  However, Plaintiffs' estimation seriously undervalues

8   this case because (1) the value estimation of the Class' claims ignores applicable exceptions to the rule

9   that damage multipliers must be limited to single digit ratios; (2) Dr. Egelman's calculation of damages

10  for unlawful retention claims is fundamentally flawed; and (3) Plaintiffs provide no analysis

11  whatsoever for their estimation of Class Members' unlawful disclosure claims.

12  First, Plaintiffs argue that a theoretical maximum award of $155 billion would be unrecoverable

13  from Netflix because it would (1) completely bankrupt them and (2) would violate due process.  These

14  points are uncontested.  However, Plaintiffs also then argue that damages would be calculated by

15  multiplying actual damages by a ratio that was limited to single digits, with a ceiling of 9:1, which they

16  estimate provides a total maximum award of $46.5 million for the Class' unlawful retention claims.

17  Plaintiffs' Motion for Final Approval at 14, 17.  Plaintiffs are incorrect in stating that the punitive

18  damages multiplier would be limited to the single digits.  While it is generally true that punitive

19  damage multipliers must remain within the single digits to comport with due process, there are

20  exceptions to the rule which apply here.  Specifically, the Supreme Court has also "consistently

21  rejected the notion that the constitutional line is marked by a simple mathematical formula" and has

22  stated that ratios exceeding the single digits are permissible where "a particularly egregious act has

23  resulted in only a small amount of economic damages" or where "the injury is hard to detect or the

monetary value of noneconomic harm might have been difficult to determine." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582 (1996). Accordingly, "[t]he smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages." *Cooper v. Casey*, 97 F.3d 914, 919-920 (7th Cir. 1996)(citing *Gore*, 517 U.S. at 1605); *Saunders v. Branch Banking and Trust Co. of Virginia*, 526 F.3d 142, 154 (4th Cir. 2008). Moreover, courts must also consider the *potential* harm "that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460-461 (1993). With these principles in mind, several courts have awarded punitive damage multipliers far beyond the single digits, even as high as *500 or 2000 times* the amount of actual damages.[13]

Here, the nominal nature of each Class Member's damages—which Plaintiffs unsoundly estimate at only $0.15 per person—as well as the fact that Netflix knowingly, and *repeatedly* violated the VPPA for years affecting tens of millions of individuals, could justify departing from a punitive damages multiplier in only the single digits. *See Gore*, 517 U.S. at 576-577 ("[R]epeated misconduct is more reprehensible than an individual instance of malfeasance."); *Lee*, 101 F.3d at 809 (listing "repeated instances of misconduct" as an "aggravating factor" under the *Gore* test); *also see Bristol Tech., Inc. v. Microsoft Corp.*, 114 F.Supp.2d 59, 88-89 (D.Conn. 2000)(finding Microsoft's repeated misstatements to several independent software vendors, that it would provide source code for its WISE program to its partners "well into the future," favored a $1 million award in punitive damages over $1 in actual damages)(vacated on other grounds in *Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152 (2d Cir. 2001)).

---

[13] *E.g. TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993)(upholding an award over 526 times the $19,000 actual damages award); *Saunders*, 526 F.3d at 154 (upholding punitive damages award of 80:1); *Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354, 1364-1365 (11th Cir. 2004)(upholding punitive damages award over 2000 times compensatory damages of $115.05); *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1339 (11th Cir. 1999)(upholding punitive

Moreover, courts must also consider the amount of statutory penalties in determining the excessiveness of punitive damages and should "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583. Here, the VPPA damages award is $2,500 individually, exponentially greater than Plaintiffs' actual contemplated damages so a court would have to adjust the amount upward to at least somewhat honor the legislative's judgment as to what constitutes appropriate liquidated damages for violation of the VPPA. *See Id.*; *Bristol Tech., Inc.*, 250 F.3d at 91 (finding statutory penalties of $5,000 per violation justified upward departure of punitive damages ratio). Moreover, the potential harm from Netflix's retention of Class Members' personally identifiable information for a prolonged period of time in the future must also be considered. *See TXO Prod. Corp.*, 509 U.S. at 460-461. Not only was there continuous, unlawful retention of Class Members' personally identifiable information, but a real risk of data theft from hackers or subversive Netflix employees.

