1  SEAN P. REIS (SBN 184044)
   sreis@edelson.com
2  EDELSON MCGUIRE LLP
   30021 Tomas Street, Suite 300
3  Rancho Santa Margarita, California 92688
   Phone: 949.459.2124
4  Fax:  949.459.2123

5  JAY EDELSON (Admitted *Pro Hac Vice*)
   jedelson@edelson.com
6  RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
7  ARI J. SCHARG (Admitted *Pro Hac Vice*)
   ascharg@edelson.com
8  CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
   cgivens@edelson.com
9  EDELSON MCGUIRE LLC
   350 North LaSalle Drive, Suite 1300
10 Chicago, Illinois 60654
   Phone: 312.589.6370
11 Fax: 312.589.6378

12 *Attorneys for Plaintiffs JEFF MILANS and PETER*
   *COMSTOCK and the SETTLEMENT CLASS*

13

14                  **UNITED STATES DISTRICT COURT**

15                 **NORTHERN DISTRICT OF CALIFORNIA**

16                        **SAN JOSE DIVISION**

17 *IN RE: NETFLIX PRIVACY LITIGATION*      Case No. 5:11-cv-00379-EJD

18                                          [Hon. Edward J. Davila]

19                                          **PLAINTIFFS' REPLY MEMORANDUM**
                                            **IN SUPPORT OF MOTION FOR FINAL**
20                                          **APPROVAL OF CLASS ACTION**
                                            **SETTLEMENT AND AWARD OF**
21                                          **ATTORNEYS' FEES, EXPENSES, AND**
                                            **INCENTIVE AWARD**
22
                                            Date:    December 5, 2012
23                                          Time:   10:00 a.m.
                                            Location: Courtroom 4, 5th Floor
24

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................... 3

    A.    THE TANNER AND KATRIEL "OBJECTIONS" ARE NOT
           PROPERLY BEFORE THE COURT ....................................................... 4

    B.    THE GENERAL AND PHILOSOPHICAL OBJECTIONS TO THE
           SETTLEMENT DO NOT IMPEDE FINAL APPROVAL. ........................ 6

          1.    The Generalized Objections About the Class Relief Should Be
                   Overruled. ................................................................................ 7

                 a.    The *cy pres* component of the Settlement is fair and
                         completely appropriate in this case. ............................. 7

                 b.    Objectors who prefer other forms of relief ignore
                         controlling Ninth Circuit authority. ........................... 15

                 c.    The recovery on behalf of the Class is substantial and
                         more than accounts for the harm actually suffered ............... 16

                 d.    Objections to the injunctive relief either misunderstand
                         the Settlement or impose an improper standard of review. ..... 19

           2.    Objections to the Requested Attorneys' Fees and Incentive Award
                   Have No Basis in Law or Fact. .............................................. 22

                   a.    Class Counsel's fee request is entirely reasonable. ........... 22

                 b.    The challenges to the incentive award misunderstand the
                           Settlement and the case law. ...................................... 27

           3.    The Philosophical Objections to Class Actions or he VPPA Miss
                   the Point and Have No Place in the Analysis of the Settlement. ......... 28

    C.    THE "INDIVIDUALIZED" OBJECTIONS FILED IN THIS CASE
           ARE MISTAKEN AND SHOULD BE DENIED. ................................. 29

          1.    Lisa Katriel's "Objection" (Dkt 198) Was Not Properly Filed and
                   is Mistaken on Key Points of Law and Fact. ........................... 30

           2.    Teri Michigan's Objection (Dkt. 200) is Completely Mistaken
                   About the *Cy Pres* Process and Asserts a Conflict of Interest
                   Where There is None. .......................................................... 36

           3.    Josh Goldfoot's Objection (Dkt. 160) Was Filed Before Plaintiffs'
                   Final Approval Motion and Asserts No Meritorious Arguments. ....... 37

           4.    Kenneth Brown's Objection (Dkt. 207) Misunderstands
                     Controlling Precedent and the Facts of This Case. ................... 38

           5.    Donald Salerno's Objection (Dkt. 168) Inaccurately Asserts
                   Hardship. ............................................................................ 40

D.      THE "PROFESSIONAL OBJECTIONS" FILED IN THIS CASE
        CONSIST OF BOILERPLATE, OBSTRUCTIONIST OBJECTIONS,
        AND OBJECTIONS RAISED BY ATTORNEYS WHO HAVE USED
        IMPROPER TACTICS TO ACHIEVE FINANCIAL GAIN. ........................ 41

        A.      Padraigin Brown's Objection Raises No Meritorious Arguments
                and is Tainted by Her Attorney's Misconduct. .................................... 42

        B.      Gary Wilens' Objection (Dkt. 194) is Entirely Baseless and Was
                Preceded by Attorney Misconduct. ..................................................... 43

        C.      The Ramsey/Griffs Objection (Dkt. 196) is No Different from the
                Dozens of Baseless Objections Their Attorney Has Filed in Other
                Large Class Actions. ............................................................................ 47

        D.      Matthew Tanner's "objection" (Dkt. 201) Was Not Filed on Time,
                Misunderstands the Facts and Law, and Establishes a Striking
                Pattern of Attorney Misconduct. ......................................................... 49

        E.      The Cesare and Ford Objection, (Dkt. 209), is the Latest in a
                Long Line of Meritless Objections Filed by Their Attorney. ............... 54

        F.      Patricia Mewinney's Objection (Dkt. 208) Was Filed Without
                Even the Most Basic Investigation or Understanding of the Case. ...... 56

        G.      The Nguyen, Sturtevant, and Shikina Objection (Dkt. 202) is
                Entirely Devoid of Substance. ............................................................. 57

        H.      Tracey Klinge's Objection (Dkt. 206) Continues Her Attorney's
                History of Boilerplate Objections Designed Simply to Obstruct. ....... 58

        I.      The Schultz Objection (Dkt. 210) Adds Nothing to the Discussion. ... 60

CONCLUSION .................................................................................................... 62

1

**<u>TABLE OF AUTHORITIES</u>**

2

**UNITED STATES SUPREME COURT CASES:**

3

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)..........................................................38, 39

4

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

5

*Becherer v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 193 F.3d 415 (6th Cir. 1999) ........... 1

6

7

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665 (8th Cir. 1987) ........... 50

*Cameron v. E.M. Adams & Co.*, 547 F.2d 473 (9th Cir. 1976)...................................................... 32

8

9

*Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ..................................... 1, 2

10

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ................................................................... 16, 17

11

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) .................................................................. 23

12

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).................................................*passim*

13

*In re AT&T Corp.*, 455 F.3d 160 (3d Cir. 2006) .......................................................................... 25

14

15

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................ 24

16

*In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006)............................................... 39

17

*In re HealthSouth Corp. Secs. Litig.*, 334 F. Appx. 248 (11th Cir. 2009) ................................. 21

18

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010)................................... 6

19

*In re Pac. Enter. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995)................................................16, 32, 52

20

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005)............................................... 24, 25

21

22

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)............................... 32

23

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ..........................................................*passim*

24

*Lewis v. McAdam*, 762 F.2d 800 (9th Cir. 1985) ................................................................... 28, 29

25

*Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) ................................. 44

26

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012).................................... 31, 32

27

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004).................................................... 43

28

iv

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ................................................ 36, 58, 59

*Moore v. City of San Jose*, 615 F.2d 1265 (9th Cir. 1980) .................................. 4

*Murray v. GMAC*, 434 F.3d 948 (7th Cir. 2006) ................................................ 58

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) ....................................... *passim*

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008) .......................................... 39

*Perotti v. Quinones*, No. 11-3217, 2012 WL 2855771 (7th Cir. July 12, 2012).......................... 53

*Redwood Empire Sav. & Loan Ass'n v. C. I. R.*, 628 F.2d 516 (9th Cir. 1980) .......................... 23

*Retired Chicago Police Ass'n v. Firemen's Annuity & Benefit Fund of Chicago*,
    145 F.3d 929 (7th Cir. 1998) ........................................................... 49

*Rodriguez v. West Pub. Corp.*, 563 F.3d 948 (9th Cir. 2009) ................................ *passim*

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...................... 21

*Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 575 (7th Cir. 2012)...................... 45

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) .......................... 15

*Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289 (7th Cir. 2010)........................ 48

*Thorogood v. Sears, Roebuck and Co.*, 624 F.3d 842 (7th Cir. 2010)........................ 48

*Thorogood v. Sears, Roebuck and Co.*, 678 F.3d 546 (7th Cir. 2012)........................ 48

*United States v. State of Oregon*, 913 F.2d 576 (9th Cir. 1990) .......................... 4

**UNITED STATES DISTRICT COURT CASES:**

*AF Holdings LLC v. Does 1-135*,
    No. 5:11-cv-03336-LHK, Dkt. No. 43-1 (N.D. Cal. Feb. 23, 2012).................................... 41

*Anderson v. Nextel Retail Stores, LLC*,
    No. CV 07-4480-SVW FFMX, 2010 WL 8591002 (C.D. Cal. Apr. 12, 2010)................. 4

*Arthur v. Sallie Mae, Inc.*,
    No. 10-CV-00198-JLR, 2012 WL 4075238 (W.D. Wash. Sept. 17, 2012) ..................... 58

*Blessing v. Sirius XM Radio, Inc.*, No. 09-cv-10035 (S.D.N.Y.) ................................ 47

*Brady v. United of Omaha Life Ins. Co.*,
    No. C-12-2245 EMC, 2012 WL 3583033 (N.D. Cal. Aug. 20, 2012) .......................... 50

*Browning v. Yahoo! Inc.*, No. C04-01463, 2007 WL 4105971 (N.D. Cal. 2007)...................... 1, 2

*Cassese v. Washington Mutual, Inc.*, No. 05-cv-02724 (E.D.N.Y.) ............................................ 47

*Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201 (E.D. Pa. 2011) ................................. 27

*CLRB Hanson Inds., LLC v. Google, Inc.*, No. 05-cv-03649 JW PVT (N.D. Cal.)..................... 47

*Conroy v. 3M Corp.*,
    No. C 00-2810 CW, 2006 U.S. Dist. Lexis 26271 (N.D. Cal. August 10, 2006) ............ 60

*Cummings v. Connell*,
    No. 99-cv-2176 WBS KJM, 2006 WL 3951867 (E.D. Cal. Nov. 27, 2006) ................... 46

*Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546 (D.N.J.2010) ................................................ 58

*Domonoske v. Bank of America, N.A.*, 790 F.Supp.2d 466 (W.D. Va. 2011)................................ 2

*Durham v. Cont'l Cent. Credit, Inc.*,
    No. 07CV1763 BTM WMC, 2011 WL 2173769 (S.D. Cal. June 2, 2011) ..................... 27

*Embry v. ACER Am. Corp.*,
    No. C 09-01808 JW, 2012 WL 3777163 (N.D. Cal. Aug. 29, 2012)............................... 59

*Fleury v. Richemont N. Am., Inc.*,
    No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008) ............................... 36

*Fraley v. Facebook, Inc.*,
    No. 11-cv-1726 RS, 2012 WL 5838198 (N.D. Cal. Aug. 17, 2012)............................... 48

*Hard Drive Productions, Inc. v. Does 1-90*,
    No. 5:11-cv-03825, 2012 WL 1094653 (N.D. Cal. Mar. 30, 2012)............................... 42

*Hartless v. Clorox Co*, 06-cv-02705-CAB (S.D. Cal.) ............................................................... 54

*Hernandez v. Vitamin Shoppe Indus., Inc.*,
    174 Cal. App. 4th 1441, 95 Cal. Rptr. 3d 734 (2009) ...................................................... 42

*Hopson v. Hanesbrands, Inc.*, No. 08-cv-0844 EDL, Dkt Nos. 24, 40 (N.D. Cal.)..................... 39

*In re Am. Intern. Group, Inc. Sec. Litig.*, No. 04-cv-08141-DAB (S.D.N.Y.)............................. 46

*In re Broadcom Corp. Class Action Litig.*, (CV-06-5036-R) (C.D. Cal.) .................................. 54

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531
    (N.D. Cal. 2012).......................................................................... 2, 40, 41, 59, 60

*In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) ....................... 40

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010) ................................................................................... 32

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
    MDL No. 08–1998, 2010 U.S. Dist. LEXIS 131775 (W.D. Ky. Dec. 13, 2010) ............ 57

*In re Dell Sec. Litig.*, No. A- 06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010) .... 54

*In re Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12 Litig.*,
    555 F.Supp.2d 661 (E.D. La. 2007) ............................................................................... 5

*In re Facebook Privacy Litig.*,
    No. 10-cv-02389-JW, Dkt. No. 69 (N.D. Cal. Dec. 10, 2010).................................. 16, 17

*In re Google Buzz Privacy Litig.*,
    No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) .......................... *passim*

*In re Google Buzz User Privacy Litig.*,
    No. 5:10-cv-00672-JW, Dkt. 117 (N.D. Cal. Feb. 16, 2011)................................... 10, 52

*In re: Google Buzz User Privacy Litig.*,
    No. 5:10-cv-00672-JW, Dkt. 31 (N.D. Cal. July 31, 2010) ........................................ 17

*In re Groupon Marketing and Sales Practices Litig.*,
    No. 3:11-md-02238-DMS-RBB, Dkt. 57 (S.D. Cal. July 6, 2012)................................. 41

*In re Heritage Bond Litig.*,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005)............................... 5

*In re Herley Indus., Inc. Sec. Litig.*, No. 06-CV-2596 (JRS) (E.D. Pa. 2010) ........................... 55

*In re HP Power Plug & Graphic Card Litig.*,
    No. 06-cv-02254 RMW, 2008 WL 2697192 (N.D. Cal. July 7, 2008)........................... 23

*In re Initial Public Offering Sec. Litig.*, No. 21-MC-92 (SAS) (S.D.N.Y. 2009) ................. 47, 55

*In re Lawnmower Engine Horsepower Mktg & Sales Practices Litig.*,
    MDL No. 1999 (E.D. Wis.)................................................................................ 47, 54, 58

*In re Lifelock, Inc. Mktg. & Sales Practice Litig.*,
    MDL No. 08–1977, 2009 WL 2222711 (D.Ariz. July 24, 2009).................................. 58

*In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.*, MDL No. 1897 (C.D. Cal.) ..................... 47

*In re Mercury Securities Litigation*, 05-cv-03395-JF (N.D. Cal.) ........................................... 6, 54

*In re MoneyGram Int'l, Inc. Sec. Litig.*, No. 08-CV-883 (D. Minn. 2010)............................ 54, 55

*In re Mut. Funds Inv. Litig.*, MDL 1586, 2011 WL 1102999 (D. Md. Mar. 23, 2011) ............... 58

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL No. 1532 (D. Me.) ................. 48

*In re NVIDIA Corp. Derivative Litig.*,
        No. 6-06-06110-SBA (JCS), Dkt. Nos. 163, 185 (N.D. Cal.)........................................... 40

*In re Oracle Sec. Litig.*, 852 F. Supp. 1437 (N.D. Cal. 1994)...................................................... 36

*In re Static Random Access memory (SRAM) Antitrust Litig.*,
        264 F.R.D. 603 (N.D. Cal. 2009) ................................................................................... 39

*In re: Static Random Access Memory (SRAM) Antitrust Litigation*, 07-md-01819-CW,
        Dkt. 1386-2 (N.D. Cal. Sept. 14, 2011) ........................................................................ 55

*In re TD Ameritrade Acc't Holder Litig.*, Nos. C 07–2852 SBA, C 07–4903 SBA,
        2011 WL 4079226 (N.D. Cal. 2011)............................................................................. 1, 5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL 3:07-MD-1827 SI, 2011 WL 7575004 (N.D.
Cal. 2011) ....................................................................................................................................... 5

*In re Trans Union Corp. Privacy Litig.*,
        No. 00-cv-4729, 2009 WL 937158 (N.D. Ill. Apr. 6, 2009) .......................................... 48

*In re Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litig.*,
        MDL No. 08–1982, 2010 WL 1924012 (D.Md. May 11, 2010) ...................................... 58

*In re UnitedHealth Group Inc. Shareholder Derivative Litig.*,
        631 F. Supp. 2d 1151 (D. Minn. 2009) ...................................................................... 5, 41

*In re Yahoo! Litig.*, No. 06-cv-2737 CAS (FMOx) (C.D. Cal.)..................................................... 48

*Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010)............................................. 21

*Lane v. Facebook*, Case No. 5:08-cv-03845 RS, Dkt. No. 1 (N.D. Cal. Aug. 12, 2008)............. 17

*Lipuma v. American Express Co.*, 406 F.Supp.2d 1298 (S.D. Fla. 2005)...................................... 1

*Miletak v. Allstate Ins. Co.*,
        No. C 06-03778 JW, 2012 WL 3686785 (N.D. Cal. Aug. 27, 2012).............................. 43

*Milliron v. T-Mobile, USA, Inc.*, No. 08-cv-04149 (JLL) (ES) (D. N.J.)...................................... 48

*Missaghi v. Blockbuster L.L.C.*,
        No. 11-cv-02559-JRT-JSM, Dkt. No. 61 (D. Minn. Nov. 27, 2012).............................. 40

*Nakash v. nVidia Corp.*, No. 08-cv-04312-JW (N.D. Cal.) .......................................................... 48

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ...... 16, 33, 53

*O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365
    (D.N.J., Aug. 9, 2012) ............................................................................................................ 2

*O'Keefe v. Mercedes–Benz USA, LLC*, 214 F.R.D. 266 (E.D.Pa. 2003) ..................................... 41

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ............................................... 27

*Roberts v. W. Airlines*, 425 F. Supp. 416 (N.D. Cal. 1976) ..................................................... 32-33

*Rodriguez v. Sony Computer Entm't Am. LLC*,
    No. 11-cv-4084, Dkt. 59 (N.D. Cal. Apr. 20, 2012) ......................................................... 46

*Rodriguez v. West Publ'g Corp.*,
    No. 05-CV-3222 R (MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) .................... 55

*Rojas v. Career Educ. Corp.*, No. 10-cv-05260 (N.D. Ill. 2011) ................................................. 27

*Shames v. Hertz Corp.*,
    No. 07-CV-2174-MMA WMC, 2012 WL 4903680 (S.D. Cal. Oct. 15, 2012) ............... 42

*Smith v. First Union Mortg. Corp*,
    No. 98-cv-5360, 1999 WL 1081362 (E.D. Pa. Dec. 1, 1999) .......................................... 27

*Sterk v. Best Buy Stores, L.P.*, No. 11-cv-1894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012)..... 46

*Sterk v. Redbox Automated Retail, LLC*, 806 F. Supp. 2d 1059 (N.D. Ill. 2011) ........................ 46

*Sterk v. Redbox Automated Retail, LLC*,
    No. 11-cv-01729, 2012 WL 1419071 (N.D. Ill. Apr. 24, 2012) ...................................... 46

*Sterk v. Redbox Automated Retail, LLC*,
    No. 11-cv-01729, 2012 WL 3006674 (N.D. Ill. July 23, 2012)........................................ 46

*Thacker v. Chesapeake Appalachia, L.L.C.*,  695 F.Supp.2d 521 (E.D. Ky. 2010)..................... 57

*The Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. 2010) ............................... 55

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ................................ 3, 44

*Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010) ................................... 17

*White v. Experian Information Solutions*, No. 05-SACV-1070 DOC (MLGx) (C.D. Cal.) ......... 48

*Young v. Polo Retail, LLC*,

No. C-02-4546, 2007 U.S. Dist. Lexis 27269 (N.D. Cal. March 8, 2007) ........................ 25

**STATE COURT CASES:**

*Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85 (Ill. Cir. Ct. Oct. 29, 2009) ................................... 61

*Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987) ................................... 31

*Credit/Debit Card Tying Cases*, J.C.C.P. No. 4335 (San Francisco Super. Ct.) ........................ 48

*Fogel v. Farmers Group, Inc.*, No. BC300142 (Los Angeles Super. Ct.) ................................... 48

*McCann v. Foster Wheeler LLC*, 225 P.3d 516 (Cal. 2010) ........................................ 32

*Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999) ........................... 31

*Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001) ................................... 31

**STATUTES AND RULES:**

18 U.S.C. § 2520 ........................................................................................... 17

18 U.S.C. § 2710 ........................................................................... 20, 21, 22

28 U.S.C. § 1712 ........................................................................................... 37

47 U.S.C. § 227(b)(1)(A) ................................................................................ 21

Cal. Civ. Code § 1798.81 ............................................................................... 31

Cal. Civ. Code § 1798.81.5 ............................................................................ 31

Fed. R. Civ. P. 23 ......................................................................................... 19

Fed. R. Civ. P. 65 ......................................................................................... 51

Fed. R. Evid. 801 ......................................................................................... 54

**MISCELLANEOUS:**

EFF — Issues: Copyright Trolls,
    http://www.eff.org/issues/copyright-trolls (last visited Nov. 22, 2012) ........................ 43

Federal Judicial Center, Manual for Complex Litigation (Fourth) §21.643 (2004) ...................... 4

Pls' Reply in Support of Mot. for Final
Approval
                                              x                          Case No. 5:11-cv-00379-EJD

Kashmir Hill, *How Porn Copyright Lawyer John Steele Has Made A 'Few Million Dollars'*
     *Pursuing (Sometimes Innocent) 'Porn Pirates,'* Forbes (Oct. 15, 2012),
     http://www.forbes.com/sites/kashmirhill/2012/10/15/how-porn-copyright-lawyer-
     john-steele-justifies-his-pursuit-of-sometimes-innocent-porn-pirates/ ............................ 42

Mike Masnick, *Massive Exodus From Netflix Over Fee Increase*,
     TechDirt (Sept. 16, 2011, 7:33 a.m.), http://www.techdirt.com/articles/20110915/
     17493415974/massive-exodus-netflix-over-fee-increase.shtml ....................................... 29

Public Citizen and National Association of Consumer Advocates,
     *Report: In Wake of Supreme Court's AT&T v. Concepcion Decision, Consumers*
     *Are Worse Off* (Apr. 25, 2012), http://www.citizen.org/pressroom/
     pressroomredirect.cfm?ID=3592 ........................................................................................ 39

Third Circuit Task Force, Selection of Class Counsel, 208 F.R.D. 340 (2002) ........................... 25

Violet Blue, *Hacker hater: meet the star client of porn's "most prolific" copyright lawyer*,
     ZDNet (Aug. 20, 2012), http://www.zdnet.com/hacker-hater-meet-the-star-client-
     of-porns-most-prolific-copyright-lawyer-7000002703/ .................................................... 42

WeddingChannel.com:
     PADRAIGIN (PADDY) BROWN and PAUL HANSMEIER Wedding,
     http://registry.weddingchannel.com/coupledir/20119/B/R318383346/
     PADRAIGINPADDY_BROWNE_AND_PAUL_HANSMEIER.htm
     (last visited Nov. 22, 2012) ............................................................................................... 42

# INTRODUCTION

Plaintiffs Jeff Milans and Peter Comstock ("Plaintiffs") have already filed lengthy papers setting forward their arguments in support of final approval of the instant class action Settlement. This brief responds to the objections to final approval.

