# EXHIBIT E

SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone:  949.459.2124
Fax:      949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:      312.589.6378

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | ) Case No. 5:11-cv-00379-EJD |
| | ) |
| | ) **DECLARATION OF JAY EDELSON IN** |
| | ) **SUPPORT OF PLAINTIFFS'** |
| | ) **REPLY IN SUPPORT OF** |
| | ) **MOTION FOR FINAL APPROVAL OF** |
| | ) **SETTLEMENT AND AWARD OF** |
| | ) **ATTORNEYS' FEES, EXPENSES, AND** |
| | ) **INCENTIVE AWARD** |

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.

2.      I am an attorney admitted to practice in the State of Illinois, in the United States District Court for the Northern District of Illinois, and in other federal district courts. I make this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award.

3.       I am the managing partner at the law firm of Edelson McGuire LLC ("EM"), which has been appointed lead counsel in this matter. A true and accurate copy of EM's firm resume is attached as Exhibit 1.

**History of the Litigation and Settlement**

4.       While Class Counsel explored a settlement structure that provided direct cash payments to the Class, such a settlement structure was impossible given the Class size of 62 million individuals. As set forth in the Affidavit of Tiffaney A. Janowicz, with a class size of over 60 million individuals, a cash distribution program would have exhausted the settlement fund approximately three times over, at a cost of between $23 million and $28 million. (*See* Exhibit F to Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award ("Mot. Ex. F"), ¶ 6.)

5.       Furthermore, if the Settlement Class were limited to only former subscribers, the Settlement Fund would still be depleted by the expenses of the claims distribution process, assuming an equal per-Class member distribution cost. (*Cf.* Mot. Ex. F, ¶ 6.)

**The Cy Pres Selection Process in This Litigation**

6.       Given the infeasibility of distributing a cash payment to Class members, the Parties agreed that a *cy pres* distribution would provide the greatest benefit to the Class. The Parties then looked to the *cy pres* selection process required by Judge Ware in the *Google Buzz* litigation as a model for achieving the greatest benefit possible for the Class. Specifically, Class Counsel: solicited proposals from potential *Cy Pres* Recipients regarding their proposed uses of the distribution, responded to and considered Class member feedback regarding the *cy pres* distribution, conferred with Netflix to select the best *Cy Pres* Recipients and the appropriate distribution amounts, and submitted the proposed recipient and distribution list to the Court, both in the Final Approval Brief, (*see* Mot. Fin. App. at 20–23), and as a stand-alone Notice (*see* Dkt. 193). Contemporaneous with the filing of the Final Approval Motion, Class Counsel caused the proposed *cy pres* distribution to be posted to the Settlement Website on October 31, 2012.

7.       As part of the Settlement of this litigation, potential *Cy Pres* Recipients were asked to submit formal proposals containing information about their respective organizations and how the

---

funds would be used if they were to be selected as *Cy Pres* Recipients. This allowed the Parties to make the most informed decision possible in the *cy pres* selection process. Specifically, the selection process called for information regarding: the organization's name and address, a description of current programs relating to technology, law, and privacy and how the program benefits the Class, the organization's annual operating budget and the budgets of its relevant programs, the total *cy pres* distribution requested, the disclosure of connections between the applicant and the Parties, its counsel, Supporting Counsel, or the Court, and the disclosure of any amounts received from the Parties or its counsel in 2011.

8.     In addition to the formal *cy pres* solicitation process, Class Counsel fielded numerous phone calls from Class members who recommended potential *Cy Pres* Recipients. In each instance, Class Counsel worked with the recommending Class member to invite the potential *Cy Pres* Recipients to apply for a distribution. Class Counsel further received statements in support of certain potential recipients. For example, approximately 44 Class members expressed their written support for the International Association of Privacy Professionals to receive funding. Other Class members expressed their written support for other organizations, including the National Organization of Victim Assistance, Family Justice Center Alliance, and the Electronic Privacy Information Center.

9.     Further, Class Counsel considered specific concerns raised by Class members about potential recipients—both over the phone and in formal objections—*before* working with Defense Counsel to determine the final proposed *cy pres* distribution.

10.     For instance, certain Class members contacted Class Counsel and expressed concern that the ACLU—who they believed would divert the money to "political" activity relating to the pro-choice movement—would receive funding. Likewise, one objector specifically noted that she did not want the *cy pres* distribution going to funds "express[ing] a stance on any religious/politically volatile issue." (*See* Dkt. 109.) Other Class members expressed similar concerns. A number more expressed concerns that the money would go to organizations in which Class Counsel had a financial interest.

11.     In response to the Class members' concerns, and consistent with Ninth Circuit authority, Class Counsel and Defense Counsel proposed *Cy Pres* Recipients who focus on consumer

privacy issues and avoided organizations with controversial political positions (and, of course, avoided organizations where conflicts arose).

12.     Class Counsel also worked extensively to ensure that Class members were adequately apprised of all information necessary during the approval process.

13.     To start, the Parties followed this Circuit's instruction that a settlement class be given an adequate opportunity to review, and if necessary, object to Class Counsel's fee motion by filing and posting to the Settlement Website Plaintiffs' Motion for Final Approval, Attorneys' Fees, and Incentive Award on October 31, 2012—two weeks before the objection/exclusion deadline. (*See* Dkt. 191.) Class Counsel then went above and beyond this Circuit's notice requirements by, contemporaneous with filing for their Final Approval Motion, submitting the proposed *cy pres* distribution to the Court and posting it on the Settlement Website. This gave the Class an equal amount of time (*i.e.*, two weeks) to review the requested fees and the proposed *cy pres* distribution.

14.     Further, for any Class member who wanted additional information regarding the *cy pres* selection process, Class Counsel provided real-time information by fielding and responding to Class member inquiries. I specifically spoke to many of these people and was able to personally return calls or emails within 24 hours (when I was unable, I worked with other attorneys at my firm to follow-up).

15.     Not a single Class member requested, from the Court or the Parties, an extension of time to consider the proposed *Cy Pres* Recipients.

***The Katriel and Tanner Objections Were Not Properly Submitted.***

16.     As part of Class Counsel's efforts to ensure the Class received adequate notice of all aspects of this litigation, both the Long-Form Class Notice (a true and correct copy of which is attached as Exhibit 2) and the "Important Dates" page on the Settlement Website (a true and correct copy of which is attached as Exhibit 3) listed the deadlines for Class members to exclude themselves from the Class or object to the Settlement.

17.     As the Long-Form Class Notice and the "Important Dates" page made clear, the postmark deadline for exclusions and objections was November 14, 2012. Regarding objections, to be valid, they had to be mailed to the Clerk of the Court, to Class Counsel, and Defense Counsel, as

1    well as be postmarked by November 14, 2012.

2          18.     On November 15, 2012, Class Counsel received a copy of Matthew Tanner's

3    objection by email. Later in the day, Class Counsel received a hard copy of Tanner's objection. The

4    cover letter to the objection says that it was sent to Class Counsel on November 15, 2012. (*See*

5    Exhibit C to Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of Class

6    Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award ("Mot. Ex. C").)

7    Accordingly, while Class Counsel does not know whether Tanner's objection was postmarked to the

8    Court before the objection deadline, it can confirm that Tanner's objection was not postmarked to

9    Class Counsel by the objection deadline, and Tanner's attempted objection was therefore not

10   properly lodged.

11         19.     Likewise, on November 16, 2012, Class Counsel received a copy of Class member

12   Lisa Katriel's objection, sent by Federal Express. While Class Counsel does not know the date on

13   which Katriel's objection was sent to the Court, the Federal Express tracking number for the

14   envelope establishes that the objection was not mailed until November 15, 2012. (*See* Exhibit D to

15   Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of Class Action Settlement

16   and Award of Attorneys' Fees, Expenses, and Incentive Award ("Mot. Ex. D").) Accordingly,

17   Katriel's objection was not postmarked to Class Counsel before the objection deadline, and Katriel's

18   objection was therefore not properly lodged.

19   ***Attorney Brett Gibbs Lodged His Objection for an Improper Purpose and Employed Unethical
     Tactics in the Wake of His Objection.***

20         20.     On October 31, just hours before Plaintiffs filed their Final Approval Motion, Class

21   member Padraigin Brown, through her attorney Brett L. Gibbs, filed her objection in this case. (*See*

22   Dkt. 190.) The following day, I called Mr. Gibbs at the phone number listed on the objection and left

23   a voice mail informing him that I was interested in discussing the objection. Later that day, two

24   individuals called me from a 1-800 phone number to discuss Brown's objection. The individuals

25   identified themselves as associates of Brett Gibbs's at "Brett Gibbs Law Offices."

26         21.     After a discussion of the merits of the objection and Gibbs's decision to file the

27   objection immediately before the Final Approval Motion rather than waiting for it to be filed to

28

consider the arguments raised in it, I asked Mr. Gibbs's purported associates if they would like me to send a copy of the Final Approval Motion to Mr. Gibbs. They responded in the affirmative, and, as Mr. Gibbs's e-mail address was not listed on the objection, I asked them for Mr. Gibbs's e-mail address. Strangely, the individuals seemed startled by this request and immediately (in a somewhat panicked way) replied that they didn't need the objection sent after all.

22.    This reaction raised suspicions and led me to inquire if the "Brett Gibbs Law Offices" even existed, and whether these individuals worked with Mr. Gibbs at all. The individuals then abruptly—and without explanation—hung up the phone.

23.    After the phone call ended, my firm researched Mr. Gibbs, his practice, and the facts relating to the phone call. We determined that "Brett Gibbs Law Offices" does not appear to exist as a legal entity, that the associates who contacted me regarding Brown's objection did not work at "Brett Gibbs Law Offices," and that the phone number the individuals called from is a number used by Prenda Law—a firm at which Mr. Gibbs is "Of Counsel"—to contact defendants that are the target of Prenda Law's mass copyright infringement lawsuits brought on behalf of pornography studios. Based on the information available, we believed that the men who called were actually associates of Mr. Gibbs's at Prenda Law and had been instructed to misrepresent their affiliation.

24.    In response to the phone call and the subsequent investigation, later in the day on November 1st, I sent Mr. Gibbs a letter detailing my concerns both with the objection and with his alleged colleagues' conduct on the phone call. (A true and accurate copy of the letter is attached hereto as Exhibit 4.)

25.    The next day, November 2nd, Mr. Gibbs sent a response letter (a true and accurate copy of which is attached hereto as Exhibit 5), questioning my professionalism and attempting to fabricate a false record by blatantly misrepresenting the substance and tone of my phone call with his alleged colleagues. Notably, Mr. Gibbs did not address or correct my concern with his alleged colleagues' misrepresentations of their affiliation.

26.    Later that same day, I sent a reply to Mr. Gibbs (a true and correct copy of which is attached hereto as Exhibit 6), correcting his representations regarding the phone call—that he was not present on—noting my concerns regarding his view of the objection, and also reiterating my

concerns regarding his alleged colleagues' misrepresentations.

27.     Finally, on November 6, 2012, Mr. Gibbs responded with yet another letter accusing me of unprofessional conduct and claiming I misrepresented the facts. (A true and correct copy of his letter is attached hereto as Exhibit 7.) Once again, however, Mr. Gibbs refused to discuss the merits of his objection, and he, for the third time, failed to deny my concerns regarding his alleged colleagues' misrepresentations.

28.     Because Mr. Gibbs had three separate chances to address my concerns about his alleged colleagues' misrepresentations but failed to do so, coupled with the fact that his purported colleagues called from a phone number used by Prenda Law, I believe that the men who called me on November 1st were not associates at the "Brett Gibbs Law Offices," but rather were Gibbs colleagues at Prenda Law. As such, Mr. Gibbs's conduct, and that of his colleagues, of misrepresenting their identities and affiliations, is unethical. *See* Ill. Rules of Professional Conduct 7.1, 7.5(d); ABA Model Rules of Professional Conduct 7.1, 7.5(d); *see also* Cal. Bus. & Prof. Code § 6106.

### *Attorney Jeffrey Wilens Improperly Sought Confidential Discovery Information and Misrepresented his Client Relationship.*

29.     Like Brett Gibbs, Jeffrey Wilens—representing his client and family member Gary Wilens—made apparent misrepresentations in connection with his objection to the Settlement. On September 19, 2012, Jeffrey Wilens sent me a letter by fax (a true and accurate copy of which is attached hereto as Exhibit 8), demanding access to the information and documents obtained from Netflix in this litigation, so that he could assess *for himself* the reasonableness of the proposed Settlement. He gave Class Counsel a deadline of four business days to provide the requested information, even though, had he checked the docket, he would have seen that the requested information could not be disclosed pursuant to the protective order in this litigation. (*See* Dkt. 73.) Mr. Wilens's letter also indicated his personal interest in the objection, repeatedly stating *his* need for the information and that *he* was deciding whether to object, thus making it clear his objection was for his own personal gain and without regard for his purported client's best interest.

30.     In a response letter to Mr. Wilens (a true and accurate copy of which is attached

1    hereto as Exhibit 9), I responded to his evaluation of the merits of the case and noted my concerns

2    with his completely arbitrary and unnecessary production deadlines, that he is pursuing his own

3    interest in the case, and that he did not yet have a client, despite his representations to the contrary.