Alternatively, a court could also hold that upward departure of the punitive damages ratio is justified by the fact that the injury caused by Netflix's conduct is "hard to detect" or that "the monetary value of noneconomic harm might have been difficult to determine." *See Gore*, 517 U.S. at 582. Here, Plaintiffs' privacy based injuries are nonmonetary in nature and the value of that harm has proven difficult to determine with specificity. Moreover, the injury was difficult to detect and if Netflix had disclosed Class Members' information to third parties or suffered a breach into its database, Class Members would most likely have been unable to detect their injury absent admission from Netflix.

Plaintiffs' estimation of maximum damages is therefore understated, and completely fails to consider the likelihood that a court would exceed (possibly vastly) the single digit ratio multiplier in calculation of damages.

---

damages award of $4.35 million, over 100 times actual damages); *Abner v. Kansas City Southern R. Co.*, 154, 165 (5th Cir. 2008)(affirming punitive damages award of $125,000 over nominal damages of $1 in Title VII and § 1981 case).

More importantly, Dr. Egelman's calculation of actual damages for unlawful retention is fundamentally flawed and reveals his misinformation of the facts of this case. Or worse yet, *bias*, since Dr. Egelman works at the Berkeley University as a postdoctoral researcher and has worked with the Berkeley Center for Law and Technology, the first *cy pres* recipient listed on Plaintiffs' Motion for Final Approval. *See* Plaintiffs' Motion for Final Approval at 20; Private Workshop Participants, http://www.law.berkeley.edu/12943.htm. In his report, Dr. Egelman bases his calculation of damages on the premium consumers would have been consensually willing to pay to grant Netflix access to their video viewing histories. Egelman's Expert Witness Report at 2. Dr. Egelman observes that the premium consumers are willing to pay for "sex toys" on a website with a "stringent" privacy policy versus a website with a "low-privacy" policy, ranges between $0.25 and $0.41, while the same premium for purchasing "batteries" is between $0.15 and $0.30. Egelman's Expert Witness Report at 6. Egelman then concludes that $0.15 (the lowest bound) is a good estimate for the premium for "Netflix Video Rental History" privacy (and thus each Class Member's damages), based on a survey he conducted for this case on October 10, 2012 in which he found that subjects ranked "Netflix Video Rental History" last (eleventh) on privacy concerns, in contrast to ranking "Mailing Address" first, "Name" fifth, and "Date of Birth" eighth. *Id.* at 8. He finds that "Receipt from Online Office Supplies Purchase" is tenth, and has no statistically significant disparity from "Netflix Video Rental History," and thus, concludes that office supply receipts are similar to batteries (which were in the $0.15 to $0.30 range). However, his estimate is fundamentally flawed.

First, his study incorrectly computes damages in terms of *one-time* purchases; in the case of batteries, a one-time purchase for approximately $15. A Netflix subscription, however, is a continuous service which is purchased/renewed with payment every month, and every month additional private video rental history items are subject to additional privacy intrusions. Similarly to how a consumer

1 would have to pay the $0.15 premium on batteries every time they ran out and he or she required new

2 ones, the premium must be calculated for every month purchased of Netflix service.  A year of Netflix

3 service costs approximately $95 for the one DVD out-at-a-time plan, and $143 for two DVDs (both

4 plans used to cost more),[14] much greater than $15 for a one-time battery purchase. Valued the proper

5 way, the damages could easily exceed *ten times* Plaintiffs' proposed figure.

6        Second, Dr. Egelman's survey, which ranks privacy levels for various items (as described

7 above) fatally misrepresents the information that was directly tied to Class Members' Entertainment

8 Content Viewing Histories prior to this case.  The entire crux of this case is that Netflix unlawfully

9 retained Class Members' Entertainment Content Viewing Histories, which were *tied together with*

10 Class Members', *inter alia*, name, mailing address, email address and date of birth; all information

11 which Dr. Egelman's study ranked far higher in privacy concern than "Netflix Video Rental History"

12 alone.  Dr. Egelman's survey does not define "Netflix Video Rental History," so subjects had no idea

13 that the category also contained more sensitive information, *e.g.* their "Mailing Address."  His results

14 logically suggest that since "Mailing Address" is ranked first in privacy concern and is tied to

15 customers' "Netflix Video Rental History," Class Members would be highly concerned about their

16 privacy with respect to that information and Dr. Egelman should have, at least, chosen the upper bound

17 of $0.30.[15]  This factor alone *doubles* the Class' actual damages.

---

[14] http://blog.netflix.com/2011/07/netflix-introduces-new-plans-and.html.