The Settlement Class consists of some 62 million individuals, or roughly the combined populations of California and Texas. Out of this massive class, there were 100 proper objections[1] to the Settlement, or approximately one objection out of every 620,000 class members and only 2,508 opt-outs. (*See* Exclusion List, attached as Exhibit A to Addendum to Affidavit of Tore Hodne, a true and accurate copy of which is attached here as Exhibit A.)  Of those objections, none have been from state attorneys general, and, unlike the *Lane* and *Google Buzz* settlements, none of the objections have been filed by privacy organizations or *cy pres* applicants, even though the overwhelming majority of *cy pres* applicants will not receive any distribution, and none of the applicants will receive the full amount requested.

As the courts explain, this "infinitesimal" amount of opposition strongly favors approval of the Settlement. *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (explaining that 1,159 opt-outs and 41 objections out of approximately nine-million notices sent supports approval); *accord Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (explaining that "court ha[s] discretion to find a favorable reaction . . . among class members"

---

[1]     There are 119 docketed items styled as "objections." Seven of those, however, are not objections at all: five of those express approval of the lawsuit (Dkt. 159, 163, 172, 176, 177) and the other two do not appear to concern the Settlement at all (Dkt. 89, 136). Eight more state objections, but also request to be "excluded," "removed," or "withdrawn" from the Settlement. (Dkt. 85, 97, 108, 120, 130, 135, 142, 173.) Because such individuals have opted out of the Settlement Class, they cannot also object. *See* Fed. R. Civ. P. 23(e)(4) (only "class member[s] may object to a proposed settlement"); *see also Olden v. LaFarge Corp.,* 472 F. Supp. 2d 922 (E.D. Mich. 2007) ("opting out of a settlement and choosing to object . . . are mutually exclusive options: if one actually opts out, she has no standing to object to the settlement as she will not be bound by it.") (*citing Becherer v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 193 F.3d 415, 426 (6th Cir. 1999)). One *pro se* objector filed a supplement to his original objection. (Dkt. 211.) Next, and as discussed in Section I, *infra*, two objections did not meet the objection submission criteria endorsed by this Court and lack standing to object. (Dkt. 198, 201.)  A final document, (Dkt. 224), which instead of being identified as an "objection" is simply styled a letter, was filed at 3:00 p.m. on November 28, 2012 and dated a week after the objection deadline. The document is late and the author is unidentified (we don't even know if s/he is a class member). The analysis adds nothing and cites to no law or other support for the few statements contained in it. As such, whatever this document was intended to be, it should not be considered.

1    where there were "only fifty-four submitted objections" out of 376,301 class members receiving

2    notification); *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming

3    approval of class action settlement with 45 objections from a 90,000 person class); *In re TD*

4    *Ameritrade Acc't Holder Litig.*, Nos. C 07–2852 SBA, C 07–4903 SBA, 2011 WL 4079226, at *7

5    (N.D. Cal. 2011)  (finding that reaction of class was "positive" where there were "only 23

6    [objections] and less than 200 [opt-outs]" out of six million class members receiving notice);

7    *Browning v. Yahoo! Inc.*, No. C04-01463, 2007 WL 4105971, at *12 (N.D. Cal. 2007) (139

8    objections out of 14 million or "1 objector for every 100,720 class members" is a "low" rate "even

9    compared to objection rates in similar class action settlements.").

10            The substance of the objections also pose no obstacle to approval. The vast majority

11   (almost 90%) of the objections come from *pro se* objectors, almost all of whom express general

12   disapproval of the relief, the attorneys' fees, the lawsuit, or class actions in general. These types of

13   "philosophical" objections are inevitable in large class actions and thus aren't considered to

14   "impugn the adequacy of the settlement itself." *See Domonoske v. Bank of Am., N.A.*, 790 F.Supp.

15   2d 466, 474 (W.D. Va. 2011) (in class of three-million, "most of the 59 objections show a

16   philosophical disagreement with class action litigation, a general disagreement with this litigation

17   in particular, or dissatisfaction with class counsel's requested attorney's fees"); *accord O'Brien v.*

18   *Brain Research Labs, LLC*, CIV.A. 12-204, 2012 WL 3242365, at *25 (D.N.J. Aug. 9, 2012)

19   (discounting statement which "embodies the objector's personal views about class action litigation

20   generally [specifically that the 'only group that makes a large profit are the lawyers representing

21   the plaintiff groups'] and is not addressed to the specifics of this settlement").

22            The nine objections received from professional objectors are also an inevitable (though

23   unfortunate) part of any large class action settlement. *See, e.g.*, *In re Cathode Ray Tube (CRT)*

24   *Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012). True to form, these objectors, whose

25   counsel have reputations that have been charitably described as "colorful," either "sling mud" or

26   simply rely on boilerplate objections, which add nothing beyond the concerns already raised by

27   the *pro se* objectors. Few even pretend, in any meaningful way, to respond to Plaintiffs' 55-page

28   brief detailing why this Settlement should be finally approved.

1    The few substantive non-professional objections (some filed *pro se*, some with the help of

2    separate counsel) also do nothing to cast any serious doubt on the Settlement. Though they submit

3    their papers in good faith, they read more like discussions of legal theories, rather than briefs that

4    understand the practicalities of complex class actions. Thus, like many attorneys who have been

5    watching this case from the sidelines, they assure this Court that the value of this case is in the

6    billions of dollars and that any "legitimate" settlement would have put "real money" in the hands

7    of the Class. Given the Class's size, that means, according to them, that Class Counsel had a nine-

8    figure settlement in their hands, if they had simply been a bit more resolute.

9    Yet, people tend to vote with their feet, not their theories. And, in this case, not a single

10   one of the objectors or their attorneys has obtained that ten-figure judgment or nine-figure

11   settlement in a statutory damage case (nor have any of them decided to sue the other industry

12   players who have been similarly alleged to have violated the VPPA). The reason, which has been

13   recognized by each lawyer who has won such a settlement and each court that has approved it, is

14   because the law nearly always comes down on the side of fairness and proportionality. This nine-

15   million dollar cash Settlement is one of the largest privacy settlements to date. It more than

16   compensates the Class Members for their harm and deters Defendant Netflix, Inc. ("Defendant" or

17   "Netflix") from violating the law (as well as enjoining Netflix from holding on to PII from here

18   forward). And it funds 20 excellent *cy pres* organizations that will do more to advance the privacy

19   interests of the Class than any nominal amount of money ever could.

20   The Court should have no hesitation in approving this Settlement.

21                                  **ARGUMENT**

22   The Ninth Circuit has long recognized that a "[class action settlement] is the offspring of

23   compromise; the question [addressed] is not whether the final product could be prettier, smarter or

24   snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150

25   F.3d 1011, 1027 (9th Cir. 1998). Under Rule 23, "[i]n evaluating a proposed settlement, it is the

26   settlement taken as a whole, rather than the individual component parts, that must be examined for

27   overall fairness." *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1063 (C.D. Cal. 2010)

28   (quoting *Hanlon*, 150 F.3d at 1026). Thus, while class member concerns that a settlement could

have been "different" or "better" have little or no bearing on the Rule 23 analysis, the Ninth Circuit has observed "the fact that the overwhelming majority of [a settlement] class willingly approved [of an] offer and stayed in the class presents at least some objective positive commentary as to its fairness." *Hanlon*, 150 F.3d at 1027. That commentary is strengthened where, as here, "a small number of class members opted-out of the class . . . which shows that 'at least some portion of the class understood the notice and chose not to participate in the settlement for whatever reason.'" *Anderson v. Nextel Retail Stores, LLC*, CV 07-4480-SVW FFMX, 2010 WL 8591002, at *12 (C.D. Cal. Apr. 12, 2010) (citing *Hanlon*, 150 F.3d at 1025).

As for substantive objections, objectors bear the burden of proving any assertions they raise challenging the reasonableness of a settlement. *United States v. State of Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citing *Moore v. City of San Jose*, 615 F.2d 1265, 1272 (9th Cir. 1980) ("In this circuit, we have usually imposed the burden on the party objecting to a class action settlement.")); *see also* Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.643 (2004) ("Even a weak objection may have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement.").

The arguments raised in the objections can more or less be broken up into the following three categories: (1) "generalized" objections (raised mainly by *pro se* objectors) suggesting that the Settlement could have been better or different, or asserting contempt for class actions in general or the other laws relevant to this case; (2) individualized challenges which are not fully dealt with in the first category; and (3) so-called "professional" objections, which rely on boilerplate language and/or resort to improper and unethical behavior to hold the Settlement hostage in hopes of achieving some sort of personal gain. As demonstrated below, none of the objections has merit and cannot—either standing alone or taken together—detract from the remarkable results obtained on behalf of the Settlement Class. The Court should overrule each and every objection.

**I.  THE TANNER AND KATRIEL "OBJECTIONS" ARE NOT PROPERLY BEFORE THE COURT.**

As an initial matter, the "objections" lodged by Class Members Tanner and Katriel are

untimely and thus, not properly before the Court. As set forth in the Court's Preliminary Approval

Order, to be valid, an objection must have been "filed and sent to Class Counsel and Netflix's

counsel on or before the Objection/Exclusion Deadline . . . Any Class Member who fails to timely

file a written objection and notice of his or her intent to appear at the fairness hearing pursuant to

this Subsection or as detailed in the Notice, shall not be permitted to object to this Settlement at

the fairness hearing, and shall be foreclosed from seeking any review of this Settlement by

appearance or other means." (*See* Dkt. 80; Class Action Settlement Agreement § 5.5, at 18:12-18,

a true and accurate copy of which is attached as Exhibit B.)[2] Here, while it is unclear whether

Tanner mailed his objection to the Court on time, there is no question that he mailed it to Class

Counsel late. That is, the cover letter that accompanied Tanner's "objection" bore the date of

November 15, 2012, which means the objection wasn't sent to Class Counsel until a day after the

November 14, 2012 Objection Deadline. (*See* Tanner Cover Letter dated November 15, 2012, a

true and accurate copy of which is attached as Exhibit C.) Similarly, from the face of the FedEx

envelope that it was delivered in, Katriel didn't send her objection to Class Counsel until

November 15, 2012—also a day after the Objection Deadline. (*See* Katriel FedEx Packing Slip

and Tracking Information, a true and accurate copy of which is attached as Exhibit D.)

Untimely filings aren't before the Court. *See In re Educ. Testing Serv. Praxis Principles of

Learning and Teaching Grades 7-12 Litig.*, 555 F. Supp. 2d 661, 671 (E.D. La. 2007) (dismissing

late objections as untimely); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL 3:07-MD-1827 SI,

2011 WL 7575004, at *3 (N.D. Cal. Dec. 27, 2011) (holding that failing to follow proper

procedures for lodging objection is grounds for court "refus[ing] to consider the objection."); *In re

Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *10 n.9 (C.D. Cal. June 10,

2005) (refusing to consider objection because it was untimely and not file stamped); *In re

UnitedHealth Group Inc. Shareholder Derivative Litig.*, 631 F. Supp. 2d 1151, 1158 n.6 (D. Minn.

2009) ("The objection is not a model of clarity. As it is also untimely, the Court does not consider

---

[2]        There can be no credible argument that the process for objecting was somehow complicated. And that's because it wasn't. To the contrary, the process couldn't have been more clear and the procedure for objecting easy to follow as evidenced by the fact that each *pro se* objector, and virtually all represented objectors, were able to follow it.

1  its merits."); *cf.*, *In re TD Ameritrade Account Holder Litig.*, 2011 WL 4079226, at *11 (rejecting

2  attempt by *pro se* objector to incorporate prior objections where he was "afforded almost three

3  months to prepare his objections" and his decision to wait until the last minute was the result of

4  his own "dilatory conduct.").

5        Tanner and Katriel failed to timely file their objections. Consequently, the Court shouldn't

6  consider them. Nevertheless, if only for purposes of completeness and the record, Plaintiffs

7  respond to the substance of those objections as well.

8  **II.    THE GENERAL AND PHILOSOPHICAL OBJECTIONS TO THE SETTLEMENT
         DO NOT IMPEDE FINAL APPROVAL.**

9        Of the 100 proper objections received, all but three contend that the Settlement could have

10  been different or better, or raise philosophical concerns with this litigation in particular or class

11  actions in general.[3] Nearly all of these concerns were taken up and addressed in detail by Plaintiffs

12  in their Final Approval Motion, (*see* Dkt. 191 ("Final Approval Mot.")), which was filed two

13  weeks *before* the objection deadline set by this Court's Preliminary Approval Order, and was

14  contemporaneously posted to the Settlement Website. (Declaration of Class Counsel Jay Edelson

15  ("Edelson Decl.") ¶¶ 12–13, a true and accurate copy of which is attached as Exhibit E.)[4] Even

16  though the Class was given the chance to consider and address Plaintiffs' arguments in support of

17  the Settlement, only 19 objections were filed *after* the filing of the Final Approval Motion, and

18  only *one* objector, (*see* Dkt. 211), supplemented his previously submitted concerns.

19        As such, Plaintiffs' Final Approval Motion more than accounts for (and responds to) the

20  vast majority of the *pro se* objections, particularly those raising concerns about: (1) the nature and

21  value of the Settlement to the Class; (2) Class Counsel's fee request; and (3) the nature of this case

22

23  _____

    [3]    *See* Dkt. 151, 155, 207.

24  [4]    Here, and even though Ninth Circuit precedent only requires Plaintiffs to file their *fee
    petition* prior to the objection deadline, Plaintiffs actually filed both their motion for final approval
25  and their petition for attorneys' fees prior to the objection deadline (which additionally set forth
    the Settlement's proposed *Cy Pres* Recipients) and also posted them to the Settlement Website.
26  This was in order to give the Settlement Class time to review and respond to the Final Approval
    Motion, and meaningfully comment on or object to the Settlement. *Cf. In re Mercury Interactive
27  Corp. Sec. Litig.*, 618 F.3d 988, 995 (9th Cir. 2010) (establishing that *fee briefs*—as opposed to
    full final approval papers—must be filed before the objection deadline in order to afford the Class
28  members adequate opportunity to examine and, if necessary, oppose the settlement).

(*i.e.*, abstract philosophical concerns). Nevertheless, for the sake of completeness and for purposes of the record, Plaintiffs here address the main points of concern about the Settlement that appeared in most of the objections received.

**A.      The Generalized Objections About the Class Relief Should Be Overruled.**

Eighty-eight objections criticize the relief obtained by the Settlement, at times questioning either (or both) the *cy pres* and injunctive relief, and recommending other ways that the Settlement might have been structured. Generalized objections, like these, asserting that a settlement could have been "better" or "different" have little or no bearing on the Rule 23 analysis. *See Hanlon*, 150 F.3d at 1027. Nevertheless, they are dealt with in turn.

**1.      The *cy pres* component of the Settlement is fair and completely appropriate in this case.**

Sixty-two objections criticize the Settlement's use of a *cy pres* distribution, claiming that such relief provides no value to the Class, expressing contempt with the mechanism, or even going so far as to call it unconstitutional. (*See*, *e.g.*, Dkt. 206 at 8–11 (over four pages, describing why "*cy pres* awards where class members receive nothing [have] no place in American jurisprudence"), 96 ("No charity had [its] personal information sold or given away, it was the people who were used by Netflix, paying for movies and then having their personal information sold."), 104 ("The main focus in this settlement is the members whose privacy rights were violated by Netflix. Yet the members or former members of Netflix, whose privacy rights were violated, are excluded from the  settlement class."), 81 (suggesting that *cy pres* funds should go to "needy organizations that help human suffering" instead of ones "tilting at the windmills of internet privacy").)[5] Taking another angle, 42 objections contend that the Settlement is inherently inadequate because it does not achieve a direct monetary payment for the Class. (*See*, *e.g.*, Dkt. 160 at 1 ("The settlement would give class members $0 each. But each class member is potentially entitled to liquidated damages of $2,500."), 86 at 1 ("I believe the settlement should be paid out to individuals whose information has been used in violation of these acts."), 99 at 1 (objecting

---

[5]      *See* Dkt. 81-82, 87-88, 92, 94-96, 100, 103-104, 106, 109-111, 113, 115, 117, 120-125, 127, 132, 139, 144, 146, 147, 149, 153, 158, 160, 164, 166, 169-171, 178-180, 185-186, 190, 194, 196, 198, 200-202, 204, 206, 209-218.

1    because "no monetary damages will be due to me as a class member"), 153 at 1 ("After attorneys'

2    fee and other expenses the remaining settlement funds should entirely be awarded to the

3    [Class]."))[6] These objections find no support in the law. Indeed, *cy pres* distribution models are

4    widely used and accepted in (and beyond) the Ninth Circuit. As that Court recently held in *Lane v.*

5    *Facebook*, *cy pres* distributions are an appropriate relief mechanism where they "account for the

6    nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the

7    silent class members. . . ." *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (quoting

8    *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)).[7]

9         Six objections claim that a *cy pres* distribution is not appropriate because Plaintiffs

10   somehow did not make an adequate showing that direct cash payments were infeasible. (*See*, *e.g.*,

11   Dkt. 186 ("Before this Court even considers approval . . . it should first be confident that direct

12   relief to the class is uneconomical or impractical."), 200 ("[I]t appears that the distribution of

13   damages to class members would be relatively simple."))[8] As Plaintiffs explained in their Final

14   Approval Motion, however, given the size of the Class (62 million individuals) the cost of

15   distributing money would be far in excess of the size of the common fund. (*See* Final Approval

16   Mot. at 32–35; *see also* Affidavit of Tiffaney A. Janowicz ("Janowicz Aff.") at ¶ 6, a true and

17   accurate copy of which is attached hereto as Exhibit F (estimating the cost of distributing

18   settlement checks at between $23 million and $28 million).)

19        Next, 17 objections challenge the *cy pres* selection process, with some specifically

20   questioning whether Class Members should have been entitled to select the proposed recipients

21   directly. (*See*, *e.g.*, Dkt. 100 ("The proposed settlement does not allow my input on where the

---

23   [6]      *See* Dkt. 82, 86-87, 93, 96, 104-107, 110, 116-118, 120, 122, 126-129, 144, 147, 149, 153,
158, 160, 164, 167-168, 175, 182, 184, 186, 190, 194, 196, 198, 206, 208, 212, 214-215.

24   [7]      Objector Goldfoot goes as far as arguing that *cy pres* distributions in class action
25   settlements are unconstitutional. (*See* Dkt. 160 at 10–11.) But the Ninth Circuit has already
considered and rejected that very position. *See Nachshin*, 663 F.3d at 1038–41; *see also Lane*, 696
26   F.3d 811 (upholding propriety of *cy pres* settlement in case with class size that was almost 60
million people smaller than the instant Settlement); *In re Google Buzz Privacy Litig.* ("*Google*
27   *Buzz*"), No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (upholding *cy pres*
settlement with smaller fund than in the instant Settlement).

28   [8]      *See* Dkt. 186, 198, 200-201, 209, 210.

1   funds will be directed."), 202 (The Settlement "fails to provide input for class members into the

2   non-profit [selected to protect] their privacy rights."), 95 (noting that Class Members "apparently

3   have no say [as to] what not for profit gets funds from the settlement).)[9]  The law in this Circuit is

4   clear, however, that "such an intrusion [*i.e.*, requiring settling parties to select *cy pres* recipients

5   that class members would find ideal] into the private parties' negotiations would be improper and

6   disruptive to the settlement process." *Lane*, 696 F.3d at 821; *see also Hanlon,* 150 F.3d at 1027.

7   Nevertheless, going well beyond the process utilized in *Lane*, where the settling parties agreed to

8   create a privacy foundation with a board of directors that included both class counsel and one of

9   Facebook's officers, here, Class Counsel set up an open, transparent (but non-disruptive)

10   application system which *included* getting input from Class Members. Indeed, apart from the

11   formal process, which asked potential recipients to submit formal proposals laying out all the

12   reasons why their organization should receive part of the Settlement distribution, Class Counsel

13   fielded numerous calls and written communications from class members who recommended

14   potential *Cy Pres* Recipients and, in each instance, worked with the recommending Class Member

15   to invite the *Cy Pres* Recipients to apply. (*See* Edelson Decl. at ¶¶ 7–14.) Further, Class Counsel

16   considered the few specific concerns Class Members had about specific potential recipients before

17   working with Defense Counsel to determine the final distribution. (*Id.* at ¶¶ 8–11.)

18        Nine objections contend that the *cy pres* selections were made in secret, or that Class

19   Members didn't receive enough advance notice of the selections. (*See*, *e.g.*, Dkt. 122 at 1

20   (suggesting "[there] should be some identification of who will receive the settlement funds and a

21   demonstration of how award [*sic*] those funds to those entities furthers the interests of the class"),

22   160 at 7 ("*Cy pres* recipients have not been selected, and the nominees won't be announced until

23   class members have only 14 days to object.").)[10] Those objections are not valid for at least four

24   reasons. First, Plaintiffs provided the Class with notice of the proposed *Cy Pres* Recipients a full

25   two weeks prior to the objection deadline, along with the filing of their Final Approval Motion.