4        31.    Four days later, on September 28, Mr. Wilens responded to my letter (a true and

5    accurate copy of which is attached hereto as Exhibit 10), reiterating his view of the merits of the

6    case: that the case is either frivolous and should be rejected on that ground, or that it is absolutely

7    meritorious, and therefore the Settlement, as a compromise, is inadequate. Mr. Wilens also offered to

8    extend his self-imposed and arbitrary deadline for producing documents, but noted that if the

9    information he was requesting was not forthcoming, he would file a motion to compel discovery.

10   Mr. Wilens failed to respond to our request that he identify his client.

11       32.    In response, on October 5, I sent a letter reiterating our concerns about Mr. Wilens's

12   conduct to date. (A true and accurate copy of the letter is attached hereto as Exhibit 11.)

13       33.    On October 8, Mr. Wilens sent yet another letter (a true and accurate copy of which is

14   attached hereto as Exhibit 12), reiterating his demands for information and absurdly claiming that he

15   lacked the authority to disclose his client's identity.

16       34.    On October 11, I sent Mr. Wilens a final letter (a true and accurate copy of which is

17   attached hereto as Exhibit 13), which summarized our view of both the case and our correspondence,

18   and I again voiced my concerns that Mr. Wilens did not actually have a client, despite his

19   representations to the contrary. Mr. Wilens did not write back to address our concerns regarding his

20   apparent misrepresentations, and the next time we heard from him, he filed an objection on behalf of

21   one of his apparent family members.

22       35.    Mr. Wilens's objection raises many of the same points raised in his letters. His

23   decision to represent a family member suggests that, at the time he first communicated with Class

24   Counsel, he did not have a client despite his representations to the contrary. Interestingly, Mr.

25   Wilens never followed through on his threat to file a motion seeking discovery. (*See* Ex. 10.)

26       36.    Finally, in his objection, Mr. Wilens, without any evidence at all, asserts that Class

27   Counsel must have "bought off" Bursor and Fisher in exchange for allowing the Settlement to

28   proceed. This is false.

DECLARATION OF JAY EDELSON          8          Case No. 5:11-cv-00379-EJD

1   *Clint Krislov's Conduct in this Litigation Demonstrates a Pattern of Deceit and Impropriety.*

2        37.    On September 12, 2012, my firm received a call from Jamie Court, President of

3   Consumer Watchdog, a non-profit that was, at that point, a potential *Cy Pres* Recipient in this

4   litigation. Mr. Court informed my firm that a non-attorney at his organization received a call from

5   John Orellana (who was then a law clerk at Krislov & Associates, Ltd.) asking Consumer Watchdog

6   to object to this Settlement.

7        38.    After receiving Mr. Court's voicemail, Class Counsel called Clint Krislov to hear his

8   side of the story and to discuss Class Counsel's concerns with Krislov's firm's conduct.

9        39.    Krislov indicated that he was unaware of the conduct, and that he would need a week

10  to investigate it further. The next day, Krislov responded with the following email (a true and

11  accurate copy of which is attached hereto as Exhibit 14) stating:

12        I Called you back, got sent to your vmail

13        jay, when you called accusing our firm of unethical actions regarding your Netflix
          settlement, I told you that I would investigate and get back to you.
14
          I'm not aware of any wrongful conduct that you claim our people engaged in.
15
          You seem upset that we did not call you before investigating how others view your
16        Netflix settlement, and ascertaining what action they are contemplating.

17        If you believe that there is something wrong with what our people have done, I would
          appreciate your telling me what it is.
18
19        40.    Class Counsel responded by letter on September 14, 2012 (a true and accurate copy

20  of which is attached hereto as Exhibit 15), providing further detail of the events as Class Counsel

21  understood them and elaborating upon our concerns based upon the information received from

22  Consumer Watchdog. Despite the additional detail provided by our letter to Krislov, he did not

23  respond, thereby confirming our view of the events in question.

24        41.    Later, and for the purposes of maintaining a record of Krislov's conduct in this case,

25  Class Counsel sent a preservation letter to John Orellana (a true and accurate copy of which is

26  attached hereto as Exhibit 16), now an attorney at Krislov's firm, informing him of his duty to retain

27  documents relevant to this litigation.

28        42.    Contrary to the alarm raised in Krislov's objection, Class Counsel never made any

1  threats via its September 14th letter or its subsequent preservation letter. (*See* Ex. 15, 16.)

2       43.    In his objection, Krislov also makes a baseless accusation that Dr. Egelman's report is

3  worthless because of bias. Without fully explaining, Krislov notes that Dr. Egelman works at "the

4  Berkeley University as a postdoctoral researcher and has worked with the Berkeley Center for Law

5  and Technology," one of the *Cy Pres* Recipients in this case. (*See* Dkt. 201 at 15.) In all of Class

6  Counsel's discussions with Dr. Egelman, the issue of *cy pres* proposals never once came up in

7  discussion. Further, the idea that some improper benefit would somehow flow from the Center for

8  Law and Technology, a clinic within the California Berkeley law school, which is itself a smaller

9  part of the University of California – Berkeley, to Dr. Egelman, a researcher at the University (or the

10  other way around, for that matter) defies logic. Mr. Krislov also seems to forget that Mr. Egelman is

11  a compensated expert and thus there would have been no need to find a vehicle to indirectly benefit,

12  even if we did practice like that (which we do not).

13  *Attorney Darrell Palmer is Continuing His Longstanding Practice of Holding-up Settlements to*
    *Get A Quick Payout.*

14

15       44.    Attorney Darrell Palmer filed an objection on behalf of his clients that, like his others,

16  lacks merit and merely serves as a vehicle for appeal. Throughout his prolific career as a serial

17  objector, Palmer has, on at least thirteen different occasions, voluntarily dismissed or stipulated to

18  dismissal of objection appeals. (*See* Exhibit H to Plaintiffs' Reply Memorandum in Support of

19  Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and

20  Incentive Award ("Mot. Ex. H").) Based on my years of experience dealing with professional

21  objectors, I understand this to mean that on at least thirteen different occasions, Palmer has filed

22  frivolous objections, appealed their denial, and then taken a small settlement to go away.

23       45.    Mr. Palmer did that one time with one of our settlements, where he objected on behalf

24  of a non-class member, before ultimately agreeing to withdraw his appeal. (We, of course, paid him

25  no money nor did we give him any consideration of any other kind.)

26  *Plaintiffs More than Adequately Supervised the Litigation.*

27       46.    One objector asserts his belief that Plaintiffs failed to supervise the litigation. (*See*

28  Dkt. 160.) But that assertion—made well before Plaintiffs filed their Final Approval Motion, which

---

1   more thoroughly documented Plaintiffs' role in the case (*see* Dkt. 191 at 54–55)—is simply

2   incorrect. Plaintiffs accepted the burdens and responsibilities attendant to serving as class

3   representatives in a high-profile lawsuit against a popular company, including being intricately

4   involved in the settlement of this case, by, *inter alia*, remotely participating in negotiation strategy

5   sessions during the mediation.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 28, 2012 in Chicago, Illinois.

Jay Edelson

# EXHIBIT 1

# EDELSON MCGUIRE, LLC FIRM RESUME

EDELSON MCGUIRE, LLC is a plaintiff's class action and commercial litigation firm with attorneys in Illinois, Colorado and California.

Our attorneys have been recognized as leaders in these fields by state and federal legislatures, national and international media groups, the courts, and our peers. Our reputation for leadership in class action litigation has led state and federal courts to appoint us lead counsel in many high-profile class action suits, including the recent Thomas the Tank Engine lead paint class actions, the AT&T mobile content class actions, the home equity credit reduction cases, and privacy class actions involving T-Mobile, Facebook, and Netflix. We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy and other issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools and are asked to serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON MCGUIRE is a leader in plaintiffs' class and mass action litigation, with a particular emphasis on technology class actions, and has been called a "class action 'super firm'" by a national organization. (Decalogue Society of Lawyers, Spring 2010.) As has been recognized by federal courts, our firm has an "extensive histor[y] of experience in complex class action litigation, and [is a] well-respected law firm[] in the plaintiffs' class action bar." *In re Pet Food Prod. Liab. Litig.*, MDL Dkt. No. 1850, No. 07-2867 (NLH) (D.N.J. Nov. 18, 2008). A leading arbitrator concurred: "The proof of [the firm's] experience, reputation, and abilities is extraordinary. . . . Each [of their cases] elaborates on the experience and unique success [they] have had in achieving leading roles in the area of 'technology consumer protection class actions.'" (Arbitration award in mobile content class action settlement, August 6, 2009) In appointing EDELSON MCGUIRE interim co-lead in one of the most high profile cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." -In Re JPMorgan Chase Home Equity Line of Credit Litig., No. 10 C 3647 (N.D.Ill, July 16, 2010).

We have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389 (N.D.Cal) (order appointing EDELSON MCGUIRE interim co-lead of privacy class action); see also In re Netflix Privacy Litigation, 5:11-cv-00379 (N.D.Cal. Aug. 12, 2011) (appointing EDELSON MCGUIRE sole lead counsel due, in part, to its "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]")

We have several sub-specialties within our plaintiffs' class and mass action practice group:

**Consumer Technology Class Actions**:  We have established the key precedent under the Telephone Consumer Protection Act concerning text message spam, resulting in multiple eight figure settlements in recent years. We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

**Representative Settlements:**

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton County Sup. Ct., GA):  Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation.  "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Illinois):  Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges.  Case settled for $36 million.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D.Ill):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $16 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.):  Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Case settled for $12 million.

- *Parone v. m-Qube, Inc.* No. 08 CH 15834 (Cook County, Illinois):  Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges.  Case settled for $12.254 million.

- *Rojas v CEC*, No. 1:10-cv-05260 (N.D.Ill):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $19,999,400.

- *Kramer v. B2Mobile, et al*, No. 0-cv-02722-CW (N.D.Cal.):  Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $12.2 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.).  Co-lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $10 million.

- *Williams, et al. v. Motricity, Inc. et al.*, Case No. 09 CH 19089 (Cook

County, Illinois):  Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.):  Lead counsel in class action settlement alleging unauthorized mobile content charges.  Case settled for $7.6 million.

- *Weinstein, et al. v. Airit2me, Inc.*, Case No. 06 C 0484 (N.D. Ill):  Co-lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $7 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (Los Angeles Sup. Ct.):  Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Settlement provided class members with full refunds.

- *Duffy v. Nevis Mobile, LLC*, No. 08 CH 21376 (Cir. Ct. Cook County, IL):  Class counsel in certified class action against mobile content provider for unauthorized mobile content charges resulting in default judgment over $10 million.

- *Zurakov v. Register.com,* No. 01-600703 (New York County, NY):  Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its deceptive practices in registering Internet domain names.  Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

***Privacy/Data Loss Class Actions***: We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Red Box, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft and others involving the failure to protect customers' private information, some resulting from security breaches.

**Representative Cases:**

- *In re Netflix Privacy Litigation,* 5:11-cv-00379 (N.D.Cal.):  Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act  by illegally retaining customer viewing information.  $9 million dollar cy pres settlement has been preliminarily approved.

- *In re Facebook Privacy Litigation,* 10-cv-02389 (N.D. Cal.):  Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *Standiford v. Palm*, No. 5:09-cv-05719-LHK (N.D. Cal.):  Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litigation,* 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *Gaos v. Google,* 10-cv-04809 (N.D. Cal.): Part of a team of attorneys in suit alleging that Google unlawfully disclosed its users' search queries to website owners and other third parties.

- *In re Sidekick Litig.,* No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Abrams v. Facebook, Inc.,* No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

- *Desantis v. Sears,* 08 CH 00448 (Cir. Ct. Cook County, IL): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the internet.

***Products Liability Class Actions***: We have been appointed lead counsel in state and federal products liability class settlements, including a $30, million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada.

### Representative Settlements:

- *Barrett v. RC2 Corp.,* No. 07 CH 20924 (Cir. Ct. Cook County, IL): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.,* No. 07-2867 (D. N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

***Banking Class Actions***: EDELSON MCGUIRE has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Its suits include claims that the certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. EDELSON MCGUIRE achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "Prompt resolution of this matter is

necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring).

**Representative Cases:**

- *Hamilton v. Wells Fargo Bank, N.A.*, 4:09-cv-04152-CW (N.D. Cal.). Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines.

- *Levin v. Citibank, N.A.*, C-09-0350 MMC (N.D. Cal.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Preliminarily-approved settlement restores hundreds of millions of dollars in credit in addition to cash payments.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D.Ill.): suing to enforce HAMP trial plans.

- Settled numerous consumer class actions alleging fraud or other unconscionable behavior by banks and other lenders.

***General Consumer Protection Class Actions:*** We have successfully prosecuted countless class action suits against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers.

**Representative Settlements:**

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D.Ill): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 1:10-cv-02964 (N.D.Ill): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No 3:11-cv-01785-si (N.D.Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763-crb (N.D.Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook County, IL): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook County, IL): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook County, IL): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook County, IL): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook County, IL): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

***Insurance Class Actions*:** We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds.

**Representative Settlements:**

- *Holloway v. J.C. Penney*, No. 97 C 4555, (N.D. Ill.):  One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class.  The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI):  Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds.  The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

*Mass/Class Tort Cases*:  Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions.