[15] Dr. Egelman also compares the premium consumers would pay to keep their GPS location data private, which he found to be between the $0.14 and $0.18 range. *Id.* at 6.  However, this is unavailing since "GPS Location" was ranked low at ninth of eleven categories, obviously much lower than "Mailing Address" which was, as revealed above, contained within what Dr. Egelman refers to as "Netflix Video Rental History."  Also, Dr. Egelman fails to show how he arrives at his $0.14 to $0.18 figure.  A review of his referenced study seems to show that he did not even interpret his own study correctly; seventy-seven (77) of the 151 subjects who he states "grant[ed] the application access" to GPS location information actually did *not* (they granted access to audio recording instead).  Rather, there were seventy-four (74) who granted access to GPS location plus 212 who granted access to GPS location *and* audio recording data.  *See* Serge Egelman, et al., *Choice Architecture and Smartphone Privacy: There's a Price for That*, Workshop on the Economics of Information Security (WEIS), 2012.  An additional 120 refused to grant both GPS location and audio recording data, but they paid a premium of $1.50 rather than $0.50.  Dr. Egelman must at least revise or show his calculations.  Nonetheless, the study fails to isolate the value of GPS location data and will lead to flawed estimates so it should not be considered.  For instance, if we take the only two categories that remove audio recording data and consider GPS location data in isolation, the study shows that 120 of 194 (61.8%) applicable subjects were willing to pay a $0.50 premium to keep their GPS location data secret, which

—16

1   Dr. Egelman's damage calculations grossly undervalue the Class' damages and should be

2   readjusted with incorporation of the proper methodology, which could result in damage figures more

3   than *twenty times* what Plaintiffs represent.

4   Third, Plaintiffs literally provide no analysis whatsoever for their damage claims with respect to

5   Class Members' unlawful disclosure Section (b) claims. Plaintiffs merely state, without analysis, that

6   "a reasonable maximum award would be under $3,000,000 plus attorneys' fees." Then, multiplying

7   their predicted success on the merits, they compute expected damages for the entire class of 62 million

8   to be only $120,000. Plaintiffs' Motion for Final Approval at 14. Plaintiffs must provide further

9   analysis or justification for this figure, which comes to less than $0.02 per Class Member and seriously

10  dilutes the common fund when compared to Class Members with legitimate Section (e) unlawful

11  retention claims. Plaintiffs' dubious calculations evidence their disingenuous attempts to justify their

12  paltry common fund of $9 million.

13  ### c.   The *Cy Pres* Relief is Not Sufficiently Related to Class Members' Claims.

14  Additionally, an appropriate nexus between the *cy pres* relief and Class Members' interests is

15  absent here. Courts require that a *cy pres* award be "guided by (1) the objectives of the underlying

16  statute(s) and (2) the interests of the silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034,

17  1039 (9th Cir. 2011). Here, the target of relief is both too broad and too narrow. Specifically, the

18  Settlement provides that "[t]he *Cy Pres* distribution shall be made to not-for-profit organizations,

19  institutions, and/or programs that educate users, regulators, and enterprises regarding issues relating to

20  protection of privacy, identity, and personal information through user control, and to protect users from

21  online threats." Settlement Agreement at 5-6. However, this objective is too broad, because it

22  encompasses *all* issues regarding online privacy, where the objectives of the VPPA are limited to

---

translates to an expected value of approximately $0.31 before application of the 95% confidence interval. *See Id.* But this result would be tainted by the effect of audio recording data on subjects' choices. Thus, use of this study would lend itself to tailored results.

Objection to Class Action Settlement
Case No. 5:11-cv-00379-EJD

1   protecting only information related to one's video content viewing history. *See* 18 U.S.C. § 2710. The

2   *cy pres* objective is also too narrow because it does not protect consumers' from misconduct with

3   respect to video rental histories stored on offline databases.

4        Furthermore, the *cy pres* objectives naively focus on the consumer's control of their privacy and

5   on privacy "education," when the source of the problems is the underlying monetary incentive for

6   companies to hoard and disclose consumers' personal data. Such an unrelated objective does not meet

7   the requirement that *cy pres* relief must be reasonably certain to benefit the class. *See Nachshin*, 663

8   F.3d at 1038-41 (indicating appropriate *cy pres* recipients would "work to protect internet users from

9   fraud, predation, and other forms of online malfeasance.") None of the alleged misconduct in this case

10  could have been prevented "through user control" because Netflix allegedly stored and maintained

11  Class Members' personally identifiable information *without their consent*.

12  

13  **III.   The Settlement Benefits Only Class Counsel and the Named Plaintiffs, and
          Administration of the *Cy Pres* Awards is Improper.**