26   (Edelson Decl. at ¶¶ 12–13.) Second, for any Class Member who wanted to understand the

---

27   [9]     *See* Dkt. 81-82, 95, 100, 103, 109, 113, 144, 147, 160, 164, 169, 190, 202, 204, 209, 216.

28   [10]    *See* Dkt. 122, 125, 160, 166, 169, 202, 204, 212, 218.

process, Class Counsel provided real-time information. (*Id.* at ¶ 14.)  Third, not a single Class

Member asked for more time to consider the proposed recipients (and indeed a number of the

objections found the time to criticize specific recipients). (*Id.* at ¶ 15.) Fourth, given the Ninth

Circuit's endorsement of the process utilized in *Lane*—which simply let Class Members know that

"a new grant-making entity" would be created, rather than inform class members of the ultimate

fund distribution—it's clear the Parties weren't required to give the Class *any* advance notice of

the proposed *cy pres* distributions, only *how* they would be used. *See Lane*, 696 F.3d at 822

(requiring only that the settlement explain that "the funds will be used . . . to 'fund and sponsor

[certain educational, online privacy-related] programs'").[11] Nevertheless, they did, and thus, the

objections on this point are ill-founded.

Two objections argue that the *cy pres* money should have funded other deserving charities,

instead of privacy-based non-profits.[12] Class Member Nathan Kennedy, for example, suggests that

*cy pres* funds should go to "needy organizations that help [*sic*] human suffering" instead of ones

"tilting at the windmills of internet privacy," (Dkt. 81), and Class Member Edna Williams

suggests funds should go to groups not "express[ing] a stance on any religious/politically volatile

issue." (Dkt. 109). But neither suggestion bears any relation to the claims of this case and, as such,

cannot serve as the basis for a *cy pres* distribution under Ninth Circuit precedent. *See Nachshin*,

663 F.3d at 1036 ("*Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the

objectives of the underlying statutes, and the interests of the silent class members, including their

geographic diversity."); *Lane*, 696 F.3d at 821 (same). Given the very clear law on who *cy pres*

funds may appropriately be distributed to, the Parties were constrained to choose non-profits that

had a sufficient nexus to the Class and the claims alleged.

---

[11]     For these same reasons, Class Member Jeffrey Gross's objection that notice of the *Cy Pres* Recipients should have been emailed to the Settlement Class a full 45 days before the deadline does not call into question the fairness of the *cy pres* distribution notice. (*See* Dkt. 125.) The Settlement Agreement, Settlement Website, and Class Notice all explained to Class Members where, when, and how they could view the proposed distributions—which is, by any measure, far better than the non-disclosure evinced by the recently approved *Google Buzz* settlement. *See In re Google Buzz User Privacy Litig.*, No. 5:10-cv-00672-JW, Dkt. 117 (N.D. Cal. Feb. 16, 2011).

[12]     *See* Dkt. 81, 109.

On the opposite end of the spectrum, 25 objections argue that there is not a sufficient nexus between the proposed *Cy Pres* Recipients (and selection process), the Class, and the claims alleged. (*See* Dkt. 200 ("The record does not support [a] 'driving nexus'"), 201 at 17–18 (suggesting the Settlement's proposed "*cy pres* objectives" are "too broad," "too narrow," or "unrelated" to the class), 209 at 3 ("[T]he *cy pres* beneficiaries will inadequately serve the goals of the statutes.").)[13]  The nexus between the chosen organizations and the Class's legal interests, however, has been fully explained in Plaintiffs' Final Approval Motion.[14] (Final Approval Mot. at 23.) As explained there and more thoroughly below, the Settlement provides for a widespread *cy pres* distribution that will go to some of the nation's leading academic institutions and organizations for protecting consumer privacy rights in the Internet age. These proposed recipients are existing organizations who have committed to spending the funds solely on privacy protection and education efforts, and not on things like startup costs. Thus, through the proposed distribution, the Class stands to receive an immediate and tangible benefit.

Ten objections express dissatisfaction over the *cy pres* aspects of the Settlement for different reasons, arguing that the people in the best position under the Settlement are those who

---

[13]    *See* Dkt. 87-88, 92, 94, 104, 106, 111, 121, 122, 124, 146, 160, 171, 178-180, 185-186, 190, 200-201, 206, 209-211.

[14]    Those Class Members represented by professional objector Joseph Palmer suggest that because nine of the twenty *Cy Pres* Recipients are "school programs or schools," seven of which are located in California, the distribution purportedly cannot benefit a *national* class. (Dkt. 209 at 2.) This shouldn't be viewed as a serious criticism of the Settlement as it is hard to see why the geographic location of certain organizations would somehow limit their reach when the monies distributed are going to be used to promote and protect consumer privacy rights in the Internet age. Further, as Palmer might be aware, much of the activity surrounding digital consumer rights is taking place in California, which helps explain why most of the schools working on the issue are also located here.

Likewise, Class Member Matt Russak's objection that the educational efforts of some *Cy Pres* Recipients would not further the interests of the Class because Netflix did not allow its users to "opt out" of the challenged practices in this case (and, thus, would not have prevented the harm from occurring) misses the point. (Dkt. 87; *see also* Dkt. 201.) The Ninth Circuit has never judged *cy pres* relief on the basis of whether it would have prevented specific harm from occurring. Rather, *cy pres* relief need only "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." *Nachshin*, 663 F.3d at 1036. Besides, the proposed *Cy Pres* Recipients aim at educating *both* consumers and organizations/corporations—so the education efforts could very well end up preventing non-opt out consumer privacy infringements, as described by Mr. Russak. (*See* Final Approval Mot. at 19-24.)

1    exclude themselves from the Class, as they get the benefits of the injunctive relief and *cy pres*

2    distribution, without foregoing their right to sue. (*See*, *e.g.*, Dkt. 92 (Individuals opting out "will

3    get the same miniscule benefits from the settlement as those who stay, but they will keep their

4    right to sue Netflix again."), 94 (same).)[15] But it's unclear how this point—that non-Class

5    Members might enjoy an ancillary benefit from the Settlement's injunctive and *cy pres* relief—

6    amounts to any objection at all. This effect is inherent to every settlement featuring a *cy pres*

7    distribution (*i.e.*, such relief almost always benefits at least some non-class members, including

8    former class members requesting exclusion)—yet no objector cites to any authority explaining

9    why this is a problem. Nor can they. In *Lane*, for example, the Ninth Circuit looked favorably

10   upon a similarly structured settlement, even though individuals who opted out benefited along

11   with class members.[16] *See Lane*, 696 F.3d at 826; *see also Google Buzz*, 2011 WL 7460099.

12   Accordingly, this objection simply goes to the nature of the *cy pres* doctrine itself, and therefore

13   fails in light of the Ninth Circuit's repeated endorsement of *cy pres* settlements.

14          Two objections also try to attack the specific proposed distributions.[17] In doing so, these

15   objectors substitute their own characterizations for fact, refuse to recognize the substantial and

16   specific benefits offered by the proposed recipients, and ignore recent Ninth Circuit precedent. For

17   instance, professional objector Palmer asserts that the proposed distribution to the USC Gould

18   School of law "does nothing to address the objectives of the underlying statutes involved." (Dkt.

19   209 at 2.) But Palmer ignores that the proposed distribution would go to the USC Intellectual

20   Property and Technology Law Clinic, which would use its distribution to hire a clinic Privacy

21   Fellow and fund technological research on issues central to information privacy law. (*See* Final

22

---

23   [15]    *See* Dkt. 92, 94, 124, 146, 171, 178-180, 185, 205.

24   [16]    Similarly, a few objectors assert that Class Members who are current Netflix subscribers
     get no value from the injunctive relief. (*See* Dkt. 95, 160, 198, 207.) But current subscribers do get
25   benefits: they benefit from the *cy pres* distribution, and, in the future, if and when they cancel their
     Netflix accounts, they will have their information properly disposed of by Netflix, unless they
26   desire otherwise. Claims that a Class Member will "never" cancel their Netflix account are
     specious, at best (and additionally presume that Netflix will continue its rental (or any) operations
27   forever).

28   [17]    *See* Dkt. 209, 211.

Approval Mot. at 23.) Thus, the USC distribution would advance the statutes' objective of protecting consumer privacy.

Objector Jeffrey Gross disagrees with the proposed funding to the USC Clinic because it does not specify the research to be funded. (Dkt. 211 at 3.) But Gross points to no authority supporting his contention that the *cy pres* proposal must specify the *exact expenditures* that will be covered by the distribution. Instead, the law only requires that the distribution goes to organizations that further the underlying purposes of the statute. *See Lane*, 696 F.3d at 822 (affirming approval of *cy pres* distribution to a new grant-making entity that would fund privacy-protective activities and finding that notice of proposed class-action settlement involving a cy pres remedy need not even name the individuals sitting on the cy pres recipient's board of directors, even if one of those individuals has some association with the settling defendant).

Similarly, Gross's challenge to the proposed distribution to the University of Maine Center for Law and Information fails, as he presents no authority supporting his argument that privacy education funding cannot benefit the Class. Indeed, the Northern District of California has recognized the opposite to be true. *See Google Buzz*, 2011 WL 7460099, at *3 (approving *cy pres* distribution to seven educational institutions, out of a total of 14 recipients).

Gross's challenge of the distribution to the Rose Foundation fails for similar reasons. Gross asserts that the Rose Foundation is an improper recipient of the funds because it will only re-distribute them. (*See* Dkt. 211 at 3.) But Gross ignores the recent Ninth Circuit precedent in *Lane*, where the Court approved the *full cy pres* distribution to a grant-making entity that would, in turn, distribute the fund in accordance with the class's interests and the objectives of the statutes. *See Lane*, 696 F.3d 811.

And Gross's attack on the proposed distribution to the NYU Information Law Institute likewise fails, because while Gross contends that the proposed use of the funds "is not targeted at privacy," (Dkt. 211 at 3), the distribution will "fund research fellowships *related to consumer privacy and VPPA issues*" among other activities. (Final Approval Mot. at 22 (emphasis added).)

1    Gross's opposition to the proposed distribution to the Markkula Center also falls flat, as

2  this District has already, *sua sponte*, found that the Markkula Center's proposed uses have a

3  "driving nexus" to consumer privacy issues. *See Google Buzz*, 2011 WL 7460099, at *1.

4    Gross's challenge to the proposed distribution to the Samuelson Clinic doesn't withstand

5  scrutiny either. Gross argues that it is unclear how the Clinic proposes to use the money. (Dkt. 211

6  at 3.) But the Final Approval Motion makes clear that the Samuelson Clinic proposes to use its

7  distribution to further its consumer privacy programs. (Final Approval Mot. at 22.) Additionally,

8  this District has already held that a distribution to the Samuelson Clinic bears a sufficient nexus to

9  consumer privacy issues. *See Google Buzz*, 2011 WL 7460099, at *4.

10    Finally, Gross objects to the proposed distribution to the Berkman Center, purportedly

11  because two of its proposed uses do not involve privacy, and "the class is not interested in

12  preparing the next cadre of privacy lawyers." (Dkt. 211 at 5.) But all programs the Berkman

13  Center proposes to fund *do* promote privacy: its Youth and Media Lab "promotes media literacy,"

14  and thereby allows consumers to better protect their online privacy; its Curriculum Development

15  Initiative will focus its use of the funds on "research activities with regard to use of personal data

16  and metadata"; and its Privacy and Security Research Initiative will, as its name suggests, promote

17  privacy research, education, and outreach. (Final Approval Mot. at 20.) As demonstrated above,

18  *none* of Gross's attacks on the proposed *cy pres* distribution has merit, and as such, all should be

19  denied in their entirety.

20    Relatedly, and perhaps most telling of all, not a single objector to the proposed *cy pres*

21  selection offers a better candidate for the funds, which only demonstrates (a) that the best

22  candidates for *cy pres* funds were selected here, and (b) that the objectors have no real interest in

23  improving the Settlement for the Class. As such, the Court should deny the objections to the

24  proposed *cy pres* distribution and approve the distribution in its entirety.

25    In the end, the objections challenging the *cy pres* distribution ask the Court to ignore Ninth

26  Circuit precedent and then substitute its judgment for the informed and experienced decisions of

27  the Parties. That is not the Court's role on approval, and thus, the objections challenging the *cy*

28  *pres* distribution should be overruled.

2.   **Objectors who prefer other forms of relief ignore controlling Ninth Circuit authority.**

Fourteen objections contend that the Settlement Fund should be distributed as a bill credit to Class Members' accounts. (*See, e.g.*, Dkt. 111 ("A simple mechanism would be a single month's reprieve on dues, as an example. A reduction in dues for one month, in an amount equal to the amount to be given to unnamed groups, would at least provide some value to the class members."); 132 ("I propose that Netflix provide current customers with a free month of service or something of similar value.").)[18]  These objections fail for at least three reasons. First, despite their vehemence, (*see, e.g.*, Dkt. 111, 132), not a single objector presents evidence that such a payment would be practically and economically feasible in this case. Second, a bill credit would fail to offer any benefit to the Class Members who have the strongest claims, *i.e.*, former customers who have cancelled their accounts. And third, the bill credit would require even current Netflix subscribers to continue doing business with Netflix—perhaps for a year or longer, as the potential appeals process plays out—before realizing the benefits of the Settlement. *See Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (noting that such in-kind relief "'require[s] the claimant to return to the Defendant to do business with him,' something that at least some class members likely would prefer not to do.").

Ultimately, the objectors' wish lists of different types of relief are both not practical and do nothing to upend this Settlement. *See Hanlon*, 150 F.3d at 1027 ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable, or adequate. Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion.").

3.   **The Recovery on Behalf of the Class Is Substantial and More than Accounts for the Harm Actually Suffered.**

At least five objections contend that the amount of the Settlement Fund should have been

---

[18]      *See* Dkt. 93, 95, 111, 121, 132-133, 149, 160, 190, 194, 200, 204, 210, 218.

Additionally, Objector William Bates asserts that "if Netflix knows whose data they kept, they give any wronged ex-subscribers a free Redbox rental." (Dkt. 121 at 2.) This recovery is obviously not feasible, as Netflix cannot be expected to subsidize a competitor's business.

1  different—some claim the fund is too small (Dkt. 113 ("Is this fine big enough to safeguard that

2  Netflix won't do this again?"), 186 (recovery "is potentially far greater than the [agreed] $9

3  million.")), and at least one objector claimed it was too punitive (*see* Dkt. 157 ("I believe the

4  settlement to be too punitive.")). Even though in their Final Approval Motion Plaintiffs explained

5  in significant detail how they valued the case and why they came to the fund amount, these

6  objectors—none of whom profess to have any experience handling privacy class actions—seek to

7  substitute this analysis with their own hunches of how this litigation would go. Most of the

8  objections give short shrift to their analysis, essentially starting and stopping at the amount of

9  damages proscribed by the VPPA. Further, the two late-filed objections—which are not properly

10  before the Court—ironically approach the analysis with more fervor, taking issue with Class

11  Counsel's opinions about whether statutory damages would ultimately be reduced in proportion to

12  the Class's actual damages. (Dkt. 198, 201.) While these objectors surely lack no confidence in

13  their positions, they are unable, of course, to cite a single case that achieved a class-wide judgment

14  or settlement that supports their position. Instead, they simply ask the Court to defer to their

15  analysis, instead of Class Counsel's.

16      The problem with these arguments (beyond being "pie in the sky" theories that prove more

17  successful in sparking interesting argument than obtaining actual results for consumers) is that

18  they misapprehend the Court's role in reviewing a settlement. Indeed, when examining whether a

19  negotiated amount is fair and reasonable, "this [C]ircuit has long deferred to the private

20  consensual decision of the parties." *Rodriguez*, 563 F.3d at 965 (citing *Hanlon*, 150 F.3d at 1027).

21  To that end, the Ninth Circuit "[has] emphasized the court's intrusion upon . . . [negotiated

22  agreements] must be limited to the extent necessary to reach a reasoned judgment that the

23  agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

24  parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all

25  concerned." *Id.* (quoting *Hanlon*, 150 F.3d at 1027). Accordingly, it is outside of the role of the

26  Court to substitute its judgment with that of the Parties. *See Nat'l Rural Telecommunications*

27  *Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (quoting *In re Pac. Enterprises*

28  *Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better

1    positioned than courts to produce a settlement that fairly reflects each party's expected outcome in

2    the litigation.")). Instead, the Court should focus on whether the settlement is the product of

3    adversarial negotiation as opposed to fraud or collusion. *Vasquez v. Coast Valley Roofing, Inc.*,

4    266 F.R.D. 482, 490 (E.D. Cal. 2010) (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.

5    1977) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its

6    own judgment for that of counsel.").

7         Here, there can be no doubt that Class Counsel's opinions are reasoned (and not as a result

8    of something untoward). With exacting detail (far beyond what is required of them), they provided

9    their best estimates of the chances of succeeding on their key theories, of obtaining adversarial

10   class certification, and the likely (realistic) outcome at trial. (*See* Final Approval Mot. at § III.)

11   Class Counsel's opinions are, here, entitled to deference—a position endorsed by courts in this

12   Circuit. *See In Re Facebook Privacy Litig.*, Case No. 10-cv-02389-JW, Dkt. 69 (N.D. Cal. Dec.

13   10, 2010) (Judge Ware, in appointing lead counsel, noted that Edelson McGuire attorneys "were

14   pioneers in the electronic privacy class action field, having litigated some of the largest consumer

15   class actions in the country on this issue").

16        But, the Court need not end the analysis there. In this case, Class Counsel's judgment is

17   backed up by the judgment of litigants and courts that have come before them. Thus, while certain

18   objectors suggest that because the Class size is significantly larger in the instant case, the *Google*

19   *Buzz* and *Lane* cases actually weigh *against* deferring to Class Counsel's judgment. (*See*, *e.g.*, Dkt.

20   201 at 31–32.) These objectors, however, misunderstand the math. The following chart compares

21   the three settlements:[19]

22

23

_____

24   [19]     In both *Lane* and *Google Buzz*, the plaintiffs asserted claims under the ECPA, which
     provides for statutory damages of up to $10,000 per person. *See* 18 U.S.C. § 2520(c)(2)(B); *see*
25   *also Lane v. Facebook*, Case No. 5:08-cv-03845 RS, Dkt. 1 (N.D. Cal. Aug. 12, 2008); *In re:*
     *Google Buzz Privacy Litig.*, Case No. 5:10-cv-00672-JW, Dkt. 31 (N.D. Cal. July 31, 2010). The
26   historical market cap data for each defendant was retrieved from Capital IQ, a Standard & Poor's
     business, http://www.capitaliq.com (last accessed Nov. 28, 2012). The values represent Google's
27   market cap as of September 1, 2010 (the business day preceding the effective date of the class
     action settlement agreement), Facebook's value as of May 18, 2012 (the date of its initial public
28   offering), and Netflix's value as of November 28, 2012.

| | Possible Statutory Recovery per Class Member | Class Size | Total Possible Statutory Recovery | Defendant's Market Capitalization |
|---|---|---|---|---|
| *Google Buzz* | $10,000 | 37 million | $370 billion | $217 billion |
| *Lane* | $10,000 | 3.6 million | $36 billion | $55.64 billion |
| *Netflix* | $2,500 | 61 million | $155 billion | $4.56 billion |

As these figures show, the total possible statutory recovery in *Google Buzz* was more than twice the size of the instant case. Yet, the total potential statutory recovery only tells part (and a misleading part) of the story. As any lawyer who has obtained a judgment in excess of a defendant's assets quickly learns, a larger verdict in excess of what a company can pay is nothing more than a paper victory. In the end, as logic would dictate, the most anyone can recover is what the defendant has. Thus, in *Google Buzz*, as well as in the instant case, recovery would be limited by the defendant's ability to pay (*see* Dkt. 191-4), while in *Lane* it would be limited by the statutory cap. In any event, both Facebook and Google could have paid out significantly higher judgments than Netflix, demonstrating that (all other things being equal) they were the more valuable cases.

Plaintiffs' settlement, which got a larger fund than in *Google Buzz* and nearly the same amount as in *Lane*, is incredibly strong by comparison. In light of these comparisons, the argument that this Settlement Fund is insufficient is not credible.

**4.    Objections to the injunctive relief either misunderstand the Settlement or impose an improper standard of review.**

Twenty-three objections take issue with the Settlement's injunctive relief. (*See*, *e.g.*, Dkt. 92 at 4 ("The mere 'decoupling' of the information is reversible."); 111 at 2 ("[The injunctive relief] has no monetary value and does nothing to redress the wrong that was, supposedly, at the heart of this litigation."); 160 at 3 ("[I]f Netflix ends its DVD-by-mail service in four years, then

1    its obligations to non-settlement class members end").)[20] But contrary to the claims raised by those

2    Class Members, the question here is not whether the injunctive relief is perfect or addressed every

3    conceivable need, but rather whether it contributes to the Settlement being fair. *Lane*, 696 F.3d at

4    818 (citing Fed. R. Civ. P. 23(e)). To that end, and as discussed in full detail in the Final Approval

5    Motion, the Ninth Circuit recently looked favorably upon injunctive measures achieved in the

6    *Lane* case, which offered *far* less meaningful relief than that presented here. (Final Approval Mot.

7    at 33-34 ("permanent termination injunction of Facebook's 'Beacon' program [was fair despite]

8    objections that 'Beacon was already effectively terminated' at the time of the settlement . . . and

9    even though class counsel had 'conceded that Facebook was free to reinstitute the same program

10   under a different name.'") (citations omitted).) By contrast, the instant Settlement's proposed

11   injunctive relief addresses and remedies the core issues of this lawsuit.