**Representative Cases:**

- *Aaron v. Chicago Housing Authority,* 99 L 11738, (Cir. Ct. Cook County, IL):  Part of team representing a group of public housing residents bringing suit over contamination-related injuries.  Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.):  Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International.  Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States.   We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes, to litigation involving corporate takeovers.  We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars.  Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.  All of our attorneys have regularly practiced in

state and federal trial and appellate courts.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner of EDELSON MCGUIRE. He has been recognized as a leader in class actions, technology law, corporate compliance issues and consumer advocacy by his peers, the media, state and federal legislators, academia and courts throughout the country.

Jay has been appointed lead counsel in numerous state, federal, and international class actions, resulting in hundreds of millions of dollars for his clients. He is regularly asked to weigh in on federal and state legislation involving his cases. He testified to the U.S. Senate about the largest pet food recall in the country's history and is advising state and federal politicians on consumer issues relating to the recent federal bailouts, as well as technology issues, such as those involving mobile marketing. Jay also counsels companies on legal compliance and legislative issues in addition to handling all types of complex commercial litigation.

Jay has litigated class actions that have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to Internet businesses, and the interpretation of numerous other state and federal statutes including the Telephone Consumer Protection Act and the Video Privacy Protection Act. As lead counsel, he has also secured settlement in cases of first impression involving Facebook, Microsoft, AT&T and countless others, collectively worth hundreds of millions of dollars.

In addition to technology based litigation, Jay has been involved in a number of high-profile "mass tort" class actions and product recall cases, including cases against Menu Foods for selling contaminated pet food, a $30 million class action settlement involving the Thomas the Tank toy train recall, and suits involving damages arising from second-hand smoke.

In 2009, Jay was named one of the top 40 Illinois attorneys under 40 by the Chicago Daily Law Bulletin. In giving Jay that award, he was heralded for his history of bringing and winning landmark cases and for his "reputation for integrity" in the "rough and tumble class action arena." In the same award, he was called "one of the best in the country" when it "comes to legal strategy and execution." Also in 2009, Jay was included in the American Bar Association's "24 hours of Legal Rebels" program, where he was dubbed one of "the most creative minds in the legal profession" for his views of associate training and firm management. In 2010, he was presented with the Annual Humanitarian Award in recognition of his "personal integrity, professional achievements, and charitable contributions" by the Hope Presbyterian Church. In 2011, he was selected as an Illinois Super Lawyer and, separately, as a top Illinois class action lawyer by Benchmark Plaintiff.

Jay is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting, including serving as panelist on national symposium on tort reform and, separately, serving as a panelist on litigating high-profile cases. He has also appeared on dozens of television and radio programs to discuss his cases. He has taught classes on class action law at

Northwestern Law School and The John Marshall Law School, and has co-chaired a 2-day national symposium on class action issues. He has been an adjunct professor, teaching a seminar on class action litigation at Chicago-Kent College of Law since 2010.

Jay is a graduate of Brandeis University and the University of Michigan Law School.

**MYLES MCGUIRE** is a Partner at EDELSON MCGUIRE. His practice concentrates on consumer protection law, class actions, and legal and political consulting to technology companies. Prior to entering private practice, Myles spent several years operating an Internet advertising company, which was later sold, in addition to counseling high-tech companies on legal issues.

Since turning to plaintiffs' advocacy, Myles has had principle control over many nationwide and multi-state class actions. Drawing on his technological background, his specific area of emphasis is on emerging technology class actions, including those involving electronic commerce, cellular telephony and wireless media, among others. He has served in leadership positions in groundbreaking settlements involving Facebook, Verizon, Sprint, and T-Mobile.

Due to his diverse legal and business expertise, Myles has been asked by members of Congress to comment on proposed legislation in the mobile content industry and has worked with state regulatory bodies in related efforts.

Myles graduated from Marquette University Law School in 2000 and is admitted to practice in Wisconsin and Illinois. He is a member of the National Association of Consumer Advocates and the Chicago Bar Association.

**RYAN D. ANDREWS** is a Partner at EDELSON MCGUIRE, and the Chair of the Telecommunications Practice Group. Mr. Andrews has been appointed class counsel in numerous state and federal class actions nationwide that have resulted in nearly $100 million dollars in refunds to consumers, including Satterfield v. Simon & Schuster, Inc., No. C 06 2893 CW (N.D. Cal.), Gray v. Mobile Messenger Americas, Inc., No. 08-CV-61089 (S.D. Fla.), Lofton v. Bank of America Corp., No. 07-5892 (N.D. Cal.), Paluzzi v. Cellco Partnership, No. 07 CH 37213 (Cook County, Ill.), Parone v. m-Qube, Inc. No. 08 CH 15834 (Cook County, Ill.), and Kramer v. Autobytel, Inc., No. 10-cv-2722 (N.D. Cal. 2010).

In addition, Mr. Andrews has achieved groundbreaking court decisions protecting consumers through the application of the Telephone Consumer Protection Act to emerging text-messaging technology. Representative reported decisions include: Lozano v. Twentieth Century Fox, 702 F. Supp. 2d 999 (N.D. Ill. 2010), Satterfield v. Simon & Schuster, Inc. 569 F.3d 946 (9th Cir. 2009), and Kramer v. Autobytel, Inc., 759 F. Supp. 2d 1165 (N.D. Cal. 2010), In re Jiffy Lube Int'l Text Spam Litig, --- F. Supp. 2d ---, No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012).

Mr. Andrews received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Recently, Mr. Andrews has returned to Chicago-Kent as an Adjunct Professor of Law, teaching a third-year seminar on Class Actions. While in law school, Mr. Andrews was a Notes & Comments Editor for The Chicago-Kent Law Review, as well as a teaching assistant for both Property Law and Legal Writing courses. Mr. Andrews externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of

Illinois, and earned CALI awards for the highest grade in five classes.

A native of the Detroit area, Mr. Andrews graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications.

Mr. Andrews is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and Group Chair at EDELSON MCGUIRE. Rafey focuses his practice on prosecuting consumer technology class actions, banking class actions, and general consumer class actions. He is also co-chair of EDELSON MCGUIRE's business litigation group.

On the plaintiff's side, Rafey has been the court appointed lead counsel in numerous high-stakes class action litigation and has obtained settlements in excess of $50 million.

On the business litigation side, Rafey has represented individual and corporate clients in a wide variety of complex cases, including commercial disputes seeking damages of $60 million and several "bet the company" cases.

Rafey has first-chaired both jury and bench trials, engaged in extensive motion practice, and acted as lead counsel in several mediations and arbitrations.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, Rafey received a certificate in international and comparative law and earned the CALI award for the highest grade in advanced trial advocacy. Rafey received his B.A. in History, *with distinction*, from the University of Colorado – Boulder in 2002.

**STEVEN LEZELL WOODROW** is a Partner and Group Chair at EDELSON MCGUIRE and the firm's hiring attorney. Steven has successfully litigated and settled a number of consumer protection cases through trial, engaged in extensive motion practice, drafted appellate briefs, prosecuted class actions and participated in multi-session mediations.

Prior to joining the firm, Steven was a litigator at a Chicago boutique focusing on consumer protection matters, real estate disputes, fraudulent transfers in bankruptcy and the prosecution of white-knight mortgage fraud cases.

Steven received his J.D. from Chicago-Kent College of Law with High Honors, *Order of Coif*, while earning his certificate in litigation and alternative dispute resolution. During law school, he served as a Judicial Extern for the Honorable Ann C. Williams on the Seventh Circuit Court of Appeals and as President of the Student Bar Association. Steven also served as a Notes and Comments Editor for THE CHICAGO-KENT LAW REVIEW and represented Chicago-Kent at the National Sports Law Moot Court Competition in New Orleans in 2004. Steven was awarded the ABA-ALI Scholarship and Leadership Award for best representing the combination of leadership and scholarship in his graduating class and also received the Lowell H. Jacobson Memorial Scholarship, which is awarded competitively to a student from one of the law schools in the Seventh Circuit to recognize personal commitment and achievement.

Steven received his B.A. in Political Science, *with Distinction*, from the University of Michigan—Ann Arbor in 2002.

**SEAN P. REIS** is Of Counsel to EDELSON MCGUIRE . Sean is an experience trial attorney and business litigator. Sean has experience in a wide-range of litigation matters, including those involving trade secrets, real estate fraud, employment, and consumer issues. Sean has tried sixteen cases, including several multi-week jury trials.

Prior to joining EDELSON MCGUIRE, Sean was trained at an international law firm and later founded his own practice. In 1993, Sean graduated from University of California at San Diego with a degree in quantative economics. Following that Sean graduated from Rutgers University School of Law, Newark, where he was the business editor of the Rutgers Law Review and where he received the graduation for appellate advocacy.

**EVAN M. MEYERS** is Senior Counsel at EDELSON MCGUIRE. Evan is an experienced trial and appellate litigator and has handled a broad range of complex litigation matters, including contract disputes, securities and consumer fraud, employment discrimination, insurance coverage, antitrust, shareholder and tax disputes, business torts and other matters. Evan has managed all aspects of the litigation process, including evaluation and strategic analysis, drafting pleadings in state and federal trial and appellate courts, taking and defending depositions, arguing motions, and representing clients in mediations and settlement conferences. He has also successfully tried cases in state court.

Prior to joining EDELSON MCGUIRE, Evan worked at Drinker Biddle & Reath LLP, where he was an associate in the firm's commercial litigation practice group and represented a wide range of clients in federal and state courts, including manufacturers, insurance and financial services companies, government agencies, close corporations, hospitals, colleges and universities and not-for-profit entities.

Evan received his J.D., cum laude, from the University of Illinois College of Law in 2002, where he was an associate editor of the Elder Law Journal. Additionally, he served as a judicial extern with the Hon. Wayne R. Andersen of the U.S. District Court for the Northern District of Illinois. Evan received his bachelor's degree, with distinction, in political science from the University of Michigan in 1999.

**DAVID DALE** is an Associate at EDELSON MCGUIRE, where he focuses on plaintiff's privacy class actions and litigation.

David received his J.D., magna cum laude, from the John Marshall School of Law, where he was a member of the Law Review, Trial Advocacy Council, and a Teaching Assistant for Prof. Rogelio Lasso in several torts courses. While in law school, David served as a judicial extern to the Honorable James F. Holderman, Chief Judge of the United States District Court for the Northern District of Illinois.

David attended the University of Missouri, where he graduated with a B.J. in Journalism in 2004. Prior to choosing law school, David worked in the fields of marketing, advertising and public relations for the University of Missouri.

**CHRISTOPHER L. DORE** is an Associate at EDELSON MCGUIRE and a member of the Technology and Privacy Practice Group. Chris focuses his practice on emerging consumer technology issues, as well as prosecuting unsolicited text message and online fraud cases.

Chris has been appointed class counsel in multiple class actions, including ground breaking technology, text-spam, and fraudulent marketing cases. (Turner v. Storm8, LLC, (09-cv-05234) (N.D. Cal.) and Espinal v Burger King Corporation, (09-20982) (S.D. Fla.)).

Prior to joining EDELSON MCGUIRE, Chris worked for two large defense firms in the areas of employment and products liability.

Chris graduated magna cum laude from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating magna cum laude from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**CHANDLER GIVENS** is an Associate at EDELSON MCGUIRE, where his practice focuses on technology and privacy class actions. His lawsuits have centered on fraudulent software development, unlawful tracking of consumers through mobile devices and computers, and illegal data retention.

Chandler graduated from the University of Pittsburgh School of Law. While in law school, he was a research assistant for Cyberlaw Professor Dr. Kevin Ashley, and a judicial extern for the Honorable David S. Cercone of the United States District Court for the Western District of Pennsylvania. Chandler received CALI awards for the highest course grades in Negotiations as well as Telecommunications Law. He graduated *cum laude* from Virginia Tech, with a B.S. in business information technology, with a focus on computer-based decision support systems. Chandler sits on the ABA committees for Information Security and e-Discovery.

Before joining the legal profession, Chandler worked as a systems analyst. He is regularly invited to speak on issues ranging from network security to consumer privacy and Internet fraud. Chandler currently leads a team of technology investigative researchers at the firm.

Prior to starting with the firm, Chandler interned at the Virginia Attorney General's Office and the U.S. Department of Justice in Washington, D.C.

**ALICIA HWANG** is an Associate at EDELSON MCGUIRE. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law in May 2012, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON MCGUIRE, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated magna cum laude from the University of Southern California, earning her B.A. in Communication in 2007. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON MCGUIRE. Nick practices in the area of consumer class action and general litigation.

Nick received his J.D., cum laude, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law in 2008 and played on the school's rugby team.

**MEGAN LINDSEY** is an Associate at EDELSON MCGUIRE. Megan practices in the area of consumer class action, focusing on complex class actions in the banking industry.

Prior to joining EDELSON MCGUIRE, Megan worked for several years as a commercial loan underwriter and portfolio officer at Merrill Lynch, Pierce, Fenner & Smith. Megan also worked as an analyst in the troubled asset group at Bank of America, helping to monitor and restructure high-risk loans.