14  

15      **a.   The Plaintiffs' Incentive Awards are Improper.**

16       Equally disturbing is the proposed monetary award to the named Plaintiffs, who receive *more*

17  *than twice* the maximum statutory award of damages ($6,000 each) while class members receive

18  nothing. This arrangement—which provides Plaintiffs with lucrative incentive awards but the Class

19  with virtually nothing—is the archetypal class "sellout" and, as other courts have stated, warrants

20  rejection of the Settlement or further scrutiny for collusion. *See Crawford*, 201 F.3d at 882 ("[T]he

21  fact that one class member receives $2,000 and the other 200,000+ nothing is quite enough to

22  demonstrate that the terms should not have been approved under Rule 23(e).")[16]; *Murray v. GMAC*

23  *Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006)("Here the proposed award is $3,000 to the

24  representative while other class members are frozen out. The payment of $3,000 to Murray is three

25  

26  

27  

28

times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum … Such a settlement is untenable. … if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit only has a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum?  And, if the chance of success is really only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny?  If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.")

If that were not enough, named plaintiffs in the other related actions will receive $3,000 each, despite having put forth *zero* commitment to this case.  Plaintiffs' commitment in this case is also lacking; Plaintiffs do not mention any actual instances of time and effort expended in this case; no depositions, no actual activity at all.  Other than engaging in hyperbole about "remain[ing] absolutely committed" and "accept[ing] the responsibilities and burdens attendant to serving as class representative," Plaintiffs only point to supposed "public scrutiny" they faced by simply placing their names on the complaint.  *See* Plaintiffs' Motion for Final Approval at 55.  Plaintiffs have not engaged in any substantial legal proceedings that justify such a large award in relation to that of the Class.

### b. Administration of the *Cy Pres* Awards Is Improper.

In anticipation of objections from non-profits, Class Counsel has cleverly co-opted likely objector organizations to instead apply for a distribution from the *cy pres* fund, with an application deadline months prior to the deadline to object.  As courts have recently begun to note, *cy pres* settlements are becoming a primary source of funding for some charities and non-profits, manufacturing great incentive for such charities and non-profits to follow the money rather than their own ideals:

---

[16] It is important to note that Judge Easterbrook of the Seventh Circuit found class members had received "nothing" even though the settlement provided *cy pres* relief in the amount of $5,500 to "the Legal Clinic of Northwestern University Law School for use in protecting consumer rights."  *See Id.* at 880.

To put themselves in better position to receive awards, groups have now started lobbying for *cy pres* distributions where it appears there might be funds remaining ... In his article, Liptak also noted that "[t]he process is starting to become institutionalized, and legal services organizations that represent poor people have begun relying on class-action settlements to finance their work." A. Liptak, *supra,* at A14. This lobbying and reliance on *cy pres* funding seems far afield from the purposes of the class action litigation, from the *cy pres* doctrine, and from the traditional functions of the courts. Courts address cases and controversies; they are not fora in which to reorder society or push social agendas.

*See In re Thornburg Mortg., Inc. Securities Lit.*, No. Civ 07-0815 JB/WDS, 2012 WL 3150408, *11 (D.N.M. July 24, 2012). Worse still, some large corporations, such as Google and Facebook in cases against them, have lobbied to include *cy pres* organizations they have already donated to in previous years, effectively allowing them to "take money from [their] left pocket and put it back in [their] right pocket."[17]

Here, the parties and Class Counsel directly "solicited proposals from applicants for *cy pres* distribution, both through letters to potential applicants, as well as through a letter posted on the Settlement Website." Plaintiffs' Motion for Final Approval at 9. Class Counsel then engaged in selection of the recipients "with input from Netflix." *Id.* Not surprisingly, at least five of the twenty recipients have recently objected to *cy pres* privacy settlements.[18] Class Counsel's and Netflix's co-opting in of these groups serves as nothing more than an attempt to suppress likely opposition, effectively through bribery. Netflix must be required to reveal the charities it has donated to in recent years.