12         Eleven objectors disagree, suggesting that the decoupling required by the Settlement may

13   be reversible. (*See*, *e.g.*, Dkt. 92 ("The mere 'decoupling' of the information is reversible."), 124

14   (same).)[21] But as explained in the Final Approval Motion, the decoupling is permanent and subject

15   to a Court-ordered injunction. (Final Approval Mot. at 19); (*see also* Ex. B, § 2.1.2 ("The

16   requirements of this Section 2.1.2 shall remain in effect and Netflix shall adhere to it for at least

17   four (4) years from the Effective Date unless inconsistent with or otherwise permitted under any

18   newly enacted or amended laws.").) Thus, while it is true that Netflix could conceivably ignore the

19   injunctive measures of the Settlement—or otherwise violate the law for that matter—and that

20   Plaintiffs can't stop it, Defendant would do so at its own peril.

21         In a similar vein, twelve objectors take issue with the term "decouple," suggesting that the

22   VPPA requires something more by using the term "destroy." (*See*, *e.g.*, Dkt. 92 ("The relevant law

23   . . . requires the <u>destruction</u> of the personally identifiable information."), 124 (same).)[22] But those

24   objections focus too closely on word choice and misunderstand what the VPPA requires. While

25

26   [20]      *See* Dkt. 81-82, 88, 92, 94, 102, 106, 111, 124, 146, 160, 171, 174, 178-180, 182, 185, 198, 201-202, 205, 212.

27   [21]      *See* Dkt. 92, 94, 124, 146, 171, 178-180, 185, 201, 205.

28   [22]      *See* Dkt. 92-94, 124, 146, 171, 178-180, 185, 201, 205.

1   the VPPA's "Destruction of Old Records" provision requires that PII be *destroyed*, the objectors

2   fail to realize that the VPPA specifically defines PII as "information which identifies a person as

3   having requested or obtained specific video materials or services from a video tape service

4   provider." 18 U.S.C. § 2710(a)(3) and (e). Thus, once retained information no longer connects an

5   individual with their specific video rental history—*i.e.*, once that information has been

6   "decoupled"—subsection (e) is satisfied and the PII is, for the purposes of the statute, "destroyed."

7   Because disassociation of personal information and rental history is exactly what the injunctive

8   relief (like the VPPA) requires, the "decoupling" is both effective and fair.

9       Four objections contend that the injunctive relief is illusory, because Netflix's obligations

10   under subsections 2.1.1 and 2.1.2 of the Settlement Agreement can be terminated if Netflix ceases

11   operating its DVD-by-mail service within four years of the Settlement's Effective Date. (*See*, *e.g.*,

12   Dkt. 160 at 3 ("[I]f Netflix ends its DVD-by-mail service in four years, then its obligations to non-

13   settlement class members end.").)[23] But that subsection by its own terms *only* applies to future

14   Netflix subscribers who are not members of the Settlement Class. (*See* Ex. B at § 2.2.3.) Neither

15   can the objectors point to the Settlement's exception for litigation holds (*see* Ex. B at § 2.1.3) as

16   proof that the injunctive relief is meaningless. Simply put, the fact that the Settlement does not try

17   to overwrite temporary *court-ordered* litigation holds does not mean only "some" members get

18   "some" injunctive relief. In fact, the VPPA contemplates this. *See* 18 U.S.C. § 2710 (allowing PII

19   retention if there are "pending requests or orders for access to such information . . . pursuant to a

20   court order.").

21       Twelve objections argue that the injunctive relief would only be adequate if it gave Class

22   Members a chance to opt-in or out of retention on cancellation.[24] (*See*, *e.g.*, Dkt. 185 ("the

23   'injunctive relief' exception section [should be amended] to make clear that the users should be

24   given a choice whether they consent to the storage of their data after the subscription

25   cancellation"); *see also* Dkt. 174 ("I find Netflix has done nothing wrong, and in fact [that]

26   maintaining the information can be very helpful . . . and saves [subscribers] a lot of time should

---

27   [23]      *See* Dkt. 93, 160, 198, 212.

28   [24]      *See* Dkt. 88, 92, 94,102, 124, 146, 171, 174, 178-180, 185.

they stop being a subscriber for any reason and restart later").) Yet, this is *exactly* what the Settlement does—it gives Class Members the ability to control the use of their PII, including by directing Netflix to either retain *or* decouple the information. (*See* Ex. B § 2.2.1.) Likewise, objector James Allen contends that the injunctive relief is only applicable to individuals who have been subscribers for less than 365 days. (Dkt. 111 at 2.) But this objection also misreads the scope of the injunctive relief, which applies to Class Members who have cancelled their Netflix accounts and have not used them within the last 365 days. (*See* Ex. B §§ 2.1.1-2.1.2.)

Finally, one objector asks "that the Court add the word '***affirmatively***' to the phrase '**express consent**'" in Section 2.2.1—suggesting that the addition would somehow "further define" and, presumably, strengthen the deal. (Dkt. 93 at 2-3 (emphasis in original).)[25] The term "express consent" is used throughout a variety of legal contexts, in part because it is a versatile concept. *See*, *e.g.,* 47 U.S.C. § 227(b)(1)(A) (requiring the "the prior express consent of the called party"); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1170 (N.D. Cal. 2010) (*quoting Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009)) (discussing Ninth Circuit's definition of the term "express consent" meaning "consent that is clearly and unmistakably stated"). Attempts at further specificity may only complicate matters. To this point, Subsection (b) of the VPPA contains the word "consent" and, at the same time, lacks the word "affirmative," or its various forms, like "affirmatively." *See* 18 U.S.C. § 2710. If Congress did not see fit to include the word "affirmative" or words of similar import in the statute itself, Plaintiffs can hardly be criticized for not making it part of the injunctive relief that requires an understanding of and adherence to that statute.

In sum, none of the common objections to the injunctive component of the Settlement in any way impugn its value or merit denying final approval.

---

[25] This same objector also believes that Netflix should have to state who it sold class members' PII to. (Dkt. 93 at ¶ 5.) But, as described in Plaintiffs' Final Approval Motion, Netflix *did not* sell any Class members' PII to any third party. (Final Approval Mot. at 10.) Likewise, this objector believes that the Parties should disclose the confidential number of exclusions required to trigger the Settlement's "blow up provision" (Dkt. 93 at ¶ 10), but such threshold numbers are routinely kept confidential so as to "encourage settlement and discourage third parties from soliciting class members to opt out." *See In re HealthSouth Corp. Secs. Litig.*, 334 F. Appx. 248, 250 n.4 (11th Cir. 2009) (per curiam).

**B.   Objections to the Requested Attorneys' Fees and Incentive Award Have No Basis in Law or Fact.**

In addition to objections discussed above challenging the relief obtained by the Settlement, some challenge Class Counsel's request for Attorneys' Fees and an Incentive Award for the Class Representatives and named plaintiffs. None, however, should give the Court pause in approving the request.

**1.   Class Counsel's fee request is entirely reasonable.**

Forty-one objections question whether Class Counsel are entitled to fees and, if so, whether the fee request here is appropriate. (*See*, *e.g.* Dkt. 88 ("I object to this settlement because it seeks to enrich plaintiffs' counsel in the amount of $2.25 million in attorneys' fees for pursuing worthless claims that produce no benefit for the class members (including me) they purport to represent"); 95 ("[S]ince the class gets nothing, the attorneys should not get anything.")[26] Of these, only twelve[27] were filed after Plaintiffs filed their Final Approval Motion,[28] wherein Class Counsel detailed—at great length—the value of the Settlement to the Class, the significant risks undertaken by Class Counsel in advancing novel theories of liability on a contingency,[29] the substantial work invested in this case to date (to say nothing of the work yet to come), and the legal bases supporting the fee (whether under a percentage or lodestar method), expense, and reward requests. (*See* Final Approval Mot. at 41-56.) That analysis fully justifies the fee request.[30]

---

[26]   *See* Dkt. 85, 88, 93, 95-96, 101, 105-106, 108, 111, 115, 119, 121-122, 124-125, 129, 131, 138, 144, 147, 149, 152, 158, 160-161, 166-167, 174, 198, 200-202, 204, 206, 209-212, 216.

[27]   *See* Dkt. 194, 198, 200-02, 204, 206, 209-12, 216.

[28]   The Final Approval brief was filed with the Court on October 31 and posted to the Settlement Website on November 1, thus defeating the "Tennessee Objectors'" accusation that "Class Counsel have failed to submit or post on the settlement website a motion for attorneys [fees]." (Dkt. 212 at 3.)

[29]   Only one objection—filed by serial objector Joseph Palmer—suggests (without explanation) that this case "does not involve any novel legal questions," (Dkt. 209 at 4), even though, as Plaintiffs explained and among other such issues, this case was the *first* national class action brought under the VPPA's "Destruction of Old Records" provision, 18 U.S.C. § 2710(e). (Final Approval Mot. at 45.)

[30]   For example, in one of the more specific objections to the fee request, Class Member Allen objected that a request for $25,000 in expenses demonstrates that Class Counsel could not possibly justify $2.25 million in fees. (Dkt. 111 at 3.) Without being certain as what Allen's gripe is, Class Counsel can only guess that in Allen's world there must be a certain correlation between out of pockets and time spent. That might be true, except for two things. First, Class Counsel, as a matter of practice, does not charge for legal research fees or routine copying costs (which are much more

1   Nor can the attacks on Class Counsel's fee request call into question the fairness of the
2   Settlement or the fee request itself. First, for example, Class Member Jeffery Gross's objection
3   (submitted well-before Plaintiffs' filed their Final Approval Motion) that most of the attorney time
4   in this case was spent jockeying for the lead counsel position is a non-starter for the primary
5   reason that this is a common fund settlement. (Dkt. 125 at 1.) Gross wants to act like the
6   leadership fight offered nothing to the Class, but he is simply incorrect. As Courts in this Circuit
7   recognize, leadership fights "minimize coordination efforts and . . . create efficiencies" that benefit
8   the class. *In re HP Power Plug & Graphic Card Litig.*, No. 06-cv-02254 RMW, 2008 WL
9   2697192, *3 (N.D. Cal. July 7, 2008). Gross's objection fails for those reasons, as the leadership
10  contest played a critical role in ensuring that the most qualified firm was selected to represent the
11  Class's interests, and it gave the attorneys fighting for lead an incentive to conduct their efforts
12  efficiently. Additionally, the attorney time spent on the leadership dispute only represents a
13  fraction of the overall work done by Class Counsel on the Class's behalf. (Final Approval Mot. at
14  46–48.)

15  Class Member Gross also cites to *Dennis v. Kellogg*, suggesting that the common fund
16  should be valued at $3 million after considering possible tax benefits the *cy pres* distribution
17  would entail for Netflix, and the fact that the selected *cy pres* recipients might use their
18  distributions for operating costs. (*See also* Dkt. 201.) Gross's "tax-break" argument doesn't make
19  sense. Given that cash settlement payments are traditionally considered deductible business
20  expenses, *see Redwood Empire Sav. & Loan Ass'n v. C. I. R.*, 628 F.2d 516, 520 (9th Cir. 1980),
21  Gross wholly fails to establish how this Settlement—a cash settlement paid into a fund and
22  ultimately distributed to *cy pres* recipients—confers any tax benefit to Netflix above and beyond a
23  traditional cash settlement, paid into a fund and distributed to class members. Additionally, the
24  cited concerns from *Kellogg* only arose because the Ninth Circuit had *no* basis for valuing the
25  relief purportedly obtained for the class—in that case, the settlement simply stated that *Kellogg*
26  would "donate '$5.5 million *worth*' of food," and the Court went to great lengths to explain that
27
28  correlated with time spent). Second, the $25,000 does not represent the full costs expended, rather
    it represents the artificial ceiling negotiated by Class Counsel.

1   they had no idea what that meant. *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012). Here, in

2   contrast, there's no question of how to value the common fund: it's $9 million. In *cy pres* fund

3   cases, courts *always* look to the cash value of the fund, *see, e.g., Lane*, 696 F.3d 811 (using the

4   cash value of the settlement fund as basis for reviewing fee award); *Google Buzz*, 2011 WL

5   7460099 (same), and the objectors cite no authority to the contrary. As such, and unlike *Kellogg*,

6   there's no need for the Parties to convince the Court that the Settlement has value.

7        Gross also argues that "it would be an abuse of discretion to apply the percentage of [*sic*]

8   common fund approach to determine reasonable attorney's fees" since, in his view, "the $9 million

9   total settlement bears no relationship to the economic benefit to the class because any such benefit

10   is ephemeral."[31] (Dkt. 211 at 2.) This argument can be easily dispatched by looking to *Lane*. As

11   already explained, the Ninth Circuit, in *Lane* (and following precedent), held that proper *cy pres*

12   distributions offer real value to a class, and that attorneys' fees can be awarded as a percentage of

13   a *cy pres* fund. *See e.g., Lane*, 696 F.3d at 819 (approving approximately $2.36 million in fees and

14   costs, and noting that a "district court's review of a class action settlement that calls for a *cy pres*

15   remedy is not substantively different from that of any other class-action settlement . . .""). The

16   Court should use the percentage of the fund approach because the $9 million Settlement Fund is a

17   true common fund that will be paid out in full (*i.e.*, it is non-reversionary) for the benefit of the

18   Class.

19        Gross recommends that the lodestar approach be utilized, but then he complains that a

20   proper analysis can't be had because Class Counsel didn't turn over their complete billing records.

21   Gross, of course, can't (and, thus, doesn't) cite to any case law requiring that Class Counsel

22   publish their billing records in order to justify their lodestar. The Ninth Circuit encourages district

23   courts to cross-check one method of awarding fees against another to ensure that the requested

24

---

25   [31]      Eight objections also seem to argue that a *cy pres* distribution isn't a real recovery, and
         therefore, attorneys' fees aren't warranted. (*See, e.g.*, Dkt. 204 (Contending that "[t]he attempt to
26   impose a 'common fund' 25% award casts doubt on the reasons for the cy pres amount, which . . .
         does not appear to be directed towards the class but, rather, appears to exist to support the attorney
27   fee award.") As already explained, this is not a valid objection. *See, e.g., Lane*, 696 F.3d at 819.
         Thus, these objectors' arguments against the attorneys' fees fail, and the objections should be
28   overruled.

1   fees are  reasonable. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 944 (9th Cir.

2   2011). In performing a lodestar cross-check, mathematical precision is not required. *Young v. Polo*

3   *Retail, LLC*, No. C-02-4546, 2007 U.S. Dist. Lexis 27269 (N.D. Cal. March 8, 2007) ("In contrast

4   to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check

5   can be performed with a less exhaustive cataloging and review of counsel's hours."); *In Re Rite*

6   *Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) ("The lodestar cross-check calculation

7   need entail neither mathematical precision nor bean-counting.").

8          The case of *In re AT&T Corp.*, 455 F.3d 160, 169 (3d Cir. 2006) is right on point. There,

9   objectors to a class action settlement claimed that class counsel's multiplier was misleading

10  because it reflected time spent on a contested lead plaintiff motion. *AT&T*, 455 F.3d at 169. The

11  objectors also suggested that the district court should have required class counsel to submit their

12  time sheets, partly to ensure time spent becoming class counsel was not included in the lodestar

13  calculation. *Id*. The Third Circuit rejected those arguments, reaffirming its belief that the lodestar

14  cross-check calculation need not entail "mathematical precision" or "bean-counting," *Rite*

15  *Aid,* 396 F.3d at 306, and is " 'not a full-blown lodestar inquiry,' " *id.* at 307, n. 16 (quoting

16  Report of the Third Circuit Task Force, Selection of Class Counsel, 208 F.R.D. 340, 423 (2002)).

17  Here, especially because not a single objector requested Class Counsel's time records, the

18  provided declarations summarizing attorney time are more than sufficient. *Id.*

19         Gross has one final bone to pick with Class Counsel: he's decided that they spent too much

20  time on certain tasks like communicating with class members and Netflix's attorneys. (Dkt. 211.)

21  Once again, however, Gross offers no analysis to back up his inflammatory statement that the

22  hours spent by Class Counsel "are either borderline misleading or run of the mill events that occur

23  in nearly every civil case in this District." (*Id.*) Instead, Gross simply makes a few arrogant

24  remarks about the tasks undertaken by Class Counsel by stating, for example, that their remark

25  about facilitating collaboration between all attorneys "means nothing more than having scores of

26  lawyers talking amongst themselves and then using it to justify their fee."  (*Id.*) Fortunately for

27  Class Counsel, an objector's subjective belief as to the appropriate amount of attorney time to

28  expend on a case, and who should expend it, is neither relevant, nor a basis for denying the fee

1    award. *See In re Nuvelo, Inc. Sec. Litig.*, C 07-04056 CRB, 2011 WL 2650592, at *3 n.2 (N.D.

2    Cal. July 6, 2011) (overruling objection to requested attorneys' fees for not being "legitimately

3    earned" by stating that plaintiffs "provided affidavits itemizing attorney hours and expenses").

4    Likewise, the argument that Class Counsel should not speak with Class Members is not simply

5    arrogant, but remarkable for its backwardness. Class Counsel has a duty to investigate the claims

6    available to Class members. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d

7    693 (1981).

8         Thus, the objectors' arguments against  the attorneys' fees fail, and the objections should

9    be overruled.[32]

10              **2.    The challenges to the incentive award misunderstand the Settlement
                        and the case law.**

11        Eleven objections contend that the proposed incentive award is excessive, and should

12    prevent final approval.[33] Eight objections contend that the awards are simply too large to warrant

13    approval. (*See* Dkt. 88, 111, 127, 133, 166, 201, 202, 204.) Three mistakenly believe that a

14    conflict of interest exists between Plaintiffs and the Class. (*See* Dkt. 128, 160, 200.) And four

15    misunderstand the Settlement and incorrectly believe that *each* Class Representative and Named

16    Plaintiff receives a $30,000 award (as opposed to $30,000 collectively). (*See* Dkt. Nos. 127, 133,

17    160, 204.) Each of these objections is fatally flawed and should be overruled.

18        Eight of the objectors contend, without analysis, that the awards are objectively too large,

19    and therefore approval should be denied. (*See* Dkt. 88, 111, 127, 133, 166, 201, 202, 204.) Five of

20    these objections, (Dkt. Nos. 88, 111, 127, 133, and 166), were filed *before* Plaintiffs' Final

21    Approval Motion, which detailed Plaintiffs' involvement in the litigation and the justification for

22    the incentive award. (*See* Final Approval Mot. at 54–55.) And *none* of the eight objections cite to

23    *any* controlling authority in support of their arguments that incentive awards are improper given

24    the lack of a cash payment to the Class. In light of recent authority confirming that incentive

25    awards are proper in *cy pres* settlements as in all others, *see Lane,* 696 F.3d 811 ($10,000

---

26   [32]     Objector Mewhinney raises an additional concern that the Settlement provides her no way
27   to recover attorney fees or costs (*see* Dkt. 208), but provides no reason why she might be so
     entitled.

28   [33]     *See* Dkt. Nos. 88, 111, 127, 133, 128, 160, 166, 200, 201, 202, 204.

1  incentive award for plaintiff Lane); *see also Google Buzz*, 2011 WL 7460099, Plaintiffs'

2  substantial role and risk in the litigation, (*see* Final Approval Mot. at 54–55), and the paucity of

3  support for the objectors' arguments, the Court should deny the objections challenging the

4  incentive award based on magnitude alone.

5         Three objections contend that the incentive awards create a conflict of interest between the

6  Plaintiffs and the Class because they are larger than Plaintiffs' potential recovery at trial. (*See* Dkt.

7  160 ("However, thanks to an aptly named 'incentive payment,' the named plaintiffs have

8  completely different interests."); 200 ("The class representatives and counsel have a significant

9  interest in finalizing the settlement; the class has no interest at all in the matter."); *see also* Dkt.

10  128.) But courts regularly award incentive payments in excess of the statutorily recoverable

11  amount. *See, e.g.*, *Durham v. Cont'l Cent. Credit, Inc.*, No. 07CV1763 BTM WMC, 2011 WL

12  2173769 (S.D. Cal. June 2, 2011) (approving a class representative award of $4,000, comprised of

13  "$1,000 in statutory damages plus $3,000 as an incentive award"); *Perry v. FleetBoston Fin.*

14  *Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) (awarding named representatives $5,000 each when the

15  statute provided for $1,000 in damages); *Rojas v. Career Educ. Corp.*, No. 10-cv-05260 (N.D. Ill.

16  2011) (awarding class representatives each $6,000 when statute provided for $500 in damages,

17  with a potential trebling to $1,500); *Smith v. First Union Mortg. Corp*, No. 98-cv-5360, 1999 WL

18  1081362 (E.D. Pa. Dec. 1, 1999) (approving $7,500 incentive awards to each of two named

19  plaintiffs where statutory maximum was $1,000); *Chakejian v. Equifax Info. Servs., LLC*, 275

20  F.R.D. 201, 220–21 (E.D. Pa. 2011) (approving $15,000 incentive award for each named plaintiff

21  when statutory damages were capped at $1,000 per person). The objectors offer no authority for

22  their contention that an incentive award beyond the potential statutory recovery is improper, and

23  as such, their objections should be denied.

24         And, four objectors fundamentally misunderstand the nature of the incentive award. (*See*

25  Dkt. 127, 133, 160, 204.) They mistakenly believe that each Class Representative will get

26  $30,000. (*See* Dkt. 133 ("The six 'named plaintiffs' are going to rake in $30,000 each."); 204

27  ("The named representatives are to receive $30,000. The rest of the class gets no money. $30,000

28  will buy a luxury car, multiple Rolex watches, over $1,000 DVDs at close to list price, or any

number of other things. So, why is so much money being awarded to them."); Dkt. 160 ("The named plaintiffs would stand to win, at most, $2,500 if the case went to trial; but if the settlement is approved, they get $30,000.")). Because the Plaintiffs are not getting $30,000 each and instead are dividing that amount amongst themselves, (*see* Ex. B § 9.2), and because the incentive awards actually proposed are reasonable, (*see* Final Approval Mot. at 54–55), these objections fail.