Megan received her J.D. from Chicago-Kent College of Law in May 2011. During law school Megan externed for the Honorable Judge Bauer in the Seventh Circuit Court of Appeals and served as Vice President-Evening Division of the Student Bar Association and Vice President of the Moot Court Honor Society. Megan also represented Chicago-Kent at the National First Amendment Moot Court Competition in Nashville, Tennessee and the National Cultural Heritage Law Moot Court Competition in Chicago, Illinois, and earned the CALI award for obtaining the highest grade in Legal Writing I, Legal Writing II and Trial Advocacy II courses.

Megan graduated with High Honors from DePaul University in July 2005, earning her B.S. in Finance.

**DAVID I. MINDELL** is an Associate at EDELSON MCGUIRE. David practices in the area of technology and privacy class actions.

David has worked on cases involving fraudulent software products, unlawful collection and retention of consumer data, and mobile-device privacy violations. David also serves as a business consultant to private companies at all stages of development, from start-up to exit.

Prior to joining EDELSON MCGUIRE, David co-founded several technology companies that reached multi-million dollar valuations within 12 months of launch. David has advised or created strategic development and exit plans for a variety of other technology companies.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the predominate cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has given speeches related to his research to a wide-range of audiences.

**JOHN OCHOA** is an Associate at EDELSON MCGUIRE. John's practice focuses on consumer class action litigation.

John graduated *magna cum laude* from the John Marshall Law School in May, 2010 and served as Managing Editor for the John Marshall Law Review. His student Comment, which examines bicycling and government tort immunity in Illinois, appears in Vol. 43, No. 1 of the JOHN MARSHALL LAW REVIEW. While in law school, John took advantage of various scholastic opportunities, serving as a research assistant, externing with Judge Thomas Hoffman at the Illinois Court of Appeals, and competing in the ABA National Appellate Advocacy Competition. John was awarded a Herzog scholarship for his academic performance and earned CALI awards for the highest grade in Torts, Property, and Administrative Law.

He received his B.A. with Honors in Political Science from the University of Iowa in 2004.

**EVE-LYNN RAPP** is an Associate at EDELSON MCGUIRE. Eve-Lynn focuses her practice in the areas of consumer and technology class action litigation.

Prior to joining EDELSON MCGUIRE, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (The Honorable Judge Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BENJAMIN H. RICHMAN** is an Associate at EDELSON MCGUIRE and is a member of the firm's Corporate Governance and Business Litigation Practice Group. He handles plaintiff's-side

consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is the director of EDELSON MCGUIRE'S Summer Associate Program.

**ARI J. SCHARG** is an Associate at EDELSON MCGUIRE. He handles all aspects of litigation from pre-filing investigation through trial. In addition to class action litigation, Ari has substantial experience litigating commercial, real estate, employment, and constitutional matters. He also counsels entrepreneurs and works closely with startup companies to manage risk and raise capital.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website. He also regularly tries his cases before judges and juries, including a trial that spanned six months.

Ari is very active in community groups and legal industry associations. He is a member of the Board of Directors of the Chicago Legal Clinic, an organization that provides legal services to low-income families in the Chicago area. Ari acts as Outreach Chair of the Young Adult Division of American Committee for the Shaare Zedek Medical Center in Jerusalem, and is actively involved with the Anti-Defamation League. He is also a member of the Standard Club Associates Committee.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for Law Review and competed nationally in trial competitions. During law school, he also served as a

judicial extern to The Honorable Judge Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**IRINA SLAVINA** is an Associate at EDELSON MCGUIRE focusing on consumer class actions. As a Russian attorney, Irina obtained her LL.M degree in International and Comparative Law, with High Honors, from Chicago-Kent College of Law in 2003. Since that time Irina has had a unique legal career in the United States that started in a boutique law office in Chicago and progressed to the legal department of a major gaming and entertainment company on the east coast.

While working in-house with General Counsel, Irina gained extensive experience in drafting and negotiating company contracts and addressing the day-to-day legal inquiries of management. Irina handled patrons' liability claims, worked with state and local government officials in obtaining and renewing company licenses, and assisted with all aspects of corporate governance and compliance.

Irina earned her J.D. from Chicago-Kent College of Law with High Honors, Order of Coif, in 2009. While in law school, Irina represented Chicago-Kent in the McGee National Civil Rights Moot Court Competition. Irina was also a member of the Chicago-Kent Law Review, and her student note on the issue of a casino liability to problem gambles was published in the March 2010 issue, 85 Chi.-Kent L. Rev. 369. Irina externed for the Honorable Susan E. Cox in the Northern District of Illinois, and earned the CALI award for obtaining the highest grade in Constitutional Law, Evidence, and Legal Writing III courses.

**BEN THOMASSEN** is an Associate at EDELSON MCGUIRE and is a member of the Banking and Financial Services Practice Group.

Ben received his J.D., magna cum laude, from Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and competed in both the ABA National Appellate Advocacy and National Moot Court Competitions. Among other scholarships and awards, Ben earned seven CALI awards for the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before his legal career, Ben worked in and around the Chicago and Washington, D.C. areas, including freelance and firm-based work as a website designer/developer, and many years experience as a film projectionist and media technician for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, summa cum laude, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.

# EXHIBIT 2

United States District Court for the Northern District of California

# If You Are a Current or Former Netflix Subscriber
## A Class Action Settlement Could Affect You

*A Federal Court authorized this Notice. It is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action lawsuit that claims Netflix unlawfully kept and used customer movie and television viewing information. Netflix denies that it has done anything wrong.

- The Settlement includes current and former Netflix subscribers as of July 5, 2012 who live in the U.S. or its territories.

- Your legal rights are affected whether or not you act. This Notice includes information on the Settlement with Netflix. Please read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **EXCLUDE YOURSELF** | This is the only option that allows you to keep any rights you currently have to sue Netflix about the claims in this case. |
| **OBJECT** | Write to the Court about why you do not like the Settlement. You must remain in the Settlement Class to object to the Settlement. After filing a written submission, you may also appear at the Final Approval Hearing. |
| **DO NOTHING** | You will give up your rights to sue Netflix about the claims in this case. |

These rights and options – **and the deadlines to exercise them** – are explained in this Notice.

## What This Notice Contains

**Basic Information**............................................................**PAGE 3**
    1. Why is there a notice?
    2. What is a class action lawsuit?
    3. What is this lawsuit about?

**Who is Included in the Settlement**.......................................**PAGE 3**
    5. Who is included in the Settlement?
    6. What does the Settlement provide?

**Remaining in the Class**.....................................................**PAGE 4**
    7. What am I giving up if I stay in the Class?
    8. What happens if I do nothing at all?

**Excluding Yourself from the Settlement**...............................**PAGE 5**
    9. How do I get out of the Settlement Class?
    10. If I don't exclude myself, can I sue the Defendants for the same thing later?

**Objecting to the Settlement**..............................................**PAGE 5**
    11. How can I object to the Settlement?
    12. What's the difference between objecting and excluding myself from the Settlement?

**Who is Representing You**..................................................**PAGE 6**
    13. Who represents the Settlement Class?
    14. How will the lawyers be paid?

**The Court's Final Approval Hearing**...................................**PAGE 7**
    15. When and where will the Court hold a hearing on the fairness of the Settlement?
    16. Do I have to come to the fairness hearing? May I speak at the hearing?

**Getting More Information**..................................................**PAGE 7**
    17. Where do I get additional information?

## BASIC INFORMATION

**1.  Why is there a notice?**

A Court authorized this Notice because you have a right to know about a proposed Settlement of this class action lawsuit, and about all of your options, before the Court decides whether to give final approval to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

The Court in charge of the case is the United States District Court for the Northern District of California. The case is called *In re Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD. The people who sued are called the Plaintiffs. The Defendant is Netflix, Inc. ("Netflix").

**2.  What is a class action lawsuit?**

A class action is a lawsuit in which one or more plaintiffs sue on behalf of a group or a "class" of people who have similar claims. In this case several former Netflix subscribers (the "Named Plaintiffs"), have sued Netflix on their own behalf and on behalf of other subscribers. In a class action, the court resolves the issues for all Settlement Class Members, except for those who exclude themselves from the Settlement Class.

**3.  What is this lawsuit about?**

The lawsuit claims that Netflix kept and disclosed information, including records on the movies and TV shows its customers viewed, in violation of the Video Privacy Protection Act and other laws.

The Court has not decided in favor of either side in the case. Netflix has denied that it did anything wrong. The Plaintiffs and their attorneys believe that the Settlement is in the best interests of the Settlement Class because it provides an appropriate recovery for Settlement Class members now while avoiding the risk, expense, and delay of pursuing the case through trial and any appeals. Defendant is settling to avoid the expense, inconvenience, and risk and disruption of litigation.

## WHO IS INCLUDED IN THE SETTLEMENT

**4.  Who is included in the settlement?**

The Settlement Class includes anyone in the U.S. or its territories who is a current or former Netflix subscriber as of July 5, 2012.

The Settlement Class does not include: (1) the Settlement Administrator, (2) the Mediator, (3) any respective parent, subsidiary, affiliate or control person of the Defendant or its officers,

directors, agents, servants, or employees as of the date of filing of the Action, (4) any judge presiding over the Action and the immediate family members of any such Person(s), (5) persons who execute and submit a timely request for exclusion, and (6) all persons who have had their claims against Defendant fully and finally adjudicated or otherwise released.

**5.   What does the settlement provide?**

**A. Injunctive Relief.**   Netflix has agreed to change its data retention practices so that it separates (known as "decoupling") Entertainment Content Viewing History (that is, movies and TV shows that someone watched) from identification information for those subscribers who have not been a Netflix for at least 365 days, subject to certain exceptions.  Full details about the injunctive relief under the Settlement are in Sections 2.1 and 2.2 of the Settlement Agreement, which can be found by going to www.VideoPrivacyClass.com.

**B. Payment to the Settlement Fund.**   Netflix has also agreed to establish a $9 million Settlement Fund that, subject to Court approval, will be used to: (1) make donations to not-for-profit organizations, institutions and/or programs approved by the Court, (2) pay notice and settlement administration expenses, (3) pay the Fee Award (attorneys' fees and out of pocket costs) to Class Counsel, and (4) pay a total incentive award of $30,000 to the Named Plaintiffs ($5,000 each) for their services in helping to settle this case.  The Parties have agreed that Netflix will not oppose plaintiffs' request for attorney's fees up to 25% of the Settlement Fund (or $2,250,000), plus up to $25,000 for out of pocket costs.

Any money remaining after paying settlement administration expenses, the attorneys' fees and costs to Class Counsel, and the incentive awards, will be donated to Court-approved, not-for-profit organizations, institutions, or programs.

Proposals from potential donation recipients will be sought, and, after consideration, recommendations will be made to the Court.  A list of the proposed donation recipients will be posted on www.VideoPrivacyClass.com by November 1, 2012.  Full details about the process for selecting recipients are in Section 2.4.3 of the Settlement Agreement, which is available at www.VideoPrivacyClass.com.

## REMAINING IN THE CLASS

**6.   What am I giving up if I stay in the Class?**

If the Settlement becomes final, you will give up your right to sue Netflix for the claims being resolved by this Settlement.  The specific claims you are giving up against Netflix are described in Section 3 of the Settlement Agreement.  You will also be "releasing" Netflix and all related people as described in Section 3 of the Settlement Agreement.  Unless you exclude yourself (*see* Question 8), you are "releasing" these claims.  The Settlement Agreement is available at www.VideoPrivacyClass.com.

The Settlement Agreement describes the released claims with specific descriptions, so read it carefully. If you have any questions, you can talk to Class Counsel listed in Question 12 for free or you can, of course, talk to your own lawyer if you have questions about what this means.

### 7. What happens if I do nothing at all?

If you do nothing, you will not be able to start a lawsuit or be part of any other lawsuit against Netflix for the claims being resolved by this Settlement.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 8. How do I get out of the Settlement Class?

To exclude yourself from the Settlement, you must send a letter (or request for exclusion) by mail stating that you want to be excluded from the Class in *In re Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD. Your exclusion request must include your name, address, telephone number, signature, and a signed statement to the effect that: "I/We hereby request to be excluded from the proposed Settlement Class in In re Netflix Privacy Litigation." You must mail your exclusion request no later than **November 14, 2012** to:

Netflix Privacy Settlement Administrator
PO Box 2750
Faribault, MN 55021-9750

### 9. If I don't exclude myself, can I sue Netflix for the same thing later?

No. Unless you exclude yourself, you give up any right to sue Netflix for the claims being resolved by this Settlement, including the alleged retention and disclosure of Plaintiffs' and the Settlement Class's personally identifiable information and Entertainment Content Viewing History.

## OBJECTING TO THE SETTLEMENT

### 10. How can I object to the Settlement?

If you do not exclude yourself from the Settlement Class, you or your attorney can object to the Settlement and have the right to appear before the Court to do so. The objection must be in writing and include the case name *In re Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD, and: (a) your full name, current address and telephone number; (b) a statement that you are a member of the Settlement Class; (c) the specific grounds for your objection; (d) all documents or writings that you want the Court to consider; and (e) a notice of intention to appear (if any).