---

[17] http://tech.fortune.cnn.com/2012/07/30/google-and-facebooks-new-tactic-in-the-tech-wars/; http://www.forbes.com/sites/danielfisher/2012/07/02/facebook-settlement-funds-groups-critics-say-are-allies/2/.
[18] Electronic Frontier Foundation and The Samuelson Law, Technology & Public Policy Clinic (U.C. Berkeley School of Law) both objected to *The Authors Guild, Inc. v. Google, Inc.* settlement on the grounds that it failed to adequately protect class members' privacy. http://tech.fortune.cnn.com/2012/07/30/google-and-facebooks-new-tactic-in-the-tech-wars/; http://www.forbes.com/sites/danielfisher/2012/07/02/facebook-settlement-funds-groups-critics-say-are-allies/2/.  Consumer Watchdog objected to *Fraley v. Facebook, Inc.*, with what appeared to be altruistic motives, which is what led this firm to contact them in the first place to ascertain their interest in working together on an objection. http://www.consumerwatchdog.org/resources/fraley_objection_letter_cwd_8-1-12_v.2.pdf.  The Electronic Privacy Information Center, The Center for Digital Democracy, and Privacy Rights Clearinghouse all objected to *Fraley v.*

—20

Also, the Settlement does not indicate whether Netflix will write off its *cy pres* payments as a charitable contribution, and whether, if it already donates to charity, it will simply offset those amounts by the amount donated pursuant to the Settlement. These questions undermine the court's ability to determine the true value of the *cy pres* relief:

> Additionally, the settlement fails to include any restrictions on how Kellogg accounts for the *cy pres* distributions. Can Kellogg use the value of the distributions as tax deductions because they will go to charity? And given that Kellogg already donates both food and money to charities every year—which is unquestionably an admiral act—will the *cy pres* distributions be in addition to that which Kellogg has already obligated itself to donate, or can Kellogg use previously budgeted funds or surplus to offset its settlement obligations? Again, the settlement is silent and we have only Kellogg's statements as to its future intentions. All of this vagueness detracts from our ability to determine the true value of the constructive common fund.

*Kellogg*, 2012 WL 3800230 at *8.

### c. The Results Achieved Do Not Justify the Attorney's Fee Award.

While we support the notion of percentage-of-recovery attorney's fees, we believe that they are appropriate only for real class recoveries. Where the class gets nothing from the settlement, class counsel must show more, to prove that his or her fee is justified by what has been actually produced.

In addition to the Rule 23(e) standard of approval, attorney's fees awards must also be "reasonable in relation to the results obtained." *In re Bluetooth Headset Products Liab. Lit.*, 654 F.3d at 944; *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983). Moreover, the fact that Netflix pays $9 million does not establish that the Class has received a benefit in the same amount. *See Kellogg*, 2012 WL 3800230 at *8 ("[I]f the alleged $5.5 million value of the product *cy pres* distribution turns out on close examination to be an illusion and is subtracted from the alleged $10.64 million value of the common fund, the dollar value of the settlement fund plummets to $5.14 million, and the $2 million attorneys' fee award becomes 38.9% of the total, which is clearly excessive under our guidelines.")

---

*Facebook, Inc.* on the basis that they had not been included as *cy pres* recipients and were entitled receive funds from the *cy pres* distribution. http://epic.org/privacy/facebook/EPIC-et-al-Fraley-Cy-Pres-Ltr-7-12-12.pdf.

Given the ineffectiveness of the injunctive relief, the paltry amount of the common fund relative to actual damages, the indirect, untargeted and tax deductible nature of the *cy pres* relief, Class Counsel's results do not justify an award of $2.25 million.

Nor is it relevant that Netflix (theoretically) suffers a diminution in income derived from disclosure of Class Members' Entertainment Content Viewing Histories to third parties. As a matter of law, Netflix's loss of revenue or diminution of economic value does not confer a benefit to class members:

> The dollars Facebook derived from using its members' names and likenesses (alleged wrongfully), cannot serve as measure of the economic value realized by members through obtaining the ability to 'opt out' from allowing Facebook to do so in the future. Under the injunctive provisions of the settlement, a member will have the choice of either continuing to allow his or her name and likeness to be used without monetary compensation (in which case Facebook will presumably derive revenue from it), or of preventing Facebook from using his or her name and likeness (in which case Facebook will not derive revenue). In neither instance will the Facebook member receive any clear or direct economic benefit.

See *Fraley*, No. 3:11-cv-01726-RS at *6; *see also In re Matzo Food Prod. Lit.*, 156 F.R.D. at 606-607 ("[A] settlement, quite obviously, cannot be approved based solely on the fact that it has a punitive or deterrent impact on defendants. The court's primary consideration must be the interests of the absent class members and the fairness, adequacy and reasonableness of the settlement.")

Given the early settlement of the case, Class Counsel's award is excessive when compared to other early settlements in this jurisdiction. *See Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002)(Where court awarded a lodestar amount equal to 3% of common fund over class counsel's request for 10%, the court stated: "The fact that the case was settled early in litigation supports the district court's ruling; the 25 percent benchmark of the percentage-of-the-fund approach might very well have been a 'windfall.'")