As a group, the objections to the incentive awards merely state personal disagreements with this litigation, and therefore cannot stand in the way of final approval.

**C.     The philosophical objections to class actions or the VPPA miss the point and have no place in the analysis of the Settlement.**

Finally, 36 objections raise philosophical concerns with the Settlement.[34] Twenty-seven of those worry that the costs of the Settlement will be passed to Netflix's customers (*i.e.*, to Class Members). (*See*, *e.g.*, Dkt. 122 ("This expense will inevitably be added to the cost of Netflix doing business, which will likely result in Class Members paying **more** for Netflix's services") (emphasis in original); 141 ("If anything, the class members stand to lose from the Settlement by Netflix passing its losses from the Settlement onto consumers (*i.e.*, class members) by way of increased monthly service rates.").[35]  But their concern is equally true of each and every settlement that secures any award against a corporate defendant, whether it be in a class action or governmental action. That concern is not unique to this Settlement, and does not call into question its fairness. Furthermore, their concern is not even a realistic one, as market conditions keep Netflix's prices in check. *See* Mike Masnick, *Massive Exodus From Netflix Over Fee Increase*, TechDirt (Sept. 16, 2011, 7:33 a.m.), http://www.techdirt.com/articles/20110915/17493415974/massive-exodus-netflix-over-fee-increase.shtml (detailing that roughly 600,000 subscribers cancelled their Netflix accounts after Netflix raised subscription prices in 2011). Most tellingly, while Netflix revised its earnings statement to reflect this Settlement months ago, it has not raised its prices to recoup those lost earnings.

---

[34]      *See* Dkt. 85, 92, 94, 97-98, 102, 104, 108, 112, 122-124, 130-131, 137, 140-143, 145-147, 150, 152, 157, 161, 165, 170-171, 178-179, 180, 185, 204-206.

[35]      *See* Dkt. 92, 94, 102, 108, 112, 122, 123-124, 131, 137, 140-143, 146-147, 152, 157, 165, 171, 178-180, 185, 204-206.

Likewise, the 24 objections believing that Netflix's retention practices aren't harmful, (*see*, *e.g.*, Dkt. 88 ("I **want** Netflix to couple this information . . ."); 145 ("I have been satisfied with all of my transactions with Netflix")),[36] have a greater concern with the VPPA itself than with the Settlement, and the final approval determination is not the time for the Court to evaluate the wisdom of a statute. *See Lewis v. McAdam*, 762 F.2d 800, 804 (9th Cir. 1985) (Courts "have no constitutional authority to rewrite a statute simply because [they] may determine that it is susceptible of improvement."). Last, two objectors express their discontent with the class action system (Dkt. 138, 161), but reform of the Federal Rules of Civil Procedure and this country's long history of supporting class actions is likewise not before the Court. In the end, that a tiny portion of the Class have lodged what can only be characterized as philosophical objections to the Settlement and the class action device as a whole, takes nothing away from the substantial results achieved for the Class through the Settlement.[37]

## III.   THE "INDIVIDUALIZED" OBJECTIONS FILED IN THIS CASE ARE MISTAKEN AND SHOULD BE DENIED.

While the vast majority the objections to the Settlement raise general concerns and are discussed in Section I, *supra*, five (referred to here as "individualized" objections) require separate treatment.[38]  The bulk of these arguments are presented by attorneys purportedly representing objecting Class Members. However, while these arguments are not specifically addressed by the preceding discussions, none—either alone or together—raise material concerns with the terms of the Settlement.

___

[36]     *See* Dkt. 88, 97-98, 102, 108, 113, 121, 126, 130-131, 135, 137, 139, 142-143, 145, 150, 154, 161, 165-166, 170, 173-174

[37]     A few colorful objections arose that had nothing to do with this case at all. For example, a handful of objectors say they were overcharged in unrelated billing matters, (Dkt. 176, 177), that Class Counsel prejudiced them and caused them financial loss, (Dkt. 89), and other non-meritorious objections. *See* Dkt. 117 (alleging that Netflix subjected his intellectual property to hackers, and then submitting a business proposal), Dkt. 131 (falsely claiming that Class Counsel accessed her information without consent); *see also* Dkts. 89, 113, 136, 155, 172, 181. And others simply misunderstand the nature of the suit, the relief offered, and basic procedural matters. (*See*, *e.g.*, Dkt. 175 (stating that notice is insufficient because it does not state how much money the class gets).)

[38]     To be clear, the objections discussed in this section *additionally* raise "general" points that were discussed above, (*see*, *e.g.*, Section III.B, *infra* (referring to the several "common" objections raised by objector Teri Michigan)), but also raise individualized objections that fall outside of that general analysis.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.   Lisa Katriel's "objection" (Dkt 198) was not properly filed and is mistaken on key points of law and fact.

As explained in Section I, *supra*, the Katriel "objection," was untimely and thus is not properly before the Court. (*See* Edelson Decl. ¶¶ 16, 17, 19.) Nonetheless, in the interests of transparency and thoroughness, Class Counsel addresses Katriel's detailed, but ultimately misguided, arguments below.

Through her "objection," Katriel attacks the settlement from both sides, arguing that it is procedurally unsound and that it is substantively insufficient. But each of Katriel's contentions misunderstand either the facts or the law. As such, while Katriel's "objection" offers great fodder for discussion, it ultimately fails to erect any barrier to approval.

Katriel suggests that, to settle on a class-wide basis, all class members must have identical claims. (Dkt. 198 at 1–10.)  Katriel is wrong. The law does not mandate that, for a settlement to pass muster, all class members have identical claims. *Lane* is again instructive. In *Lane*, the Ninth Circuit held that, there, the common fund recovery—a $9.5 million *cy pres* distribution—was both "substantial under most circumstances" and sufficient in that case because "a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims." *Lane*, 696 F.3d at 824 (emphasis in original). The Ninth Circuit further observed that differing claims and amounts of damages amongst individual class members is "an inherent feature of the class-action device . . . which is why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out . . . [and] pursue their claims separately." *Id.* at 824 (citing *Hanlon*, 150 F.3d at 1024). Likewise, here, because Class members—including those who felt they had stronger or different claims than the rest of the Class—had an opportunity to (and did in fact) opt out, the Settlement comports with due process, especially in light of the analogous and "substantial" $9 million common fund recovery.

Katriel next argues that the Plaintiffs cannot adequately represent the Class, because Plaintiffs are Virginia residents and cannot assert claims under the California Consumer Records Act. (Dkt. 198 at 2–5.) But Cal. Civ. Code § 1798.81—the section of the CCRA under which

1   Plaintiffs have sued Netflix, (*see* Dkt. 61 at 13)—contains no California residency requirement.

2   *See* § 1798.81. Katriel repeatedly cites to Cal. Civ. Code § 1798.81.5 to argue that the California

3   Consumer Records Act claims can *only* be asserted by California residents. As to § 1798.81.5,

4   Katriel is right, but Plaintiffs are not suing under that section. The California legislature clearly

5   knew how to limit a statute to California residents, which is borne out in the section immediately

6   following, and thus, § 1798.81 cannot be limited solely to California residents.

7          Likewise, Katriel mistakenly relies on the Ninth Circuit's recent decision in *Mazza v. Am.*

8   *Honda Motor Co., Inc.*, 666 F.3d 581, 590 (9th Cir. 2012), for the proposition that UCL claims

9   can only be pursued by California residents. (Dkt. 198 at 5-7.) But clear California precedent

10  demonstrates that the UCL can be applied by non-residents. *See*, *e.g.*, *Wershba v. Apple Computer,*

11  *Inc.*, 91 Cal. App. 4th 224, 243 (2001) ("[A] California court may apply [the UCL and California's

12  Consumer Legal Remedies Act] to non-California members of a nationwide class where the

13  defendant is a California corporation and some or all of the challenged conduct emanates from

14  California") (*citing Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612-13 (1987);

15  *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999)). *Mazza* says nothing

16  to the contrary. In *Mazza*, the Ninth Circuit refused to certify a nationwide class bringing UCL

17  claims for false advertising. *See generally*, *Mazza*, 666 F.3d 581. The Ninth Circuit found that

18  because a large portion of the allegedly unlawful conduct (there, false representations made to car

19  purchasers) took place in different states nationwide, and the different states had different

20  requirements for *scienter* and reliance under their consumer protection laws, that the UCL could

21  not be applied to the nationwide class. *Id.* at 591–94.

22         Here, in contrast, no such problem exists. Plaintiffs' UCL claims include allegations of

23  "unlawful" conduct—*i.e.*, violations of the VPPA and CCRA—with uniform standards for

24  liability and harm throughout the country. Furthermore, unlike the allegedly fraudulent conduct in

25  *Mazza*, which was conducted at discrete locations throughout the country (*i.e.* different car

26  dealerships), *id.* at 593-94, the allegedly unlawful conduct here focuses solely on Netflix (and not,

27  as in *Mazza*, communications delivered by Defendant to putative class members) and its conduct

28  undertaken at its corporate headquarters *in California*. Thus, the "place of the wrong,"—the most

1  important factor in a nonresident's ability to bring a UCL claim—here is California. *See id.* at 593

2  (*citing McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 94 n.12 (2010)). As such, none of *Mazza*'s

3  hurdles to nationwide application of the UCL apply, and Plaintiffs are fit to represent the Class in

4  asserting their UCL claims.[39]

5       For the third argument of her "objection," Katriel next contends that representation is

6  inadequate because the Plaintiffs' claims are time-barred. (Dkt. 198 at 7-10.) This argument fails

7  to take into account the fact that the limitations period on Plaintiffs' claims were tolled since

8  Netflix's privacy violations were ongoing. It is well-settled that ongoing violations of the law tolls

9  the statute of limitations. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th

10  Cir. 2002) (finding that for ongoing violations of the Lanham Act, "the statute of limitations is

11  conceivably only a bar to monetary relief for the period outside the statute of limitations; the

12  plaintiff is free to pursue monetary and equitable relief within the limitations period."); *Cf.*

13  *Roberts v. W. Airlines*, 425 F. Supp. 416, 429 (N.D. Cal. 1976) ("The Court agrees that a suit is

14  not barred by the statute of limitations if the single act complained of is part of an ongoing

15  violation of Title VII."). And, in any event, even if some Class Members' claims were somehow

16  time-barred, it is no barrier to settlement. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales and

17  Marketing Litig.*, 270 F.R.D. 521, 531 n.8 (N.D. Cal. 2010) ("Courts have held . . . that individual

18  issues relating to the statute of limitations do not bar certification where there is otherwise a

19  sufficient showing of commonality.") (*citing Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 477–

20  78 (9th Cir. 1976)). Thus, because Netflix's allegedly unlawful retention of Plaintiffs' PII is an

21  *ongoing* violation, (*see* Dkt. 61 at ¶ 31 (alleging that Netflix retains PII indefinitely)), Katriel's

22  argument that Plaintiffs' claims are time-barred is incorrect and, ultimately, irrelevant.

23       Like most of the other objectors, Katriel also mistakenly argues that the relief obtained

24  through the Settlement is inadequate (Dkt. 198 at 11-15.) In this regard, though, Katriel raises two

---

[39]      Furthermore, to the extent Katriel is concerned that the Settlement does not achieve additional recovery for the UCL and CCRA claims, the remedies for those statutes are subsumed by the VPPA (the CCRA has no private right of action, the UCL allows injunctive relief and recovery of actual damages, while the VPPA allows for the greater of actual damages or $2,500), and the actual damages available under the UCL are recovered by the Settlement Fund. (*See* Final Approval Mot. at 31–32.).

1   nuanced—albeit defective—arguments not advanced by the other objectors. First, Katriel argues

2   that due process does not limit a statutory damage recovery, and therefore the Fund is far too small

3   to warrant approval. (*Id.* at 11-14.) That "objection" is essentially nothing more than a

4   disagreement with Class Counsel about the value of the case, and such a disagreement is

5   insufficient to prevent approval. *See, e.g., Nat'l Rural Telecomm'ns Coop*, 221 F.R.D. at 528

6   (quoting *In re Pac. Enterprises Sec. Litig.*, 47 F.3d at 378; *Rodriguez*, 563 F.3d at 965; *Hanlon*,

7   150 F.3d at 1027. Further, as explained in their Final Approval Motion, Plaintiffs do not believe

8   that the due process analysis limits statutory damages, whether brought in a class action or

9   individually. (Final Approval Mot. at 13 n.6.) But Plaintiffs also believe that it is unreasonable and

10  irresponsible to think that a Court would actually allow a $155 *billion* judgment to stand in this

11  case. Though she disagrees with Counsel's assessment of the case, Katriel cannot point to a single

12  statutory privacy case that has resulted in a 10-figure verdict, nor can she cite a single nine-figure

13  privacy settlement. As explained above, Class Counsel's valuation of the case is entitled to

14  deference and it would be inappropriate for the Court to substitute its judgment with that of the

15  Parties. *See Rodriguez*, 563 F.3d at 965–66.

16          In light of the Ninth Circuit's recent *Lane* decision, and the Northern District's approval of

17  the *In re Google Buzz* settlement—both of which involved non-distributable funds, *cy pres*-only

18  relief, statutory damages claims, and funds and fees of similar size to this case—the Court should

19  defer to Class Counsel's judgment, rather than Katriel's. *See Rodriguez*, 563 F.3d at 965 ("We are

20  not persuaded otherwise by Objectors' further submission that the Court should have weighted the

21  merits of the class's case against the settlement amount and quantified the expected value of fully

22  litigating the matter.").

23          And finally, Katriel's second unique attack on the Settlement's recovery contends that Dr.

24  Egelman's damages report is inadequate, and therefore so too is the relief. (Dkt. 198 at 14–15.)

25  Katriel offers two reasons why she believes Dr. Egelman's report is fatally deficient. First, she

26  believes Dr. Egelman should not  have compared the privacy of Netflix viewing histories to

27  privacy of sex toy purchases. (*See* Dkt. 198 at 15.) Second, she believes Dr. Egelman's survey had

28

1    an inadequate sample size from which to draw conclusions. (*Id.*) But Katriel's attacks are flawed

2    for several reasons.

3          First, it is worth noting that Katriel does not claim to be a qualified expert. Thus, her

4    challenge to Dr. Egleman's Report amounts to a layman arguing with the findings of one of the

5    nation's foremost experts on the behavioral economics of privacy.[40] (*See* Dkt. 191-2, Ex. 1 (noting

6    that Dr. Egelman holds a PhD in Computation, Organizations, and Society from the School of

7    Computer Science at Carnegie Mellon University, and published, among other things, a leading

8    paper *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental*

9    *Study*).) It is of little surprise, then, that Katriel's objections fail on their own merit, and result

10   from fundamental reading comprehension errors. For instance, Katriel begins by attacking (as

11   ridiculous) Dr. Egelman's comparison of disclosure of information concerning a sex toy purchase

12   against Netflix's alleged conduct in this case for purposes of determining the value of PII privacy.

13   (Dkt. 198 at 15.) But sex toy purchases were only one of the categories of information to which

14   PII was compared—others were far more innocuous, including textbooks, shoes, and laptops—and

15   Dr. Egelman's report expressly states (1) that sex toy purchases are significantly more sensitive

16   than video rental and viewing histories, (2) that the value assigned to privacy in sex toy purchases

17   would represent the absolute upper bound of any value assigned to VPPA compliance (Dkt. 191-2,

18   Ex. 2 at 4-5), and ultimately, (3) that the sensitivity of video viewing and rental histories is

19   statistically distinguishable from sensitivity of sex toy purchases, (*Id.* at 8-9.) These findings are

20   precisely why Dr. Egelman valued Netflix's VPPA compliance at $0.15 per person, roughly equal

21   to the perceived value of privacy in office supply purchases. (*Id.* at 9.)

22         Likewise, Katriel's second attack on Egelman's report also stems from her misreading.

23   Katriel argues that the relevant sample size in Dr. Egelman's survey was only 16 participants, and

24   thus cannot form the basis of a reliable estimate of damages. (Dkt. 198 at 15 (quoting Dkt. 191-2,

25   Ex. 2 at 5).) But that is not what Dr. Egelman's report says. The language relied upon by Katriel

26   actually refers to a subset of a previous privacy survey done by Dr. Egelman. (*See* Dkt. 191-2, Ex.

---

[40]      It is worth noting that no expert has objected to or otherwise challenged Dr. Egelman's
findings, and none of the objectors have retained an expert to do so either.

2 at 4-6 (describing the results of a 2006 privacy valuation study).) In the survey performed *for this case*, Dr. Egelman conducted an entirely new survey, with a sample size of 173 individuals, including 139 Netflix users, (*id.* at 7), which Dr. Egelman considered sufficient to draw statistically significant conclusions. (*Id.* at 8-9.)

As for the rest of Katriel's objections, they are either addressed above (*see*, *e.g.*, Dkt. 198 at 15-16 (arguing that the injunctive relief is insufficient)), or fall apart without the support of her other objections (*see id.* at 16 (arguing that because damages should be greater and the Class should be smaller, *cy pres* distribution is improper)). Accordingly, the Court should overrule Katriel's objection in whole, and grant final approval.

### B. Teri Michigan's objection (Dkt. 200) is completely mistaken about the *cy pres* process, and asserts a conflict of interest where there is none.

Objector Teri Michigan raises many of the common objections in this case—*e.g.*, that the Class Members should receive a bill credit instead of a *cy pres* distribution, that the proposed *cy pres* distributions lack a nexus to the issues of the case, and that no discovery was undertaken—but also adds a few twists to those now-familiar objections. (*See* Dkt. 200.) Her unique assertions are addressed below.

First, Michigan argues that *cy pres* relief is not proper here because there would be no difficulty in ascertaining the statutory damages available to the Class. (Dkt. 200 at 2.) This objection misunderstands Plaintiffs' position and the governing case law. Plaintiffs do not argue that *cy pres* is warranted because statutory damages are impossible to calculate. Rather, the Parties utilized *cy pres* here in accordance with Ninth Circuit precedent that speaks to recovered-damages being non-distributable. (*See* Final Approval Mot. at 33 (*quoting Lane*, 696 F.3d at 819).) Because the propriety of *cy pres* relief does not depend on damages being incalculable, this first objection fails.

Second, Michigan asserts that the requested fees and incentive award, combined with the *cy pres*-only relief, create a conflict of interest between Plaintiffs and Class Counsel on one hand, and the Class on the other. (Dkt. 200 at 4–5.)[41] But there is no conflict of interest where, as here

---

[41]    Objector Matthew Tanner raises these same points in his objection, (*see* Dkt. 201 at 21–23), and they are responded to herein.

1   Class Counsel is incentivized to obtain the largest recovery possible. *See In re Oracle Sec. Litig.*,

2   852 F. Supp. 1437, 1454 (N.D. Cal. 1994) (citation and internal punctuation omitted) ("[A]

3   percentage of the fund contingent fee is superior as a monitoring device [that is particularly

4   appropriate for class actions] because percentage of the fund better align[s] the interest of lawyer

5   and client. The lawyer gains only to the extent his client gains."). The Ninth Circuit's recent

6   decision in *Lane* puts Michigan's assertion to rest by confirming that incentive and fee awards can

7   be awarded in Settlements using *cy pres* in lieu of cash payments to class members. *See Lane*, 696

8   F.3d at 824–25 ("Unlike the $195,000 *cy pres* fund in *Molski*, the settlement in this case provides

9   for a substantial $9.5 million pay-out by Facebook for the benefit of the class and thus does not

10  present a situation in which class representatives and counsel accepted their respective fees as a

11  quid pro quo for quietly going away while the class receives nothing.").[42]

12       In the end, Michigan's objections are squarely foreclosed by *Lane* and should therefore be

13  overruled.

**C.    Josh Goldfoot's objection (Dkt. 160) was filed before Plaintiffs' Final Approval Motion and asserts no meritorious arguments.**

15       Objector Josh Goldfoot raises a number of unique, but fatally flawed, arguments in his

16  objection, which was filed well before Plaintiffs' Final Approval Motion. First, Goldfoot asserts

17  that the Settlement is similar enough to a coupon settlement that the Class Action Fairness Act's

18  rules regarding fee awards in coupon settlements should apply here. (*See* Dkt. 160 at 4.) Goldfoot

19  makes this assertion with no support in law or fact, and he ignores that coupon settlements have a

20  very specific defining characteristic that is simply not present here: "a coupon settlement is one

21  where the relief constitutes 'a discount on another product or service offered by the defendant in

22  the lawsuit.'" *True*, 749 F. Supp. 2d at 1069 (quoting *Fleury v. Richemont N. Am., Inc.*, No. C-05-

23  4525 EMC, 2008 WL 3287154 at *2 (N.D. Cal. Aug. 6, 2008)). This is a full-cash settlement

---

[42]    Michigan relies on *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003), in support of her "conflict of interest" argument. (*See* Dkt. 200 at 4.) But that case doesn't support her argument in the slightest. In *Molski*, the Court held that the use of a *cy pres* remedy failed because "there [was] no evidence that proof of individual claims would be burdensome or that distribution of damages would be costly." The Court expressly refused to answer whether "a *cy pres* award can ever be used as a substitute for actual damages." 318 F.3d at 955. Because here, Plaintiffs explain why distribution of damages would be prohibitively costly (*i.e.*, would result in no distribution at all), *Molski* is inapposite.

(with the fund being distributed to *cy pres* recipients), and it's treated the same as a fund from which class members could receive direct cash payments. *See Lane*, 696 F.3d at 819 (observing that "[a] district court's review of a class-action settlement that calls for a *cy pres* remedy is not substantively different from that of any other class-action settlement . . ."). Because this is not a coupon settlement, CAFA's coupon settlement rules, by their own terms, don't apply. *See* 28 U.S.C. § 1712 (". . . the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to the class members of the coupons that are redeemed.").