If you want to appear and speak at the Fairness Hearing to object to the Settlement, with or without a lawyer (explained below in the answer to Question 15), you must say so in your letter

or brief. Mail the objection to these three different places postmarked no later than **November 14, 2012:**

| Court | Class Counsel | Defense Counsel |
|---|---|---|
| Clerk of the Court United States District Court for The Northern District of California (San Jose Division) Robert F. Peckham Federal Building 280 South 1ST Street San Jose, CA 95113 | Jay Edelson Rafey S. Balabanian Ari J. Scharg Chandler R. Givens Edelson McGuire LLC 350 N. LaSalle, Suite 1300 Chicago, IL 60654 | Keith E. Eggleton Rodney Strickland Dale Bish Wilson Sonsini Goodrich & Rosati 650 Page Mill Road Palo Alto, CA 94304 |

### 11. What's the difference between objecting and excluding myself from the Settlement?

Objecting simply means telling the Court that you don't like something about the Settlement. You can object only if you stay in the Class. Excluding yourself from the Class is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

## WHO IS REPRESENTING YOU

### 12. Who represents the Settlement Class?

**A. Class Representatives.** For purposes of the Settlement, the Court has appointed Plaintiffs Jeff Milans and Peter Comstock as Class Representatives. There are four other named plaintiffs who filed claims. Under the Settlement Agreement, each of the six named plaintiffs may seek to share in an incentive award of $30,000.

**B. Settlement Class Counsel.** The Court has approved the appointment of Jay Edelson, Rafey S. Balabanian, Ari J. Scharg, and Chandler R. Givens of Edelson McGuire LLC as Settlement Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 13. How will the lawyers be paid?

From the beginning of the case in 2011 to the present, Class Counsel have not received any payment for their services in prosecuting the case or obtaining the Settlement, and have not been reimbursed for any out-of-pocket expenses. Class Counsel will ask the Court for an award of attorneys' fees of 25% of the Settlement Fund and up to $25,000 in out of pocket expenses. Netflix has agreed not to oppose Class Counsel's application for an award of attorneys' fees if limited to this amount. If the Court approves the attorneys' fee request, it will be paid from the

Settlement Fund established by Netflix. The Settlement Class members will not have to pay anything toward the fees or expenses to Class Counsel. You may hire your own lawyer to represent you in this case if you wish, but it will be at your own expense.

## THE COURT'S FINAL APPROVAL HEARING

### 14. When and where will the Court hold a hearing on the fairness of the Settlement?

A fairness hearing has been set for **December 5, 2012** at 10:00 a.m. before Judge Edward J. Davila in his courtroom at the United States District Court for the District of the Northern District of California (San Jose Division), Robert F. Peckham Federal Building, 280 South 1st Street, Courtroom 4 – 5th Floor, San Jose, California 95113. At the hearing, the Court will hear any objections to the proposed settlement, including the amount requested by Settlement Class Counsel for attorneys' fees and expenses. You do not need to attend this hearing. You also do not need to attend to have your objection considered by the Court.

**Note:** The date and time of the fairness hearing are subject to change by Court Order. Any changes to the date and time of the fairness hearing will be posted to the Settlement Website.

### 15. Do I have to come to the fairness hearing?  May I speak at the hearing?

You do not need to attend the fairness hearing to remain a class member. You or your own lawyer may attend the hearing if you wish, at your own expense.

If you do not exclude yourself from the Settlement Class, you may ask the Court for permission to speak at the hearing concerning the proposed Settlement or the application of Settlement Class counsel for attorneys' fees and expenses by following the instructions in Question 10 above.

## GETTING MORE INFORMATION

### 16. Where do I get additional information?

This notice provides only a summary of the matters relating to the Settlement. For more detailed information, you may wish to review the Settlement Agreement. You can view the Settlement Agreement and get more information at www.VideoPrivacyClass.com. You can also get more information by calling toll-free 1-866-898-5088. If you would like additional information, you can write to Settlement Class Counsel at the address listed in Question 10.

**Please Do <u>Not</u> Contact the Court, the Judge, or the**
**Defendant with Questions about the Settlement**

# EXHIBIT 3

*In re: Netflix*
*Privacy Litigation*

A A A

*Case No. 5:11-CV-00379 EJD;*
*United States District Court,*
*Northern District of California,*
*San Jose Division*

**CLASS ACTION LAWSUIT**

*Last Updated: 10/31/2012*

HOME

COMMONLY ASKED QUESTIONS

SETTLEMENT AGREEMENT

COMPLAINT

CY PRES AWARD INFORMATION

NOTICE

LA NOTIFICACION

IMPORTANT DATES

**DOWNLOAD ACROBAT READER**
Adobe Reader is free and is required to
view and print documents on this site.

## Important Dates

The cy pres application postmark deadline is **September 19, 2012.**

The postmark deadline to file for exclusion is **November 14, 2012.**

The postmark deadline to object to the settlement is **November 14, 2012.**

The Fairness Hearing is currently scheduled for **December 5, 2012.**

## Announcements

**DISCLAIMER**

Please do not contact either the Defendants or the Court about this Settlement. Any and all callers will be directed to this website. If you have questions, please refer to the information posted here.

This site is not operated by the Plaintiffs or the Defendants. This class action settlement is supervised by the Court and is administered by a claims administration firm that handles all aspects of settlement administration.

View the **Privacy Policy**

# EXHIBIT 4

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370  f 312.589.6378

www.edelson.com

November 1, 2012

**VIA ELECTRONIC & FIRST CLASS MAIL**

Brett L. Gibbs
38 Miller Avenue, Suite 263
Mill Valley, California 94941
blgibbs@wefightpiracy.com

Re:   *In re: Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD (N.D. Cal.)

Dear Mr. Gibbs:

Earlier today, I left a voice mail for you at (415) 325-5900 regarding the objection you filed to the class action settlement reached in the above-referenced matter.

This afternoon, I received a bizarre, and disturbing, return phone call from two gentlemen (calling from the number (800) 308-0480). Chris Dore and Ben Richman, both associates at my firm, were on the call with me. The men began the call by explaining that they were returning my voicemail. When I asked what their connection to you or your client was, they got agitated (asking me whether I wanted to waste my time with those type of questions or just talk about the objection). When I persisted – by explaining that I needed to know who I was speaking to -- they clearly and unequivocally identified themselves as associates at your firm. I asked for the name of that firm and they replied: "Brett Gibbs Law Offices."

Accepting that at face value, I then moved on to the substance of my voicemail, which was to explain how your objection misunderstood the *cy pres* process. The gentlemen listened politely, but not inquisitively (that is, it did not seem to matter to them that they had gotten the facts wrong, nor what the true facts were). At the end, they explained that they would review my final approval brief (which as I explained to them, was filed within hours of your objection and gave more detail about the points I was making), and then make a determination as to whether (a) they would "stand on their objection" or (b) file "supplemental" papers. (It is noteworthy that they did not initially even acknowledge that there would be a third option, namely seeking to withdraw the objection if their concerns were satisfied. When I pressed a bit on this point, they did ultimately concede that a third option was to seek leave to withdraw the objection.)

I then asked them why they filed the objection the day before the deadline to file final approval papers and the naming of the *cy pres* recipients, instead of simply waiting 24 hours, especially since your objection was focused on the idea that the *cy pres* recipients were not known. They responded that because their objection was supposedly not contingent on anything we might have said in our brief, they saw no reason to wait any period of time. I

Edelson McGuire, LLC

disagreed, pointing out that if that were true, they would have no need to file supplemental papers.

I then – and this is where the call took a turn for the weird – asked if they wanted me to email them our final approval brief, or, if alternatively, they wanted to wait until it was up on the settlement website. When they indicated the former, I asked for the proper email address. They told me to send it to you, at the email you listed on the objection. When I informed them that no such email was listed, they started stumbling over themselves and quickly indicated they would just pull it off PACER. Sensing that something was amiss, I asked them if they knew your email address. They got extremely defensive, claiming both that (a) there were mysterious (and of course unexplained) reasons why they might not want to give me your address and (b) you may have "multiple" email addresses and they might be uncertain which ones to use.

I then asked them if they were indeed licensed attorneys or if they were engaged in something elicit. They said they were licensed attorneys. I then asked them if they were truly associates at your firm. They refused to answer, saying that it didn't make sense to waste time on these issues. When I asked a second time for them to answer the question, they abruptly hung up.

Brett, I am at a loss.  I do not know who these gentlemen are or why they were pretending to be something they clearly are not. I can tell you that their actions raise a host of questions. I look forward to your response.

Best regards,

Edelson McGuire LLC

Jay Edelson

EXHIBIT 5

# BRETT L. GIBBS, ESQ.
38 MILLER AVENUE, #263
MILL VALLEY, CA 94941

November 2, 2012

<u>VIA ELECTRONIC MAIL</u>

Jay Edelson
Edelson McGuire, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654

**RE:** ***In re Netflix Privacy Litigation***, **No. 5:11-CV-00379 EJD (N.D. Cal.)**

Dear Mr. Edelson,

Speaking of "bizarre" and "disturbing," in all of my professional experience I have never read a letter like yours. The lack of professionalism displayed in your letter seriously undermines, in my view, your adequacy as counsel to the class. In response to *your* telephone request, my office contacted you as a professional courtesy to hear your arguments regarding our objection. I was engaged in other business, and could not attend. Rather than engaging in a substantive discussion, my associates were treated to a barrage of bizarre accusations regarding everything from whether they worked for another law firm to being engaged in, as you phrase it, "something elicit [sic]." Indeed, at one point you allegedly threatened my associate by saying, "if he said another word that would be the last thing he ever said." Obviously, threats of violence are not a characteristic becoming of class counsel.

Upon reading your account of the telephone call with my office I must say that I find nothing "bizarre" nor "disturbing," with the sole exception of your demeanor as displayed in your letter and your comments during that phone call.   Based upon your conduct in the aforementioned telephone call and the tenor of your letter, you appear to be engaged in a "witch hunt" of some sort. I cannot say what you might suspect, and what the cause of your mistrust might be, but the accusatory tone is perfectly clear.

I expect any further communications from you to be civil and substantive and, of course in light of the past phone call, always in writing. If that is not something you are capable of—a distinct possibility, it would seem—then let us simply direct our arguments to the Court from here on out. I sincerely doubt that you will tell Judge Davila that if "he says another word, that will be the last thing he ever says."

Finally, you obviously did not read my client's objection before calling my office. You misconstrue the nature of our objection as "the idea that the *cy pres* recipients were not known." Had you read our objection, you would know that it is focused on matters which are

# BRETT L. GIBBS, ESQ.

### 38 MILLER AVENUE, #263
### MILL VALLEY, CA 94941

unlikely to have changed with the filing of your final approval papers. These are: (1) the criteria employed in *cy pres* beneficiary selection (Part II.A), (2) the absence of a limiting principle governing the *cy pres* beneficiaries' use of disbursed funds (Part II.A), and (3) the propriety of a *cy pres* distribution in general (Part II.B).

It is unclear from your letter whether you are demanding that my client seek leave to withdraw her objection. You certainly believe that option to be "noteworthy." If that is your demand, please make it explicit.

We are reviewing your papers filed in support of final settlement approval. After appraising them and consulting with our client, we will make a determination as to how to proceed.

Sincerely,

Brett L. Gibbs

CC: TO FILE

# EXHIBIT 6

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

November 2, 2012

**VIA ELECTRONIC & FIRST CLASS MAIL**

Brett L. Gibbs
38 Miller Avenue, Suite 263
Mill Valley, California 94941
blgibbs@wefightpiracy.com

Re:     *In re: Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD (N.D. Cal.)

Mr. Gibbs:

Your letter misstates the record and intentionally so. I did not, of course, make any physical threat, nor did your colleagues suggest otherwise. When your colleague threatened me I said, "If you ever speak to me like that again, this will be the last call we have." (Ironically, my response was very similar to what you included in your letter, when you erroneously suggested that if we couldn't be civil, you would not speak to me on the phone.) I also did engage in an extremely substantive conversation with your colleagues, explaining our view of the *cy pres* process and the relevant case law (including the recent *Lane v. Facebook* decision). In the end, your letter is just a transparent (and poor) attempt to manufacture a false record. I also find it strange that you are writing as if you have actual knowledge of the conversation, as you were not present.

In terms of a demand, I have made none (other than what follows). The point I was making was that your colleagues saw only two possibilities—standing on the objection or supplementing the objection. The fact that at no point did they seem to contemplate circumstances in which their concerns would be answered speaks volumes.

Most importantly, your letter continues to hide the identification of the individuals who were on the phone and explain what their affiliation is with your office. Please identify them now and also state clearly whether there is, in fact, a Brett Gibbs Law Offices. I also note that you don't purport to explain why your colleagues abruptly hung up the phone when I asked what their affiliation with you was. But, of course, there can be no legitimate reason for that.

Best regards,

EDELSON MCGUIRE LLC

Jay Edelson

# EXHIBIT 7

# BRETT L. GIBBS, ESQ.

38 MILLER AVENUE, #263
MILL VALLEY, CA 94941

November 6, 2012

<u>VIA ELECTRONIC MAIL</u>

Jay Edelson
Edelson McGuire, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654

RE: *In re Netflix Privacy Litigation*, No. 5:11-CV-00379 EJD (N.D. Cal.)