Moreover, the actual percentage of time spent actually doing something for the Class appears to

be minimal. A substantial portion of Class Counsel's time was spent litigating to become lead counsel in this case. Plaintiff filed its motion to appoint the Edelson firm as lead counsel on March 23, 2011, and from that time on, the case docket was consumed almost entirely by motions, responses and replies to obtain the role as lead counsel, a role which the Edelson firm was appointed to August 12, 2011.

### IV.    Class Counsel's Unethical Conduct Warrants their Removal as Lead Counsel.

As alluded to above, Class Counsel's attempts to intimidate this firm and deter our objection by threatening ARDC action violates the California Rules of Professional Conduct, Rule 7-104, and the Illinois Code of Professional Responsibility, Rule 7-105 and 7-102(a)(1). California Formal Opinion No. 1983-73 explicitly condemns "use or threat of use, of criminal, administrative or disciplinary proceedings to exert leverage in the settlement of civil disputes." In fact, the opinion specifically notes that the California version "extends the protections of the American Bar Association rule [from only criminal proceedings] to administrative and disciplinary proceedings" and likens such inflammatory tactics to *extortion*.[19]

Illinois Opinion No. 87-7 also prohibits threats of disciplinary action from attorneys. The opinion explicitly extends Rule 7-105's prohibition against threatening criminal prosecution to threats of disciplinary action:

> Rule 7-105 of the Illinois Code of Professional Responsibility expressly prohibits threatening to present criminal charges, in contrast to administrative or disciplinary charges, to obtain an advantage in a civil matter … The Committee believes that the same reasoning should apply to threats of administrative or disciplinary action … Threatening to use the lawyer disciplinary process to coerce adjustment of private claims would subvert that process as well as deter the target lawyer from asserting his or her legal rights in a civil action. Thus, the use of threats of disciplinary action to influence litigation would compromise both the disciplinary system and the civil adjudicative process.

---

[19] "Rule 7-104's legacy in attorney discipline for acts amounting to extortion is apparent when considering that Penal Code section 518 defines extortion as 'obtaining property from another, with his consent… by the wrongful use of force or fear, *or under color of official right*." (emphasis in original).

1  Illinois Ethics Opinion No. 87-7. The opinion further indicates that such threats also violate Rule 7-

2  102(a)(1) which prohibit actions which solely harass or maliciously injure another.

3      The American Bar Association condemns this conduct as well:

4      A lawyer's use of the threat of filing a disciplinary complaint or report against
5      opposing counsel, to obtain an advantage in a civil case, is constrained by the
       Model Rules, despite the absence of an express prohibition on the subject. Such
6      a threat may not be used as a bargaining point when the subject misconduct
       raises a substantial question as to opposing counsel's honesty, trustworthiness, or
7      fitness as a lawyer, because in these circumstances, the lawyer is ethically
       required to report such misconduct. Such a threat would also be improper if the
8      professional misconduct is unrelated to the civil claim, if the disciplinary
       charges are not well founded in fact and in law, or if the threat has no substantial
9      purpose or effect other than embarrassing, delaying or burdening the opposing
10     counsel or his client, or prejudicing the administration of justice.

11 ABA Comm. On Ethics and Professional Responsibility, Use of Threatened Disciplinary Complaint

12 Against Opposing Counsel, Formal Op. 94-383; *In re Discipline of Eicher*, 661 N.W.2d 354, 367 (S.D.

13 Supr. Ct. 2003)(quoting ABA Formal Op. 94-383).

14

15      This firm has committed no wrongdoing. *See* Declaration of John Orellana In Support of

16 Objection to Class Action Settlement, *Attachment A*. Class Counsel Edelson, however, has violated all

17 of the above ethics rules. After a then-clerk for our firm attempted to contact the non-profit which had

18 previously objected to a similar settlement in *Fraley v. Facebook, Inc.*, Consumer Watchdog (this firm

19 had no knowledge Consumer Watchdog was seeking to become a potential *cy pres* recipient), in order

20 to discuss *with their attorneys* their views on the Settlement as well as the possibility of working

21 together on an objection (as co-counsel or in some other non-plaintiff capacity), we were contacted by

22 Jay Edelson and accused of attempting to solicit Consumer Watchdog as a plaintiff for our objection.

23 When this firm rightfully denied having engaged in improper solicitation, Jay Edelson forwarded a

24 self-serving letter outrageously misstating the facts and law, and accusing this firm of improper