Goldfoot also argues that Plaintiffs are inadequate representatives because they are former subscribers, and they failed to supervise the lawsuit. (Dkt. 160 at 11–12.) But, as described above and in the Final Approval Motion, the Class Members all have similar privacy interests, and Plaintiffs, like the rest of the Class, were incentivized to maximize the value of the injunctive and cy pres relief. As such, Goldfoot's "different interests" argument fails.

Likewise, Goldfoot's argument that Plaintiffs failed to adequately supervise the litigation fails. Specifically, Goldfoot asserts that Plaintiffs are inadequate class representatives because they were not present in the room for the Settlement negotiations or the *cy pres* selection. (*See* Dkt. 160 at 12.) Yet there is no requirement that class representatives be physically present during each negotiation session. Here, Plaintiffs were intricately involved in the settlement of this case, including participating in negotiation strategy sessions during the mediation (albeit remotely). (Edelson Decl. ¶ 46.) Thus, Goldfoot's argument that Plaintiffs failed to take an active enough role in the litigation is simply misplaced.

For the reasons stated above, Goldfoot's objection should be denied in its entirety.

**D.     Kenneth Brown's objection (Dkt. 207) misunderstands controlling precedent and the facts of this case.**

*Pro se* objector Kenneth Brown raises arguments unique to his objection, but he fundamentally misunderstands class actions, both generally, and this one specifically. Brown's first assertion is that current Netflix subscribers should be excluded from the Class because their injuries are not common with former subscribers. (*See* Dkt. 207 at 6-8.) He bases this contention

1  on his views that (1) there was no disclosure violation and (2) current subscribers have not yet

2  suffered a retention injury. (*Id.*) As to the disclosure allegations, all Class Members—whether

3  current or former subscribers—*do* have the same factual basis for their claims, so that aspect of

4  Brown's assertion fails. Regarding the retention claims, and as discussed in Section II.A., *supra*,

5  Brown's contention is contrary to established Ninth Circuit precedent holding that not all class

6  members need to have identical injuries. *See Lane*, 696 F.3d 811 (affirming approval of Settlement

7  where "only a fraction" of the class asserted VPPA claims).

8      Brown then raises what he calls "the elephant in the court room"—*i.e.*, that this Settlement

9  fails because Netflix implemented an arbitration clause before the Settlement received preliminary

10  approval and class members are losing out on their rights to arbitrate their claims. (*See* Dkt. 207 at

11  8–10.) Unfortunately for Brown, this "elephant" exists completely in his fantasy. Arbitration

12  clauses are generally viewed as being hurdles to consumer lawsuits, not something that consumers

13  are holding out for.[43] More to the point, should consumers truly desire to arbitrate their claims

14  (and assuming they can point to an enforceable agreement), they were permitted to exclude

15  themselves from the Settlement, thus preserving all of their claims, even those in arbitration.

16      Turing to Brown's attack on commonality, he argues that Rule 23(a)(2) can't be satisfied

17  because the Class consists of both current (including those that have been members of Netflix for

18  more and less than one year) and former Netflix subscribers. Brown misunderstands the law.

19  Commonality is present where a common nucleus of operative fact exists—even if as to one

20  question of law or fact—and has often been found to require very little. *In re First Alliance*

21  *Mortgage Co.*, 471 F.3d 977, 990-91 (9th Cir. 2006); *see also In re Static Random Access Memory*

22  *(SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009); *Hanlon*, 150 F.3d at 1019 ("[t]he

23  existence of shared legal issues with divergent factual predicates is sufficient, as is a common core

24  of salient facts coupled with disparate legal remedies within the class."). The common contention

25  must be of such a nature that it is capable of class-wide resolution, and that the "determination of

26

27  _____
[43]      *See* Public Citizen and National Association of Consumer Advocates,  *Report: In Wake of Supreme Court's AT&T v. Concepcion Decision, Consumers Are Worse Off* (Apr. 25, 2012),
28  http://www.citizen.org/pressroom/pressroomredirect.cfm?ID=3592.

its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Moreover, the permissive standard of commonality provides that "[w]here the circumstances of each particular class member vary but retain a common core of factual and legal issues with the rest of the class, commonality exists." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008).

Here, as the Court found in it Amended Order granting preliminary approval of the Settlement:

> There are  questions of law or fact common to class members [] because all claims for relief arise from Netflix's stated policy for and uniform practice of retaining and disclosing the personally identifiable information and Entertainment Content Viewing Histories of its subscribers and former subscribers—affecting all those individuals in the same way. Such allegations show that Plaintiffs and the proposed Settlement Class share common statutory claims under the VPPA, as well as various state law claims, that likewise result in common and shared factual and legal questions.

(Dkt. 80, p. 5:1-7.) Given, as the Court correctly points out, that Netflix had a stated policy and uniform practice across both its current and former subscribers of retaining and disclosing their PII, there can be no real question that commonality is present.

Accordingly, Brown's objection should be denied in its entirety.[44]

**E. Donald Salerno's objection (Dkt. 168) inaccurately asserts hardship.**

Finally, objector Donald Salerno contends that final approval must be denied because objections must be sent to three separate addresses (*i.e.*, Class Counsel, Netflix's counsel, and the Clerk of the Court), and because the Court's address listed on the Notice was incomplete because it lacked a courtroom number. (*See* Dkt. 168.) To his first concern, the Northern District regularly approves settlements that require notice to the Court and to the parties' counsel, and there is no reason to depart from that trend here. *See*, *e.g.*, *Hopson v. Hanesbrands, Inc.*, No. 08-cv-0844 EDL, Dkt. 24, 40 (N.D. Cal.); *In re NVIDIA Corp. Derivative Litig.*, No. 6-06-06110-SBA (JCS), Dkt. 163, 185 (N.D. Cal.). And regarding his contention that the listed Court address was incomplete, the Courtroom number was unnecessary because the objections were filed with the

---

[44] This is not Brown's first time objecting to one of Class Counsel's VPPA settlements. In a recent case brought by Class Counsel, *Missaghi v. Blockbuster L.L.C.*, Case No. 11-cv-02559-JRT-JSM (D. Minn.), that Court granted final approval and overruled Brown's objection. *See id.*, Dkt. 61 (D. Minn. Nov. 27, 2012).

1  *Clerk of the Court*, and not in any particular courtroom. (*See* Long-Form Notice,

2  http://www.videoprivacyclass.com/Portals/0/Documents/120724-2395-Netflix-

3  LF_dates%20v2_website.pdf). Further, the Court received over 100 objections mailed to the

4  address listed in the Notice, without a single other person reporting any consternation. (*See*

5  *generally*, Dkt. 81-190, 184-220.) Finally, given that Salerno was able to timely file his objection

6  anyway, his argument becomes all the more spurious.

7  **IV.   THE "PROFESSIONAL OBJECTIONS" FILED IN THIS CASE CONSIST OF
       BOILERPLATE, OBSTRUCTIONIST OBJECTIONS, AND OBJECTIONS**

8  **RAISED BY ATTORNEYS WHO HAVE USED IMPROPER TACTICS TO
       ACHIEVE FINANCIAL GAIN.**

9         Federal Rule 23 rightly affords class members the opportunity to present their objections to

10  the terms of a class action settlement that affects their interests, and in many instances, objectors

11  can and do play a valuable adversarial role when it comes to testing the fairness, reasonableness

12  and adequacy of proposed class action settlements. However, an unfortunate byproduct of this

13  settlement—like others of its size and scope—is that it attracts so-called "professional objectors,"

14  who "routinely represent[] objectors purporting to challenge class action settlements . . . [not] to

15  effectuate changes to settlements, but . . . for [personal financial gain.]" *In re Cathode Ray Tube*

16  *(CRT) Antitrust Litig.*, 281 F.R.D. at 533 (discussing objection of objector represented by

17  Christopher Bandas, who the court described as "a 'professional' or 'serial' objector"); *see also In*

18  *re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d at 1109 (explaining that professional

19  objectors' "goal was, and is, to hijack as many dollars for themselves as they can wrest from a

20  negotiated settlement").

21        The conduct and cost of professional objectors is well documented by the federal courts.

22  "[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that

23  has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost:

24  Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised,

25  gains nothing." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. at 533 n.3 (quoting *In*

26  *re Checking Account Overdraft Litigation,* 830 F.Supp.2d 1330, 1361, n. 30 (S.D. Fla. 2011)); *see*

27  *also In re UnitedHealth Group PSLRA Litig.,* 643 F.Supp. 2d at 1108–09 ("The remoras are loose

28

1   again."); *O'Keefe v. Mercedes–Benz USA, LLC,* 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003)

2   (observing that "Federal courts are increasingly weary of professional objectors.").

3       The *modus operandi* for professional objectors is easy to spot: (1) wait until the very last

4   minute of the objection deadline; (2) file an objection that adds nothing to the court's analysis; (3)

5   on behalf of a client they can control (often a family member, friend, or colleague); (4) threaten

6   appearances, appeals, or other action; and (5) in response to accusations of unethical conduct,

7   suggest it is the *accuser* who is unethical for suggesting improper conduct and/or motivations.[45]

8       This Settlement is no different, having drawn the attention of at least *nine* attorneys who,

9   purportedly acting on behalf of concerned Class Members, resort to some of the most egregious

10   and shameful conduct that, at best, wastes everyone's time and adds nothing to the Settlement, and

11   at worst, is deserving of sanctions and other disciplinary conduct. Those objectors—along with

12   their unique objections—are addressed below.

13   **A.   Padraigin Brown's objection raises no meritorious arguments and is tainted by her attorney's misconduct.**

14       The objections advanced by Padraigin Browne[46] through her renowned objector[47] and

15   "porn pirate"[48] attorney Brett L. Gibbs[49]—*i.e.*, that the *cy pres* recipients were not identified in the

---

16   [45]    Here, for example, attorney Chris Bandas fires a preemptive shot by stating that he has

17   been the undeserving victim of "ad hominem attacks" when objecting to other class action settlements. (Dkt. 210 at 2.).

18   [46]    It appears that Padraigin Brown, is the wife of her attorney Brett Gibbs's Prenda Law

19   business partner, Paul Hansmeier. *See* WeddingChannel.com: PADRAIGIN (PADDY) BROWN and PAUL HANSMEIER Wedding,

20   http://registry.weddingchannel.com/coupledir/20119/B/R318383346/PADRAIGINPADDY_BRO WNE_AND_PAUL_HANSMEIER.htm (last visited Nov. 22, 2012); *see also In re Groupon*

21   *Marketing and Sales Prac. Litig.*, Case No. 3:11-md-02238-DMS-RBB, Objection of Padraigin Brown, Dkt. No. 57 (S.D. Cal. July 6, 2012) (Brown objected with Gibbs and her husband, Paul

22   Hansmeier, as her attorneys).

23   [47]    Mr. Gibbs' penchant for lodging baseless objections has been called out by courts in this

     Circuit. As recently as October 15, 2012 a court from the Southern District of California cited Mr.

24   Gibbs' co-counsel's "bold and improper" conduct when he waited until the very last minute to object to a class settlement and then demanded "$30,000 in exchange for his not filing lengthy

25   objections to the class settlement and attorneys' fees request." *Shames v. Hertz Corp.*, 07-CV-2174-MMA WMC, 2012 WL 4903680 at * 1 (S.D. Cal. Oct. 15, 2012).

26   [48]    *See* Violet Blue, *Hacker hater: meet the star client of porn's "most prolific" copyright*

27   *lawyer*, ZDNet (Aug. 20, 2012), http://www.zdnet.com/hacker-hater-meet-the-star-client-of-porns-most-prolific-copyright-lawyer-7000002703/; *see also* Kashmir Hill, *How Porn Copyright Lawyer*

     *John Steele Has Made A 'Few Million Dollars' Pursuing (Sometimes Innocent) 'Porn Pirates,'*

28   Forbes (Oct. 15, 2012), http://www.forbes.com/sites/kashmirhill/2012/10/15/how-porn-copyright-lawyer-john-steele-justifies-his-pursuit-of-sometimes-innocent-porn-pirates/.  *See, e.g., AF*

---

Settlement Agreement, that the *cy pres* selection criteria are somehow insufficient, and that a cash or bill-credit settlement would be preferable—add nothing to the discussion. Each is addressed above, in Section II.A, *supra*, and throughout the Final Approval Motion.

Beyond engaging in some incredibly questionable conduct in pursuing this objection, (*see* Edelson Decl. ¶¶ 20–28), the Brown objection introduces one novel argument: that organizations like the Electronic Frontier Foundation—one of the nation's leading privacy organizations—may use its *cy pres* distribution to support advocacy efforts beyond those related to the class.[50] (*See* Dkt. 190 at 5.) But, Brown is again incorrect. The EFF, like all *cy pres* recipients, has committed to use the funds to promote the privacy interests of the class. Thus, it may not use those funds for other purposes, however laudable.

The Court should deny Brown's objection in its entirety.

**B.      Gary Wilens' objection (Dkt. 194) is entirely baseless and was preceded by attorney misconduct.**

Objector Gary Wilens brings his objection through his attorney and family member Jeffrey Wilens,[51] and presents no arguments that militate against final approval. After his attorney

*Holdings LLC v. Does 1-135*, No. 5:11-cv-03336-LHK, Dkt. No. 43-1 at 4–5 (N.D. Cal. Feb. 23, 2012) (admitting that Prenda Law and its predecessor Steele Hansmeier filed approximately 118 BitTorrent copyright infringement cases involving multiple joined John Doe Defendants—comprising over 15,000 individuals in total—over the course of a year and a half, but that neither firm ever served a single defendant with a Complaint).

[49]      Magistrate Judge Lloyd, from this District, recently condemned Gibbs's business practices: "[T]he court will not assist a plaintiff who seems to have no desire to actually litigate but instead seems to be using the courts to pursue an extrajudicial business plan against possible infringers (and innocent others caught up in the ISP net). Plaintiff seeks to enlist the aid of the court to obtain information through the litigation discovery process so that it can pursue a non-judicial remedy that focuses on extracting 'settlement' payments from persons who may or may not be infringers. This court is not willing to do." *Hard Drive Productions, Inc. v. Does 1-90*, No. 5:11-cv-03825, 2012 WL 1094653, *7 (N.D. Cal. Mar. 30, 2012).

[50]      These concerns are likely rooted in the EFF's public opposition to Prenda Law's tactics. *See* EFF — Issues: Copyright Trolls, http://www.eff.org/issues/copyright-trolls (last visited Nov. 22, 2012).

[51]      Attorney Jeffrey Wilens has a long history of using improper tactics to file meritless objections on behalf of family members. For example, in 2009, Wilens's co-counsel in another class action objection (which raised many of the same erroneous objections Wilens raises here), was sanctioned for improperly soliciting class members to opt-out of the settlement. *See Hernandez v. Vitamin Shoppe Indus., Inc.*, 174 Cal. App. 4th 1441, 1447, 95 Cal. Rptr. 3d 734, 739 (2009). The award of monetary sanctions against Wilens's co-counsel was reversed, but the appellate court upheld the lower court's ruling prohibiting Wilens's co-counsel from contacting any other class members. *Id.* Likewise, earlier this year, Wilens represented his mother in another class action objection, and the Northern District found his objections so completely without merit

1  improperly attempted to leverage the threat of an objection to obtain confidential discovery (and

2  apparently misrepresented on whose behalf he was seeking that information), (*see* Edelson Decl.

3  ¶¶ 29–36), Wilens filed an objection making meritless demands for confidential information, and

4  contending that the Settlement should be thrown out either because the case is worth more than the

5  relief obtained, or because it is frivolous. Each of Wilens's objections fails to withstand even the

6  lowest level of scrutiny.

7      Wilens begins by contending that the Court has insufficient evidence to determine

8  Defendant's maximum exposure. (Dkt. 194 at 2–10.) To that end, Wilens contends that "[i]f this is

9  a frivolous lawsuit, then Class Counsel should not be rewarded. If this lawsuit has merit and

10  Netflix was violating my rights, then Class Counsel should not be rewarded for selling me and the

11  other Class members out." (*Id.* at 1.) But this assertion ignores the middle ground: a lawsuit can

12  have merit, but ultimately succeeding on the merits at trial or recovering a judgment for the

13  statutory amount would pose great challenges. As established in Plaintiffs' Final Approval

14  Motion, that is the case here. (*See* Final Approval Mot. at 10–18); *see also True v. Am. Honda*

15  *Motor Co.*, 749 F. Supp. 2d at 1073 ("[C]olorable legal claims are not worthless merely because

16  they may not prevail at trial. A colorable claim may have considerable settlement value (and not

17  merely nuisance settlement value) because the defendant may no more want to assume a nontrivial

18  risk of losing than the plaintiff does.") (quoting *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783

19  (7th Cir. 2004)).

20      Wilens also makes an absolutist challenge to the *cy pres* doctrine as a whole: "Since the

21  settlement proposes to pay zero dollars to Class Members, even if they suffered violations of

22  subdivision (b) (*i.e.*, their PII was illegally disclosed), the settlement is on its face not fair." (Dkt.

23  194 at 5.) But, as described in Section II.A.1, *supra*, the Ninth Circuit has confirmed that *cy pres*-

24  only funds are acceptable, even in cases asserting statutory damages, and are particularly

25

26

_____

27  that it required him to post a bond before he could appeal the Court's denial of his objections. *See*
   *Miletak v. Allstate Ins. Co.*, C 06-03778 JW, 2012 WL 3686785, at *2 (N.D. Cal. Aug. 27, 2012).

28  Wilens' improper conduct in this litigation is just more of the same.

1  appropriate where, like here, a cash distribution to the Settlement Class was not feasible. *See Lane*,

2  696 F.3d 811.

3  Wilens also contends that the Edelson Declaration attached to the Final Approval Motion,

4  (Dkt. 191-3) was insufficiently detailed to justify the Settlement, specifically because the formal

5  and informal discovery responses produced by Netflix should have been attached. (*See* Dkt. 194 at

6  5-10.) Importantly, Wilens fails to cite a single case in support of his contention that Counsel

7  needed to disclose Netflix's confidential discovery responses to support final approval. It is

8  sufficient that Class Counsel was able to obtain the information necessary to effectively negotiate

9  the Settlement, and the Court can defer to the Parties' reasonable evaluation of the merits of the

10  case. *See Rodriguez*, 563 F.3d at 965 (observing that the Ninth Circuit "has long deferred to the

11  private consensual decision of the parties"); *see also Lobatz v. U.S. West Cellular of Cal., Inc.*,

12  222 F.3d 1142, 1147–48 (9th Cir. 2000) (finding that objector was not entitled to discovery on

13  settlement negotiations merely because she challenged the fairness of the settlement, fees, and

14  costs.). Further, attaching Defendant's discovery responses in support of the Final Approval

15  Motion would violate the protective order entered in this case, (*see* Dkt. 73), as they contain

16  confidential and proprietary information. Wilens simply offers no support for his demand that

17  confidential information produced through discovery be disclosed during the Settlement approval

18  process.[52]

19  Wilens next contends that because Plaintiffs' expert stated that Netflix could sustain a

20  $150 million judgment without going out of business, that $150 million should have been the basis

21  for calculating any recovery. (Dkt. 194 at 11.) But the $150 million figure does not establish the

22  damages that would be awarded at trial. Rather, it shows that the potential statutory damages—

23  which are over a thousand times larger than necessary to drive Netflix out of business—would

24  trigger due process concerns and drive the Court to use actual damages as a basis for recovery.

25  (*See* Final Approval Mot. at 13–15.)

26

---

27  [52]   Further, Wilens specifically stated that he would seek leave from the Court to obtain that
    discovery. Having not even tried to follow through on his promise, he can hardly complain now
28  that he didn't have access to that information. (*See* Edelson Decl. ¶¶ 31, 35.)

1    Wilens next argues that the comparison of this Settlement to *Lane* is inapt because

2    statutory damages are more readily available here. (Dkt. 194 at 12–15.) This argument fails for

3    two reasons. First, Wilens relies on the fact that the only "video tape service provider" in *Lane*

4    was Blockbuster, which "was on the verge of bankruptcy." (Dkt. 194 at 12.) But that does not

5    make statutory damages any less recoverable than this case, where the statutory damages would

6    *assuredly* bankrupt Netflix if awarded. (*See* Final Approval Mot. at 14.) Wilens's argument also

7    ignores that Blockbuster's co-defendant, Facebook, Inc.—which assuredly had significant

8    exposure for its role in the *Beacon* program—is perhaps one of the most profitable companies in

9    history, and *could* afford to pay a statutory damage award well in excess of what Netflix could

10   pay. *See* Section II.A.3, *supra*. Second, Wilens argues that the plaintiffs in *Lane* raised "novel

11   legal theories" and "disputed factual issues" not present in this case, and that statutory damages

12   are more obviously applicable here. (Dkt. 194 at 12.) But Plaintiffs' legal theories here are just as

13   novel, and even less likely to result in the recovery of statutory damages.[53] To that end, for claims

14   where statutory damages would be theoretically available—*i.e.*, concerning the unlawful

15   disclosure of PII—the merits of the disclosure claims in *Lane* are significantly stronger than in this

16   case.[54]

17   Finally, Wilens contends that the fees sought by Class Counsel in this litigation are

18   excessive. (*See* Dkt. 194 at 15–19). Similar objections have already been responded to. *See*

19   _____

20   [53]    *See, e.g.*, *Sterk v. Redbox Automated Retail, LLC*, 806 F. Supp. 2d 1059 (N.D. Ill. 2011)
     *rev'd by* 672 F.3d 575 ("*Redbox I*") (finding a private right of action for damages for claims under
21   § 2710(e)); *Sterk v. Redbox Automated Retail, LLC*, 672 F. 3d 575 (7th Cir. 2012) ("*Redbox II*")
     (finding no private right of action for damages under § 2710(e)); *Sterk v. Redbox Automated
22   Retail, LLC*, No. 11-cv-01729, 2012 WL 1419071 (N.D. Ill. Apr. 24, 2012) ("*Redbox III*")
     (finding, on a motion for leave to amend, that Stored Communication Act private right of action
23   applies to violations of § 2710); *Sterk v. Redbox Automated Retail, LLC*, No. 11-cv-01729, 2012
     WL 3006674 (N.D. Ill. July 23, 2012) ("*Redbox IV*") (finding on motion to dismiss that Stored
24   Communications Act private right of action does not apply to violations of § 2710(e)); *Rodriguez
     v. Sony Computer Entm't Am. LLC*, No. 11-cv-4084, Dkt. 59 (N.D. Cal. Apr. 20, 2012) (finding no
25   private right of action for violations of § 2710(e), and applying "ordinary course of business"
     exception to dismiss disclosure claims); *Sterk v. Best Buy Stores, L.P.*, No. 11-cv-1894, 2012 WL
26   5197901 (N.D. Ill. Oct. 17, 2012) (finding that Plaintiff stated claims under VPPA for disclosure
     and unlawful retention, but dismissing for lack of standing).