Dear Mr. Edelson,

With all due respect, your new allegations are rather sophomoric. If my colleagues had, in fact, threatened you I have no doubt that you would have raised such unbecoming behavior in your original letter—and you did not. To be clear, the only threat that was made during the conversation was your threat to my associate. You are obviously just making things up as you go along. Your plainly false statements are simply another addition to the list of conduct unbecoming of class counsel. Mendacious flights of fancy and outright fabrication are not necessary here—but they are unsurprising all the same, considering your unfortunate position in having to defend settlement terms that are indefensible on the merits.

Your continued inquiries into the internal structure of my law practice are not well-taken. My question—as to whether you were demanding that my client withdraw her objection—was not an invitation to make further demands entirely unrelated to the legal substance of this matter. If, as is quite apparent, you are looking for some sort of *ad hominem* attack to make in opposition to her objection, I suggest that you look elsewhere.

As to your final note, I believe it was quite clear from my previous letter that my colleagues elected to discontinue their conversation rather than be associated with your unprofessional conduct. I would have done the same. If you have anything substantive to add to our conversation please let me know. Otherwise, please refrain from sending further silly letters. Again, your conduct is clearly unbecoming of class counsel.

Sincerely,

Brett L. Gibbs

CC: TO FILE

# EXHIBIT 8

# LAKESHORE LAW CENTER
18340 Yorba Linda Blvd., Suite 107-610
Yorba Linda, CA 92886
714-854-7205
714-854-7206 (fax)

Edelson McGuire LLC
Mr. Jay Edelson, Esq.
350 North LaSalle Street, Suite 1300
Chicago, IL 60654

DATE:  September 19, 2012

By fax to 312-589-6378

Re:   In Re Netflix Privacy Litigation, United States District Court for the
Northern District of California, Case No. 5:11-cv-00379-EJD

Dear Mr. Edelson:

I received and reviewed the class notice and other documents in the aforementioned
case on behalf of a class member.  I am trying to decide whether to object, opt out or
do nothing.  I am an experienced class action attorney and have practiced for more
than 25 years.  More information about my firm is available at www.lakeshorelaw.org.

In order to decide what to do, I need additional information from your office.  As
explained below, specifically I need a written statement from you explaining 1) what
discovery was conducted regarding violations of 18 U.S.C. § 2710 (b) as to current and
former subscribers; and 2) what information in that regard was obtained through this
discovery.  **Please provide me this information in writing by Monday, September
24, 2012 so I can determine the best course of action.**

As you know, the complaint alleges, inter alia, a violation of 18 U.S.C. § 2710, which
contains a damages provision including minimum damages of $2,500 per violation.
However, the trend in case law does seem to allow this damages provision only in the
case of a violation of subdivision (b) (knowing disclosure of personally identifiable
information.).  For violations of subdivision (e) (failure to destroy old records) there
appears to be no damages remedy.

Your lawsuit alleges violations of both subdivisions (b) and (e) although the focus is
mostly on (e).  The motion for preliminary approval states in a brief and vague manner
that "Netflix disclosed the information to third parties without prior consent to do so."
(Doc. 76, p. 7.)The declaration of Mr. Edelson, submitted in support of preliminary
approval, states the parties engaged in unspecified discovery regarding class and
merits issues.  (Doc. 76-2, p. 3.)   The class notice states "The lawsuit claims that
Netflix kept and disclosed information, including records on the movies and TV shows
its customers viewed, in violation of the Video Privacy Protection Act and other laws."

 **It is not clear if discovery was conducted on the "knowing  disclosure of PII"
theory or not.  If it were conducted, the results of that discovery are not stated in
the preliminary approval papers.**  Yet, the proposed class includes persons who were
subscribers as of July 5, 2012.  The settlement release would release all claims arising

under 18 U.S.C. § 2710 including the damages claims under § 2710 (c). However, the settlement would make no payment of any kind to class members.

Therefore, the release is clearly overbroad in that a claim for minimum damages of $2,500 is being released for no payment to the actual victims, who are easily identifiable from Netflix's records. The remaining question is whether this overbreadth is prejudicial to the Class or not.

Put simply, if there is no substance to the claimed violation of subdivision (b), no evidence of Netflix's sharing PII with third parties, then releasing that claim is of little significance. Of course, this assumes Netflix has denied the practice under oath and you have found no contradicting evidence.

On the other hand, if it appears there is a factual basis for the subdivision (b) theory of liability, then it is not proper to release claims based on that theory since there is no compensation to the Class. I do not consider a payment to a Cy Pres organization to satisfy the Class Member's right to recover statutory damages, at least not on the showing made in the preliminary approval papers. If Netflix cannot or will not pay the statutory damages to actual victims, then the obvious solution is to exclude the claims arising under subdivision (b) from the settlement release.

Therefore, I await your timely response to this letter. If I do not hear back from you, I will have to assume you have abrogated your fiduciary duty to class members and are refusing to provide pertinent information to class members. This is will necessitate a formal objection and request for court-ordered discovery.

Thank you for your prompt attention to this matter.

**Yours truly,**

/s/

**Jeffrey N. Wilens**
**Attorney at Law**

cc. Sean P. Reis, fax to 949-459-2123

# EXHIBIT 9

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312 589 6370 f 312 589 6378

www.edelson.com

September 24, 2012

**VIA FIRST CLASS MAIL**
**AND FACSIMILE TRANSMISSION**

Mr. Jeffrey N. Wilens
Lakeshore Law Center
18340 Yorba Linda Blvd.
Yorba Linda, CA 92886
Fax: (714) 854-7206

Re:  *In re Netflix Privacy Litig.*, Case No.: 5:11-cv-00379-EJD
     (United States District Court for the Northern District of California)

Dear Mr. Wilens:

This is in response to your letter dated September 19, 2012, and to follow up our telephone conference that took place later that day. Present on the call were you, me, my partner Rafey Balabanian, and my associate Chandler Givens. Based on your letter and statements on the call, we understand that you are a class action attorney purporting to represent an unidentified settlement class member[1] who is contemplating whether to object to, or opt out of, the settlement in the above case. We further understand that if we do not provide you with the information demanded in your letter within two business days during the High Holidays, you plan to lodge an objection to the settlement. We here respond to your letter and provide further follow up to our call. As explained below, your demand for information is improper, as is the arbitrary deadline you try to impose.

I.    *The Relief Obtained Under the Settlement is Fair and Reasonable for the*
      *Resolution of Both the Subdivision (b) and (e) Claims Under the VPPA*

First, we understand from your letter and statements on our call that you have no objection to the relief obtained under the settlement for the alleged Subdivision (e) claim under the VPPA (*i.e.*, for Netflix's alleged unlawful retention of the Plaintiffs' and Class' personally identifiable information ("PII")). Your position is that the "trend in the case law [] seem[s] to allow this [$2,500 per violation] damages provision only in the case of a violation of subdivision (b) (knowing disclosure of personally identifiable

---

[1]    Interestingly, you have never identified your supposed client nor have you even engaged in the pretense that he or she has concerns that need to be redressed. Rather, during our phone call, you repeatedly made clear that you personally had concerns that needed to be addressed. Indeed, the first two lines of your letter seem to suggest that you are simply using your "client" as a means to insert yourself in this process. *See* Wilens Letter dated Sept. 19, 2012 (hereinafter "Sept. 19 Ltr.") ("I received and reviewed the class notice and other documents ... on behalf of a class member. I am trying to decide whether to object, opt out, or do nothing.")

information.).["2] You further explained on our call that you believed Netflix would also be able to challenge a judgment in favor of the class for the statutory amount on constitutional grounds.

We also understand from your letter and statements on our call that you may not have an objection to the relief obtained under the settlement for the alleged Subdivision (b) violation (*i.e.* for Netflix's alleged unlawful disclosure of the Plaintiffs' and the Class' PII), but that your decision would largely depend on whether we were willing to share any evidence obtained demonstrating that "there is no substance to the claimed violation of subdivision (b) …"[3] In that context, you explained that in terms of what you consider a violation of subdivision (b) warranting an award of statutory damages, it would be in situations where the video tape service provider (Netflix in this case) knowingly disclosed its customers' PII to third parties for profit. You indicated, on the other hand, that if disclosures were made for other reasons, like for example, if they were made in connection with enhancing the algorithm that allows Netflix to customize movie choices for its customers, then the Class may not be entitled to the entire statutory recovery as Netflix would again likely have a valid challenge at its disposal.

You stated that if the disclosures were for-profit, then the settlement is objectionable because it provides no direct payment to Class members. You also said that if the latter proves to be the case, however, then your view would be that the relief obtained for the Class under the settlement is sufficient. We asked you to explain your reasons for distinguishing between the first type of violation (*i.e.* knowing disclosure for profit) and the second (*i.e.*, disclosure for reasons other than for pure profit), and relatedly, why statutory damages were warranted for type 1 but not type 2 violations, but you were unable to point to any authority on the topic, and instead, simply expressed that the first type of violation felt much more wrong (morally speaking). We continue to be confused by the distinction as it sounds like its derived from emotion rather than the state of the law. We encourage you to share with us any authority supporting these distinctions.

In any event, as a threshold matter, we disagree that the relief to the Class under the settlement would be insufficient under either factual scenario. First, even if it were proven that Netflix sold all of its customers' PII for profit, a judgment against Netflix for the statutory amount would still be subject to the very constitutional challenges to which you referred. Indeed, a class[4] judgment at trial would result in a verdict of more than

---

[2]      *See* Sept. 19 Ltr. at 1.

[3]      *Id.* at 2.

[4]      The same analysis actually holds true for individual damage awards, but is more striking when considered in the class context.

$100 billion.[5]  Such a result, we believe, would not be constitutionally proper and would be reduced to a number in line with what we recovered through this settlement.

The recent Ninth Circuit decision in *Lane v. Facebook, Inc.*, 2012 WL 4125857 (9th Cir. Sept. 20, 2012), upholding a settlement with a similar (albeit not as strong) *cy pres* component, leaves no doubt that the recovery here is fundamentally fair.  Indeed, *Lane* is a case where the defendants were alleged to have knowingly disclosed their customers' (a class size of 3.6 million) PII for profit *repeatedly* and without authorization, and the Ninth Circuit found that a settlement structured around a *cy pres* distribution (in that case $9.5 million) was a fair result for the class[6]. Accordingly, even though it was never our theory, we continue to be confused by, and believe the law categorically rejects, your blanket conclusion that if Netflix committed for-profit disclosures in violation of Subdivision (b), then the settlement reached here would somehow be inadequate.  Given the facts and the now settled law on the subject, we disagree.  The settlement affords Class members with meaningful monetary relief through *cy pres* distributions to not-for profit organizations aimed at protecting online privacy, identity, and personal information through user control.  That, coupled with the robust injunctive relief which puts an end to the challenged practice of unlawfully retaining PII—the conduct at the heart of this suit—clearly illustrates the reasonableness of the settlement.

II.     *Your Demand for Information by the Arbitrary Deadline of September 24, 2012 is Improper, And Your Assumption that My Firm Would Ignore Your Concerns is Inappropriate—Both Show that You and Your Client Are Acting in Bad Faith.*

You have made clear both in your letter and on our call that if we do not acquiesce to your demand for information by your unilaterally imposed deadline of September 24, 2012, then your "client" will lodge a formal objection to the settlement.  In response, I explained to you that while it is ultimately up to you and your client whether to object, your demand that we provide you with evidence of Netflix's disclosures (or non-disclosures) is improper, and your assumption that we would ignore your concerns based on the supposed "trend" you've encountered recently among the plaintiffs' bar is inappropriate.

---

[5]     As you know, such a judgment would only drive Netflix into bankruptcy which would ultimately just end up hurting the Class.  We note that you may have less sensitivity to this issue.  Indeed, it appears that you have a habit of obtaining settlements and/or judgments against companies that then are never realized.  Especially when notice of a settlement goes out—upon which class members naturally rely and give up individual rights—and that settlement is never actually paid out, the "settlement" ends up being a mere illusion, raising a series of uncomfortable questions for you, I'm sure.

[6]     Notably, in that case the relevant defendants could have paid significantly more than Netflix did in this case, a factor that did not scuttle the settlement.

Edelson McGuire, LLC

Your demand is improper because there is information available to the public from which to evaluate the strength of the Subdivision (b) claim, namely Netflix's Answer and Affirmative Defenses, in which it denies the allegations that it unlawfully disclosed its customers' PII to third parties. That pleading alone, which is subject to the strictures of Rule 11, answers the question you pose in your letter of whether Netflix has denied that it violated Subdivision (b). As for further facts that we've uncovered underlying the Subdivision (b) claim, as I explained, that information is subject to a mediation privilege and/or other protections.