25

26

27

28

solicitation and targeting potential *cy pres* recipients with the intention to deter their applications.[20]
*See Attachment B*. Most egregiously, Edelson threatened this firm with disciplinary action, stating
"[a]s you should be aware, it would be improper for your firm to solicit potential objectors for
representation" and further stating about our response to his accusations that "you might want to revise
your statement in light of what we know." *Id.* Then, on November 5, 2012, Jay Edelson wrote and had
delivered to John Orellana, in his "personal capacity" (an attorney just admitted to practice November
1, 2012) a letter repeating Edelson's previous unfounded accusations and declaring that Mr. Orellana
had a duty to preserve "tangible evidence that are relevant to or which may lead to discovery of
information relevant to the issues raised in this letter. *See Attachment C*. Given the context of the
situation, Edelson's actions and letters clearly constitute a threat and attempt to intimidate and deter
this firm from filing an objection to the Settlement. *See Crane v. State Bar of California,* 30 Cal.3d
117, 123 (1981)[21]; California Formal Opinion No. 1983-73.[22]

Edelson's use of threats to influence this civil litigation warrant its disqualification as lead
counsel. *See In re Pharmaceutical Industry Average Wholesale Price Lit.*, 2008 WL 53278, *4
(2008)(class counsel was disqualified for, *inter alia*, threatening to withdraw his named plaintiffs'
claims if he was not named lead counsel: "I interpreted these declarations as threats to take his toys and
go home if the court declined his request.  Mr. Haviland intended to coerce the Court into appointing
him as Co-Lead Class Counsel or risk losing class representatives in a class action involving the sick
and elderly.  Both the nature and timing of these declarations raised concerns about Haviland's loyalty
to the class.")  Several California courts have found violation of a disciplinary rule sufficient to warrant

---

[20] Indeed, even if this firm had known Consumer Watchdog was a *cy pres* applicant, it would not have called.  To contact an
organization to discuss objecting to settlement that they had implicitly accepted by applying for funds therefrom would not
only be nonsensical, but futile.
[21] A letter from an attorney in a real estate matter to his adversary's client demanding a beneficiary statement and $100 in
purported statutory penalties within five days, or else actions would be commenced and "the Department of Savings and
Loan and Attorney General's office" notified (the letter included a "cc" to those agencies) was an impermissible threat when
"considered in context."

disqualification of counsel. *Chambers v. Superior Court*, 121 Cal.App.3d 893 (1981); *William H. Raley Co. v. Superior Court*, 149 Cal.App.3d 1042 (1983); *Elliot v. McFarland Unified School Dist.*, 165 Cal.App.3d 562 (1985); *Mills Land & Water Co. v. Golden West Refining Co.*, 186 Cal.App.3d 116 (1986).  Class Counsel Edelson and his firm should be removed as lead counsel in this case.

Lastly, contrary to Mr. Edelson's knowing smear tactics and libel, we are not "professional objectors".  Rather, over thirty years of class action and public interest practice, we have obtained hard-fought recoveries with real benefits to class members, with over two hundred reported decisions.

Nonetheless, over that period we have also objected to some half-dozen settlements, when we felt that the settlement, like this one, was structurally defective, and offered ways to fix the settlement that had actual beneficial results.  *See Attachment D.*  In *In re Domestic Air Transportation Antitrust Litigation*, MDL 861, 144 F.R.D. 421 (N.D.Ga. 1992), our objection to the settlement's preclusion of using flight coupons through travel agents resulted in adding that provision to the settlement's benefits. In *In re Asbestos Litigation (Ahearn)*, 90 F.3d 963 (5th Cir. 1996) and  *Georgine v. AmChem Prod., Inc.* 1994 WL 124866  (E.D. Pa. 1994) , our objection to the mega-settlements in the asbestos litigations created a cure for an overlooked defect that would have triggered cancellation of longshoremen's compensation benefits  from their employers.  In *In re Prudential-Bache Energy Income Partnership Securities Litigation*, 1994 WL 202394 (E.D.La. 1994), we intervened, objected to a roll-up settlement of those partnerships into a new listed entity managed by the same persons who had defrauded investors in the first place, forced an auction of the properties, resulting in cash recoveries of hundreds of millions of dollars to defrauded investors, and forced the disclosure of Prudential's investigation showing widespread systemic fraud in selecting investment vehicles to push through the Prudential sales pipeline; eventually initiating the civil RICO action that became *In re Prudential Securities Inc. Ltd. Partnerships Litigation*,  MDL 1005, 912 F.Supp. 97 (S.D.N.Y. 1996),