27   [54]    Wilens also disputes Counsel's valuation of the unlawful disclosure claims. Because his
     argument is essentially identical to that raised in the Krislov objection, that argument is addressed
28   below in Section III.D, *infra*.

1   Section II.B, *supra*. However, Wilens specifically contends that no more than 500 hours of

2   attorney time were reasonable over the course of this litigation, and that too many attorneys

3   worked on the case. (*Id.*)  Of course, he offers no basis in fact or law whatsoever for his 500 hour

4   benchmark or for his "too many attorneys" assertion, and an objector's subjective belief as to the

5   appropriate amount of attorney time to expend on a case, and who should expend it, is neither

6   relevant, nor a basis for denying the fee award in this case. *See Cummings v. Connell*, 99-cv-2176

7   WBS KJM, 2006 WL 3951867, *5 (E.D. Cal. Nov. 27, 2006) (overruling objector's claim of

8   "'arbitrary' billing practices" because "rigorous statutory and common-law protections" already

9   exist to ensure accurate billing records."). Furthermore, as a result of being chosen after a highly-

10  contested leadership fight, Class Counsel was able to achieve recovery substantially similar to the

11  *Lane* and *Google Buzz* settlements. (*See* Final Approval Mot. at 52–53.)[55]

12          Sensing that his objections entirely lack merit, Wilens resorts to attacking Class Counsel

13  personally. (Dkt. 194 at 18–19.) First, Wilens looks to earlier briefing in the class leadership fight

14  and, citing to cases litigated by Class Counsel's former law partner,[56] falsely asserts that Class

15  Counsel has been involved in bad settlements in the past (including, ironically, *Lane v. Facebook*).

16  (*Id.*) Class Counsel already responded to these baseless accusations via their Reply in support of

17  their motion to be appointed lead counsel. (*See* Dkt. 43 at 8–10.) More importantly, this Court

18  already rejected those contentions in appointing Jay Edelson as first, Interim Lead Class Counsel,

19  and then, second, Class Counsel, following certification of the Settlement Class. (*See* Dkt. 59)

20  Obviously grasping at straws, Wilens concludes his objection by arguing that Class Counsel must

21  have "bought off" the law firm Bursor and Fisher in exchange for allowing the Settlement to

22  proceed. Wilens has no basis to make such a claim and it is absolutely false. Perhaps that is the

23  world in which Wilens lives, but Class Counsel did no such thing. (Edelson Decl. ¶ 36.)

24  _____

25  [55]      Additionally, while Wilens contends that too many attorneys worked on the case,
    spreading work among attorneys with varying degrees of experience—and thus, varying hourly
26  rates—had the intentional effect of keeping the lodestar number low. Class Counsel could, in
    theory, have asked only senior attorneys at Edelson McGuire to perform all the activity in this
27  case, but that would have been inefficient and would have resulted in a much higher fee request.

    [56]      These purportedly inadequate settlements included *Lane*, which was recently upheld by the
28  Ninth Circuit. (*Compare* Dkt. No. 50 at 4 *and*  696 F.3d 811).

Wilens's objections are spurious and should be overruled.

**C.    The Ramsey/Griffs objection (Dkt. 196) is no different from the dozens of baseless objections their attorney has filed in other large class actions.**

Like many of the other professional objectors flocking to this Settlement, attorney Steve A. Miller—purportedly representing objectors Hugh Ramsey and Stephen Griffs—has a long and documented history of filing meritless objections to class action settlements for personal gain.[57] Mr. Miller continues that history with his meritless objections to this Settlement.

As for his "substantive" arguments, Miller suggests that the very act of bringing class actions under statutes that provide sizeable per-violation recoveries (like the VPPA, which provides for $2,500 per violation of the Act) on behalf of a large class (like this one) is *per se* evidence of a "purely fee driven" lawsuit. (Dkt. 196 at 2.) The conclusion follows because, according to Miller, individual actions to recover $2,500 under the VPPA are a far better course of action for "motivated" class members than participating in a class action lawsuit that carries no prospect of monetary recovery for each and every class member. (*Id.*) Such observations carry no weight.

At the outset, and under the terms of the Settlement, if a truly "motivated" class member (such as Hugh Ramsey, presumably) wants to pursue his own VPPA claim, hire his own attorney, and seek a $2,500 recovery from Netflix (a result that has *never* been achieved by any plaintiff,

---

[57]    *See In re Am. Intern. Group, Inc. Sec. Litig.*, No. 04-cv-08141-DAB (S.D.N.Y.) (final approval granted); *Nakash v. nVidia Corp.*, No. 08-cv-04312-JW (N.D. Cal.) (final approval granted); *Blessing v. Sirius XM Radio, Inc.*, No. 09-cv-10035 (HB)(RLE) (S.D.N.Y.) (final approval granted); *Cassese v. Washington Mutual, Inc.*, No. 05-cv-02724 (E.D.N.Y.) (final approval granted); *Fogel v. Farmers Group, Inc.*, No. BC300142 (Los Angeles Super. Ct.) (final approval granted); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL No. 1532 (D. Me.) (final approval granted); *In re Lawnmower Engine Horsepower Marketing & Sales Practices Litig.*, MDL No. 1999 (E.D. Wis.) (final approval granted, Miller appealed and then voluntarily dismissed appeal); *Credit/Debit Card Tying Cases*, J.C.C.P. No. 4335 (San Francisco Super. Ct. (final approval granted); *In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.*, MDL No. 1897 (C.D. Cal.) (final approval granted, Miller appealed and then stipulated to dismissal of appeal); *In re Yahoo! Litig.*, No. 06-cv-2737 CAS (FMOx) (C.D. Cal.) (final approval granted, Miller appealed and then voluntarily dismissed appeal); *White v. Experian Information Solutions*, No. 05-SACV-1070 DOC (MLGx) (C.D. Cal.) (final approval granted); *In re Initial Public Offering Sec. Litig.*, No. 21-MC-92 (SAS) (S.D.N.Y.) (final approval granted); *CLRB Hanson Inds., LLC v. Google, Inc.*, No. 05-cv-03649 JW PVT (N.D. Cal.) (final approval granted); *Milliron v. T-Mobile, USA, Inc.*, No. 08-cv-04149 (JLL) (ES) (D. N.J.) (final approval granted, Miller appealed and later stipulated to dismissal of appeal); *In re Trans Union Corp. Privacy Litig.*, No. 00-cv-4729, 2009 WL 937158 (N.D. Ill. Apr. 6, 2009) (final approval granted, Miller appealed and later voluntarily dismissed the appeal);

1   anywhere), he was free and welcome to do so by excluding himself from the Settlement and

2   proceed accordingly. Further, this idea—*i.e.*, that this class action is inappropriate because it's

3   "simply too big to settle" (Dkt. 196 (*quoting Fraley v. Facebook, Inc.*, No. 11-cv-1726 RS, 2012

4   WL 5838198, *2 (N.D. Cal. Aug. 17, 2012)))—has already been implicitly rejected by Ninth

5   Circuit authority approving the use of *cy pres* in non-distributable fund, statutory damages cases.

6   *See Lane*, 696 F.3d 811; *see also In re Google Buzz Privacy Litig.*, 2011 WL 7460099; *Nachshin*,

7   663 F.3d 1034.

8          Notably, Miller never argues that the *cy pres* or injunctive relief here lacks value for the

9   Class as a whole or for individual Class Members—even the highly "motivated" ones he

10  postulates. Rather, Miller suggests that because *cy pres* and injunctive relief is forward-looking,

11  rather than purely compensatory, it is no substitute for statutory damages. (Dkt. 196 at 3.) That

12  observation is true of any *cy pres* relief and, in any event, the Ninth Circuit has expressly held that

13  the "indirect benefit" to class members flowing from a *cy pres* remedy is appropriate so long as it

14  "account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and

15  the interests of the silent class members . . . ." *Lane*, 696 F.3d at 819-20 (quoting *Nachshin,* 663

16  F.3d at 1036). In other words, the Ninth Circuit has never limited *cy pres* remedies as being

17  appropriate only in cases calling for prospective (as opposed to compensatory) relief.

18         Consequently, Miller's criticisms of this Settlement amount to little more than a complaint

19  against the use of *cy pres* remedies generally in this Circuit. Because the Ninth Circuit has

20  conclusively stated that the type of relief offered here is valid, *see Lane*, 696 F.3d at 819-20;

21  *Nachshin*, 663 F.3d at 1036, the substance of Miller's objections fail.

22         **D.     Matthew Tanner's "objection" (Dkt. 201) was not filed on time,**
                    **misunderstands the facts and law, and establishes a striking pattern of**
23                  **attorney misconduct.**

24         Objector Matthew Tanner's attorney, Clint Krislov, has, in a single objection, managed to,

25  *inter alia*, (1) add to his long history of misconduct,[58] (2) violate numerous ethical rules in his

_____

26  [58]      Clint Krislov has a storied history of ignoring rules of the court and professional conduct
    because he feels like it. The case of *Retired Chicago Police Ass'n v. Firemen's Annuity & Benefit
27  Fund of Chicago* provides a telling example. In that case, a magistrate judge awarded sanctions
    against Krislov "for his failure to correct pleading deficiencies" and for "'fundamental
28  deficiencies' in his request for class certification." 145 F.3d 929, 932 (7th Cir. 1998). The district

attempt to solicit a client (for the purposes of objecting), (*see* Edelson Decl. ¶¶ 37–43), (3)

knowingly and intentionally interfere with the *cy pres* process by encouraging potential *cy pres*

applicants to object to the settlement (rather than apply), (*see id.*), (4) failing to follow the Court-

ordered procedures for filing his client's objection (by lodging an untimely objection), and (5)

making baseless and rambling accusations in his improperly-filed objection. While Krislov's

conduct in this litigation is noteworthy, his attempt at an objection is not.

Despite his having started to recruit clients no later than mid-September, as explained

above, Krislov failed to submit his objection on time. (*See* Edelson Decl. ¶ 37.) To that end, while

the Court-approved long-form Class notice sets forth the procedures for lodging a valid objection

in this case (*i.e.*, requiring that objectors mail their objection to the Clerk of the Court, Class

Counsel, and Defense Counsel no later than November 14, 2012), Krislov neglected to follow

those simple instructions. Thus, even though dozens of *pro se* objectors timely and properly filed

their objections, Krislov sent his to Class Counsel and Defense counsel late, on November 15,

2012.[59] (*See* Ex. C.) Because Krislov failed to follow the most basic Court-ordered procedures for

filing Tanner's objection, it is invalid. (*See* Ex. B at § 5.5.)[60]

---

court adopted the magistrate's recommendations, and, three months later, held Krislov in contempt
for his failure to pay the sanction award. *Id.*

Judge Posner recently characterized Krislov's class action tactics as "something close to
settlement extortion," and noted that in pursuit of his plan, "Krislov [was] nothing if not
determined, indeed pugnacious." *Thorogood v. Sears, Roebuck and Co.*, 624 F.3d 842, 847, 848
(7th Cir. 2010) *judgment vacated by* 131 S. Ct. 3060 (2011). On rehearing, Judge Posner reiterated
his characterization of Krislov's tactics, noting that Krislov's excuses for his conduct were "a
joke." *Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289, 293 (7th Cir. 2010). Later, on remand
from the Supreme Court, Judge Posner confirmed that the Seventh Circuit "unsay nothing [they]
said in [the original opinion], and in [their] other opinions in this protracted litigation, in criticism
of the suits and of lawyer Krislov and his cocounsel." *Thorogood v. Sears, Roebuck and Co.*, 678
F.3d 546, 550 (7th Cir. 2012).

[59]    Strangely, even though Krislov spent enough time familiarizing himself with the
Settlement Agreement and Notice to construct a 28-page objection, he failed to recognize the
easily-understood objection requirements contained therein. Additionally, while Krislov contends
that he is not a professional objector, it appears that he dabbles in the practice. (*See* Ex. G-D, ¶ 6
(noting that Krislov has previously objected to six different class action settlements).)

[60]    It should be noted that in a declaration to the objection (which was sent to Class counsel
but apparently not filed with the Court), Orellana attempts to deny that he either (1) knowingly
contacted a represented party or (2) solicited a client with whom he had no existing relationship.
Unfortunately for Orellana, however, his declaration actually admits both. (*See* Ex. G at ¶ 7
(admitting that he contacted a non-attorney to see if Consumer Watchdog would "consider
working together on the matter").) Neither Attachment A to Krislov's (Orellana's declaration),

---

1  Given his history, Krislov's objections are, unsurprisingly, undeveloped and lack merit.

2 Some—like his claim that the Settlement's injunctive relief is illusory, because Netflix could

3 theoretically re-identify Class Members' information and reconstruct it to personally-identifiable

4 form, even after the de-coupling required by the Settlement—have been already dealt with above.

5 (*See* Dkt. 201 at 3-5.)

6  Krislov's other objections show no more understanding for the applicable law or facts of

7 this case. To that end, Krislov contends that the Settlement must fail because the Class releases its

8 VPPA disclosure claims, but does not receive an injunction to prevent disclosure. (*Id.* at 6.) But as

9 described in Plaintiffs' Final Approval Motion, Netflix did not have any meaningful practice of

10 unlawful disclosure in place, (Final Approval Mot. at 10-12), and therefore any prospective

11 injunctive relief would say essentially nothing more than "obey the law" (rather than correcting

12 conduct, like Netflix's retention practices addressed by this case). Here, there's no need for

13 injunctive relief compelling Netflix to obey § 2710(b), and indeed, any such injunction would be

14 impermissible. *See Brady v. United of Omaha Life Ins. Co.*, No. 12-cv-2245 EMC, 2012 WL

15 3583033, *8 (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669

16 (8th Cir. 1987)) (Because injunctive relief must "describe in reasonable detail . . . the act or acts

17 restrained or required," Fed. R. Civ. P. 65(d)(1)(C), injunctive language "'essentially requir[ing] a

18 party to obey the law in the future is not encouraged and may be struck from an order for

19 injunctive relief.'"). Likewise, Krislov notes that injunctive relief alone cannot compensate the

20 Class for the damages they suffered. (Dkt. 201 at 6-7.) Surprisingly, Krislov is correct on this

21 point, and that is why, in addition to the injunctive relief, the Settlement additionally produced a

22 $9 million fund (which is well in excess of the actual damages) for the benefit of the Class. *See*

23 *Lane*, 696 F.3d at 824–25.

24  Next, Krislov states that the Settlement's *cy pres* relief is insufficient because, to hear him

25 tell it, such relief was only necessary because Class counsel impermissibly expanded the class to

26

27 Attachment B (the September 14th letter from Edelson to Krislov), nor Attachment C (the
  preservation letter) were attached to Tanner's objection, although they were referenced therein.

28 They are included in Exhibit G, the copy of the objection sent by Krislov to Class Counsel.

1   include current subscribers. (Dkt. 201 at 8–12.) This, again, ignores the reality of the situation.

2   Even if the Class included only former subscribers, potential statutory damages would still number

3   in the billions of dollars, and thus would be unrecoverable for many reasons. (*See* Final Approval

4   Mot. at 12-15.) And again, even if the Class were limited to former subscribers, the Settlement

5   Fund would still be depleted by the expenses of the claims distribution process. (*See* Edelson Decl.

6   ¶ 5; *see also* Janowicz Aff. ¶6.) The Fund would still be non-distributable, and *cy pres* would be

7   the appropriate remedy. *See Nachshin*, 663 F.3d at 1038. As a result, even if Krislov were right

8   (he's not) that the Class should include only former subscribers (it shouldn't), a *cy pres*

9   distribution would still be the appropriate form of relief.[61]

10      Next, Krislov attacks Dr. Egelman's report, substituting his own judgment—notably,

11  without an expert of his own—for one of the nation's leading experts on the behavioral economics

12  of privacy.[62] Krislov derides the report for valuing the harm to the Class as part of a "one-time

13  purchase," rather than as part of a recurring monthly fee. (Dkt. 201 at 15.) But this fundamentally

14  misunderstands the nature of Dr. Egelman's report. Dr. Egelman's survey did not ask "how much

15  of your monthly Netflix subscription rate pays for VPPA compliance," it asked participants how

16  much they value VPPA compliance on their own. (*See* Dkt. 191-2, Ex. 2 at 9 ("[b]ased on

17  previous research that has examined willingness to pay for privacy during these types of

18  transactions. . .")). Thus, because the Class did not receive protections they valued at $0.15 per

19  person (as a standalone figure), the monthly recurring Netflix fee is irrelevant, and the Class

20  Members, on average, should have paid $0.15 less to Netflix, per person.

21      What's more, Krislov also attacks Class Counsel's valuation of the case. Specifically, he

22  argues that there is insufficient evidence to support Class Counsel's view that the maximum

23

24

---

25  [61]    Further, Krislov, like Objector Katriel, argues that due process would not limit the
    statutory recovery in this case. The responses to that argument, *see* Section III.A, *supra*, are
26  incorporated herein.

    [62]    Krislov starts by accusing Dr. Egelman of bias, noting that Dr. Egelman works at "the
27  Berkeley University as a postdoctoral researcher and has worked with the Berkeley Center for
    Law and Technology," one of the *Cy Pres* Recipients in this case. (*See* Dkt. 201 at 15.) That
28  personal assault is patently absurd. (*See* Edelson Decl. ¶ 43.)

1    recovery at trial for disclosure claims would be $3 million. (*See* Dkt. 201 at 17.)[63] But that

2    observation proves Class Counsel's point. *Nobody* knows what Plaintiffs' disclosure claims would

3    bring if successful at trial. Given the massive statutory damages, and the absence of actual harm to

4    the Class, Class Counsel believes some nominal damages amount would be awarded—with a *real*

5    value of zero, but estimated here at $3 million across the entire Class. (*See* Final Approval Mot. at

6    14; *see also* Dkt. 194 at 10–11.) For his part, Krislov does not offer his own estimate of (much

7    less a rationale for) a potential disclosure recovery, nor does any other objector for that matter.

8    Thus, given Class Counsel's expertise in the issues involved in this case, and the absolute vacuum

9    in the case law on the issue, the Court should not accept Krislov's invitation to second-guess Class

10   Counsel's valuation and undergo a mini-trial to arrive at its own determination. *See Rodriguez*,

11   563 F.3d at 965; *Nat'l Rural Telecomm'ns. Coop.*, 221 F.R.D. at 528 (quoting *In re Pac.*

12   *Enterprises Sec. Litig.*, 47 F.3d at 378); *Hanlon*, 150 F.3d at 1027.

13          Krislov's penultimate attack focuses on the *cy pres* process, but is nonsensical at best.

14   Essentially, Krislov argues that the Settlement should be denied approval because the *cy pres*

15   recipients are too good. Specifically, he states that the *cy pres* distribution here is improper

16   because "Class Counsel's and Netflix's co-opting of [five groups that have objected to other

17   settlements] serves as nothing more than an attempt to suppress likely opposition, effectively

18   through bribery." (*Id.*) That point is absurd. Class Counsel's efforts to work with the nation's

19   leading privacy organizations were designed to ensure that the best proposals possible were

20   presented, and that the *cy pres* distribution would provide the greatest benefit to the Class in

21   furtherance of the aims of the lawsuit and the underlying statutes. (*See* Final Approval Mot. at 9,

22   20–23.) Indeed, similar procedures were *required* by the Court in *Google Buzz* before final

23   approval was issued. *See* No. 5:10-cv-00672-JW, Dkt. 117 (N.D. Cal. Sept. 16, 2011). For Krislov

24   to contend that there is something improper about ensuring the best possible *cy pres* distribution

25   for the Class is completely obstructionist, insulting, and, most importantly, plainly incorrect.[64]

26   _____

     [63]     Objector Wilens raises the same point, and this section responds to that aspect of his
27   objection as well.

28   [64]     Krislov also contends that control and education could not have prevented the harm
     suffered in this case, and that the *Cy Pres* Recipients are not adequately related to the suit. (*See*

1    Krislov's last point asserts that Class Counsel is inadequate because of purportedly

2    unethical activity. But, as discussed above, Krislov and his associates—not Class Counsel—are

3    the only ones involved in unethical behavior. Krislov asserts that Class Counsel threatened his

4    firm with disciplinary action in an attempt to get Krislov to abandon his objection. (Dkt. 201 at

5    23–24.) That is not true and the letters cited by Krislov for this assertion (but not attached to his

6    objection) belie his accusations. To start, Krislov misrepresents the nature of his correspondence

7    with Class Counsel. Counsel never threatened Krislov—period. (*See* Edelson Decl. ¶¶ 38–42.)