Your demand for information seems premised on the notion that you believe as "an attorney for a[n unidentified] class member," you are entitled to each and every bit of information to which Class Counsel is privy in order to evaluate whether to object to the settlement. You also seem to believe that you are entitled to that information immediately and in the precise form you desire. Of course, the reality is, you don't enjoy those rights simply because you purport to be an attorney for a class member. The Class consists of tens of millions of individuals and if everyone had the right to make demands like the ones you're making, it would completely eviscerate the Protective Order entered by the Court and the Confidentiality Agreement between the Parties, and would make it impossible to prosecute and settle with large multi-national companies where sensitive and highly proprietary information is at issue. Absent some extreme circumstances not present here, such an argument is, frankly, non-sensical. If you have authority to the contrary (including instances where you made clear that you were willing to turn over your entire case file in high-publicity cases to random attorneys requesting it), please let us know.

And, your assumption that my firm would ignore you and, as you put it, "abrogate[] [our] fiduciary duty to class members and [] refuse to provid[e] pertinent information,"[8] immediately is totally inappropriate. As you conceded on our call, you've never dealt with me or any of the other attorneys from my firm and have absolutely no reason to believe that we would ignore your communication, and certainly no basis to accuse us of being prone to "abrogat[ing] [our] fiduciary duty to class members." These kinds of sweeping and baseless assumptions, along with the timeframes set out in your demand, are proof positive that you're acting in bad faith.

As for your demand for information, all I can say is that we will consider your request, and try and figure out a way to provide you the information that we think will ally your concerns, but in a way that is in keeping with the Protective Order entered by the Court, and the mediation privilege and the confidentiality agreement to which I am bound. Consequently, we won't be constrained by the arbitrary deadline you impose. We note that the objection deadline for this settlement is November 14, 2012, so there is absolutely no reason why you need this information now as opposed to some later point over the next two months.

---

[8]  Sept. 19 Ltr. at 2.

Mr. Jeffrey N. Wilens
September 24, 2012
Pg. 5 of 5

      If you would like to discuss this further, I would be happy to.  Otherwise, I will follow up as appropriate.  In the meantime, please share with me the details of the client you claim to represent to put to rest some of our concerns about how you have been proceeding.

Best regards,

EDELSON MCGUIRE LLC

Jay Edelson

cc:    Mr. Rafey S. Balabanian
      Mr. Chandler R. Givens

EXHIBIT 10

# LAKESHORE LAW CENTER
18340 Yorba Linda Blvd., Suite 107-610
Yorba Linda, CA 92886
714-854-7205
714-854-7206 (fax)

**Edelson McGuire LLC**                           DATE:  September 28, 2012
**Mr. Jay Edelson, Esq.**
**350 North LaSalle Street, Suite 1300**          **By fax to 312-589-6378**
**Chicago, IL 60654**

Re:   **In Re Netflix Privacy Litigation, United States District Court for the
      Northern District of California, Case No. 5:11-cv-00379-EJD**

Dear Mr. Edelson:

I appreciate your lengthy if somewhat argumentative recitation of the potential grounds
for objection discussed in my last letter and in our phone call.  I am going to ignore
some subtle (and not so subtle) personal jabs and focus on the facts.

The fact is the proposed settlement pays zero dollars to Class Members who allegedly
had personally identifiable information (PII) illegally transferred by Netflix to third
parties.

The fact is 18 U.S.C. § 2710 allows for the Class Members to recover a minimum of
$2,500 in damages per violation if they can prove Netflix "knowingly disclose[d], to any
person, personally identifiable information concerning any consumer of such provider."

The fact is the proposed settlement releases the Class Members' right to recover the
$2,500 in damages in exchange for a payment to them of zero dollars.

The question is whether this is a fair settlement or whether it sells out the Class
Members' rights in exchange for a large Cy Pres payment and a large chunk of cash to
Class Counsel.

I argue this assessment of fairness cannot be made unless we know: 1) what evidence
is there that Netflix did or did not knowingly disclose PII to third parties; and 2) if Netflix
did this, what were the circumstances under which it was done.

Your Motion for Preliminary Approval provides <u>no</u> information to the Court or the Class
Members regarding these two facts. Your September 24th letter, despite its length and
stridency, also provides <u>no</u> information regarding these two facts.

I will respond to the points your letter does make.

First, to the extent you are requesting additional time to provide the requested
information, that is acceptable to me. **I will wait until after October 5, 2012 before
taking any further action in this regard.**

Secondly, you allude to a protective order that was approved by the Court. However, if Netflix <u>denied</u> in discovery responses that it shared PII with third parties, then I do not see how that denial could be designated as "confidential." If your office failed to conduct discovery on this topic, that non-action would not be subject to the protective order either. Only if Netflix admitted it was sharing PII could there be an arguable evocation of the protective order. However, in order for Netflix to obtain court approval of this settlement, I do not see how that protective order can be asserted; it would have to be waived in order to present the facts to the court.

Thirdly, you engage in a esoteric discussion of the "legal" difference between disclosure to third parties for profit and disclosure for more benign reasons. To be clear, I never made that distinction, nor does the statute. Any knowing disclosure carries the same $2,500 penalty. However, I would make a "moral" distinction between the two types of disclosure and I agree that moral distinction could be a factor the court could consider in assessing the fairness of the settlement.

Fourthly, you argue classwide liability could be $100 billion. While you present no facts to back up your calculation, even if it is accurate that does not make the statute unconstitutional nor does it justify this settlement. I am confident there are many amounts between zero dollars and $100 billion that could be paid to the Class. Relief could also be provided in some circumstances in a non-monetary way, such as with free video downloads or DVD rentals.

Fifthly, I have review the recent decision, Lane v. Facebook, Inc., approving the settlement of the Facebook "Beacon" program class action. As you known, Facebook is not the same type of company as Netflix. While Netflix clearly meets the definition of a "video tape service provider" under the VPPA, it does not appear Facebook meets that definition. Facebook is not in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ."

The Court in Lane addressed the possibility of liability under the VPPA, but observed only a small number of Class Members might have claims based on the VPPA and the company against whom such a claim might be made, Blockbuster, was on the verge of bankruptcy. By contrast, Netflix is clearly subject to the VPPA as to all of the Class Members and is not on the verge of bankruptcy. Thus, the court reasoning in <u>Lane</u>, <u>supra</u>, is based upon inapposite facts and circumstances.

I refer you to this language: "So even if some of the Class Members in this case would have successful claims for $2,500 in statutory damages under the VPPA, those individuals represent, to use the candid phrasing of Objectors, "only a fraction of the 3.6 million-person class." Their presence does not in itself render the settlement unfair or the $9.5 million recovery among all class members too low." (<u>Lane</u> v. <u>Facebook</u>, <u>Inc.</u> (9th Cir., Sept. 20, 2012, 10-16380) 2012 WL 4125857, *8.)

I would also refer you to footnote 5 of that decision, where it is said: "Although a settlement is not categorically unfair for certain class members simply because they might recover higher damages than other class members were they to prosecute their claims individually, significant variation in claimed damages among class members is relevant to the Rule 23(b)(3) "predominance" analysis during class certification. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624–25, 117 S.Ct. 2231, 138 L.Ed.2d

689 (1997). **However, Objectors do not challenge the district court's class certification or its decision to include individuals with VPPA claims in the settlement class, so we express no opinion on that issue here.**" (emphasis added)

By contrast, if my office files an Objection, it will challenge the inclusion of Class Members with damage claims under the VPAA (for sharing of PIII) in the settlement class.

The foregoing analysis is based on the majority opinion in Lane. There was a dissent by Circuit Judge Kleinfeld which found the settlement was not fair to the Class.

Sixthly, your suggestion that I should rely on the Defendant's Answer denying it violated the VPPA is absurd. Rule 11 notwithstanding, no competent class counsel would fail to conduct discovery and rely solely on an Answer to establish the truth of a denial of liability. I cannot believe you even wrote that. Further, I am not asking for you to "turn over" your case file to me or any other attorney or objector. I am simply pointing out that so far you are concealing material information from the Court and the Class.

Finally, your letter concludes with assurances of your good faith, questions about my supposed bad faith, and a promise to get back to me—maybe, if you feel like it. I have no reason to question your good faith and therefore assume you will respond with substantive information and/or the relevant discovery responses within a reasonable time frame. However, since you have cited no explanation for why you need an extended period of time to respond, **I will treat October 5, 2012, as giving you adequate time to respond.**

If I do not hear back from you or you continue to withhold substantive information, I can only infer there is some ulterior motive to conceal material information from the Class, leaving me no choice but to register a formal objection and to document to the Court that I have made reasonable efforts to obtain a candid response from Class Counsel and that these efforts failed due to obstructionism by said Class Counsel. I will also seek a discovery order from the Court.

**Yours truly,**

**/s/**

**Jeffrey N. Wilens**
**Attorney at Law**

cc. Sean P. Reis, fax to 949-459-2123

EXHIBIT 11

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370  f 312.589.6378

www.edelson.com

October 5, 2012

**VIA FACSIMILE AND FIRST CLASS MAIL**

Jeffrey N. Wilens
Lakeshore Law Center
18340 Yorba Linda Blvd., Suite 107-610
Yorba Linda, California 92886
Fax: (714) 854-7206

Re:   *In re: Netflix Privacy Litigation*, **Case No. 5:11-cv-00379-EJD (N.D. Cal.)**

Dear Mr. Wilens:

With respect, your letter was, admittedly, frustrating. Like your previous letter (and our phone call), it was long on unsupported demands, false assumptions, misstatements about the facts and case law (including *Lane v. Facebook*, which we suggest you take a closer look at) and arbitrary deadlines. It was short on responsiveness. If you think that it is inappropriate for us to ask you to identify your client or provide any legal authority for your positions, please just say so. But ignoring our requests—which we see as eminently reasonable—as you make more threats seems unproductive.

In the end, your letter only reinforces our suspicion that your goal is simply to hold this settlement hostage.

We'd be more than pleased to have a thoughtful exchange with a class member and his or her representative, but that can only happen if both parties are acting in good faith and trying to communicate constructively.[1] Given that, we ask that you provide us with a more thoughtful response to our letter.

Best regards,

EDELSON MCGUIRE, LLC

Jay Edelson

---

[1]     In your letter, you complain that we have made "personal jabs" against you. That's not true. We have not expressed any personal views about you. We have, however, expressed concerns about you professionally, which inform our view of your motives in this matter.

# EXHIBIT 12

# LAKESHORE LAW CENTER
18340 Yorba Linda Blvd., Suite 107-610
Yorba Linda, CA 92886
714-854-7205
714-854-7206 (fax)

Edelson McGuire LLC                                    DATE: October 8, 2012
Mr. Jay Edelson, Esq.
350 North LaSalle Street, Suite 1300        By fax to 312-589-6378
Chicago, IL 60654

Re:    In Re Netflix Privacy Litigation, United States District Court for the
       Northern District of California, Case No. 5:11-cv-00379-EJD

Dear Mr. Edelson:

I am disappointed that you will not give me a straight answer to a very simple question.
To refresh your recollection, this settlement releases all claims based upon 18 U.S.C. §
2710 (b) which allows for recovery of minimum damages of $2,500.  However, zero
dollars is being paid to Class Members in exchange for that generous release.

My question is Why?

It occurred to me that perhaps the reason could be that there was no proof that Netflix
violated § 2710 (b) by sharing personally identifiable information (PII) with a third party.
Therefore, you might have concluded the Class was not giving up anything of
substance by releasing claims based upon violations of § 2710 (b)

I have now asked you three times if you will disclose in writing the information obtained
through formal or informal discovery with respect to whether Netflix did or did not violate
§ 2710 (b).

To date, you have danced around this question, and have declined to give a straight
answer.  Will you disclose in writing the information obtained through formal or informal
discovery with respect to whether Netflix did or did not violate § 2710 (b)?  Please, Yes
or No?

Please let me know no later than Wednesday, October 10, 2012 the answer (Yes or
No).  If the Answer is "no," I will take this up with the Court.  If the Answer is "yes,"
please let me know "When."  If "When" is not quickly, then I may have to file a
protective objection.

Regarding the identity of my client or client(s), I have not been authorized to release
that information at this time.  However, since I am personally a member of the Class (no
doubt along with court personnel, other attorneys in this case and perhaps the Judge),
there should be no question of my right to request your cooperation.  So stop stalling!

Yours truly,

/s/

Jeffrey N. Wilens
Attorney at Law

cc.  Sean P. Reis, fax to 949-459-2123

EXHIBIT 13

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370  f 312.589.6378

www.edelson.com

October 11, 2012

VIA FIRST CLASS MAIL
AND FACSIMILE TRANSMISSION

Mr. Jeffrey N. Wilens
Lakeshore Law Center
18340 Yorba Linda Blvd.
Yorba Linda, CA 92886
Fax: (714) 854-7206

      Re:   *In re Netflix Privacy Litig.*, Case No.: 5:11-cv-00379-EJD
             (United States District Court for the Northern District of California)

Dear Mr. Wilens:

      This letter responds to your letter dated October 8, 2012.

      Based on our dealings to date, this is what we believe has been demonstrated:

- Your statements that you were acting on behalf of a client are almost certainly false.[1]

- You have a pressing need to gain confidential proprietary information about one of the most well-known publicly traded technology companies in the world.

- Your deadline for receiving this information bears no relation to anything happening in this case. Rather, it is independent and immediate.

- You have no authority suggesting that you are entitled to this information.

- In order to extract this information from us, you have used two strategies: (1) the constant threat that you will try to interfere with a class action involving 40 million people, and (2) the use of arbitrary deadlines to try to create a false sense of urgency.