---

[22] "The import of *Crane* is that a threat need not be expressly stated but may be inferred from the circumstances.  This result

which produced hundreds of millions more dollars for investors in the more than 700 limited partnerships sponsored by Prudential. In *City of Chicago v. Korshak*, 206 Ill.App.3d 968 (1st Dist. 1990), we were actually class counsel, objecting to a settlement entered into between the City and the City's pension funds' trustees. Our continued representation of those retirees against opponents far more threatening than Mr. Edelson, has preserved promised retirement healthcare benefits for City retirees that we have single-handedly protected through the reserved revival of the litigation in 2013. In *Ho v. BSG Holdings Subsidiary, Inc.*, No. 99 CH 3657 (Ill. Cir. Ct. February 9, 2009) we objected to a settlement which provided only injunctive relief against the defendant's practices of marking up postage charges. Our objection led to the discovery of approximately 15,000 class members who had previously been deemed unidentifiable, and to the imposition of an approximately $750,000 common fund for direct distribution to class members. And in *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2001 WL 243494 (D.Me. 2001), we challenged the 60-firm leadership structure, and disqualified the Milberg Weiss firm for filing on behalf of conflicting interests.

Though we have been the target of settlement objections ourselves, we have never stooped to making personal accusations of impropriety in order to deter or intimidate others from objecting to our settlements. Rather, having faith in the results we have achieved, we have regarded objectors as part of the settlement process; standing by the substantive merits of our settlements to overcome objections in other cases, recognizing that they may have meaningful information that deserved consideration and sometimes incorporating their changes into a final approved settlement.

## CONCLUSION

Despite Plaintiffs' and Class Counsel's insistence to the contrary, this Settlement does not follow a clear "benchmark" in privacy cases nor does recent *cy pres* settlement case law support their position that the Settlement is a "resounding victory." Plaintiffs and Class Counsel point to only two

---

is consistent with cases under the extortion statute which hold that a threat may in some cases be implied."

similar settlements: *Lane v. Facebook* and *In re Google Buzz Privacy Litigation.* Of those two, *Lane* has drawn extreme criticism in dissent and is currently pending rehearing (discussed *supra*). Plaintiffs and Class Counsel narrowly focus only on the similar total size of the common fund in those cases, ignoring the fact that the class size here is literally *twice* the size of that in *In Re Google Buzz Privacy Litigation,*[23] and approximately *seventeen times* the size of that in *Lane v. Facebook.*[24] Plaintiffs and Class Counsel, of course, avoid discussion of the recently rejected *cy pres* settlements in *Fraley v. Facebook* or *Dennis v. Kellogg.*

Indeed, a more appropriate "benchmark" is currently unfolding in *Fraley v. Facebook, Inc.* where the parties recently proposed a new settlement, ditching the previously rejected *cy pres* relief for direct monetary payment from a common fund of $20 million (doubled from $10 million) and providing for additional injunctive relief, as well as increased clarity on the nature of the injunctive relief.[25] Though that settlement is currently pending review (and may even be rejected for want of better terms), it serves as an improved benchmark for the instant case.

On the other hand, this Settlement must be rejected for what it is; an attempt to cash out at the argued "going rate" for privacy class actions[26] as quickly and with as little effort as possible, by a firm that never intended to litigate its clients' claims.[27]

For the foregoing reasons the proposed settlement should be rejected.

Respectfully submitted,

*[signature]*

CLINTON A. KRISLOV
Attorney for Objector, Matthew Tanner

---

[23] *See* 2012 WL 3590379, ¶ 41 (N.D.Cal. 2010)(Consolidated Amended Class Action Complaint)(estimating "most or all" of the 31.2 million Google users as part of the class).
[24] 696 F.3d 811, 820 (9th Cir. 2012)(stating the class is over 3.6 million).
[25] *Revised Settlement Proposes Up to $10 Per Claimant in Facebook Use of Likes in Ads,* http://www.bna.com/revised-settlement-proposes-n17179870250/ (October 15, 2012).
[26] http://www.forbes.com/sites/kashmirhill/2012/08/06/facebook-judge-doesnt-realize-10-million-is-the-going-rate-to-settle-privacy-lawsuits/.
[27] http://www.businessinsider.com/meet-the-most-feared-and-loathed-law-firm-in-silicon-valley-2011-6.

Clinton A. Krislov
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel:  (312) 606-0500
Fax: (312) 606-0207
Firm Number: 21169

John Orellana
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel:  (312) 606-0500
Fax: (312) 606-0207
Firm Number: 21169