8    Instead, after Class Counsel learned of Krislov's firm's unethical conduct of phoning potential *cy*

9    *pres* applicants and asking them to object to the Settlement, alerted Krislov to that conduct and

10   asked him to investigate, which he promised to do within a week. (*Id.* at ¶¶ 37–39.) He did not,

11   and instead almost immediately denied that his firm did anything wrong. (*Id.* at ¶ 39.) Class

12   Counsel responded with a letter detailing its understanding of Krislov's conduct, and the bases for

13   its concerns. (*Id.* at ¶ 40.) In this context, Counsel referenced the Illinois Rules of Professional

14   Conduct that prohibit solicitations of the sort engaged in by Krislov's firm, and encouraged

15   Krislov to "revise his statement" that he was "*not aware of any wrongful conduct that … our*

16   *people engaged in*." (*Id.* at ¶ 39.) Krislov chose not to, and in so doing, admitted the facts as Class

17   Counsel had described them. *See Perotti v. Quinones*, no. 11-3217, 2012 WL 2855771, at *4 (7th

18   Cir. July 12, 2012) (*citing* Fed. R. Evid. 801(d)(2)(B)). Counsel never threatened anyone with

19   ARDC action, or disciplinary action of any other form.[65] (*Id.* at ¶ 42.) Likewise, the preservation

20   letter sent to Orellana explicitly dealt with preserving documents as necessary *for this litigation*,

21   and not for any other disciplinary proceeding. (*Id.* at ¶¶ 41–42.)

22   Krislov's disingenuous accusations of threats—like his baseless and incorrect accusation

23   of "libel" (Dkt. 201 at 25)—should be ignored,[66] and his objection denied in its entirety.[67]

24   Dkt. 201 at 17–19.) These objections are responded to above. *See* Section II.A.2, *supra*; *see also*
25   note 4, *supra* (Russak Response). Ironically, Krislov complains *both* that the *Cy Pres* Recipients were too carefully chosen and that they were not carefully chosen enough.

26   [65]   A mere reference to the ethical rules would only be perceived as a threat by someone who has, in fact, acted unethically.

27   [66]   Krislov seems to have a historical reflex of launching personal counterattacks whenever his
28   ethical conduct is called into question. For example and as described above, Krislov recently brought a volley of such attacks against one of the leading jurists in the nation, Circuit Judge

**E.      The Cesare and Ford objection (Dkt. 209) is the latest in a long line of meritless objections filed by their attorney.**

Here, Mr. Palmer—a well-known serial objector with a documented history of misconduct[68]—purports to represent three objecting Class Members, Andrew Cesare, Katherine Stohlein, and William Ford. In reality, though, these people are just Palmer's pawns, and his latest objection is just as meritless as each of the thirty-plus objections he has made to class action settlements in recent years, utilizing himself, relatives, and other individuals as "clients."[69] In this case, Mr. Palmer is not seeking to improve the Settlement. Rather, he is embarking on his normal

---

Posner. *See Thorogood*, 627 F.3d at 291 ("Thus, to disparage the merits or professional motivations of the parties or their counsel [*i.e.*, Krislov and Boling] is unjustified and must be corrected because it runs afoul of the Code of Conduct for United States Judges.") (*quoting* Krislov's briefing in the case).

[67]     Krislov's other contentions—that the incentive award creates a conflict of interest, that the recovery for the class is inadequate because Netflix can take a tax deduction, and that the fees are excessive—are raised by other objectors and therefore addressed elsewhere in this brief. *See* Sections II.B.2 (conflict), II.B.1 (tax benefits and fees), *supra.*

[68]     In addition to filing baseless objections (all for the likely purpose of holding up a settlement in hopes of a quick payday), Palmer also regularly engages in questionable conduct. To that end, in past cases Palmer has refused to respond to counsel, refused to have his client sit for depositions or produce documents when his motives or standing has been questioned, acted in violation of court orders, acted in violation of local rules, and appealed an order after the court found his objector had no standing and refused to post an appellate bond as ordered. *See, e.g., Sullivan*, No. CV 08-03893-CW; *Hartless v. Clorox Co*,No. 06-cv-02705-CAB (S.D. Cal.); *In re Mercury Sec. Litig.*, 05-cv-03395-JF (N.D. Cal.); *In re Broadcom Corp. Class Action Litig.*, No. CV-06-5036-R (C.D. Cal.); *In re Dell Sec. Litig.*, No. A- 06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010).

[69]     *See In re: Static Random Access Memory (SRAM) Antitrust Litigation*, (07-md-01819-CW) (Dkt. 1386-2) (N.D. Cal. Sept. 14, 2011) (providing a comprehensive chart of Mr. Palmer's objections, his clients, and his utter lack of results obtained, a true and accurate copy of which is attached at Exhibit H.)

Amazingly, the cataloging of Mr. Palmer's objections included in the attached chart is not inclusive of the totality of his serial objecting. *See also Hartless v. Clorox Co.*, (06-cv-02705-CAB) (S.D. Cal.); *In re Mercury Sec. Litig.*, (05-cv-03395-JF) (N.D. Cal.); *Rodriguez v. West Publ'g Corp*., No. 05-CV-3222 R (MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) (objections overruled, court found objectors added nothing to settlement); *In re Dell Sec. Litig.*, No. A- 06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010) (Mr. Palmer found in violation of the local rules for filing without being admitted by the court); *In re Lawnmower Engine Horsepower Mktg. & Sales Practice Litig.*, No. 08-MD-01999 (E.D. Wis. 2010) (court overruled objections and required $80,000 bond for appeal); *In re MoneyGram Int'l, Inc. Sec. Litig.*, No. 08-CV-883 (D. Minn. 2010): *In re Initial Public Offering Sec. Litig.*, Case No. 21 MC 92 (SAS) (S.D.N.Y. 2009) (court noted Palmer was professional objector and objection overruled); *The Authors Guild, Inc. v. Google, Inc*., No. 05 CV 8136 (S.D.N.Y. 2010); *In re Herley Indus., Inc. Sec. Litig.*, Case No. 06-CV-2596 (JRS) (E.D. Pa. 2010) (overruling objection in its entirety and requiring appeal bond).

pattern of extortion: file a baseless objection he knows will be overturned and then file an appeal

to maximize leverage on the parties to the settlement.[70]

In any event, the substantive points raised by Mr. Palmer's objection do nothing more than

rehash several of the objections already addressed above, by lashing out against the proposed *cy*

*pres* distribution and Class Counsel's fee request. (Dkt. 209 at 2–5.) Mr. Palmer's brief does little

more than adopt conclusory positions opposing those advanced through the Final Approval

Motion. For example:

- Plaintiffs explained that this case involved novel legal issues due in large part to the fact that Plaintiff Milan's complaint "was the nation's first class action specifically alleging a violation of the VPPA's unlawful retention provision" (FA Mot. at 45), but Palmer matter-of-factly contends "[t]his lawsuit does not involve any novel legal questions" (Dkt. 209 at 4);

- Plaintiffs summarized the USC Gould School of Law's proposal to use *cy pres* funds to "help lawmakers and regulators nationwide make sound policy in the area of information privacy law," (Final Approval Mot. at 33), but Palmer counters that USC will use the funds to "most likely . . . train a few attorneys who go on to champion consumer privacy rights down the road" (Dkt. 209 at 3); and,

- Plaintiffs detailed the substantial work that went into this case (Final Approval Mot. at 46-48), but Palmer claims "[t]his lawsuit was uninvolved. Class counsel took some discovery and participated in mediation." (Dkt. 209 at 4.)

Such "no you didn't" tactics are wholly ineffective, and underscore the frivolousness of Palmer's

objection.

As such, the objections advanced by Palmer carry no weight and can be easily rejected.

### F. Patricia Mewinney's objection (Dkt. 208) was filed without even the most basic investigation or understanding of the case.

Among her common objections (all of which are accounted for and addressed above),

Objector Mewhinney raises two arguments that—perhaps owing to their absurdity—were not

raised elsewhere. First, Mewhinney argues that the Settlement does not make her whole for the

tort, contract, and emotional distress damages, or costs and attorneys' fees, she purportedly

incurred (but does not, in any way, either support or explain). (*See* Dkt. 208 at 2.) But Mewhinney

cites to no authority whatsoever stating that she is entitled to damages, nor does she attempt to

---

[70]   Mr. Palmer has had at least thirteen cases "voluntarily dismissed" on appeal, which, more than likely, means he was successful in leveraging the appeal into a personal payment. *See* Ex. H; (*see also* Edelson Decl. ¶¶ 44–45.)

1   calculate what damages she is owed. Nor does Mewhinney explain why—assuming she uniquely

2   had emotional distress for the privacy claims asserted, and had incurred attorneys' fees as a

3   result—she has not excluded herself and filed her own lawsuit. *See Thacker v. Chesapeake*

4   *Appalachia, L.L.C.*, 695 F.Supp.2d 521, 528 (E.D. Ky. 2010) ("It is well settled, however, that

5   '[o]bjections based purely upon individual claims of loss do not warrant disapproval of the

6   proposed settlement.'"  Instead, "the criteria or methodology employed by the litigants is

7   sufficient if its terms, when applied to the entire group of individuals represented, appear

8   reasonable.").

9         Mewhinney's second unique argument—that the Settlement is vague and ambiguous

10  because "it is impossible to ascertain what if any part of the monetary settlement go to any

11  ordinary member of the Class, apart from the named Plaintiffs" is nonsensical. (*See* Dkt. 208 at 2.)

12  As the Settlement Agreement, (Dkt. 76-1 at 12–15), the Preliminary Approval Motion, (Dkt. 76 at

13  9–10), and the Final Approval Motion, (Final Approval Mot. at 19–20), all make clear, the

14  Settlement provides for *cy pres* distributions in lieu of direct cash payments to the Class Members.

15        Mewhinney's objections are meritless and can be quickly rejected.

16  **G.    The Nguyen, Sturtevant, and Shikina objection (Dkt. 202) is entirely devoid of**
        **substance.**

17

18        Objectors Nguyen, Sturtevant, and Shikina, represented by attorneys Johnny Knadler and

19  Ivan Jen (collectively, the "Knadler Objectors") and filing a single objection, raise twelve

20  conclusory objections in a single paragraph—without devoting even a full sentence to each and

21  with no explanation or support for any of them. (*See* Dkt. 202 at 2.) Several of these grounds for

22  objection—such as claims of excessive fees and incentive awards—are rebutted in Section II,

23  *supra*, while several more—inadequate injunctive relief, inadequate compensation, inadequate

24  future protection, and inadequate notice—are thoroughly addressed in Plaintiffs' Final Approval

25  Motion.

26        The remainder of the Knadler Objectors' assertions lack any basis in reality. For example,

27  the Knadler Objectors contend that the Settlement and Notice fail to provide adequate information

28  about the non-profit that will be created, and fail to ensure that the non-profit will benefit the

Class. (Dkt. 202 at 2.) The Knadler Objectors seem to have this Settlement, which does not *create* a non-profit, mixed up with the *Lane v. Facebook* settlement, which did. *See Lane*, 696 F.3d at 817. The Knadler objectors also contend that the Settlement did not leave enough time for the Class to review the Settlement and object. (Dkt. 202 at 2.) Contrary to that assertion, the Court already found the proposed (and, ultimately, implemented) Notice Plan sufficient (*see* Dkt. 80 at 6-8), and, given the Knadler Objectors failure to substantiate their position, there is no reason to depart from that finding. Finally, the Knadler objectors argue that the Court "failed to adequately consider the harm caused in determining any settlement." (Dkt. 202 at 2.) It's not clear what this even means, but the Court previously found the recovery adequate to warrant preliminary approval (*see* Dkt. 80 at 4), and Plaintiffs' Final Approval Motion thoroughly details the relationship between the harm suffered and the relief obtained, (*see* Final Approval Mot. at 10–18, 28, 31–32.)

The Knadler Objectors' unfounded objections should be denied in their entirety.

### H.    Tracey Klinge's objection (Dkt. 206) continues her attorney's history of boilerplate objections designed simply to obstruct.

The objection filed by Thomas L. Cox on behalf of his client, Tracey Klinge,[71] is the latest of a long string of baseless objections filed by Cox in opposition to class action settlements across the country.[72] Although no one can question that Mr. Cox is a prolific objector, his success rate (or, more appropriately, the lack thereof) exposes the frivolousness of his practice.[73] *See id.*

---

[71]    Curiously, although Mr. Cox states that his client's name is Tracey Klinge through his briefing, in the accompanying letter sent to Class Counsel, he substitutes his own last name for that of his client (*i.e.*, "Tracy K. Cox."). (Dkt. 206.) Accordingly, it's unclear exactly who his client is.

[72]    *See In re Mut. Funds Inv. Litig.*, MDL 1586, 2011 WL 1102999 (D. Md. Mar. 23, 2011) (in a case where Cox once again represented Tracey Klinge, the court noted that "[i]t appears that Mr. Cox is a frequent and professional objector, as he has objected or represented objectors in at least six other class actions since 2010.") (citing *In re Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litig.*, MDL No. 08–1982, 2010 WL 1924012 (D.Md. May 11, 2010)); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546 (D.N.J.2010); *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs Litig.*, 733 F.Supp.2d 997; *In re Lifelock, Inc. Mktg. & Sales Prac. Litig.*, MDL No. 08–1977, 2009 WL 2222711 (D.Ariz. July 24, 2009); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, MDL No. 08–1998, 2010 U.S. Dist. LEXIS 131775 (W.D.Ky. Dec. 13, 2010)); *see also Arthur v. Sallie Mae, Inc.*, 10-CV-00198-JLR, 2012 WL 4075238 (W.D. Wash. Sept. 17, 2012) (overruling Cox's objection as "meritless").

[73]    At times, Mr. Cox's brief makes little sense and shows that it was cobbled together with little care for the facts or governing law of this litigation. For example, Cox writes: "Here, the proposed settlement attempts to distribute the funds to **unnamed groups** that advocate for internet

1   (noting that "Mr. Cox's objections were not sustained in any of [the above] cases [cited by the

2   court].")). Like those arguments raised by his serial objector cohorts, the majority of Cox's

3   concerns are quite general, and fall in with those raised by the majority of the *pro se* objections

4   raised in this case. *See* Section II, *supra*. Cox's remaining points, which are unique to his brief, are

5   easily disposed of.

6       Cox repeatedly accuses Class Counsel of "selling out" the Class by pointing to the non-

7   monetary distribution, offering that "[i]t is hard to imagine another settlement result that is more

8   self-serving of the Class Attorneys," and citing to Seventh Circuit case law in support of his

9   conclusion. (Dkt. 206 at 3 (*citing Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006).)[74] Later,

10  Cox additionally (but without analysis) likens this case to *Molski*—presumably because, in that

11  case, the Ninth Circuit rejected a consent decree, which included *cy pres* donations, as "unfair."

12  *Molski v. Gleich*, 318 F.3d at 942.

13      The problem with Cox's analysis is that there is none. To that end, rather than address—in

14  any way—the arguments presented by Plaintiffs regarding the value of the Settlement's *cy pres*

15  and injunctive relief for the Class or the reasons why a cash distribution was not feasible in the

16  case (*see* Final Approval Mot. at 35; *see also* Ex. F at ¶ 6; *Nachshin*, 663 F.3d at 1036 (holding *cy*

17  *pres* appropriate where fund is non-distributable)), Cox takes a shortcut and just concludes "class

18  members will end up with zero." (Dkt. 206 at 3.) That approach fails to account for (or even

19  address) recent Ninth Circuit precedent *approving* settlements relying on a *cy pres* distribution as

20  a primary form of class relief—which this case matches or surpasses. *See Lane*, 696 F.3d at 821.

21      Further, Cox's reliance on *Molski* (likely the one case Cox could quickly find where the

22  Ninth Circuit rejected a settlement using *cy pres* distributions) is wholly misplaced. (Dkt. 206 at

23  5.) There, the Ninth Circuit expressly reserved ruling on the appropriateness of using a *cy pres*

24  award as a substitute for actual damages, and instead held that, in that case, a *cy pres* award was

25  inappropriate because, *inter alia*, "there [was] no evidence that . . . distribution of damages would

26

27  privacy," inserts an impromptu line break, and then writes "the recipients were identified on 11/1/2012." (Dkt. 206 at 9 (emphasis added).)

28  [74]    In his brief, Cox mistakenly identifies this case as coming from the Eighth Circuit.

be costly." *Molski*, 318 F.3d at 954-55. Here, Plaintiffs have explained that the administrative and distribution costs of any monetary distribution would completely consume any settlement fund and, consequently, the proposed *cy pres* and injunctive relief will most effectively utilize the Settlement Fund and provide the maximum benefit to the Class. (*See* Final Approval Mot. at 35; *see also* Ex. F at ¶ 6; *Nachshin*, 663 F.3d at 1036) Cox does not even pretend to address those arguments.

In the end, apart from adding some colorful language, Cox's brief does not call the fairness of the Settlement into question. It should, thus, be rejected as meritless.

### G.   The Schultz objection (Dkt. 210) adds nothing to the discussion.

Perhaps realizing that his reputation precedes him, attorney Chris Bandas—purportedly representing objector Bradley Shultz—fires a preemptive shot, noting that he has been the focus of "unwarranted *ad hominem* attacks" when objecting to other class action settlements in this Circuit. (Dkt. 210 at 2.) Whether such attacks are or are not "warranted," Mr. Bandas cannot escape the negative trail of condemnation and comments levied against him and his serial objections by judges across the country.[75]  Consistent with his reputation, here, Bandas offers nothing more than conclusory remarks that simply oppose individual points discussed at length both here and in the

---

[75]    As recently as August 29, 2012, for example, Bandas was held in contempt by Judge Ware (who additionally struck Bandas's objection to the parties' final settlement) for failing to obey a court order. *Embry v. ACER Am. Corp.*, C 09-01808 JW, 2012 WL 3777163 (N.D. Cal. Aug. 29, 2012). Likewise, this past April, Judge Conti separately observed that "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain . . . [and] has been excoriated by Courts for this conduct." *In re Cathode Ray Tube (CRT) Litig.*, 281 F.R.D. at 533. For her part, Judge Wilken responded to yet another Bandas effort by noting that his "objections were patently frivolous: [his] cookie-cutter written objection bore no particular relationship to the circumstances of the settlement here, and at the hearing, [Bandas] erroneously referred to this case as involving 'defective' tape," which had nothing to do with the class claims or settlement. *Conroy v. 3M Corp.*, No. C 00-2810 CW, 2006 U.S. Dist. Lexis 26271, at *10 (N.D. Cal. August 10, 2006). Unsurprisingly, Bandas fares no better in state courts, where he also plies his serial objection practice. *See, e.g., Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85, "Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission" (Ill. Cir. Ct., Fourteenth Judicial Cir. October 29, 2009) ("The Bandas Objection . . . is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' client . . . the record before the Court demonstrates that Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel . . .").

1   Final Approval Motion[76] (*e.g.*, claiming that the *cy pres* selection process is vague, that

2   distributing cash payouts to Netflix customers is feasible, or that the requested fees are excessive).

3   (*See* Dkt. 210 at 3-6.)

4          In fact, the only "new" contentions raised by Bandas are confused and conclusory

5   assertions that can be quickly rejected. For instance, Bandas claims that Plaintiffs and Class

6   Counsel cannot "take credit for" the injunctive relief contemplated by the Settlement because it

7   "will not occur unless the Settlement is approved." (Dkt 210 at 3 n.1.) But, under that logic (and to

8   the extent Bandas's statement makes any sense at all) no settling Party would ever be able to "take

9   credit for" any aspect of a settlement in a class action case, as all such settlements require court

10  approval and "will not occur unless the Settlement is approved." Relief contemplated by class

11  settlements *always* informs a plaintiff's motion for final approval and request for fees, expenses,

12  and awards. *See, e.g.*, *Lane*, 696 F.3d 811; *Google Buzz*, 2011 WL 7460099.

13         In another nonsensical argument, Bandas faults Class Counsel for not taking an exhaustive

14  effort to identify which Class Members had their PII disclosed, and suggests that there is a

15  problematic conflict between those Class Members who did and those who did not have their

16  information disclosed. (Dkt. 210 at 6.) True to form, that contention wholly ignores the fact that

17  Plaintiffs already explained that their investigation showed that no unlawful disclosures had

18  occurred—so such an individual person-by-person investigation would be fruitless, would

19  artificially inflate Class Counsel's lodestar figure (not to mention being a complete waste of time),

20  and any conflict is purely imagined. (Final Approval Mot. at 10-11.

21                                         Accordingly, Bandas's objections be overruled.

22  **V.     CONCLUSION.**

23         For the foregoing reasons, Plaintiffs respectfully request that this Court overrule each of

24  the objections to the Settlement.

25  _____

[76]    One of Bandas's main problems is that he only cites to Plaintiffs' preliminary approval

26  motion and, even though his objection was filed *after* Plaintiffs moved for final approval, he
    doesn't seem to realize that most of his points are directly taken up by the Final Approval Motion.

27  For example, Bandas complains that the *cy pres* distribution will go to "unnamed charities" (Dkt
    210 at 3), despite each such *cy pres* recipient being identified and discussed in the Final Approval

28  Motion.

1

2

3   November 28, 2012

4                                   Respectfully Submitted,

5                                   **JEFF MILANS and PETER COMSTOCK**,
                                    individually and on behalf of classes of similarly
6                                   situated individuals,

7                                   By: /s/ Jay Edelson
                                    One of Plaintiffs' Attorneys
8

9
    SEAN P. REIS (sreis@edelson.com) – SBN 184044
10  EDELSON MCGUIRE LLP
    30021 Tomas Street, Suite 300
11  Rancho Santa Margarita, California 92688
    Tel: 949.459.2124
12  Fax: 949.459.2123

13
    JAY EDELSON (jedelson@edelson.com)*
14  RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
    ARI J. SCHARG (ascharg@edelson.com)*
15  CHANDLER R. GIVENS (cgivens@edelson.com)*
    EDELSON MCGUIRE LLC
16  350 North LaSalle Drive, Suite 1300
    Chicago, Illinois 60654
17  Tel: 312.589.6370
    Fax: 312.589.6378
18  *Admitted *pro hac vice*
    *Attorneys for Plaintiffs and the Putative Class*
19

20

21

22

23

24

25

26

27

28

### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on DATE, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated:                                                    /s/ Rafey S. Balabanian