      I will not, at this point, speculate as to what your true motivations are. I can tell you that you are walking down a dangerous path. Indeed, lawyers are required to act with

---

[1]    Indeed, the idea that you lack the authority to disclose the name of your client but have the carte blanche authority to decide whether, and on what basis, s/he may object is absurd. The fact that even the number of unnamed clients you represent is evolving only hammers home this point.

Mr. Jeffrey N. Wilens
October 11, 2012
Pg. 2 of 3

honesty and integrity in their dealings. Inventing clients,[2] for example, is far beyond the pale of acceptable conduct. *See, e.g., Attorney Grievance Commission of Maryland v. Barneys*, 370 Md. 566, 1054 (disbarring attorney for "wrongfully representing five clients in Maryland state court proceedings and pretending to represent [another] in a workers' compensation matter when he did not."); *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (attorney may be subject to sanctions for objecting to class action settlement without a class-member client); *Cf.* ABA Formal Ethics Op. 95-397 (Sept. 18, 1995) (Failure to disclose death of client is unethical because once the client is dead, "any subsequent communication to opposing counsel with respect to the matter would be the equivalent of a knowing, affirmative misrepresentation should the lawyer fail to disclose that she no longer represents the previously identified client.").

With regard to the substance of your letters, rest assured that the Court is fully aware of the record, and our final approval papers will thoroughly go through how we valued the strength of the claims and the factual investigation and discovery underlying that analysis.

My concern is that you do not realize the seriousness of your actions.[3] I would therefore ask that you spend some time reflecting on everything, and I hope that you will formally withdraw your letters.

Best regards,

EDELSON MCGUIRE LLC

Jay Edelson

---

[2]     Your letter suggests a future justification, *i.e.*, that because you are a class member, it is irrelevant whether your representations about acting on behalf of a client were accurate. As you know, in class action practice there is a significant difference between acting *pro se* in pursuing an objection and acting as someone's lawyer—if you object on your own behalf, you will not recover attorneys' fees for your efforts. *See In re Westinghouse Sec. Litig.*, 219 F. Supp. 2d 657, 662 (W.D. Pa. 2002) (denying *pro se* attorney-objector's request for fees based on Supreme Court precedent that "a *pro se* litigant who was also an attorney should be treated just the same as other *pro se* litigants who are not entitled to attorney's fees.") (citing *Kay v. Ehrler*, 499 U.S. 432, 436–37 (1991)); *see also In re Texaco Inc. Shareholder Derivative Litig.*, 123 F. Supp. 169 (denying *pro se* class action objector's request for fees and noting "[t]here is authority in many types of cases for the position that a *pro se* litigant who is also an attorney should not be awarded attorney's fees.") (collecting cases).

[3]     Indeed, the tone in your letters suggests that you find this situation amusing. I can assure you that our view is vastly different.

Edelson McGuire, LLC

Mr. Jeffrey N. Wilens
October 11, 2012
Pg. 3 of 3

cc:     Mr. Rafey S. Balabanian
        Mr. Chandler R. Givens

EXHIBIT 14



Jay Edelson <jedelson@edelson.com>

# i see that you called. In light of the conversation yesterday, i think it is better if we communicate by email, so we both have the same record of what occurs.

**Clint** <Clint@krislovlaw.com>                                                    Thu, Sep 13, 2012 at 5:13 PM
To: "jedelson@edelson.com" <jedelson@edelson.com>

i see that you called.
In light of the conversation yesterday, i think it is better if we communicate by email, so we both have the same record of what occurs.

## Clint Krislov
## Krislov & Associates, Ltd.
## Civic Opera Building-Suite 1350
## 20 North Wacker Drive
## Chicago, IL   60606
## 312-606-0500
## facsimile:312-606-0207
## email:Clint@krislovlaw.com
## website:www.krislovlaw.com

---

**From:** Clint
**Sent:** Wednesday, September 12, 2012 6:54 PM
**To:** jedelson@edelson.com
**Subject:** getting back to you as promised.


I Called you back, got sent to your vmail.
jay, when you called accusing our firm of unethical actions regarding your Netflix settlement, i told you that i would investigate and get back to you.
I'm not aware of any wrongful conduct that you claim our people engaged in.
You seem upset that we did not call you before investigating how others view your Netflix settlement, and ascertaining what action they are contemplating.
If you believe that there is something wrong with what our people have done, I would appreciate your telling me what it is.

## Clint Krislov
## Krislov & Associates, Ltd.
## Civic Opera Building, Suite 1350
## 20 North Wacker Drive

Chicago, Illinois  60606
Telephone: 312-606-0500
Facsimile: 312-606-0207
Website: www.krislovlaw.com
Email: clint@krislovlaw.com

# EXHIBIT 15

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

September 14, 2012

**VIA FIRST CLASS AND ELECTRONIC MAIL**

Clinton A. Krislov
Krislov Law
20 North Wacker Drive, Suite 1350
Chicago, IL 60606
clint@krislovlaw.com

Re:   *In re: Netflix Privacy Litigation*, No. 5:11-cv-00379-EJD (N.D. Cal.) —
      Solicitation of Potential Objectors

Dear Clint:

This letter follows our September 12, 2012 phone conversation and your e-mail of the same date. The reason I called you was to voice my concern that certain members of your firm acted improperly by contacting privacy organizations to urge them to object to the settlement reached in the above captioned case (the "*Netflix* settlement"), and also to fully understand your position on the same before taking the appropriate action.

So that you are entirely clear on where I'm coming from, my concerns stem from a voicemail we received from Jamie Court of the privacy organization Consumer Watchdog, which is a non-profit focused on consumer-protection that has been in contact with us regarding its *cy pres* application in the *Netflix* settlement. Mr. Court informed us that a non-attorney at Consumer Watchdog received a phone call from John Orellana (who referenced Michael R. Karnuth) of your firm, encouraging Consumer Watchdog to object to the *Netflix* settlement.

During our phone call, we expressed our view that your office's phone call(s) soliciting public interest groups to object to the *Netflix* settlement were improper. You responded that you had no knowledge of any such calls (which, as we said, we believe could not be accurate, given the size of your office and how it is run (*i.e.*, decisions like this invariably go through you)), and that you would need upwards of a week to investigate the issue. Interestingly, you did acknowledge that you were looking into the *Netflix* settlement and that you felt there were a number of problems with it. When I asked you to identify those problems, you were unable to name a single issue. (You claimed that you were not fully versed on the settlement, but that there were 3 to 4 issues that jumped out. You ignored my second request to identify any such issues.) We ended the call with my request that you provide me with your position by yesterday morning, which you did by email. Your email states the following:

> I Called you back, got sent to your vmail.
> jay, when you called accusing our firm of unethical actions regarding your

Edelson McGuire, LLC

Mr. Clinton A. Krislov
September 14, 2012
Page 2 of 3

> Netflix settlement, i told you that i would investigate and get back to you.
> I'm not aware of any wrongful conduct that you claim our people engaged
> in.
> You seem upset that we did not call you before investigating how others
> view your Netflix settlement, and ascertaining what action they are
> contemplating.
> If you believe that there is something wrong with what our people have
> done, I would appreciate your telling me what it is.

Your email is unsatisfactory and disappointing, to say the least. The most pertinent part of it consists of the following 14 words: "*I'm not aware of any wrongful conduct that you claim our people engaged in.*" The clear import of this statement is that you're simply trying to avoid the issue and cover your firm's tracks.

First, as to the vagueness of your statement, to the extent you are suggesting that the misconduct occurred without your authorization, then say so directly. If, on the other hand, you were aware of the contact but your view is that your firm is permitted to personally contact organizations to gin up clients to object to our settlement, then you should likewise come right out and say it. As to the latter, please allow me to point you to the law.

As you should be aware, it would be improper for your firm to solicit potential objectors for representation. *See* Illinois Rule of Professional Conduct 7.3:

> (a)     A lawyer shall not by in-person, live telephone, or
> real time electronic contact solicit professional employment
> from a prospective client when a significant motive for the
> lawyer's doing so is the lawyer's pecuniary gain, unless the
> person contacted:
>
> (1) is a lawyer; or
>
> (2) has a family, close personal, or prior
> professional relationship with the lawyer.

Consumer Watchdog informed me that your firm (a) contacted it to file an objection, (b) has no prior professional relationship with it, and (c) made the call specifically to a non-lawyer. Given that your firm employs only four attorneys (based on my review of your website this morning), and you are the founder, the statement that you have no knowledge of Mr. Orellana's improper solicitation of Consumer Watchdog after completing your supposed investigation (which, based on the time we ended our call to the time you sent the above email, couldn't have lasted longer than an hour) is not credible. Thus, you might want to revise your statement in light of what we know.

Edelson McGuire, LLC

Mr. Clinton A. Krislov
September 14, 2012
Page 3 of 3

Additionally, by soliciting objections from potential *cy pres* recipients, your firm is actively and intentionally harming the interests of the class, and interfering with the Settlement Agreement. Since class notice went out, we have spent hundreds of attorney hours answering questions from interested organizations that are preparing applications, in hopes of improving them so as to give the Parties as much information as possible from which to make informed decisions about deserving recipients and, ultimately, the potential benefits to the class. By soliciting objections, your firm has obstructed the *cy pres* application process by potentially decreasing the quantity and quality of the applications submitted, which has the effect only of harming the class as they have an obvious interest in seeing the money go to organizations who will put it to the best use.

This leads to my next point: it seems clear that your underlying goal is actually to discourage organizations from submitting applications, so that you can later argue that the *cy pres* money is not going to the appropriate organizations.[1] Otherwise, why would your firm have chosen this point in time—with only days left until the deadline for submission of applications, but as you recognized on our call, a couple months from the objection deadline—to reach out to potential *cy pres* recipients.

Third and finally, the fact that you were unable to articulate a single issue with the settlement, while simultaneously trying to gin up clients for an objection, leaves no doubt that you are pursuing this course of action to hold up the settlement for your own private benefit.

We look forward to any response you may have.

Yours truly,

EDELSON McGUIRE LLC

Jay Edelson

JE/sc

---

[1]     By calling Consumer Watchdog and asking it to object to the settlement, the only logical conclusion is that you believe that (a) Consumer Watchdog is a proper *cy pres* recipient and (b) it would help your position if such an organization was opposing, as opposed to benefiting from, the settlement.

# EXHIBIT 16

Edelson McGuire, LLC

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

November 5, 2012

<u>Via Hand Delivery</u>

John Orellana
Krislov Law
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606

Re:   *In re: Netflix Privacy Litigation*, Case No. 5:11-cv-00379 EJD (N.D. Cal.)
 <u>Preservation, Discovery, and Production</u>

Dear Mr. Orellana:

As you are aware, I am the lead counsel in the Netflix Privacy Litigation case, referenced above. (*See* Dkt. 59.) I am writing to you in your personal capacity (as opposed to your capacity as an employee of Krislov Law[1]) to alert you to our concerns regarding your improper attempts to interfere with this case.

Specifically, it is our understanding that you took affirmative steps to locate and contact one or more not-for-profit organizations (hereinafter "*Cy Pres* Organizations") that were in the process of submitting *Cy Pres* applications pursuant to the Court's preliminary approval order dated July 5, 2012. When you contacted the *Cy Pres* Organizations, you reached out to non-attorneys, even though you knew or should have known that they have in-house attorneys and/or outside firms representing them. Your goal was to discourage the *Cy Pres* Organizations from participating in the settlement and to instead retain your firm to represent them in filing an objection to the settlement. In short, you cynically attempted to damage the Class's benefits under the settlement to then manufacture an objection that the settlement was deficient.[2]

When I contacted your firm about your misconduct, Mr. Krislov agreed to investigate. Then, apparently trying to put some distance between the two of you, he claimed that he had no personal knowledge of the alleged misconduct, but nevertheless invited me to provide him additional information to aid in his investigation. When I followed up with a detailed letter (attached hereto) on September 14, 2012, Mr. Krislov accepted my allegations with his silence. *See Perotti v. Quinones*, No. 11-3217, 2012 WL 2855771, at \*4 (7th Cir. July 12, 2012) (citing Fed. R. Evid. 801(d)(2)(B)).

The letter serves as formal notice of your instant and continuing duty to preserve all documents, records, data, information, and other tangible evidence that are relevant to or which may lead to the discovery of information relevant to the issues raised in this letter. That duty

---

[1]     We have already notified Krislov Law and will be separately serving it with a document preservation letter.

[2]     Indeed, the only stake a *Cy Pres* Organization would have in objecting would be if the process were set up to exclude them.

Edelson McGuire, LLC

extends to any emails, text messages, and phone records relating to your attempts to contact the *Cy Pres* Organizations as well as any documents relating to Mr. Krislov's investigation of the same.

Additionally, you have a continuing duty to suspend all routine data-destruction policies and other processes or practices to the extent they involve the destruction of any evidence that is or is likely to be considered relevant in this matter. We also remind you of your continuing obligation to preserve evidence that may come into existence after the date of this letter, or which may exist now or in the future, but of which you have no current knowledge.

Very truly yours,

EDELSON MCGUIRE, LLC

Jay Edelson

/Enclosure